## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

REED CONSTRUCTION DATA INC.,  )
                                    )
        Plaintiff,          )
                                      )
        v.                )     Case No. *09 CV 8578 (RWS)(HP)*
                                      )
THE MCGRAW-HILL COMPANIES, INC.;  )
JOHN DOES One through Five; and  )
JOHN DOE ENTITIES One through Five,  )
                                      )
        Defendants.     )

RECEIVED
DEC 1 0 2009
U.S.D.C. S.D. N.Y.
CASHIERS

### FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Reed Construction Data Inc. ("RCD") and files this First Amended Complaint asserting claims against Defendants The McGraw-Hill Companies, Inc., John Does One through Five, and John Doe Entities One through Five, and shows the Court as follows:

### NATURE OF THE ACTION

1.     This is a case of brazen industrial espionage committed by a sophisticated corporate entity with the intent of forcing its top competitor out of the marketplace. RCD has recently discovered conclusive evidence that its primary competitor, McGraw-Hill Construction Dodge ("Dodge"), a division of Defendant The McGraw-Hill Companies, Inc., has been fraudulently stealing its confidential and trade secret information for years through a web of fictitious companies posing as legitimate customers of RCD. Dodge has used its unauthorized access to RCD's confidential and trade secret information to compete unfairly with RCD by misleading the general marketplace as to the purported superiority of its products and services over RCD's,

in an apparent attempt to force RCD out of business and obtain a monopoly over the construction data industry.

## PARTIES

2.      Plaintiff RCD is a wholly owned subsidiary of Reed Elsevier Inc.  RCD is part of Reed Elsevier Inc.'s Reed Business Information division.  RCD's ultimate parent companies are Reed Elsevier PLC and Reed Elsevier NV.  RCD is a Delaware corporation with its principal place of business at 30 Technology Parkway South, Suite 100, Norcross, Georgia 30092.

3.      Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill") is a New York corporation with its principal place of business at 1221 Avenue of the Americas, New York, New York 10020.  Dodge is a division of McGraw-Hill operated primarily from McGraw-Hill's principal place of business in New York.  The actions of Dodge and its agents are at issue in this case.  For ease of reference, McGraw-Hill and Dodge will be collectively referenced herein as "Dodge."

4.      As the evidence may show, Defendants John Does One through Five ("John Does One through Five") are individual current and/or former officers, employees, contractors, or agents of Dodge, all of whom directed or participated in or directed or authorized the acts and omissions described in this Complaint with knowledge of the unlawful nature of their activities. The identities and addresses of these specific persons are currently unknown.  However, once identified in discovery, these persons will be substituted for John Does One through Five.

5.      As the evidence may show, Defendants John Doe Entities One through Five ("John Doe Entities One through Five") are legal entities who contracted or conspired with Dodge to perform or participate in the acts and omissions described in this Complaint with knowledge of the unlawful nature of their activities.  The identities and addresses of these specific entities are

currently unknown.  However, once identified in discovery, these entities will be substituted for

John Doe Entities One through Five.  John Does One through Five and John Doe Entities One

through Five will be referenced collectively as the "John Doe Defendants."

## JURISDICTION AND VENUE

6.      This Court has original subject matter jurisdiction in this case pursuant to 28 U.S.C.

§§ 1331 and 1337 because Counts Seven, Eight, Nine, and Ten arise under the laws of the United

States, and this Court has supplemental jurisdiction over RCD's state law claims pursuant to 28

U.S.C. § 1367(a).

7.      This Court also has subject matter jurisdiction in this case pursuant to 28 U.S.C. §

1332 because there is complete diversity between the parties and the amount in controversy

exceeds $75,000 exclusive of interest and costs.

8.      Dodge is subject to the in personam jurisdiction of this Court because it resides within

this jurisdiction, does business within this jurisdiction, and has committed acts within this

jurisdiction giving rise to this Complaint.

9.      The John Doe Defendants are each subject to the in personam jurisdiction of this

Court because, upon information and belief, they each either reside within this jurisdiction,

transact business within this jurisdiction, and/or have committed tortious acts within this

jurisdiction giving rise to this Complaint.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Dodge resides in

this judicial district and because a substantial part of the events that gave rise to the claims

asserted in this Complaint occurred in this judicial district.

11.     Venue is also proper in this Court pursuant to 18 U.S.C. § 1965 because Dodge resides in this jurisdiction and Dodge and the John Doe Defendants transact business in this jurisdiction.

## BACKGROUND

### *Overview of RCD's Business*

12.     RCD is a leading provider of construction project news and information to the construction industry.

13.     In general, RCD provides information regarding construction projects at the national, regional, and local levels to customers such as manufacturers of building products, contractors, and subcontractors.  The project information, which often includes the building plans and specifications for particular products, is generally used by RCD's customers to identify projects for which they may be able to seek specification of their product within the building plans or seek to submit bids for products or services.  For example, RCD may have a customer that manufactures specialized shingles.  That customer will be able to use RCD's products and services to identify construction projects across the country which require specialized shingles, and then seek to have its shingles specified by name in the project's master plan.

14.     One of the primary services provided by RCD, and the service that is directly implicated in this action, is a web-based system commonly referred to as "Reed Connect."

15.     Reed Connect is a proprietary, online service that was designed by RCD.  Among other things, Reed Connect operates as a search engine that permits RCD's customers who subscribe to the service to search RCD's database easily for construction projects that are of interest to them.  Reed Connect provides detailed information about virtually every commercial, private, public, civil and government construction project nationwide from the planning phase

through completion of the project.  This information typically includes the full building plans, specifications, and information necessary for customers to submit bids on the projects.  Reed Connect permits RCD's customers to search the available building plans, specifications, and any other information related to a construction project at a high level of detail.  For example, a building manufacturer that makes light fixtures can use Reed Connect to search all building projects nationwide to identify any building plans or specifications calling for light fixtures of the type made by that manufacturer.

16.     A particularly valuable and distinguishing characteristic of Reed Connect is the ability for customers to obtain construction project information for projects across the United States in the early planning phase of those projects.  This gives many customers the ability to contact architects, owners, or other companies involved in the early planning phase of a construction project to offer their products and services prior to the bidding phase of the project.  By having access to information about construction projects in the early stages of planning, a manufacturer, for example, can make efforts to present its products to an architect early in the process to have its particular products specified by name in the building plans.

17.     Reed Connect was launched by RCD in 2002.  Prior to the launch of Reed Connect, there were various other services by which RCD's customers could access RCD's project information.  For example, customers could subscribe to printed bulletins published by RCD containing project information or they could purchase a subscription to CMD Online.  CMD Online, the predecessor to Reed Connect, was a search tool which, like Reed Connect, permitted RCD's customers to search RCD's project information.  However, unlike Reed Connect, the project information was not hosted online.  Rather, customers periodically received a raw data

file containing updated project information.  The customer was required to load the data file onto its own computer system, and could then use CMD Online to search the file.

18.     When RCD launched Reed Connect, it revolutionized the manner in which RCD's customers could search for project information.  Rather than forcing customers to await a periodic data file before their project information could be updated, Reed Connect hosts all of RCD's available project information online.  Accordingly, RCD's customers can easily search for up-to-date project information on Reed Connect and do not have to manually load the project information, which takes up space on the customers' computer servers.

19.     Reed Connect's proprietary search functions enable RCD's customers to tailor narrowly their searches to optimize the results.  For instance, Reed Connect gives RCD's customers the ability to search for projects in a particular region, to search only for projects that are in a certain stage of development (such as projects that are in the bid stage), to search only for projects in which the specifications call for the customer's precise product, etc.

20.     RCD's customers can purchase subscriptions to Reed Connect at various levels depending upon the geographic region in which they would like to be able to search for project information.  For instance, a local contractor can purchase a subscription to Reed Connect that will only allow it to search for projects in the area in which the contractor operates, while a national building product manufacturer or construction company can purchase a subscription to Reed Connect that will allow it to search for information on all projects in RCD's database in the United States.

21.     RCD's representatives gather the project information available on Reed Connect from a variety of different sources, including by contacting architects or builders to obtain information about specific projects, performing online searches for the projects, and leveraging RCD's

relationships with architectural or building associations to collect information.  RCD also has exclusive arrangements with certain organizations pursuant to which they only provide certain project information to RCD instead of RCD's competitors.

22.      Because the primary product RCD sells to its customers is its extensive compilation of project information, RCD goes to great lengths to ensure that the information in its database is used by its customers appropriately and is not shared with RCD's competitors.  RCD's standard subscription agreements that are signed by its customers state that the information available on Reed Connect is proprietary information belonging to RCD; prohibit the customers from disclosing the information to any person or entity other than the customer's own employees; and explicitly prohibit the customers from disclosing the information available on Reed Connect to RCD's competitors.  RCD investigates any of its customers who it suspects may be using its information in an unauthorized manner.

### *The Construction Project Information Marketplace*

23.      While RCD has a number of competitors at the regional and local levels, RCD only has one primary competitor for its national accounts: Dodge.

24.      Dodge provides its customers with construction data and project information in a manner similar to RCD.  Dodge has a web-based program which permits Dodge's customers to search for project information available in Dodge's database.  This program will be referred to herein as "Dodge Network."  Dodge Network was launched in August 2003.

25.      Although both programs have similar purposes, Reed Connect and Dodge Network are different in a number of material respects.  Reed Connect contains proprietary algorithms and search functions which differ from Dodge Network to enable customers to search for information.  Both programs therefore have different search capabilities.

26.     If either RCD or Dodge were to have simultaneous access to both the Reed Connect program and the Dodge Network program, the competitor would be able to determine which search parameters work better on one program than the other.  For instance, even if RCD and Dodge had the same project information in their respective databases, the different algorithms used by the two programs could cause a specific search term to return more project results on the Reed Connect program than the Dodge Network program.

27.     This anomaly is exacerbated by the fact that RCD and Dodge use different identifiers for their various projects.  For example, the same project may be in both the RCD and Dodge database, but the competitors may identify the project by different names.  The construction of John F. Kennedy High School may be listed in RCD's database as "John F. Kennedy High School," but listed in Dodge's database as "JFK High School."  If RCD or Dodge had access to both programs, it would be able to craft a search that would identify the project using one program but make it seem as though the project were not available using the other program.

28.     Another example is the description "bid" that RCD and Dodge attach to the projects in their database.  RCD immediately removes projects in its database from the active "bid" phase in its database the day after the bidding phase on the project ends, while Dodge may have a lag time of several weeks or months after that day before it removes projects in its database from the "bid" phase.  Therefore, even if RCD and Dodge had exactly the same projects available in their databases, running a search for "bid" projects on both programs would make it appear as though Dodge had many more projects available than RCD.

29.     Moreover, a competitor with access to both systems could easily search for projects that were not in that competitor's database and, after contacting the architect or builder in charge

of the project to verify that the project information was accurate, add the missing project to the database.

30.     Because of the various competitive risks attendant to allowing Dodge, or any other competitor, to access Reed Connect, RCD does not permit its competitors to access Reed Connect.  As discussed above, RCD also takes steps to ensure that its customers do not permit RCD's competitors to access the program through their own accounts.

31.     RCD does not have access to Dodge Network.

32.     The cost of an annual subscription to Dodge Network is generally twice as much as the cost of a subscription to Reed Connect.

33.     In general, Reed Connect is a superior product to Dodge Network.  Customers who have used both systems report that Reed Connect offers quicker downloads of information than Dodge Network; offers more useful functions than Dodge Network; and is easier to use than Dodge Network.  RCD has had several customers who initially left Reed Connect to subscribe to Dodge Network change their subscriptions back to Reed Connect due to the program's superiority over Dodge Network.

## DODGE'S UNAUTHORIZED ACCESS TO REED CONNECT THROUGH INDUSTRIAL ESPIONAGE

### *Dodge's Access to Reed Connect Through Eric Kubicka ("The Spy"), Pat Major, and Henning Lorenz ("Mr. X")*

34.     Despite RCD's efforts to prevent unauthorized access to Reed Connect, RCD has recently learned that Dodge has had full and virtually uninterrupted access to Reed Connect for several years through a web of industrial espionage, and that Dodge has been using its access to Reed Connect to compete unfairly with RCD.

35.     Beginning in the mid-to-late 1990s, Dodge created the position of Director of Competitive Intelligence and appointed Eric Kubicka ("Kubicka") to the role.  Kubicka reported at times to Dodge's President, Norbert Young.  A Dodge employee named Pat Major ("Major") reported at times to Kubicka.

36.     Upon information and belief, one of Kubicka's primary responsibilities as the Director of Competitive Intelligence was to obtain access to RCD's confidential and proprietary information without RCD's knowledge.  Indeed, Kubicka was referred to in the Dodge organization as "The Spy."

37.     In an apparent attempt to gain unfettered access to RCD's information and, specifically, the Reed Connect program, Kubicka and Major hired several contractors to subscribe to RCD's products and customers by posing as customers of RCD.

38.     One such contractor was Henning Lorenz ("Lorenz").

39.     At all times relevant to this Complaint, Lorenz was the President and Chief Executive Officer of NE14T Corporation, Inc. ("NE14T"), a New Jersey corporation that began operating in 1999.  NE14T had a two-person board of directors, one of whom was Lorenz.

40.     Dodge hired both Lorenz and NE14T at various times from 1997 to 2002 to perform legitimate consulting services for Dodge.  For instance, Dodge hired Lorenz in or about 1997 to research acquisition targets in the Asian Pacific region.  Upon information and belief, Dodge also hired NE14T to perform software consulting services after it was incorporated in 1999.  Lorenz and NE14T also provided various consulting services, such as software development and information technology consulting, for businesses other than Dodge.

41.     Due to its concerns about the success of Reed Connect following the program's launch, Dodge hired Lorenz and NE14T in late 2002 for the illegitimate, and illegal, purpose of

subscribing to Reed Connect under false pretenses so that Dodge could have unfettered, and unauthorized, access to the program.  At the time Dodge hired Lorenz and NE14T to access Reed Connect, Dodge did not offer Dodge Network and did not have a comparable, fully web-based program similar to Reed Connect.

42.     To carry out Dodge's plan, Lorenz represented to RCD that NE14T was a consultant for Hager Hinge Company ("Hager Hinge").  Hager Hinge is a legitimate building product manufacturer.  Posing as a consultant for Hager Hinge, NE14T purchased a subscription to Reed Connect in December 2002, shortly after the program was launched.

43.     RCD did not know at the time NE14T purchased the subscription to Reed Connect, but has since learned, that neither NE14T nor Lorenz was a consultant for Hager Hinge and that NE14T was not purchasing a subscription on Hager Hinge's behalf.

44.     Hager Hinge was unaware that Lorenz purchased a contract under its name.

45.     The annual subscription purchased by NE14T was paid for by Dodge.  Dodge also paid Lorenz and NE14T a fee for their services in securing the Reed Connect subscription.  At times Dodge paid Lorenz personally for his services in securing the subscription, and at other times Dodge paid NE14T for the services.

46.     In an attempt to hide the payments to Lorenz and NE14T, Dodge often paid Lorenz and NE14T in cash or money orders purchased from the McGraw-Hill Federal Credit Union. Dodge employees would either hand Lorenz payments in cash when he visited Dodge's offices or personally accompany him to the branch of the McGraw-Hill Federal Credit Union located in Dodge's offices to purchase a money order made payable to him, which Lorenz could then immediately cash.

47.     The original subscription purchased by NE14T covered RCD's project information in ten states.

48.     The subscription agreement signed by Lorenz, as President of NE14T, provides that the information available through Reed Connect is "proprietary, confidential, and trade secret information belonging to [RCD]."

49.     The subscription agreement signed by Lorenz, as President of NE14T, also prohibited him from disclosing the information available through Reed Connect "to any person other than direct employees of Client required to have such knowledge in the normal course of Client's business."

50.     In January 2004, NE14T purchased a national subscription to Reed Connect that covered RCD's project information across the entire country.

51.     The subscription agreement signed in 2004 by Lorenz, as President of NE14T, contained nondisclosure provisions similar to those quoted above.

52.     Lorenz renewed NE14T's subscription agreement with RCD on several occasions between 2002 and 2006.  Each renewal agreement contained nondisclosure provisions similar to those quoted above.

53.     Using NE14T's subscription, Dodge had unfettered access to Reed Connect and the project information in RCD's database from at least 2002 to 2006.

54.     Dodge used its unauthorized access to Reed Connect to compete unfairly with RCD in a number of ways.

55.     Posing as a consultant for Hager Hinge, Lorenz used his access to Reed Connect and to RCD's employees to obtain confidential and proprietary information about the Reed Connect software and programming as well as the project information available on Reed Connect.  As

discussed below, Lorenz then shared this information with Dodge's employees for use in competitive situations with RCD and/or for use in Dodge's development of the Dodge Network program.

56.     Dodge's sales representatives and its upper management regularly contacted Kubicka or Major with questions about Reed Connect or RCD's project information.  Kubicka and/or Major would then obtain the requested information from Lorenz, who, upon information and belief, would permit Kubicka and/or Major to view Reed Connect or to run comparisons between Dodge's project information and RCD's information, and pass the requested information on to Dodge's sales representatives and its upper management to use in competing with RCD for customer accounts and/or developing Dodge Network.

57.     In order to maintain his secrecy, Dodge's sales representatives were not given Lorenz's actual name.  Instead, Lorenz was commonly referred to by Dodge's employees as "Mr. X."

58.     Further, in or about late 2004 or early 2005, Dodge held a meeting in Philadelphia for the majority of its national account sales representatives and upper management.  During the meeting, Kubicka and/or Major used Dodge's unauthorized access to Reed Connect to demonstrate the Reed Connect program to the sales force.

59.     Kubicka and/or Lorenz also at other times showed images of the Reed Connect program to the sales force.  Dodge would not have had access to those images without improperly obtaining the subscription through Lorenz and NE14T.

60.     Further, Kubicka and/or Lorenz demonstrated to the sales force the manner in which the Reed Connect program operated and pointed out perceived weaknesses of Reed Connect as compared to Dodge Network that the sales force could emphasize in sales pitches to potential

clients.  Lorenz held a number of presentations for Dodge's sales representatives in which he demonstrated Reed Connect and advised them of software updates to the program.

### *RCD's Termination of Lorenz's Subscription*

61.     RCD did not know at the time, but has since learned, that while Dodge was using Lorenz and NE14T to subscribe to Reed Connect as a purported agent for Hager Hinge, the real Hager Hinge Company was actually a customer of Dodge.

62.     However, in December 2005, the real Hager Hinge Company moved its business from Dodge to RCD, purchasing a national subscription to Reed Connect similar to that purchased by Lorenz and NE14T posing as consultants for Hager Hinge.

63.     This, of course, raised suspicions about Lorenz's true affiliations.

64.     RCD determined that Lorenz did not work for the real Hager Hinge Company and promptly cancelled his subscription on January 16, 2006.

65.     Upon information and belief, around the time RCD cancelled Lorenz's subscription, Dodge fired Kubicka after discovering that he was reaping unauthorized profits from his espionage activity.

### *Dodge's Unauthorized Access to Reed Connect Through Glenn Lewin*

66.     After Dodge terminated Kubicka, Dodge's Senior Vice President of Business Operations, Timothy Ryan ("Ryan") assumed Kubicka's former role as head of Dodge's Competitive Intelligence department.

67.     Ryan immediately hired another "contractor" to obtain a national subscription to Reed Connect under false pretenses to replace the subscription Dodge had previously purchased through Lorenz.

68.      As discussed below, the contractor, Glenn Lewin ("Lewin"), purchased a national subscription to Reed Connect on behalf of a fictitious company in February 2006, less than one month after RCD terminated Dodge's subscription to Reed Connect through Lorenz.

69.      Lewin is a freelance writer who provides consulting, professional writing, and researching services to a number of businesses other than Dodge.  Lewin's website claims that he provides such services to at least 37 clients.  Dodge is not listed on the website as one of Lewin's clients, even though they have had a business relationship for at least nine years, as discussed below.

70.      Prior to purchasing the national subscription to Reed Connect, Lewin had been providing consulting services to Dodge, in addition to his other clients, since at least 2003.  In March 2003, Lewin purchased a regional subscription to Reed Connect limited to Illinois, purportedly as an agent for Northern Construction Development Company ("Northern Construction").

71.      Northern Construction was not an actual company.  Rather, as it did with Lorenz, Dodge paid the cost of the subscription to Reed Connect and used the subscription to access the regional Reed Connect service directly.

72.      In September 2005, Lewin purchased another Illinois regional subscription to Reed Connect, this time purportedly as an agent for a business named Central Business Services.

73.      Central Business Services was also not an actual company.  Dodge paid the cost of the subscription to Reed Connect and used the subscription to access the regional Reed Connect service directly.

74.   On February 14, 2006, less than one month after RCD terminated Lorenz's national subscription to Reed Connect, Central Business Services expanded its subscription to a national subscription to Reed Connect.

75.   Dodge paid Lewin the cost of the subscription to Reed Connect as well as a monthly fee for his services to pose as a customer of RCD and to obtain the subscription under false pretenses.

76.   The contract Lewin signed as the purported agent for Central Business Services prohibits Lewin from sharing access to Reed Connect with Dodge.  Specifically, the contract states:

> **NONDISCLOSURE**:  The Information [available through the subscription] constitutes proprietary, confidential and trade secret information belonging to RCD.  Customer agrees not to disclose or otherwise make the Information available to any person other than employees of Customer required to have such knowledge in the normal course of Customer's business.  Customer agrees not to copy, disclose, publish, distribute or disseminate the Information to any third party, directly or indirectly.

77.   On March 10, 2006, Lewin sent RCD a letter under the alias "John Carlson."  The letter stated that Central Business Services had been acquired by Northern Construction, and that Northern Construction would assume the subscription to Reed Connect.  The letter further stated that Northern Construction's "principal line of business is assisting manufacturers in developing new clients and new market opportunities for their products."  The letter identifies John Carlson as the contact person for Northern Construction.

78.   John Carlson is an alias created by Lewin, and Northern Construction is a fictitious company.

79.   Upon information and belief, Lewin changed his fictitious company's name from Central Business Services to Northern Construction and began operating under an alias because

Kubicka and Lorenz, who by then had been terminated by Dodge, threatened to expose to RCD Lewin's relationship with Dodge and Dodge's unauthorized access to Reed Connect.

80.     Because Northern Construction was purportedly a consultant to building product manufacturers rather than a direct manufacturer, RCD contacted Lewin (who had informed RCD that he was still involved with Northern Construction) in December 2006 to inquire about Northern Construction's business and verify that Northern Construction was not using its access to Reed Connect in an unauthorized manner.

81.     On or about December 20, 2006, during a telephone call with one of RCD's Directors, Craig Roberts, Lewin represented that he did not work for any of RCD's competitors, explicitly denied any relationship with Dodge, and represented that he was not providing information gathered from Reed Connect to any of RCD's competitors.  Lewin stated that Northern Construction provided consulting services to building product manufacturers and contractors.

82.     Dodge continued its unauthorized access to Reed Connect under the fictitious name of Northern Construction through the end of 2007.

83.     In January 2008, Lewin purchased a national subscription under a new fictitious name: Arrington Partners.  To purchase the subscription, Lewin again used the alias John Carlson.

84.     In the subscription agreement signed by Lewin (as John Carlson), Lewin acknowledged that the information available through access to Reed Connect constitutes the proprietary, confidential, and trade secret information of RCD.

85.   Specifically, the contract states:

**PROPRIETARY RIGHTS:** The Information [available through the subscription to Reed Connect] constitutes proprietary, confidential and trade secret information belonging to RCD or its licensors.… Customer acknowledges, and agrees not to challenge in any fashion, that the Information (a) constitutes original collections and assemblies of preexisting data, the selection, coordination and arrangement of which results in works which are original, (b) contains data which is not preexisting, but instead is RCD's own original expression; and (c) derives value from Information gathered and published by RCD in a prompt fashion.

86.   The subscription agreement also contains, in addition to a general nondisclosure provision, a direct representation that Arrington Partners was not subscribing to Reed Connect under a fictitious name in order to provide RCD's competitors with access to the program or RCD's other information.

87.   Specifically, the agreement provides:

**NONDISCLOSURE RESTRICTIONS:** Customer agrees not to disclose or otherwise make the Information available to any person other than employees of Customer required to have such knowledge in the normal course of Customer's business and authorized to access the Information hereunder. Customer agrees not to: (I) disclose, publish, distribute, transfer or disseminate the Information to any third party, directly or indirectly; (II) use the Information, directly or indirectly to compete with any products or services of RCD or its affiliates; (III) use the Information as a basis for providing project leads in any product or service disseminated to any third party (a "Competitive Product"), directly or indirectly, or otherwise use the Information to compete with RCD or its affiliates; or (IV) use the Information, directly or indirectly, to provide data or competitive information to any provider of Competitive Products or affiliate thereof. ***Customer represents, warrants and covenants to RCD that: (I) it is not, and shall not be during the Term, a supplier of Competitive Products, nor is it subscribing to the Information, directly or indirectly, for the purpose of providing data or competitive information to a supplier of Competitive Products or any affiliate thereof: and (II) it has entered into this Agreement under its true name and is not, directly or indirectly, impersonating any real or fictitious person or entity or otherwise acting so as to deceive RCD as to the actual identity of Customer.***

88.   Similar to Central Business Services and Northern Construction, Arrington Partners was not a real business. Rather, Dodge used Arrington Partners' subscription to access Reed

Connect without authorization and in direct breach of the representations made by its agent, Lewin.

89.     Dodge paid Lewin the cost of the national subscription purchased by Arrington Partners as well as a monthly fee for his services in obtaining the subscription under false pretenses.

90.     Dodge continued its unauthorized access to Reed Connect under the fictitious name of Arrington Partners through the end of 2008.

91.     In January 2009, Lewin again changed the name of his fictitious company, this time purchasing a national subscription under the company name Site Amenities.  The contact person for Site Amenities was listed as Andy Anderson, another of Lewin's aliases.

92.     As with the previous contracts, Site Amenities is not a real company, and Andy Anderson is not an actual person.

93.     Dodge paid Lewin the cost of the national subscription purchased by Site Amenities as well as a monthly fee for his services in obtaining the subscription under false pretenses.

94.     Dodge used the subscription purchased by Site Amenities to access Reed Connect directly without RCD's knowledge.

95.     Upon information and belief, Dodge directly accessed Reed Connect on a regular basis using Lewin's account information from 2006 to 2009.  Dodge used Lewin's account information over that period to run numerous searches for project information in Reed Connect. RCD has traced the IP address for the computer which conducted the majority of these searches to an area within five city blocks of Dodge's corporate office in Manhattan, New York.

### *RCD's Discovery of Dodge's Unauthorized Access to Reed Connect Through Glenn Lewin*

96.     In connection with RCD's investigation of an internal employment issue concerning the RCD sales representative who sold the various subscriptions to Lewin, RCD sent Site Amenities a letter dated July 14, 2009, notifying Site Amenities of its intent to conduct an audit of Site Amenities' business and its use of Reed Connect.

97.     Even after RCD sent Lewin the audit letter, Dodge continued to access Reed Connect directly using Lewin's account information.  Dodge used Lewin's account information to run searches in Reed Connect on July 21 and 23, 2009.  RCD has traced the IP address for the computer Dodge used to conduct these searches to an area within five city blocks of Dodge's corporate office in Manhattan, New York.

98.     On August 4, 2009, in connection with the audit referenced above, Lewin admitted to RCD that he worked for Dodge.

99.     Among other things, Lewin admitted that Central Business Services, Northern Construction, Arrington Partners, and Site Amenities were all fictitious companies, and that John Carlson and Andy Anderson were aliases used by Lewin to purchase the subscriptions.

100.    Lewin further admitted that Dodge paid for all of the subscriptions purchased by Lewin; that Dodge accessed Reed Connect directly through his subscriptions; and that Dodge paid Lewin approximately $2,000 per month to serve as the "straw man" for its access to Reed Connect.

101.    Lewin further admitted that Dodge used other "consultants" to access Reed Connect prior to using him, and he stated that at least one of the other consultants were fired by Dodge for inflating the cost of the subscriptions to Dodge and retaining for themselves some of the funds that were intended to pay for the subscriptions (as discussed above).

102.     Lewin further admitted that, in his role as a straw man for Dodge, he was in direct contact with Dodge's President, Norbert Young.

103.     Lewin further admitted that he had discussed with Dodge the fact that Dodge's unauthorized access to Reed Connect was a breach of the subscription agreement, but that the Dodge representative with whom he spoke informed him that Dodge did not believe the unauthorized access constituted anything more than a breach of contract.

104.     After the conversation with Lewin, RCD terminated Lewin's subscriptions to Reed Connect.

105.     Upon information and belief, Dodge has used other "contractors" and fictitious companies in addition to Lorenz, Lewin, and the companies identified above to subscribe under false pretenses to RCD's products and services, including products and services other than Reed Connect, beginning as early as the mid-to-late 1990s.  These persons and entities, as well as the corporate officers and employees of Dodge who facilitated or authorized Dodge's scheme, as alleged herein, are the John Doe Defendants.

### DODGE'S USE OF ITS UNAUTHORIZED ACCESS TO REED CONNECT TO COMPETE UNFAIRLY WITH RCD

106.     Dodge has been using its unauthorized access to RCD's products and services for years to compete unfairly with RCD.

107.     Beginning in the late 1990s, Dodge's sales representatives and its upper management regularly obtained from Kubicka and Major regional comparisons of RCD's and Dodge's project information to use in competition with RCD for customer accounts.  Upon information and belief, these purported data comparisons were intentionally skewed in Dodge's favor in order to mislead customers as to the superiority of Dodge's products and services as compared to RCD's.

The data comparisons were obtained by Kubicka and Major by way of Dodge's unauthorized access to RCD's products and services using "contractors" similar to those described above.

108.    Moreover, as discussed above, Dodge has held formal presentations using its unauthorized access to Reed Connect, in which Dodge falsely informed its sales agents of supposed weaknesses in the Reed Connect program and allowed them to view information in Reed Connect in order to compete for accounts with RCD.

109.    Upon information and belief, Dodge has also used confidential and proprietary information it obtained about Reed Connect's software and programming to develop and alter the competing Dodge Network program.

110.    Further, as discussed above, because of the differences between the Reed Connect and Dodge Network programs and the differences in the manner in which RCD and Dodge list available information for their projects, search parameters for either program may be manipulated in a way that gives the misimpression that far less information is available on one program than the other.  Upon information and belief, Dodge has used its access to Reed Connect to identify specific search parameters which will generate far more results using Dodge Network than Reed Connect (even in situations where the actual number of projects in Dodge's and RCD's database are very similar), thereby giving the false impression that Dodge Network is far superior to Reed Connect.

111.    Upon information and belief, after identifying search parameters which resulted in the most favorable results for Dodge using these methods, Dodge used those search parameters to create misleading comparisons between its data and that of RCD.

112.   Upon information and belief, Dodge has presented these misleading comparisons to Roper Public Affairs & Media ("Roper"), a division of GfK NOP, LLC.  Roper is a high-profile consulting company that is independent of Dodge.

113.   Roper has used the misleading comparisons provided by Dodge to create a report (the "Roper Report") which purportedly contains an unbiased, third-party comparison of the amount of project information available on the Dodge Network and Reed Connect programs.

114.   Specifically, the Roper Report compares the number of construction projects available on Dodge Network and Reed Connect in every state.

115.   Because the information in the Roper Report is compiled using the misleading comparisons created by Dodge, the results of the Roper Report are demonstrably false and misleading.

116.   The Roper Report misrepresents the ratio of projects available on the Dodge Network program as compared to the Reed Connect program.

117.   In fact, when current and potential customers of RCD or Dodge have performed direct comparisons of the Reed Connect and Dodge Network programs in circumstances in which representatives of both RCD and Dodge have been available to conduct searches, and Dodge has not been able to use its misleading search parameters, Reed Connect has consistently performed as well or better than Dodge Network.

118.   The Roper Report was first issued in or about 2004.  Since 2004, the Roper Report has been regularly "updated" using misleading comparison information provided by Dodge.

119.   Without its unauthorized access to Reed Connect, Dodge would not have been able to have the Roper Report created.  Without its unauthorized access to Reed Connect, Dodge would not have had access to the project information in RCD's database nor would it have been able to

use its access to Reed Connect to manipulate the search parameters in order to obtain misleading search results. Accordingly, without access to Reed Connect, Dodge would have been unable to present Roper with the misleading data comparisons and Roper would not have validated the comparisons presented by Dodge.

120. Dodge has issued the Roper Report to its national account sales representatives for use in competitive situations with RCD and has instructed them regarding the "rules" for the use of the report. In an apparent attempt to prevent RCD from discovering the existence of the report and the fact that Dodge was accessing Reed Connect without authorization, Dodge has instructed all of its sales representatives to never leave copies of the Roper Report with their customers.

121. Dodge's rules governing the use of the Roper Report (entitled "Rules for NOPWorld/Roper Report") state:

> [T]he [Roper Report] is available for use with customers…. The analysis should be used with extreme caution and **should not** be left with a customer…. [A]ll information contained in the study should be noted as confidential and is proprietary information only meant for the client/prospect and redistribution outside their organization is prohibited. (Emphasis in original.)

122. Upon information and belief, national account sales representatives for Dodge have regularly shown the Roper Report to Dodge's existing and potential customers as well as RCD's existing and potential customers from at least 2004 to the present.

123. In addition to the Roper Report, Dodge has also used its access to Reed Connect to compete with RCD by other improper means.

124. Upon information and belief, Dodge's sales representatives have instructed Dodge's and RCD's existing and potential customers to compare the Reed Connect and Dodge Network programs using the misleading search parameters developed by Dodge in order to give the customers the false impression that Dodge's information was far superior to RCD's.

125.    For instance, Dodge has used its access to Reed Connect to identify regions of the country in which Dodge generally has more projects available than RCD.  Dodge's sales representatives have then directed potential customers who were attempting to decide whether to subscribe to Dodge's services or RCD's services to compare the projects available from the two competitors in those specific regions, with the goal of making it seem as though Dodge's nationwide project information is much better than RCD's, when in fact it is not.

126.    In another instance a Dodge sales representative contacted one of RCD's existing customers and identified seven specific projects for which it claimed RCD did not have certain project information available on Reed Connect.  In fact, the relevant information was available on Reed Connect for six of the seven projects.  However, the information was identified differently on Reed Connect than it was on Dodge Network, and the Dodge sales representative attempted to take advantage of these differences to make it appear as though the information was unavailable on Reed Connect.

127.    Fortunately, the customer contacted RCD directly to inquire about the projects before terminating its subscription to Reed Connect, and RCD was able to demonstrate for the customer that the project information was actually available on Reed Connect and that the Dodge sales representative had misrepresented the facts.

128.    Without its unauthorized access to Reed Connect, Dodge would not have been able to develop the misleading search parameters it has presented to RCD's current and prospective customers, as discussed above.

129.    Upon information and belief, Dodge sales representatives have used tactics similar to these with other existing and prospective customers of RCD to compete with RCD.

130.     Aside from using Reed Connect to create the Roper Report and other misleading comparisons for customers discussed above, Dodge has also used its unauthorized access to Reed Connect to misappropriate the construction project information available on Reed Connect.

131.     From September 2007 to July 2009, Dodge used its access to Reed Connect through Lewin to view the specific project details for 3,438 specific projects in RCD's database.  Of these, Dodge tracked 1,174 projects as "Active," meaning that Dodge received automatic notification whenever RCD updated the information in its database regarding those projects. Dodge searched for a number of these projects using the specific project identification codes assigned to the projects by RCD, indicating that Dodge identified certain projects as being of interest from prior searches, then used RCD's identification codes to view the detailed information for the projects.

132.     During the same time period, Dodge also downloaded hundreds of documents relating to specific projects available on Reed Connect, including the plans and specifications for those projects.

133.     Upon information and belief, Dodge used its access to Reed Connect to view the specific project details for a large number of projects prior to September 2007 and to download the plans and specifications for certain projects prior to September 2007.

134.     Upon information and belief, Dodge used the project information and documents referenced above to populate its own construction project database, either by directly copying RCD's project information into its database or by using Reed Connect to identify projects that were available in RCD's database but not Dodge's, then having its representatives contact the appropriate builder, architect, or contractor to obtain project information relating to such projects.  By misappropriating RCD's project information in this manner, Dodge was able to

improperly increase the amount of projects available in its database and, therefore, eliminate the competitive advantage that RCD should have enjoyed by having such projects exclusively available on Reed Connect.

135.    Dodge has misrepresented to consumers in the construction data marketplace that it legitimately obtains all of the project information in its database (rather than misappropriating the information from RCD), and that it therefore has more project information in its database than RCD.

136.    As a result of the above tactics, a number of RCD's national account customers have terminated or chosen not to renew their subscription agreements with RCD to subscribe instead to Dodge's products and services.  Upon information and belief, these customers selected Dodge after Dodge sales representatives presented them with false or misleading information regarding the superiority of Dodge's products as compared to RCD's products, including the amount of projects available on Dodge Network as compared to Reed Connect.

137.    Further, Dodge's use of false and misleading information regarding the superiority of its products as compared to RCD's has also caused a number of RCD's prospective customers who were actively comparing RCD's products and services with those of Dodge to subscribe with Dodge instead of RCD.

138.    Moreover, even if the customers and prospective customers performed or were shown accurate project count comparisons between Reed Connect and Dodge Network, the comparisons would have unfairly favored Dodge due to the fact that Dodge misappropriated a number of the projects in its database from RCD

139.    Accordingly, the customers and prospective customers referenced above subscribed to Dodge Network instead of RCD because of the misleading claims made in the Roper Report

and by Dodge's sales representatives, as discussed herein, as well as the fact that Dodge's project count was inflated due its misappropriation of project information from Reed Connect.

140.    In doing so, these customers and prospective customers have been misled into paying for a subscription to Dodge Network that is generally more expensive than a subscription to Reed Connect, even though Reed Connect is a superior product to Dodge Network.

### COUNT ONE – FRAUD

141.    RCD incorporates and realleges paragraphs 1 through 140 as if fully set forth herein.

142.    At all times relevant herein, Lorenz, Lewin, and certain of the John Doe Defendants acted as Dodge's agents and the agents for the John Doe Defendants who were corporate officers and employees of Dodge.

143.    As alleged above, Dodge and the John Doe Defendants who were corporate officers and employees of Dodge misrepresented through Lorenz and Lewin that they did not work for Dodge and that they would not provide Dodge with access to Reed Connect or with RCD's confidential and trade secret information available on Reed Connect.

144.    Further, the John Doe Defendants who worked as "contractors" for Dodge directly misrepresented to RCD that they did not work for Dodge and that they would not provide Dodge with access to Reed Connect or with RCD's confidential and trade secret information available on Reed Connect.

145.    Dodge and the John Doe Defendants (collectively, "Defendants") knew that these representations were false when they were made.  The very purpose of Lorenz's and Lewin's subscription agreements with RCD, and the purpose of the subscriptions agreements entered by the John Doe Defendants who worked as contractors for Dodge, was to provide Dodge with

unauthorized access to Reed Connect and the confidential and trade secret information contained therein.

146.    If RCD knew about Lorenz's and Lewin's affiliation with Dodge or their intent to provide Dodge with unauthorized access to Reed Connect, it would not have permitted Lorenz or Lewin to purchase the subscription agreements.

147.    Similarly, if RCD knew that the John Doe Defendants who worked as contractors for Dodge were affiliated with Dodge or that they intended to provide Dodge with unauthorized access to Reed Connect, it would not have permitted them to purchase subscription agreements to RCD's products and services.

148.    Defendants intended for RCD to rely upon the misrepresentations made through Lorenz and Lewin and certain of the John Doe Defendants, as alleged herein.

149.    RCD was justified in relying on Dodge's misrepresentations through Lorenz and Lewin and the misrepresentations of the John Doe Defendants, as alleged herein.

150.    RCD has suffered damages as a proximate result of Dodge's misrepresentations through Lorenz and Lewin and the John Doe Defendants' misrepresentations, as alleged herein, in an amount to be proven at trial.

151.    Further, by their actions alleged herein, Defendants actively and wrongfully concealed from RCD material facts relating to its misconduct, which prevented RCD from discovering its claims against Dodge and the John Doe Defendants asserted herein, including the instant claim, until recently.  Among other things:

> (a)    Defendants instructed Lorenz and Lewin to make a number of misrepresentations to RCD to conceal their affiliation with Dodge and their intent to provide Dodge with access to Reed Connect.  Defendants instructed Lorenz and Lewin to make the following misrepresentations, among others, to RCD:

i.  During a telephone conversation in or about December 2002, Lorenz misrepresented to a sales representative of RCD, Ken Schreiber, that NE14T was purchasing a subscription agreement to Reed Connect on behalf of Hager Hinge in order to conceal the fact that he was actually purchasing the subscription on behalf of Dodge;

ii.  On at least four occasions, on or about December 9, 2002, January 30, 2004, January 25, 2005, and June 3, 2005, Lorenz signed subscription agreements in which he misrepresented that he was purchasing a subscription to Reed Connect on behalf of Hager Hinge and that he would not disclose the information available on Reed Connect to any third parties in order to conceal the fact that he was actually purchasing the subscriptions on behalf of Dodge;

iii.  On at least three occasions, on or about March 31, 2003, September 29, 2005, and February 14, 2006, Lewin signed subscription agreements in which he misrepresented that Central Business Services, which was a fictitious business created by Lewin, was purchasing a subscription to Reed Connect on its own behalf and that it would not disclose the information available on Reed Connect to any third parties in order to conceal the fact that he was actually purchasing the subscriptions on behalf of Dodge;

iv.  On or about March 10, 2006, Lewin mailed a letter to RCD under the alias "John Carlson," in which he misrepresented that Northern Construction, a fictitious company created by Lewin, had purchased Central Business Services, another fictitious company created by Lewin, in order to prevent RCD from discovering that he worked for Dodge.

v.  On or about March 16, 2006, Lewin signed a subscription agreement under the fictitious name "John Carlson" in which he misrepresented that Northern Construction, which was a fictitious business created by Lewin, was purchasing a subscription to Reed Connect on its own behalf and that it would not disclose the information available on Reed Connect to any third parties in order to conceal the fact that he was actually purchasing the subscription on behalf of Dodge;

vi.  During a telephone conversation on or about December 20, 2006, Lewin concealed the fact that he worked for Dodge by misrepresenting to one of RCD's Directors, Craig Roberts, that he did not work for Dodge and that he was not providing Dodge with unauthorized access to Reed Connect;

vii.  On at least three occasions, on or about January 31, 2008, February 27, 2008, and September 16, 2008, Lewin signed subscription agreements under the fictitious name "John Carlson" in which he misrepresented

that Arrington Partners, which was a fictitious business created by Lewin, was purchasing a subscription to RCD's products and services on its own behalf and that it would not disclose the information available on Reed Connect to any third parties in order to conceal the fact that he was actually purchasing the subscriptions on behalf of Dodge;

viii.   On or about January 25, 2009, Lewin signed a subscription agreement under the fictitious name "Andy Anderson" in which he misrepresented that Site Amenities, which was a fictitious business created by Lewin, was purchasing a subscription to Reed Connect on its own behalf and that it would not disclose the information available on Reed Connect to any third parties in order to conceal the fact that he was actually purchasing the subscription on behalf of Dodge; and

ix.   In numerous telephone conversations with employees of RCD from 2003 to 2009, Lewin misrepresented that he was subscribing to Reed Connect on behalf of legitimate businesses and not for the purpose of providing RCD's information to third parties in order to conceal the fact that he was working for Dodge and providing it with direct access to Reed Connect.

(b)   Defendants attempted to conceal from RCD the Roper Report and Dodge's sales representatives' use of the same by instructing all of Dodge's sales representatives to never leave copies of the Roper Report with their customers.

152.   Defendants' wrongful concealment of these material facts prevented RCD from discovering Defendants' use of Lorenz and Lewin and certain of the John Doe Defendants to obtain unauthorized access to Reed Connect and RCD's confidential and trade secret information.  Defendants' wrongful concealment of material facts further prevented RCD from discovering the fact that the damage to RCD's business, as alleged herein, was a result of Defendants' misconduct.  Accordingly, Defendants' wrongful concealment of material facts prevented RCD from discovering the nature of its claims against Dodge and the John Doe Defendants asserted herein, including the instant claim, until recently.

153.   RCD exercised due diligence in attempting to discover the claims against Dodge and the John Doe Defendants asserted herein, including the instant claim.  Among other things:

(a)    RCD investigated customers it suspected to have been providing Roper and/or competitors of RCD with unauthorized access to Reed Connect;

(b)    RCD terminated Lorenz's access to Reed Connect on January 16, 2006, when it suspected that he did not actually work for the real Hager Hinge Company;

(c)    On or about December 20, 2006, one of RCD's Directors, Craig Roberts, questioned Lewin directly about his affiliation with Dodge, but Lewin misrepresented that he did not work for Dodge and that he was not providing Dodge with unauthorized access to Reed Connect;

(d)    RCD included non-disclosure provisions in its subscription agreements which prohibited its customers from providing third parties such as Roper or Dodge with unauthorized access to Reed Connect; and

(e)    RCD included in the subscription agreements signed by Lewin purportedly on behalf of Arrington Partners and Site Amenities explicit representations that Lewin would not provide RCD's competitors such as Dodge with access to Reed Connect and that Lewin was not subscribing to Reed Connect under false pretenses in order to provide a competitor such as Dodge with access to Reed Connect.

154.    Despite the above efforts, RCD was unable to discover Defendants' misconduct, including without limitation Defendants' unauthorized access to Reed Connect through Lorenz and Lewin and their use of the same to create the misleading Roper Report and misappropriate RCD's project information, until recently.

155.    RCD is entitled to recover its damages suffered as a proximate result of Defendants' misrepresentations through Lorenz, Lewin, and certain of the John Doe Defendants, as alleged herein, in an amount to be proven at trial.

156.    In addition, RCD is entitled to recover punitive damages against Defendants, as they acted willfully, wantonly, and maliciously in making the misrepresentations and misappropriating RCD's project information, as described herein.

157.    Further, as alleged herein, Dodge has shown a consistent pattern of attempting to gain unauthorized access to Reed Connect in order to misappropriate RCD's confidential and trade secret information.

158.    RCD does not have an adequate remedy at law for Dodge's unauthorized access to Reed Connect.

159.    RCD will suffer irreparable injury if Dodge continues to access Reed Connect without authorization; misappropriate RCD's confidential and trade secret information; and use the misleading claims in the Roper Report to compete unfairly with RCD.

160.    The balance of the hardships weighs in favor of a permanent injunction preventing Dodge from accessing Reed Connect without authorization and misappropriating RCD's confidential and trade secret information and other project information and from using any version of the Roper Report based upon information gained by Dodge's unauthorized access to Reed Connect or RCD's confidential and trade secret information, or any claim made in such a report, to compete with RCD.  Dodge will not be prejudiced by such an injunction, because it is unlawful and tortious for Dodge to access Reed Connect without authorization, misappropriate RCD's confidential and trade secret information and other project information, and use the misleading claims in the Roper Report in the manner alleged herein.

161.    The public interest will not be disserved by entry of a permanent injunction against Dodge.

162.    In fact, the public interest will be served by entry of a permanent injunction against Dodge because it will preclude Dodge from using its unauthorized access to Reed Connect to disseminate misleading reports to consumers in the construction data market.

163.    RCD is entitled to a permanent injunction preventing Dodge from accessing Reed Connect without authorization; misappropriating RCD's confidential and trade secret information; using any of RCD's confidential and trade secret information it has misappropriated, including without limitation by accessing Reed Connect without authorization

or using project information it obtained from Reed Connect; and using any version of the Roper Report based upon information gained by Dodge's unauthorized access to Reed Connect or RCD's confidential and trade secret information, or any claim made in such a report, to compete with RCD.

## COUNT TWO: MISAPPROPRIATION OF TRADE SECRETS

164.    RCD incorporates and realleges paragraphs 1 through 163 as if fully set forth herein.

165.    The information available on Reed Connect, including without limitation RCD's compilation of project information and other confidential information, Reed Connect's unique and proprietary search algorithms and methodologies, and the use of those search algorithms and methodologies in Reed Connect to obtain specific search results, constitutes trade secret information of RCD.

166.    As a condition of receiving RCD's trade secrets, Lorenz and Lewin, as Dodge's agents, explicitly acknowledged that the information available on Reed Connect constitutes RCD's trade secret information.

167.    RCD protects its trade secret information by, among other things, entering into subscription agreements with its customers prohibiting them from disclosing such information to any third parties, specifically including competitors of RCD.

168.    As alleged herein, Dodge obtained RCD's trade secret information through improper means, including through the use of fictitious customers of RCD.

169.    Dodge's unauthorized access to the trade secret information was in breach of RCD's confidential relationship with Lorenz and Lewin.

170.    As alleged herein, Dodge used RCD's trade secret information to compete with RCD.

171.    As a result of Dodge's misappropriation of RCD's trade secret information, Dodge has deprived RCD of the availability to reap the full profits of its trade secret information.

172.    RCD has suffered damages as a proximate result of Dodge's misappropriation of its trade secret information in an amount to be determined at trial.

173.    Further, as alleged herein and specifically set forth in paragraph 151, Dodge actively and wrongfully concealed from RCD material facts relating to its misconduct, which prevented RCD from discovering Dodge's misappropriation of its trade secret information and its use of the same to compete with RCD.  Dodge's wrongful concealment of material facts further prevented RCD from discovering the fact that the damage to RCD's business, as alleged herein, was a result of Dodge's misconduct.  Accordingly, Dodge's wrongful concealment of material facts prevented RCD from discovering the nature of its claims against Dodge asserted herein, including the instant claim, until recently.

174.    As alleged herein and specifically set forth in paragraph 153, RCD exercised due diligence in attempting to discover the claims against Dodge asserted herein, including the instant claim. Despite its efforts, RCD was unable to discover Dodge's misconduct, including without limitation Dodge's unauthorized access to Reed Connect through Lorenz and Lewin and its use of the same to create the misleading Roper Report and misappropriate RCD's project information, until recently.

175.    RCD is entitled to recover its damages suffered as a proximate result of Dodge's misappropriation of its trade secret information, as alleged herein, in an amount to be proven at trial.

176.    Dodge acted willfully, wantonly, and maliciously in obtaining RCD's trade secret information through improper means and in violation of RCD's confidential relationship with its customers.

177.    As a result of Dodge's willful, wanton, and malicious conduct, RCD is entitled to recover punitive damages against Dodge in an amount to be determined at trial.

178.    As alleged herein, RCD is also entitled to a permanent injunction preventing Dodge from accessing Reed Connect without authorization; misappropriating RCD's confidential and trade secret information; using any of RCD's confidential and trade secret information it has misappropriated, including without limitation by accessing Reed Connect without authorization; and using any version of the Roper Report based upon information gained by Dodge's unauthorized access to Reed Connect or RCD's confidential and trade secret information, or any claim made in such a report, to compete with RCD.

**COUNT THREE: MISAPPROPRIATION OF CONFIDENTIAL INFORMATION**

179.    RCD incorporates and realleges paragraphs 1 through 178 as if fully set forth herein.

180.    The information available on Reed Connect, including without limitation RCD's compilation of project information and other information available on Reed Connect, Reed Connect's unique and proprietary search algorithms and methodologies, and the use of those search algorithms and methodologies in Reed Connect to obtain specific search results, constitutes the confidential information of RCD.

181.    As a condition of receiving RCD's confidential information, Lorenz and Lewin, as Dodge's agents, explicitly acknowledged that the information available on Reed Connect constitutes the proprietary and confidential information of RCD.

182.    RCD protects the confidential information available on Reed Connect by, among other things, entering into subscription agreements with its customers prohibiting them from disclosing such information to any third parties, including specifically competitors of RCD.

183.    As alleged herein, Dodge obtained RCD's confidential information through improper means, including through the use of fictitious customers of RCD.

184.    Dodge's unauthorized access to the confidential information was in breach of RCD's confidential relationship with Lorenz and Lewin.

185.    As alleged herein, Dodge used RCD's confidential information to compete with RCD.

186.    As a result of Dodge's misappropriation of RCD's confidential information, Dodge has deprived RCD of the availability to reap the full profits of the information.

187.    RCD has suffered damages as a proximate result of Dodge's misappropriation of its confidential information in an amount to be determined at trial.

188.    Further, as alleged herein and specifically set forth in paragraph 151, Dodge actively and wrongfully concealed from RCD material facts relating to its misconduct, which prevented RCD from discovering Dodge's misappropriation of its confidential information and its use of the same to compete with RCD.  Dodge's wrongful concealment of material facts further prevented RCD from discovering the fact that the damage to RCD's business, as alleged herein, was a result of Dodge's misconduct.  Accordingly, Dodge's wrongful concealment of material facts prevented RCD from discovering the nature of its claims against Dodge asserted herein, including the instant claim, until recently.

189.    As alleged herein and specifically set forth in paragraph 153, RCD exercised due diligence in attempting to discover the claims against Dodge asserted herein, including the

instant claim. Despite its efforts, RCD was unable to discover Dodge's misconduct, including without limitation Dodge's unauthorized access to Reed Connect through Lorenz and Lewin and its use of the same to create the misleading Roper Report and misappropriate RCD's project information, until recently.

190.    RCD is entitled to recover its damages suffered as a proximate result of Dodge's misappropriation of its confidential information, as alleged herein, in an amount to be proven at trial.

191.    Dodge acted willfully, wantonly, and maliciously in obtaining RCD's confidential information through improper means and in violation of RCD's confidential relationship with its customers.

192.    As a result of Dodge's willful, wanton, and malicious conduct, RCD is entitled to recover punitive damages against Dodge in an amount to be determined at trial.

193.    As alleged herein, RCD is also entitled to a permanent injunction preventing Dodge from accessing Reed Connect without authorization; misappropriating RCD's confidential and trade secret information; using any of RCD's confidential and trade secret information it has misappropriated, including without limitation by accessing Reed Connect without authorization or using project information it obtained from Reed Connect; and using any version of the Roper Report based upon information gained by Dodge's unauthorized access to Reed Connect or RCD's confidential and trade secret information, or any claim made in such a report, to compete with RCD.

## COUNT FOUR: UNFAIR COMPETITION

194.    RCD incorporates and realleges paragraphs 1 through 193 as if fully set forth herein.

195.    Dodge used its agents, including Lorenz and Lewin, to subscribe to RCD's products and services, including Reed Connect, under false pretenses and by creating fictitious companies.

196.    Dodge used those subscriptions to obtain unauthorized access to Reed Connect and to misappropriate all of the confidential and trade secret information available on Reed Connect, as alleged herein.

197.    The confidential and trade secret information available on Reed Connect, which was misappropriated by Dodge, reflects the fruit of RCD's labors, skills, and expenditures.

198.    Dodge used its unauthorized access to Reed Connect and all of the confidential and trade secret information it misappropriated to compete unfairly with RCD by, among other things, creating the misleading Roper Report, disclosing the misleading Roper Report to its own prospective and existing customers as well as using the Roper Report to solicit prospective and existing customers of RCD, misleading its own prospective and existing customers and RCD's prospective and existing customers by comparing Dodge Network and Reed Connect using misleading search parameters developed by Dodge through its unauthorized access to Reed Connect, and using the project information available on Reed Connect to populate its own database, thereby improperly increasing the number of projects available in its database and eliminating the competitive advantage that RCD should have enjoyed by having such projects exclusively available on Reed Connect.

199.    Dodge has also misrepresented to consumers in the construction data marketplace that it legitimately obtains all of the project information in its database (rather than misappropriating the information from RCD), and that it therefore has more project information in its database than RCD.

200.   In obtaining unauthorized access to Reed Connect to compete with RCD, as alleged herein, Dodge acted in bad faith.

201.   Dodge's bad faith conduct as described herein is commercially immoral and unfair.

202.   RCD has suffered damages as a proximate result of Dodge's unfair competition in an amount to be determined at trial.

203.   Further, as alleged herein and specifically set forth in paragraph 151, Dodge actively and wrongfully concealed from RCD material facts relating to its misconduct, which prevented RCD from discovering Dodge's misappropriation of its confidential and trade secret information and use of the same to compete unfairly with RCD.  Dodge's wrongful concealment of material facts further prevented RCD from discovering the fact that the damage to RCD's business, as alleged herein, was a result of Dodge's misconduct.  Accordingly, Dodge's wrongful concealment of material facts prevented RCD from discovering the nature of its claims against Dodge asserted herein, including the instant claim, until recently.

204.   As alleged herein and specifically set forth in paragraph 153, RCD exercised due diligence in attempting to discover the claims against Dodge asserted herein, including the instant claim.  Despite its efforts, RCD was unable to discover Dodge's misconduct, including without limitation Dodge's unauthorized access to Reed Connect through Lorenz and Lewin and its use of the same to create the misleading Roper Report and misappropriate RCD's project information, until recently.

205.   RCD is entitled to recover its damages suffered as a proximate result of Dodge's unfair competition, as alleged herein, in an amount to be proven at trial.

206.   Dodge's unfair competition has been willful, wanton and malicious.

207.    As a result of Dodge's willful, wanton, and malicious conduct, RCD is entitled to recover punitive damages against Dodge in an amount to be determined at trial.

208.    As alleged herein, RCD is also entitled to a permanent injunction preventing Dodge from accessing Reed Connect without authorization; misappropriating RCD's confidential and trade secret information; using any of RCD's confidential and trade secret information it has misappropriated, including without limitation by accessing Reed Connect without authorization or using project information it obtained from Reed Connect; and using any version of the Roper Report based upon information gained by Dodge's unauthorized access to Reed Connect or RCD's confidential and trade secret information, or any claim made in such a report, to compete with RCD.

### COUNT FIVE: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

209.    RCD incorporates and realleges paragraphs 1 through 208 as if fully set forth herein.

210.    Since at least 2002, when Dodge began accessing Reed Connect without authorization to compete unfairly with RCD, a number of RCD's national account customers have terminated or chosen not to renew their subscription agreements with RCD to subscribe instead to Dodge's products and services.

211.    These customers include, without limitation, the following customers (arranged by year in which the customers terminated or chose not to renew their subscription agreements with RCD):

### 2006-2007

- o  ABB Instrumentation and Analytical USA
- o  ABT
- o  AH Harris & Sons, Inc.
- o  American Athletic
- o  American Seating

- o  Anchor Block Company
- o  Andersen Windows
- o  Belimo Air Controls
- o  Belknap White Alcco
- o  Berridge Manufacturing Company

- Bradco Supply
- CNA Surety
- Control Management, Inc.
- CPI Construction Ltd.
- East Cost Lightning Equipment, Inc.
- Fabcon
- GE Consumer & Industrial
- Harrington Industrial Plastics LLC
- Hendrix Manufacturing Company
- Hubbell Incorporated
- Invensys
- Kalwall Corporation
- Katolight Corp.
- Key Resin Company
- Kirchner Block & Brick, Inc.
- Lindab
- Major Industries
- Mechanical Maintenance Incorporated
- NanaWall Systems, Inc.
- Nicholas J. Bouras, Inc.
- Northwest Pipe Company
- Orbit Manufacturing
- Masco Contractor Services
- Polyvision
- Power Fasteners
- Powers Fasteners
- Prosoco, Inc.
- Shelter Products, Inc.
- Rite Hite
- Roscoe Steel
- Southern Bleacher Company, Inc.
- Sport Court
- The Proudfoot Company, Inc.
- Thermal Ceramics
- Tnemec Inc.
- TOLI International
- Trus Joist/Weyerhaeuser
- Tectum, Inc.
- Universal Timber Structures, inc.
- VT Industries, Inc.
- Won-Door Corp.

**2008**

- Guardian Industries
- Josam Company
- Waterman Industries
- Sauder Manufacturing Co.
- Ohio Medical Corporation
- Aacer Flooring LLC
- Eastern Architectural Reps
- Acrow Corp of America
- Berkel & Company Contractors, Inc.
- Synteen Technical Fabrics, Inc.
- Chicago Faucets
- Spacesaver Corporation
- Horner Flooring Company, Inc.
- Hon Industries
- Ohio Gratings, Inc.
- Simpson Strong-Tie Company, Inc.
- National Gypsum Company

**2009**

- Crossville Porcelain & Stone
- Watersaver Company
- CertainTeed Corporation
- Gerdau Ameristeel Corporation
- Wasau Tile
- Gaco Western LLC
- Idaho Pacific Lumber Company
- National Time & Signal
- RJF Koroseal
- Dietrich Metal Framing
- Vela Systems, Inc.
- Concrecel USA
- E.L. Burns Company, Inc.
- Miller Paint Company
- Signature Skylights LLC
- Gaylon Lumber
- Cornell Iron Works, Inc.
- Maxim Construction, Inc.

212.   Each of these customers had a subscription agreement for Reed Connect in 2006, 2007, 2008, and/or 2009.

213.   Although RCD's subscription agreements are typically annual contracts, the majority of RCD's customers renew their subscription agreements every year.  In fact, RCD generally retains its customers for a period of ten to twelve years.

214.   RCD had a business relationship with each of these national account customers while they were subscribing to RCD's products and services, including Reed Connect.

215.   Further, RCD had a reasonable expectancy that the customers would renew their subscription agreements for Reed Connect upon the expiration of those agreements.

216.   However, each of these customers either terminated their subscription agreements or chose not to renew their subscriptions with RCD to subscribe instead to Dodge's products and services.

217.   Upon information and belief, these customers selected Dodge because Dodge sales representatives presented them with false or misleading information regarding the superiority of Dodge's products as compared to RCD's products including, without limitation, misleading comparisons of the two competitors' products, the misleading Roper Report, the results of misleading search parameters in Dodge Network and Reed Connect that were developed by Dodge using its unauthorized access to Reed Connect, and information regarding the number of projects available in Dodge's database, which number was inflated by Dodge's misappropriation of RCD's project information, as alleged herein.  Upon information and belief, certain of these customers selected Dodge because of the number of projects available in its database, which number included the projects Dodge misappropriated from RCD, as well as Dodge's

misrepresentations that it legitimately obtains all of the project information in its database (rather than misappropriating the information from RCD).

218.    Dodge knew of RCD's relationships with these national account customers and intentionally interfered with them by presenting them with false and misleading information, as alleged herein.

219.    As alleged herein, Dodge used dishonest, unfair, and improper means to interfere with RCD's relationships with its national account customers by misappropriating RCD's confidential and trade secret information and using it to mislead RCD's customers.

220.    Dodge's interference with RCD's relationships with its national account customers, as alleged herein, caused injury to RCD's relationships with those customers by misleading the customers to either terminate or choose not to renew their subscription agreements with RCD and to instead subscribe to Dodge's products and services.

221.    But for Dodge's interference with RCD's relationships with its national account customers, as alleged herein, RCD would have consummated additional subscription agreements with those customers.

222.    Upon information and belief, Dodge has intentionally interfered with RCD's relationships with national account customers in addition to those named in Paragraph 211.

223.    Further, Dodge has also interfered with RCD's relationship with certain prospective customers who did not have existing subscription agreements with RCD.

224.    Since at least 2002, when Dodge began accessing Reed Connect without authorization to compete unfairly with RCD, a number of RCD's prospective customers who were actively comparing RCD's products and services with those of Dodge subscribed with Dodge instead of RCD after presentations by Dodge's sales representatives.

225.    These prospective customers include, without limitation, the following customers (arranged by the year in which the contract was being negotiated):

### 2006-2007

- CENTRIA
- Hobart Corporation
- Republic Storage Systems, LLC
- APC Construction, Inc.
- Lightolier
- Floor Seal Technology, Inc.
- Morrow Equipment Company, L.L.C.
- Sierra Pacific Windows
- Northwest Pipe Company
- Parker Paint
- Roberts & Schaefer Company
- Steel Encounters, Inc.
- Canada Won-Door, Inc.
- Daktronics, Inc.
- MDC Wallcoverings
- Thompson Lightning Protection, Inc.
- Metal Sales
- Atlas Roofing Corporation
- Georgia-Pacific LLC
- HVLS Fan
- J&J Industries
- Lochinvar Corporation
- Milliken Carpet
- SE Stud
- Slate Security Systems, Inc.
- Tandus US, Inc.
- Baase Co.
- Ductmate Industris, Inc.
- P.J. Dick Inc.
- The Roberts Filter Group
- Sapling Company, Inc.
- Sauereisen Co.
- Victaulic
- Aacer Flooring LLC
- Action Sports Flooring
- Dorr Oliver Eimco
- GHP Systems, Inc.
- Buechel Stone Corp.
- InPro Corporation
- KI
- Novum Structures LLC
- Old Republic Surety Company
- Poblocki Sign Company
- Symons
- Wagner
- Patio Enclosures, Inc.
- Erico International Corporation
- Advanced Protection Technologies Inc.
- Figueras International Seating
- Laborers-Employers Cooperation and Education Trust (LECET)
- DORMA
- Stromberg Architectural Products, Inc.
- Wilsonart International
- Contech Construction Products, Inc.
- Continental Cast Stone
- Draper Inc.
- Dwyer Compact Kitchens
- Key Resin Company
- The Kupferle Foundry Company, Inc.
- LinEl Signature
- Mortar Net USA Ltd.
- Peerless Pump Company
- Robbins Sports Surfaces
- Solomon Colors, Inc.
- Tensar International Corporation, Inc.
- COVI
- International Cellulose Corporation
- MBCI
- Raco
- Custom Window
- Golden Railings Inc.
- SEMCO Incorporated
- Able Body Labor
- Arthur Shuster Inc.
- Degussa
- Hughes Supply
- List Industries, Inc.
- Marvin Windows and Doors
- Nystrom

o  U.S. Door and Building Components        o  Versa-Lok Retaining Walls

## 2008

o  ABC Supply Co., Inc.                     o  Huber Engineered
o  iCrete, LLC                              o  PlayPower, Inc.
o  Hacker Industries, Inc.                  o  Republic Storage Systems, LLC
o  Ohio Gratings, Inc.                      o  Alside
o  Briggs & Stratton Corporation            o  Acrow Corp of America
o  Draper                                   o  Designer Door
o  Continental Girbau, Inc.                 o  Invista
o  Habersham Metal Products Co.             o  K-Flex USA
o  ASM Modular Systems, Inc.                o  United States Aluminum
o  Hurd Windows and Doors                   o  U. S. Concrete Inc.
o  American Warming and Ventilating         o  Cabrillo Hoist & Crane
o  Crescent Electric Supply Company         o  Action Floor Systems, LLC
o  Symons                                   o  Zurn Industries, LLC
o  Painters                                 o  Englert Inc.
o  National Gypsum Company                  o  Sonitrol Franchise Company, LLC
o  Bird Barrier America, Inc.               o  Power & Pumps, Inc.
o  Ambassador Steel Corporation             o  Baldwin Hardware
o  Major Industries

## 2009

o  ACI Bldg Systems, Inc.                   o  Trane Inc.
o  Architectural Components Group, Inc.     o  Watersaver Company
o  Claridge, Inc.                           o  Perdue Acoustics
o  Continental Cast Stone Manufacturing Inc. o  CMC Americas
o  Fabcon                                   o  Newline
o  Gerdau Ameristeel Corporation            o  CEMEX S.A.B. de C.V.
o  LeJuene Bolt Company                     o  Waste Management, Inc.
o  McCormick Paints                         o  McQuay International
o  Sports Imports                           o  ProBuild
o  Tank Connection

226.   Upon information and belief, these prospective customers selected Dodge because

Dodge sales representatives presented them with false or misleading information regarding the

superiority of Dodge's products as compared to RCD's products including, without limitation,

misleading comparisons of the two competitors' products, the misleading Roper Report, the

results of misleading search parameters in Dodge Network and Reed Connect that were

developed by Dodge using its unauthorized access to Reed Connect, and information regarding the number of projects available in Dodge's database, which number was inflated by Dodge's misappropriation of RCD's project information, as alleged herein.  Upon information and belief, certain of these prospective customers selected Dodge because of the number of projects available in its database, which number included the projects Dodge misappropriated from RCD, as well as Dodge's misrepresentations that it legitimately obtains all of the project information in its database (rather than misappropriating the information from RCD).

227.    RCD had a business relationship with each of these prospective customers, many of whom had submitted requests for proposals to RCD and/or were in active negotiations with RCD at the time Dodge's sales representatives presented them with the misleading information.

228.    RCD had a reasonable expectancy that it would enter a contract with each of these prospective customers.

229.    Dodge knew of RCD's relationships with these customers and intentionally interfered with them by presenting them with false and misleading information, as alleged herein.

230.    As alleged herein, Dodge used dishonest, unfair, and improper means to interfere with RCD's relationships with these prospective customers by misappropriating RCD's confidential and trade secret information and using it to mislead the customers.

231.    Dodge's interference with RCD's relationships with these prospective customers, as alleged herein, caused injury to RCD's relationships with those customers by misleading the customers to subscribe to Dodge's products and services instead of RCD's.

232.    But for Dodge's interference with RCD's relationships with these prospective customers, as alleged herein, RCD would have consummated subscription agreements with them.

233.   Upon information and belief, Dodge has intentionally interfered with RCD's relationships with prospective national account customers in addition to those named in Paragraph 225.

234.   RCD has suffered damages as a proximate result of Dodge's tortious interference with RCD's relationships with its former and prospective customers, as alleged herein, in an amount to be determined at trial.

235.   Further, as alleged herein and specifically set forth in paragraph 151, Dodge actively and wrongfully concealed from RCD material facts relating to its misconduct, which prevented RCD from discovering Dodge's misappropriation of its confidential and trade secret information and use of the same to interfere with RCD's relationship with its former and prospective customers.   Dodge's wrongful concealment of material facts further prevented RCD from discovering the fact that the damage to RCD's business, as alleged herein, was a result of Dodge's misconduct.   Accordingly, Dodge's wrongful concealment of material facts prevented RCD from discovering the nature of its claims against Dodge asserted herein, including the instant claim, until recently.

236.   As alleged herein and specifically set forth in paragraph 153, RCD exercised due diligence in attempting to discover the claims against Dodge asserted herein, including the instant claim. Despite its efforts, RCD was unable to discover Dodge's misconduct, including without limitation Dodge's unauthorized access to Reed Connect through Lorenz and Lewin and its use of the same to create the misleading Roper Report and misappropriate RCD's project information, until recently.

237.    RCD is entitled to recover its damages suffered as a proximate result of Dodge's

tortious interference with its former and prospective customers, as alleged herein, in an amount

to be proven at trial.

238.    Dodge's tortious interference with RCD's relationships with its former and

prospective customers has been willful, wanton and malicious.

239.    As a result of Dodge's willful, wanton, and malicious conduct, RCD is entitled to

recover punitive damages against Dodge in an amount to be determined at trial.

240.    As alleged herein, RCD is also entitled to a permanent injunction preventing Dodge

from accessing Reed Connect without authorization; misappropriating RCD's confidential and

trade secret information; using any of RCD's confidential and trade secret information it has

misappropriated, including without limitation by accessing Reed Connect without authorization

or using project information it obtained from Reed Connect; and using any version of the Roper

Report based upon information gained by Dodge's unauthorized access to Reed Connect or

RCD's confidential and trade secret information, or any claim made in such a report, to compete

with RCD.

## COUNT SIX: VIOLATION OF SECTION 349
## OF THE NEW YORK GENERAL BUSINESS LAW

241.    RCD incorporates and realleges paragraphs 1 through 240 as if fully set forth herein.

242.    By its acts alleged herein, Dodge deceived consumers in the construction data market

in New York regarding the superiority of Dodge Network as compared to Reed Connect by,

among other things: creating and disseminating the misleading Roper Report to a large number

of consumers in New York (including to prospective and existing customers of Dodge and RCD

in New York); misleading prospective and existing customers of Dodge and RCD in New York

by comparing Dodge Network and Reed Connect using misleading search parameters developed

by Dodge through its unauthorized access to Reed Connect; misrepresenting that Dodge legitimately obtains all of the project information in its database (rather than misappropriating the information from RCD); and improperly populating its own database with project information misappropriated from Reed Connect, thereby misleading consumers in the construction data market in New York regarding Dodge's ability to validly obtain more project information than RCD.

243.    As a result of these deceitful acts, consumers in the construction data market in New York were misled into purchasing subscription agreements to Dodge Network rather than Reed Connect, even though subscriptions to Dodge Network are generally more expensive than subscriptions to Reed Connect and Reed Connect is a superior product to Dodge Network.

244.    Accordingly, consumers in the construction data market in New York were harmed as a result of Dodge's conduct, as alleged herein, by purchasing Dodge Network at a higher cost than Reed Connect on the basis of Dodge's misleading and deceitful claims regarding Dodge Network's superiority to Reed Connect.

245.    Dodge's conduct constitutes deceptive acts and practices in the conduct of a business, trade, commerce, or service in New York in violation of Section 349 of the New York General Business Law.

246.    RCD has suffered damages as a proximate result of Dodge's deceptive acts and practices in an amount to be determined at trial.

247.    Further, as alleged herein and specifically set forth in paragraph 151, Dodge actively and wrongfully concealed from RCD material facts relating to its misconduct, which prevented RCD from discovering Dodge's misappropriation of its confidential and trade secret information and use of the same to create and disseminate the misleading Roper Report to a large number of

consumers in New York, including to prospective and existing customers of Dodge and RCD. Dodge's wrongful concealment of material facts further prevented RCD from discovering the fact that the damage to RCD's business, as alleged herein, was a result of Dodge's misconduct. Accordingly, Dodge's wrongful concealment of material facts prevented RCD from discovering the nature of its claims against Dodge asserted herein, including the instant claim, until recently.

248.    As alleged herein and specifically set forth in paragraph 153, RCD exercised due diligence in attempting to discover the claims against Dodge asserted herein, including the instant claim. Despite its efforts, RCD was unable to discover Dodge's misconduct, including without limitation Dodge's unauthorized access to Reed Connect through Lorenz and Lewin and its use of the same to create the misleading Roper Report and misappropriate RCD's project information, until recently.

249.    RCD is entitled to recover its damages suffered as a proximate result of Dodge's deceptive acts and practices, as alleged herein, in an amount to be proven at trial.

250.    RCD is also entitled to permanent injunctive relief as a result of Dodge's violation of Section 349 of the New York General Business Law.

251.    Dodge acted willfully and in knowing violation of Section 349 of the New York General Business Law in conducting its deceptive acts and practices, as alleged herein.

252.    As a result of Dodge's willful conduct and its knowing violation of Section 349 of the New York General Business Law, RCD is entitled to an award of exemplary damages and its attorneys' fees as provided by Section 349 of the New York General Business Law.

## COUNT SEVEN: VIOLATION OF RICO, 18 U.S.C. § 1962(c)

253.    RCD incorporates and realleges paragraphs 1 through 252 as if fully set forth herein.

254.    At all relevant times, RCD was a "person" within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(3) and 1964(c).

255.    At all relevant times, Dodge and its co-conspirators, Lorenz, Lewin, NE14T, Central Business Services, Northern Construction, Arrington Partners, Site Amenities, Roper, and the John Doe Defendants (collectively, the "Other Conspirators") were each a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

256.    At all relevant times, Dodge and the Other Conspirators formed an association-in-fact for the purpose of defrauding RCD and obtaining unauthorized access to Reed Connect and RCD's confidential and proprietary information.  This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter, "the Enterprise").

257.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).  Among other things, the Enterprise negotiated and entered agreements with RCD in interstate commerce to purchase RCD's products and services, transferred funds across state lines for the purpose of purchasing RCD's products and services, and accessed RCD's confidential and trade secret information through interstate communications over the internet and otherwise, thereby affecting RCD's business in various states and in the construction data industry in general.

258.    At all relevant times, Dodge and the Other Conspirators associated with the Enterprise conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

259.    Specifically, Dodge and the Other Conspirators engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by the acts alleged herein, including without limitation the following:

        (a)    Certain of the Other Conspirators misrepresented to RCD their true business affiliations in communications via interstate telephone conversations and/or

the United States mail by purporting not to work for Dodge and/or purporting to work for fictitious companies.  Among other things:

    i.    During a telephone conversation in or about December 2002, Lorenz, who was located in New Jersey or New York and acting as the agent for NE14T, misrepresented to a sales representative of RCD located in Georgia, Ken Schreiber, that NE14T was purchasing a subscription agreement to Reed Connect on behalf of Hager Hinge;

    ii.    During a telephone conversation on or about December 20, 2006, Lewin, who was located in Illinois and acting as the agent for Northern Construction, misrepresented the nature of his business to one of RCD's Directors, Craig Roberts, who was located in Vancouver, Canada, including explicitly misrepresenting that he did not work for Dodge and that he was not providing Dodge with unauthorized access to Reed Connect;

    iii.    In numerous telephone conversations with employees of RCD located in Georgia from 2003 to 2009, Lewin, who was located in Illinois and acting as the agent for Central Business Services, Northern Construction, Arrington Partners, and Site Amenities, misrepresented that he was purchasing the subscription agreements for Reed Connect on behalf of legitimate businesses and not for the purpose of providing RCD's information to third parties; and

    iv.    On or about March 10, 2006, Lewin mailed a letter to RCD via United States mail under the alias "John Carlson," in which he misrepresented that Northern Construction, a fictitious company created by Lewin, had purchased Central Business Services, another fictitious company created by Lewin.  As alleged herein, Lewin mailed this letter in order to prevent RCD from discovering the fraudulent scheme being perpetrated by the Enterprise.

(b)    Certain of the Other Conspirators sent via United States mail and/or interstate facsimiles RCD subscription agreements entered under false pretenses and containing various misrepresentations, as alleged herein, including false names, fictitious businesses, and misrepresentations that the Other Conspirators would not disclose the information available on Reed Connect to Dodge.  Among other things:

    i.    On at least four occasions, on or about December 9, 2002, January 30, 2004, January 25, 2005, and June 3, 2005, Lorenz, acting as the agent for NE14T, faxed from New Jersey or New York to RCD in Georgia a signed subscription agreement in which he misrepresented that he was purchasing a subscription to Reed Connect on behalf of Hager Hinge and that he would not disclose the information available on Reed Connect to any third parties, as alleged herein;

ii.   On at least three occasions, on or about March 31, 2003, September 29, 2005, and February 14, 2006, Lewin, acting as the agent for Central Business Services, faxed from Illinois to RCD in Georgia a signed subscription agreement in which he misrepresented that Central Business Services, which was a fictitious business created by Lewin, was purchasing a subscription to Reed Connect on its own behalf and that it would not disclose the information available on Reed Connect to any third parties;

iii.  On or about March 16, 2006, Lewin, acting as the agent for Northern Construction, faxed from Illinois to RCD in Georgia a signed subscription agreement in which he misrepresented that Northern Construction, which was a fictitious business created by Lewin, was purchasing a subscription to Reed Connect on its own behalf and that it would not disclose the information available on Reed Connect to any third parties. Lewin signed the agreement under the fictitious name "John Carlson;"

iv.   On at least three occasions, on or about January 31, 2008, February 27, 2008, and September 16, 2008, Lewin, acting as the agent for Arrington Partners, faxed from Illinois to RCD in Georgia a signed subscription agreement in which he misrepresented that Arrington Partners, which was a fictitious business created by Lewin, was purchasing a subscription to RCD's products and services on its own behalf and that it would not disclose the information available on Reed Connect to any third parties. Lewin signed the agreement under the fictitious name "John Carlson;" and

v.    On or about January 25, 2009, Lewin, acting as the agent for Site Amenities, faxed from Illinois to RCD in Georgia a signed subscription agreement in which he misrepresented that Site Amenities, which was a fictitious business created by Lewin, was purchasing a subscription to Reed Connect on its own behalf and that it would not disclose the information available on Reed Connect to any third parties. Lewin signed the agreement under the fictitious name "Andy Anderson."

(c)   Certain of the Other Conspirators sent funds to RCD via United States mail and/or wire transfer to purchase their various subscriptions. Among other things:

i.    On or about February 24, 2003, Lorenz caused funds to be transmitted to RCD by means of an interstate wire transfer by charging the payment for his subscription to Reed Connect to a credit card;

ii.   On or about March 10, 2006, Lewin, acting as the agent for Central Business Services, caused funds to be transmitted to RCD by means of

an interstate wire transfer by authorizing the issuance of a check from a bank account in Illinois to RCD in Georgia;

    iii.    On or about March 16, 2007, Lewin, acting as the agent for Northern Construction, caused funds to be transmitted to RCD by means of an interstate wire transfer by authorizing the issuance of a check from a bank account in Illinois to RCD in Georgia;

    iv.    On or about March 18, 2008, Lewin, acting as the agent for Arrington Partners, mailed to RCD via United States mail a check in payment of his subscription to Reed Connect; and

    v.    On or about March 2, 2009, Lewin, acting as the agent for Site Amenities, mailed to RCD via United States mail a check in payment of his subscription to Reed Connect.

(d)    From approximately 2002 to 2009, Dodge sent funds to certain of the Other Conspirators via United States mail and/or interstate wire transfers for use in purchasing subscription agreements with RCD under false pretenses and as payment for their services in defrauding RCD, misappropriating RCD's confidential and trade secret information, and/or creating misleading data comparisons, as alleged herein;

(e)    Dodge sent via United States mail or interstate facsimile some or all of the Other Conspirators agreements to obtain their services in defrauding RCD, misappropriating RCD's confidential and trade secret information, and/or creating misleading data comparisons, as alleged herein;

(f)    Dodge transmitted via email and the internet to its customers and certain of its prospective customers, as well as certain of RCD's customers and prospective customers, documents containing misleading data comparisons as well as misrepresentations that Dodge legitimately obtains all of the project information in its database (rather than misappropriating the information from RCD). Among other things:

    i.    On or about February 15, 2008, Dodge sent via email to its customers and certain of its prospective customers, as well as certain of RCD's customers and prospective customers, a document entitled "Project News and Intelligence: Data and Support for Informed Decision-Making" which contained misleading data comparisons purportedly taken from the Roper Report as well as misrepresentations that Dodge legitimately obtains all of the project information in its database;

    ii.    In or about March 2009, Dodge sent via email to its customers and certain of its prospective customers, as well as certain of RCD's customers and prospective customers, another document entitled "Project News and Intelligence: Data and Support for Informed Decision-Making" which again contained misleading data

comparisons purportedly taken from the Roper Report as well as misrepresentations that Dodge legitimately obtains all of the project information in its database; and

iii.   In or about 2009, Dodge transmitted via email or the internet to its customers and certain of its prospective customers a presentation entitled "Why McGraw-Hill Construction," which contains misleading comparison results purportedly taken from the Roper Report.

(g)   From approximately 2002 to 2009, Dodge instructed certain of the Other Conspirators to make the misrepresentations alleged herein in communications via interstate telephone conversations and the internet; and

(h)   Dodge and the Other Conspirators communicated with one another in furtherance of their fraudulent conspiracy via interstate telephone conversations and the internet.

260.    Dodge and the Other Conspirators knew that the above-referenced misrepresentations and the other misrepresentations alleged herein which were directed toward RCD were false when they were made, and they intended for RCD to rely upon the misrepresentations. RCD justifiably relied on the misrepresentations of Dodge and the Other Conspirators, as alleged herein, by providing its confidential and trade secret information to them. As alleged herein, RCD has suffered damages as a proximate result of this misappropriation of its confidential and trade secret information by Dodge and the Other Conspirators.

261.    Further, Dodge knew that the above-referenced misrepresentations and the other misrepresentations alleged herein which were directed toward the customers and prospective customers of Dodge and RCD were false when they were made, and they intended for these customers and prospective customers to rely upon the misrepresentations. The customers and prospective customers justifiably relied on the misrepresentations of Dodge and the Other Conspirators, as alleged herein, by subscribing to Dodge's products and services rather than RCD's. As alleged herein, RCD has suffered damages as a proximate result of the customers

and prospective customers' reliance upon the misrepresentations by Dodge because RCD lost customers to Dodge that RCD would have secured but for the misrepresentations.

262.    RCD was the direct target and actual victim of the Enterprise's fraudulent scheme.

263.    The above-referenced acts and the other acts alleged herein constitute a violation of one or more of the following statutes: 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

264.    The above-referenced acts and the other acts alleged herein were necessary to and in furtherance of the Enterprise's scheme to defraud RCD and its customers and prospective customers.  The Other Conspirators' various misrepresentations in telephone communications with RCD's employees and in the subscription agreements regarding their true business affiliations and their intent not to provide Dodge with access to Reed Connect were necessary to induce RCD to permit them to purchase the subscription agreements and to continue to access Reed Connect after the agreements were entered; the Other Conspirators' payments to RCD were necessary to purchase their subscriptions to Reed Connect; Dodge's various communications with the Other Conspirators were necessary in order coordinate, direct, and further the fraudulent scheme; Dodge's payments to the Other Conspirators for the subscription agreements and the Other Conspirators' fees were necessary to allow and induce the Other Conspirators to enter into the subscription agreements with RCD under false pretenses; and Dodge's various misrepresentations to the customers and prospective customers of Dodge and RCD were necessary to induce them to subscribe to Dodge's products and services rather than RCD's.

265.    Dodge and the Other Conspirators each committed and/or aided and abetted the commission of two or more of the above-referenced acts of racketeering activity.

266.    The acts of racketeering activity set forth above constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants (Dodge and the Other Conspirators), a common victim (RCD), a common method of commission, and the common purpose and common result of defrauding RCD, securing unauthorized access to Reed Connect and RCD's confidential and trade secret information, and enriching Dodge and the Other Conspirators while concealing their activities.

267.    The fraudulent scheme continued for at least nine years and threatened to continue longer but for RCD's discovery of Dodge and the Other Conspirators' activities.

268.    RCD's business was damaged as a proximate result of Dodge and the Other Conspirators' violation of 18 U.S.C. § 1962(c).  Among other things, RCD lost prospective and existing customers, and the resultant revenues and profits associated with those customers, and has suffered a substantial loss of goodwill as a result of Dodge's use of its unauthorized access to Reed Connect to compete unfairly with RCD.

269.    Further, as alleged herein and specifically set forth in paragraph 151, Dodge actively and wrongfully concealed from RCD material facts relating to its misconduct, which prevented RCD from discovering its claims against Dodge asserted herein, including the instant claim, until recently.  Among other things, Dodge instructed certain of the Other Conspirators to make the misrepresentations alleged herein to conceal the fact that the Enterprise was defrauding RCD to obtain unauthorized access to Reed Connect and RCD's confidential and trade secret information, and Dodge instructed the customers and prospective customers who received data comparisons not to disclose those comparisons to third parties.

270.    Dodge's wrongful concealment of material facts prevented RCD from discovering Dodge's association with the Other Conspirators and the Enterprise's efforts to obtain

unauthorized access to Reed Connect and RCD's confidential and proprietary information. Dodge's wrongful concealment of material facts further prevented RCD from discovering the fact that the damage to RCD's business, as alleged herein, was a result of the Enterprise's wrongful activities.  Accordingly, Dodge's wrongful concealment of material facts prevented RCD from discovering the nature of the instant claim until recently.

271.   As alleged herein and specifically set forth in paragraph 153, RCD exercised due diligence in attempting to discover the claims against Dodge asserted herein, including the instant claim. Despite its efforts, RCD was unable to discover the Enterprise's activities and Dodge's unauthorized access to Reed Connect through the Other Conspirators' subscription agreements until recently.

272.   As a result of its misconduct, as alleged herein, Dodge is liable to RCD for its losses in an amount to be determined at trial.

273.   Pursuant to RICO, 18 U.S.C. § 1964(c), RCD is entitled to recover treble damages plus costs and attorneys' fees from Dodge.

## COUNT EIGHT: RICO CONSPIRACY, 18 U.S.C. § 1962(d)

274.   RCD incorporates and realleges paragraphs 1 through 273 as if fully set forth herein.

275.   At all relevant times, Dodge and each of the Other Conspirators each were associated with the Enterprise and agreed to conspire to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

276.   Dodge and the Other Conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count Seven and the other acts alleged herein.

277.    RCD's business was damaged as a proximate result of Dodge and the Other Conspirators' violations of 18 U.S.C. § 1962(d). Among other things, RCD lost prospective and existing customers, and the resultant revenues and profits associated with those customers, and has suffered a substantial loss of goodwill as a result of Dodge's use of its unauthorized access to Reed Connect to compete unfairly with RCD.

278.    Further, as alleged herein and specifically set forth in paragraph 151, Dodge actively and wrongfully concealed from RCD material facts relating to its misconduct, which prevented RCD from discovering its claims against Dodge asserted herein, including the instant claim, until recently.  Among other things, Dodge instructed each of the Other Conspirators to make the misrepresentations alleged herein to conceal the fact that the Enterprise had conspired to defraud RCD by obtaining unauthorized access to Reed Connect and RCD's confidential and trade secret information and Dodge instructed the customers and prospective customers who received data comparisons not to disclose those comparisons to third parties.

279.    Dodge's wrongful concealment of material facts prevented RCD from discovering Dodge's association with the Other Conspirators and the Enterprise's conspiracy to defraud RCD and obtain unauthorized access to Reed Connect and RCD's confidential and proprietary information.  Dodge's wrongful concealment of material facts further prevented RCD from discovering the fact that the damage to RCD's business, as alleged herein, was a result of the Enterprise's wrongful activities.  Accordingly, Dodge's wrongful concealment of material facts prevented RCD from discovering the nature of the instant claim until recently.

280.    As alleged herein and specifically set forth in paragraph 153, RCD exercised due diligence in attempting to discover the claims against Dodge asserted herein, including the instant claim. Despite its efforts, RCD was unable to discover the Enterprise's activities and

Dodge's unauthorized access to Reed Connect through the Other Conspirators' subscription agreements until recently.

281.    As a result of its participation in the conspiracy, as alleged herein, Dodge is liable to RCD for its losses in an amount to be determined at trial.

282.    Pursuant to RICO, 18 U.S.C. § 1964(c), RCD is entitled to recover treble damages plus costs and attorneys' fees from Dodge.

### COUNT NINE: MONOPOLIZATION, 15 U.S.C. §§ 15 and 26

283.    RCD incorporates and realleges paragraphs 1 through 282 as if fully set forth herein.

284.    RCD brings this claim under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

285.    RCD's national online subscription service for construction project information, Reed Connect, provides detailed information about virtually every commercial, private, public, civil and government construction project nationwide from the planning phase through completion of the project.  This information typically includes the full building plans, specifications, and information necessary for customers to submit bids on the projects.  Reed Connect permits RCD's customers to search the available building plans, specifications, and any other information related to a construction project at a high level of detail.  For example, a building manufacturer that makes light fixtures can use Reed Connect to search all building projects nationwide to identify any building plans or specifications calling for calling for light fixtures of the type made by that manufacturer.

286.    A particularly valuable and distinguishing characteristic of Reed Connect is the ability for customers to obtain construction project information for projects across the United States in the early planning phase of those projects.  This gives many customers the ability to

contact architects, owners, or other companies involved in the early planning phase of a construction project to offer their products and services prior to the bidding phase of the project. By having access to information about construction projects in the early stages of planning, a manufacturer, for example, can make efforts to present its products to an architect early in the process to have its particular products specified by name in the building plans.

287.    RCD and Dodge are the only providers of national online subscription services for construction project information.  Consumers of these services generally view Reed Connect and Dodge Network as substitutes and typically only subscribe to one or the other.  No other products or services in the United States offer the same information.

288.    RCD's and Dodge's national online subscription services for construction project information are available and sold to consumers across the entire United States and collectively generate over $100 million in revenues per year.  RCD and Dodge are each engaged in interstate commerce and their activities are in the flow of, and substantially affect, interstate commerce.

289.    National online subscription services for construction project information, as provided by RCD and Dodge, represents a relevant and distinct product market within the meaning of Section 2 of the Sherman Act, 15 U.S.C. § 2.

290.    The consumers of national online subscription services for construction project information primarily consist of national manufacturers of building products, such as manufacturers of light fixtures or ceiling tiles.  Additional consumers include financial services companies that offer financing and surety bonds for construction projects, national building contractors and subcontractors, and national trade unions that make efforts to obtain work for their members on the construction projects.  These consumers of national online subscription services for construction project information generally seek information from these services

concerning construction projects in all parts of the United States. The relevant geographic market is the entire United States.

291.     Upon information and belief, Dodge maintains an 80-90% share of the market for national online subscription services for construction project information.

292.     Barriers to entry in the market for national online subscription services for construction project information are high. A potential provider of national online subscription services for construction project information must develop an extensive network of relationships with the thousands of architectural firms, architectural associations, builders, builder associations, owners, government agencies and other data sources across the county necessary to compile the project information contained in RCD's and Dodge's databases. It can take years to develop these types of relationships and would require hundreds of employees to collect the information. Moreover, it can take a long period of time to develop the knowledge and skills necessary to collect this information. For example, there are thousands of federal, state and local government agencies that are responsible for construction projects. Each agency can have different processes and procedures for gaining access to the information needed for a database such as RCD's. A potential entrant into this market must also develop a searchable database, an online search engine through which to search the database, and the capability to search building plans and specifications at the level of detail demanded by consumers in this market. It would take a large capital investment and a significant amount of time to develop a successful competing product. Dodge can raise its prices to a supracompetitive level and RCD is not aware of any other potential competitor that could enter the relevant market within any reasonable amount of time.

293.   Due to its large market share and power to exclude competition, Dodge has monopoly power in the market for national online subscription services for construction project information.

294.   Dodge has willfully engaged in predatory, anticompetitive and illegal conduct with the specific intent of acquiring and maintaining monopoly power in the market for national online subscription services for construction project information.  Among other things, Dodge has:

   (a)   Obtained unauthorized access to Reed Connect and RCD's confidential and trade secret information with the intent to disparage RCD's product and deceive consumers by directing its agents to illegally subscribe to Reed Connect under false identities, as alleged herein;

   (b)   Used this unauthorized access to manipulate search results from Reed Connect to give the false appearance that Reed Connect was significantly inferior to Dodge Network in an effort to intentionally disparage Reed Connect and wrongfully maintain Dodge's market share;

   (c)   Used its manipulated search results to create disparaging and misleading comparisons between its data and that of RCD;

   (d)   Presented the results of these manipulated, misleading data comparisons and other false and disparaging information about the strengths and weaknesses of Reed Connect to consumers in an effort to unlawfully gain or maintain monopoly power and drive RCD out of business;

   (e)   In further effort to disparage Reed Connect and deceive consumers, commissioned the Roper Report, which is based on the false and misleading data comparisons and search results created by Dodge using its illicit access to Reed Connect;

   (f)   Used the Roper Report as a primary tool to deceive consumers in the relevant market about the strengths and weaknesses of Reed Connect as compared to Dodge Network; and

   (g)   Disparaged Reed Connect to existing and potential customers of RCD on the basis of the false information generated by the manipulated comparisons alleged herein and the Roper Report.

295.    Dodge's false advertising and product disparagement of Reed Connect was conducted over a prolonged period of time, was clearly false and misleading, and was intended to induce reliance by consumers who were not in a position to make accurate comparisons of Dodge Network and Reed Connect themselves.

296.    Dodge engaged in this predatory conduct with the intent of acquiring and maintaining monopoly power and driving RCD out of business.  Dodge's tortious and anticompetitive activities have stifled competition in the relevant market, thereby allowing Dodge to exercise monopoly power unlawfully and harm competition in the relevant market in violation of Section 2 of the Sherman Act.

297.    Dodge's conduct also has also harmed consumers of national online subscription services for construction project information by misleading them about the competitive strengths and weaknesses of the only two products available in the relevant market.

298.    As alleged herein and specifically set forth in paragraph 151, Dodge actively and wrongfully concealed from RCD material facts relating to its misconduct, which prevented RCD from discovering Dodge's predatory, anticompetitive and illegal conduct, as alleged herein. Dodge's wrongful concealment of material facts further prevented RCD from discovering the fact that the damage to RCD's business, as alleged herein, was a result of Dodge's misconduct. Accordingly, Dodge's wrongful concealment of material facts prevented RCD from discovering the nature of its claims against Dodge asserted herein, including the instant claim, until recently.

299.    As alleged herein and specifically set forth in paragraph 153, RCD exercised due diligence in attempting to discover the claims against Dodge asserted herein, including the instant claim. Despite its efforts, RCD was unable to discover Dodge's misconduct, including

without limitation Dodge's unauthorized access to Reed Connect and its use of the same to deceive customers and disparage Reed Connect, until recently.

300.     As a direct and proximate result of Dodge's monopolization of the market for national online subscription services for construction project information, RCD has been injured in its business and property, including lost profits and damage to its reputation and goodwill in an amount to be proven at trial, which amount must be trebled pursuant to 15 U.S.C. § 15.  RCD is also entitled to the injunctive relief sought herein pursuant to 15 U.S.C. § 26.  Finally, RCD is entitled to recover its costs incurred in prosecuting this claim, including reasonable attorneys' fess, as provided for in 15 U.S.C. § 15.

### COUNT TEN: ATTEMPTED MONOPOLIZATION, 15 U.S.C. §§ 15 and 26

301.     RCD incorporates and realleges paragraphs 1 through 300 as if fully set forth herein.

302.     RCD brings this claim under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

303.     RCD provides national online subscription services for construction project information through Reed Connect, which provides detailed information about virtually every commercial, private, public, civil and government construction project nationwide from the planning phase through completion of the project.  This information typically includes the full building plans, specifications, and information necessary for customers to submit bids on the projects.  Reed Connect permits RCD's customers to search the building plans, specifications, and any other information related to a construction project at a high level of detail.

304.     RCD's and Dodge's national online subscription services for construction project information are available and sold to consumers across the entire United States and collectively

generate over $100 million in revenues per year.  RCD and Dodge are each engaged in interstate commerce and their activities are in the flow of, and substantially affect, interstate commerce.

305.    National online subscription services for construction information is a relevant product market within the meaning of Section 2 of the Sherman Act, 15 U.S.C. § 2.  The relevant geographic market is the United States.

306.    RCD and Dodge are the only providers of national online subscription services for construction project information.

307.    Consumers in the relevant product and geographic market include national manufacturers of building products, financial services companies that provide financing and surety bonds for construction projects, national contractors and subcontractors, and national trade unions.

308.    As alleged above, Dodge has engaged in predatory, anticompetitive and illegal conduct with the specific purpose and intent to monopolize the market for national online subscription services for construction project information in the relevant nationwide market.

309.    Dodge's predatory and anticompetitive conduct has harmed both consumers and competition in the relevant market.  Dodge has intentionally and unlawfully disparaged Reed Connect and deceived and misled consumers as to the competitive strengths and weaknesses of the only two products available in the relevant market.

310.    Through its illicit conduct, Dodge has stifled competition on the merits in the relevant market in an intentional effort to secure monopoly power.

311.    Dodge has a dangerous probability of success in attaining monopoly power in the relevant market.  Upon information and belief, Dodge already has an 80-90% share of the market

and has exerted its market power to exclude competition through its predatory and anticompetitive conduct.

312.    Moreover, barriers to entry in the market for national online subscription services for construction project information are high.  A potential entrant into the relevant market would have to make a very large capital investment, hire hundreds of employees, invest a significant amount of time developing a network of connections with information sources, and develop a web-based platform and database with high performance search capabilities as demanded by consumers in the relevant market.  Dodge can raise its prices to a supracompetitive level and RCD is not aware of any other potential competitor that could enter the relevant market within any reasonable amount of time.

313.    As alleged herein and specifically set forth in paragraph 151, Dodge actively and wrongfully concealed from RCD material facts relating to its misconduct, which prevented RCD from discovering Dodge's predatory, anticompetitive and illegal conduct, as alleged herein. Dodge's wrongful concealment of material facts further prevented RCD from discovering the fact that the damage to RCD's business, as alleged herein, was a result of Dodge's misconduct. Accordingly, Dodge's wrongful concealment of material facts prevented RCD from discovering the nature of its claims against Dodge asserted herein, including the instant claim, until recently.

314.    As alleged herein and specifically set forth in paragraph 153, RCD exercised due diligence in attempting to discover the claims against Dodge asserted herein, including the instant claim. Despite its efforts, RCD was unable to discover Dodge's misconduct, including without limitation Dodge's unauthorized access to Reed Connect and its use of the same to deceive customers and disparage Reed Connect, until recently.

315.    As a direct and proximate result of Dodge's attempted monopolization of the market

for national online subscription services for construction project information, RCD has been

injured in its business and property, including lost profits and damage to its reputation and

goodwill in an amount to be proven at trial, which amount must be trebled pursuant to 15 U.S.C.

§ 15.  RCD is also entitled to the injunctive relief sought herein pursuant to 15 U.S.C. § 26.

Finally, RCD is entitled to recover its costs incurred in prosecuting this claim, including

reasonable attorneys' fees, as provided in 15 U.S.C. § 15.

### COUNT ELEVEN: UNJUST ENRICHMENT

316.    RCD incorporates and realleges paragraphs 1 through 315 as if fully set forth herein.

317.    As alleged herein, Dodge obtained and used its unauthorized access to RCD's

confidential and trade secret information to deceive prospective and existing customers of Dodge

and RCD regarding the superiority of Dodge Network as compared to Reed Connect and to

persuade those customers to purchase subscriptions to Dodge Network rather than Reed Connect.

318.    Accordingly, Dodge was unjustly enriched at RCD's expense.  The unjust enrichment

to Dodge at RCD's expense includes, without limitation, the profits Dodge received from

customers it persuaded to contract with Dodge rather than RCD using the misleading

comparisons Dodge prepared by accessing Reed Connect.

319.    It is against equity and good conscience to permit Dodge to retain this unjust

enrichment.

320.    As alleged herein and specifically set forth in paragraph 151, Dodge actively and

wrongfully concealed from RCD material facts relating to its misconduct, which prevented RCD

from discovering Dodge's unjust enrichment at RCD's expense.  Accordingly, Dodge's wrongful

concealment of material facts prevented RCD from discovering the nature of its claims against Dodge asserted herein, including the instant claim, until recently.

321.   As alleged herein and specifically set forth in paragraph 153, RCD exercised due diligence in attempting to discover the claims against Dodge asserted herein, including the instant claim. Despite its efforts, RCD was unable to discover Dodge's misconduct, including without limitation Dodge's unauthorized access to Reed Connect through Lorenz and Lewin and its use of the same to create the misleading Roper Report and misappropriate RCD's project information, until recently.

322.   If this Court rules that Dodge is not liable to RCD for the legal claims asserted herein, RCD will not have an adequate remedy at law for the unjust enrichment to Dodge at the expense of RCD.

323.   Thus, RCD is entitled to judgment against Dodge for damages due to Dodge's unjust enrichment in an amount to be determined at trial.

### JURY DEMAND

324.   RCD hereby demands that this case be tried by jury.

**WHEREFORE**, by virtue of the unlawful and tortious conduct of Defendants as alleged in this Complaint, RCD respectfully prays:

1.   That the Court award judgment to RCD and against Dodge on all counts of the Complaint;

2.   That the Court award RCD damages sustained due to Dodge's fraud, misappropriation of RCD's trade secrets, misappropriation of RCD's confidential information, unfair competition, and tortious interference with RCD's prospective economic advantage, in an amount to be proven at trial;

3.      That the Court award RCD punitive damages as a result of Dodge's tortious conduct in amount that the Court deems just, equitable, and proper;

4.      That the Court award permanent injunctive relief enjoining Dodge from subscribing to or otherwise accessing Reed Connect or any other product or service sold by RCD to its customers without RCD's knowledge and express consent; misappropriating RCD's confidential and trade secret information; using any of RCD's confidential and trade secret information it has misappropriated, including without limitation by accessing Reed Connect without RCD's authorization or using project information it obtained from Reed Connect; and using any version of the Roper Report based upon information gained by Dodge's unauthorized access to Reed Connect or RCD's confidential and trade secret information, or any claim made in such a report, to compete with RCD;

5.      That the Court award judgment to RCD and against the John Doe Defendants on Count I;

6.      That the Court award RCD damages sustained due to the John Doe Defendants' fraud, in an amount to be proven at trial;

7.      That the Court award RCD punitive damages as a result of the John Doe Defendants' tortious conduct in amount that the Court deems just, equitable, and proper;

8.      That the Court award RCD damages sustained as a result of Dodge's violation of Section 349 of the New York General Business Law, in an amount to be proven at trial;

9.      That the Court award RCD exemplary damages and its attorneys' fees for Dodge's violation of Section 349 of the New York General Business Law, as provided by that Section;

10.     That, as a result of Dodge's violation of Section 349 of the New York General Business Law, the Court award permanent injunctive relief enjoining Dodge from subscribing to or otherwise accessing Reed Connect or any other product or service sold by RCD to its customers without RCD's knowledge and express consent; misappropriating RCD's confidential and trade secret information; using any of RCD's confidential and trade secret information it has misappropriated, including without limitation by accessing Reed Connect without RCD's authorization or using project information it obtained from Reed Connect; and using any version of the Roper Report based upon information gained by Dodge's unauthorized access to Reed Connect or RCD's confidential and trade secret information, or any claim made in such a report, to compete with RCD;

11.     That the Court award RCD damages sustained due to Defendants' violations of 18 U.S.C. §§ 1962(b), (c), and (d);

12.     That the Court award RCD three times its damages resulting from Defendants' violations of 18 U.S.C. §§ 1962(b), (c), and (d), plus costs and attorneys' fees, as provided by 18 U.S.C. § 1964(c);

13.     That the Court award RCD damages sustained due to Dodge's violations of 15 U.S.C. §§ 15 and 26;

14.     That the Court award RCD three times its damages resulting from Dodge's violations of 15 U.S.C. §§ 15 and 26, plus costs and attorneys' fees, as provided by 15 U.S.C. § 15;

15.     That the Court award permanent injunctive relief pursuant to 15 U.S.C. § 26 enjoining Dodge from subscribing to or otherwise accessing Reed Connect or any other product or service sold by RCD to its customers without RCD's knowledge and express consent;

misappropriating RCD's confidential and trade secret information; using any of RCD's

confidential and trade secret information it has misappropriated, including without limitation by

accessing Reed Connect without RCD's authorization; and using any version of the Roper

Report based upon information gained by Dodge's unauthorized access to Reed Connect or

RCD's confidential and trade secret information, or any claim made in such a report, to compete

with RCD;

      16.     That the Court award RCD damages sustained due to Dodge's unjust enrichment

at RCD's expense, in an amount to be proven at trial;

      17.     That the Court award RCD recovery of its costs and expenses related to the

instant action, including without limitation its reasonable attorneys' fees;

      18.     That the Court award RCD pre-judgment and post-judgment interest on its claims;

and

      19.     That the Court grant such other, further, and different relief as the Court deems

just and equitable.

TROUTMAN SANDERS LLP


*s/ AURORA CASSIRER*

Aurora Cassirer
Matthew J. Aaronson
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Tel: (212) 704-6000
aurora.cassirer@troutmansanders.com
matthew.aaronson@troutmansanders.com

William N. Withrow, Jr.
James A. Lamberth
Dominic Kouffman
Charles R. Burnett
(Admitted *Pro Hac Vice*)
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
Tel: (404) 885-3000
william.withrow@troutmansanders.com
james.lamberth@troutmansanders.com
dominic.kouffman@troutmansanders.com
charles.burnett@troutmansanders.com

Attorneys for Plaintiff Reed Construction Data Inc.