UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
REED CONSTRUCTION DATA INC.,                    :     Case No. 09-cv-8578 (RWS) (HP)
                                                :
                    Plaintiff,                  :
                                                :
          v.                                    :
                                                :
THE MCGRAW-HILL COMPANIES, INC.,                :
JOHN DOES One through Five; and                 :
JOHN DOE ENTITIES One through Five,             :
                                                :
                    Defendant.                  :
-------------------------------------------------------X

### PLAINTIFF REED CONSTRUCTION DATA INC.'S RESPONSE TO DEFENDANT THE MCGRAW-HILL COMPANIES, INC.'S MOTION TO DISMISS COUNTS THREE, FIVE, SIX, SEVEN AND EIGHT OF THE COMPLAINT

TROUTMAN SANDERS LLP
Aurora Cassirer
Matthew J. Aaronson
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Tel: (212) 704-6000
aurora.cassirer@troutmansanders.com
matthew.aaronson@troutmansanders.com

*Attorneys for Plaintiff Reed Construction Data Inc.*

OF COUNSEL:
William N. Withrow, Jr.
James A. Lamberth
Dominic Kouffman
Charles R. Burnett
(Admitted *pro hac vice*)
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
Tel: (404) 885-3000
william.withrow@troutmansanders.com
james.lamberth@troutmansanders.com
dominic.kouffman@troutmansanders.com
charles.burnett@troutmansanders.com

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

PROCEDURAL HISTORY ......................................................................................2

STATEMENT OF FACTS ........................................................................................2

   I.   Background .......................................................................................................2

   II.   MHC's Unauthorized Access to Reed Connect Through Industrial Espionage ...............5

        A.   MHC's Unauthorized Access to Reed Connect Through Henning Lorenz ..........5

        B.   MHC's Unauthorized Access to Reed Connect Through Glenn Lewin ...............7

        C.   RCD's Discovery of MHC's Unauthorized Access to Reed Connect and Lewin's Admissions of Misconduct ...............11

   III.   MHC's Use of its Unauthorized Access to Reed Connect to Compete Unfairly with RCD ...............12

        A.   Presentations on Reed Connect's Purported "Weaknesses." ...............12

        B.   Creation of the Roper Report and Other Misleading Data Comparisons ...........12

        C.   Misappropriation of RCD's Project Information ...............14

   IV.   RCD's Injury as a Result of MHC's Misconduct ...............15

   V.   MHC Cannot and Will Not Deny the Material Allegations in the Complaint ...............16

ARGUMENT ...............17

   I.   Standard for MHC's Motion to Dismiss ...............17

   II.   RCD Has Adequately Pled Its RICO Claims ...............17

        A.   RCD's RICO Claim is Appropriate in this Case ...............17

        B.   RCD Has Adequately Pled an Enterprise ...............19

        C.   RCD Was Injured as a Proximate Result of the Enterprise's RICO Violations ...............25

            1.   MHC's Use of its Access to Steal Project Information ...............25

            2.   MHC's Use of its Access to Create Misleading Comparisons ...............26

            3.   MHC's Communications to Customers ...............28

   III.   RCD's RICO Conspiracy Claim Should Not Be Dismissed ...............30

   IV.   RCD Has Adequately Pled Misappropriation of Confidential Information ...............30

   V.   RCD Adequately Pled Its Tortious Interference Claim ...............33

   VI.   RCD's Section 349 Claim Has Been Sufficiently Pled ...............38

CONCLUSION ...............40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Albemarle Theatre, Inc. v. Bayberry Realty Corp.*,
  277 N.Y.S.2d 505, 27 A.D.2d 172 (N.Y. App. Div. 1st Dep't 1967) ........................ 31, 32, 33

*Apple Records, Inc. v. Capitol Records, Inc.*,
  529 N.Y.S.2d 279, 137 A.D.2d 50 (N.Y. App. Div. 1st Dep't 1988) .................. 30, 31, 32, 33

*Ashcroft v. Iqbal*,
  --- U.S. ---, 129 S. Ct. 1937 (2009) ................................................................. 36, 37

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................... 17, 36

*Bhandari v. Bittner*,
  No. 03-CV-0012E(Sc), 2004 U.S. Dist. LEXIS 29356 (W.D.N.Y. Oct. 5, 2004) ................ 28

*Boyce v. Greeley Square Hotel Co.*,
  228 N.Y. 106, 126 N.E. 647 (N.Y. 1920) ............................................................ 31

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639, 128 S. Ct. 2131 (2008) ............................................................ 28, 29

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
  786 F. Supp. 182 (E.D.N.Y. 1992) ..................................................................... 38

*Carvel Corp. v. Noonan*,
  350 F.3d 6 (2d Cir. 2003) ............................................................... 30, 31, 32, 33

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) ..................................................................................... 20, 21

*City of New York v. Smokes-Spirits.com, Inc.*,
  541 F.3d 425 (2d Cir. 2008) .......................................................................... 20, 21

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*,
  70 N.Y.2d 382, 516 N.E.2d 190 (N.Y. 1987) ....................................................... 32

*Construction Technology v. Lockformer Co.*,
  704 F. Supp. 1212 (S.D.N.Y. 1989) ............................................................... 38, 39

*Crab House of Douglaston, Inc. v. Newsday, Inc.*,
  418 F. Supp. 2d 193 (E.D.N.Y. 2006) .................................................................. 20

*De Falco v. Bernas*,
  244 F.3d 286 (2d Cir. 2001) ................................................. 23

*Draper and Kramer, Inc. v. Baskin-Robbins, Inc.*,
  690 F. Supp. 728 (N.D. Ill. 1988) ....................................... 36

*G-I Holdings v. Baron & Budd*,
  238 F. Supp. 2d 521 (S.D.N.Y. 2002) (Sweet, J.) ...................... 23, 24

*Gross v. Waywell*,
  628 F. Supp. 2d 475 (S.D.N.Y. 2009) .................................. 17

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
  277 F. Supp. 2d 269 (S.D.N.Y. 2003) ................................. 39, 40

*Hemi Group, LLC v. City of New York*,
  No. 08-969, 2010 U.S. LEXIS 768 (U.S. Jan. 25, 2010) .............. 25, 29

*Holmes v. Sec. Investor Prot. Corp.*,
  503 U.S. 258 (1992) ..................................................... 25

*In re Initial Publ. Offer. Secs. Litig.*,
  383 F. Supp. 2d 566 (S.D.N.Y. 2005) .................................. 17

*Jim Mazz Auto, Inc. v. Progressive Cas. Ins. Co.*,
  Nos. 08-CV-00494, 00541, 00566, and 00583, 2009 U.S. Dist. LEXIS 27687
  (W.D.N.Y. Mar. 31, 2009) .............................................. 34

*Kaleida Health v. Medtronic Sofamor Danek USA, Inc.*,
  No. 05-CV-0675C(F), 2006 U.S. Dist. LEXIS 92295 (W.D.N.Y. Dec. 21, 2006) .......... 32, 33

*Kforce, Inc. v. Alden Pers., Inc.*,
  288 F. Supp. 2d 513 (S.D.N.Y. 2003) .................................. 40

*Leadsinger, Inc. v. Cole*,
  No. 05 Civ. 5606, 2006 U.S. Dist. LEXIS 55638 (S.D.N.Y. Aug. 10, 2006) ...................... 33

*Merrin Jewelry Co. v. St. Paul Fire & Marine Ins. Co.*,
  301 F. Supp. 479 (S.D.N.Y. 1969) ..................................... 32

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
  317 F. Supp. 2d 301 (S.D.N.Y. 2003) ................................ 33, 34

*Red Ball Interior Demolition Corp. v. Palmadessa*,
  874 F. Supp. 576 (S.D.N.Y. 1995) .................................... 25, 28

*Rich v. New York C. & H. R. R. Co.*,
  87 N.Y. 382, 1882 N.Y. LEXIS 13 (N.Y. 1882) ...................... 31, 32, 33

- iii -

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
　　30 F.3d 339 (2d Cir. N.Y. 1994) ................................................................................. passim

*Safe-Strap Co. v. Koala Corp.*,
　　270 F. Supp. 2d 407 (S.D.N.Y. 2003) ................................................................................. 36

*Securitron Magnalock Corp. v. Schnabolk*,
　　65 F.3d 256 (2d Cir. 1995) ................................................................................. 21, 22, 38

*Sedima v. Imrex Co.*,
　　473 U.S. 479 (1985) ................................................................................................. 19

*Shen v Signature Dev. Corp.*,
　　No. 35803/04, 2009 NY Slip Op 52627U (N.Y. Sup. Ct. Dec. 29, 2009) ....................... 32, 33

*Shred-It USA, Inc. v. Mobile Data Shred, Inc.*,
　　202 F. Supp. 2d 228 (S.D.N.Y. 2002) ................................................................................. 33

*SLM, Inc. v. Shelbud Products Corp.*,
　　No. 92 Civ. 3073, 1993 U.S. Dist. LEXIS 5171 (S.D.N.Y. Apr. 19, 1993) .................. 33, 34

*Something Old, Something New, Inc. v. QVC, Inc.*,
　　No. 98 Civ. 7450, 1999 U.S. Dist. LEXIS 18878 (S.D.N.Y. Dec. 7, 1999) ......................... 40

*Willets Point Indus. & Realty Ass'n v. City of New York*,
　　No. 08-cv-1453, 2009 U.S. Dist. LEXIS 110181 (E.D.N.Y. Nov. 25, 2009) ....................... 37

STATUTES

18 U.S.C. § 1962(c) ................................................................................................. 18, 19, 23, 24

Plaintiff Reed Construction Data Inc. ("RCD") files this memorandum of law in response to Defendant The McGraw-Hill Companies, Inc.'s Motion to Dismiss Counts Three, Five, Six, Seven and Eight of the Complaint ("Motion").

## INTRODUCTION

This is a case involving brazen corporate espionage unbefitting any ethical business, much less a Fortune 500 public company.  McGraw-Hill Construction Dodge, a division of Defendant The McGraw-Hill Companies, Inc.,[1] has been stealing RCD's confidential information for at least seven years through an elaborate scheme involving fictitious companies, aliases, off-the-books cash payments, and serial misrepresentations led by members of its "Competitive Intelligence" department and hired spies aptly nicknamed "The Spy" and "Mr. X" by MHC employees.  MHC has used the information it has stolen from RCD to mislead the marketplace and induce customers to purchase its products instead of RCD's, all with the intent of driving RCD out of business and maintaining its monopoly.

Notably, by moving to dismiss only five of the eleven counts in RCD's Amended Complaint but failing to file an answer, MHC runs from the allegations of its misconduct. However, MHC will soon have to confront these allegations.  RCD has set forth detailed allegations of fact in its Amended Complaint that establish each of its claims for relief.  MHC's arguments in support of dismissal are based largely on mischaracterizations of RCD's allegations and misinterpretations of applicable law.  When all of the allegations are considered in the context of well-settled legal principles, it is clear that Dodge's motion should be denied.

---

[1] Both McGraw-Hill Construction Dodge and The McGraw-Hill Companies, Inc. will be referred to as "MHC."

## PROCEDURAL HISTORY

RCD initiated this action by filing its original Complaint on October 8, 2009 (the "Original Complaint").  On November 20, 2009, MHC moved to dismiss five of the eleven counts in the Original Complaint (the "Original Motion").  Due to its discovery of relevant information after filing its Original Complaint, as discussed below, RCD filed its First Amended Complaint (the "Amended Complaint" or "Complaint") on December 10, 2009.  By including this newly discovered information and adding more specific allegations, the Amended Complaint nullified the alleged deficiencies raised in MHC's Original Motion.  Following RCD's amendment of the Complaint, MHC nonetheless filed a revised Motion to Dismiss, which, for the most part, ignores the changes made to RCD's Original Complaint.

## STATEMENT OF FACTS

**I.      Background.**

RCD and MHC are competing providers of construction project news and information to the construction industry.  (*See* Amended Complaint at ¶¶ 12, 23.)[2]  Both companies provide information regarding construction projects at the national, regional, and local levels to customers such as building product manufacturers and contractors.  (¶¶ 13, 24.)  The project information, which often includes building plans and specifications, is used by customers to identify projects for which they may seek specification of their product within the plans or seek to submit bids for products or services.  (¶ 13.)  RCD and MHC are the only providers of construction project information on a national scale and are thus the sole competitors for national accounts.  (¶ 23.)

One of the primary services RCD provides its customers is a web-based subscription service known as "Reed Connect," which operates as an online search engine that permits RCD's

---

[2] Hereinafter, all citations to paragraph numbers shall be citations to the Amended Complaint.

customers who subscribe to the service to search RCD's construction project database for construction projects that are of interest to them.  (¶¶ 14-15.)  Reed Connect provides detailed information about virtually every private, public, civil and government construction project nationwide from the planning phase through completion, including the full building plans, specifications, and information necessary for customers to submit bids on the projects.  (¶ 15.)

RCD spends a significant amount of time and money gathering such project information from various sources, including by contacting architects or builders, performing online searches for projects, leveraging RCD's relationships with architectural or building associations, and using RCD's exclusive arrangements with certain organizations to obtain information that is not provided to RCD's competitors.  (¶ 21.)  Because it goes to such lengths to gather the information, and because the primary product RCD sells is its extensive compilation of project information, RCD insists that its customers not share the information with RCD's competitors. (¶ 22.)  RCD's standard subscription agreements state that the information available on Reed Connect is proprietary information; prohibit customers from disclosing the information to any person or entity other than the customer's own employees; and explicitly prohibit customers from disclosing the information available on Reed Connect to RCD's competitors.  (*Id.*)

MHC offers its customers an online search program similar to Reed Connect named "Network."  (¶ 24.)  Although Reed Connect and Network have similar purposes, the programs are different in a number of material respects.  One difference that is particularly relevant to this lawsuit is that the programs use different search algorithms to permit users to search for projects. (¶ 25.)  The different algorithms cause the programs to have different search capabilities, each with their own strengths and weaknesses.  As a result, if anyone had simultaneous access to both systems, the competitor would be able to determine which search parameters work better on one

program than the other. (¶ 26.) For instance, even if RCD and MHC had the same project information in their databases, the different algorithms used by the programs could cause a search term to return more project results on Reed Connect than it would on Network. (*Id.*)

This anomaly is exacerbated by the fact that RCD and MHC use different identifiers for their projects. (¶ 27.) For example, the same project may be in both RCD's and MHC's databases, but the competitors may identify the project by different names. Someone with access to both programs could craft a search that would identify the project on one program but make it seem as though the project was not available on the other program. (*Id.*) Another example is the description "bid" that RCD and MHC attach to projects in their databases. RCD immediately removes projects from the active "bid" phase the day after the bidding phase on the project ends, while MHC may have a lag of several weeks or months before it removes projects from the "bid" phase. (¶ 28.) Thus, even if RCD and MHC had the same projects in their databases, searching for "bid" projects on both programs would make it seem like MHC had more projects than RCD.

In general, Reed Connect is a superior program to Network. (¶ 33.) Customers who have used both systems report that Reed Connect offers quicker downloads and more useful functions than Network, and it is easier to use. (*Id.*) RCD has had several customers who initially left Reed Connect to subscribe to Network change their subscriptions back to Reed Connect due to the program's superiority. (*Id.*) Despite Reed Connect's superiority to Network, MHC generally charges approximately twice as much for an annual subscription to Network as the cost for the same subscription to Reed Connect. (¶ 32.) As explained below, MHC is able to charge twice as much as RCD for an inferior program due to the blatant misconduct alleged in the Complaint.

RCD launched Reed Connect in 2002. (¶ 17.) Reed Connect revolutionized the manner in which RCD's customers could access project information by allowing them to access it online.

Prior to Reed Connect, customers were forced to download a raw data file, which was updated periodically, onto their own computer systems and use a program to search the file.  (*See* ¶ 17.) Reed Connect allows customers to view up-to-date project information online without having to manually download the information or wait for periodic updates.  (¶ 18.)  At the time Reed Connect was launched, MHC did not offer Network or any similar web-based program.  (*See* ¶¶ 24, 41.)  MHC's customers were thus forced to manually download data files that did not offer up-to-date information while RCD's customers were able to easily access timely information online.  Network was not launched until August 2003, one year after Reed Connect.  (¶ 24.)

## II.    MHC's Unauthorized Access to Reed Connect Through Industrial Espionage.

Beginning in the mid-to-late 1990s, MHC created the position of Director of Competitive Intelligence and appointed Eric Kubicka to the role.  (¶ 35.)  Kubicka reported at times to MHC's President, Norbert Young.  (*Id.*)  A MHC employee named Pat Major reported at times to Kubicka.  (*Id.*)  One of Kubicka's primary responsibilities was to obtain access to RCD's confidential and proprietary information without RCD's knowledge.  Indeed, Kubicka was referred to in the MHC organization as "The Spy."  (¶ 36.)  Because MHC did not offer a similar product at the time, MHC was concerned about, and threatened by, the launch of Reed Connect in 2002 and its immediate success in the marketplace.  Accordingly, Kubicka and Major hired several contractors to subscribe to Reed Connect by posing as customers of RCD.[3]  (*See* ¶¶ 37, 41.)  One such contractor was an individual named Henning Lorenz.  (¶ 38.)

### A.    MHC's Unauthorized Access to Reed Connect Through Henning Lorenz.

Lorenz was the President and CEO of NE14T Corporation, Inc. ("NE14T"), a New Jersey corporation that began operating in 1999.  (¶ 39.)  MHC hired both Lorenz and NE14T at various

---

[3] As alleged in the Complaint, RCD believes MHC also hired contractors to subscribe to RCD's products and services other than Reed Connect.  (*See id.* at ¶ 37.)

times from 1997 to 2002 to perform legitimate consulting services.  (¶ 40.)  However, in late

2002 MHC hired Lorenz and NE14T for the illegitimate, and illegal, purpose of subscribing to

Reed Connect under false pretenses so that MHC could have unfettered access to the Reed

Connect program.  (¶ 41.)  To carry out MHC's scheme, Lorenz represented to RCD that NE14T

was a consultant for Hager Hinge Company ("Hager Hinge"), a legitimate building product

manufacturer, although neither Lorenz nor NE14T actually worked for Hager Hinge.  (¶ 42-43.)

Posing as a consultant for Hager Hinge, NE14T purchased a Reed Connect subscription in

December 2002.  (*Id.*)

     MHC paid NE14T the cost of the annual subscription to Reed Connect, and it also paid

both Lorenz and NE14T a fee for securing the subscription.  (¶ 45.)  MHC often paid Lorenz and

NE14T in cash or money orders purchased from the McGraw-Hill Federal Credit Union to hide

the payments.  (¶ 46.)  MHC employees would either hand Lorenz payments in cash when he

visited MHC's offices or accompany him to the Credit Union branch located in MHC's offices to

purchase a money order made payable to him, which he could then immediately cash.  (*Id.*)

     The original subscription purchased by NE14T covered RCD's project information in ten

states.  (¶ 47.)  The subscription agreement signed by Lorenz, as President of NE14T,

acknowledged that the information available through Reed Connect was RCD's confidential and

trade secret information, and it explicitly prohibited him from disclosing such information "to

any person other than direct employees of Client required to have such knowledge in the normal

course of Client's business."  (¶ 49.)  In January 2004, NE14T purchased a national subscription

to Reed Connect that covered RCD's project information nationwide.  (¶ 50.)  Lorenz renewed

NE14T's national subscription on several occasions between 2002 and 2006.  Each renewal

agreement contained nondisclosure provisions similar to those in the first agreement.  (¶ 52.)

Using NE14T's subscription, MHC had unfettered access to Reed Connect and RCD's project information from at least 2002 to 2006.  (¶ 53.)  MHC used the access to compete unfairly with RCD in a number of ways.  (¶ 54.)  For instance, Lorenz used his access to Reed Connect to obtain confidential and proprietary information about the program's software and the information available on Reed Connect.  Then, as described below, Lorenz shared this information with MHC's employees for use in competitive situations with RCD and/or for use in MHC's development of Network.  (¶ 55.)  Further, Lorenz demonstrated to the sales force the manner in which Reed Connect operated and pointed out perceived weaknesses of Reed Connect that the sales force could emphasize in sales pitches to potential clients.  (¶ 60.)  Lorenz even held a number of presentations for MHC's sales representatives in which he demonstrated Reed Connect and advised them of software updates to the program.  (*Id.*)  In order to maintain his secrecy during these presentations, MHC's sales representatives were not given Lorenz's actual name.  Instead, Lorenz was commonly referred to by MHC's employees as "Mr. X."  (¶ 57.)

At the time MHC was using Lorenz and NE14T to subscribe to Reed Connect as a purported agent for Hager Hinge, the real Hager Hinge was actually a customer of MHC.  (¶ 61.)  However, in December 2005, the real Hager Hinge moved its business from MHC to RCD and purchased a subscription to Reed Connect similar to that purchased by Lorenz, which raised suspicions about Lorenz's true affiliations.  (¶¶ 62-63.)  RCD determined that Lorenz did not work for the real Hager Hinge and cancelled his subscription on January 16, 2006.  (¶ 64.)  Around that same time, MHC terminated Kubicka's employment.  (¶ 65.)

B.    MHC's Unauthorized Access to Reed Connect Through Glenn Lewin.

After MHC terminated Kubicka, MHC's Senior Vice President of Business Operations, Tim Ryan, assumed Kubicka's role as head of MHC's Competitive Intelligence department and immediately hired another "contractor" to obtain a Reed Connect subscription under false

pretenses to replace the subscription MHC had purchased through Lorenz.  (¶¶ 66-67.)  The contractor, Glenn Lewin, purchased a national subscription to Reed Connect in February 2006, less than one month after RCD terminated MHC's subscription through Lorenz.  (¶ 68.)

Lewin is a freelance writer who provides consulting, professional writing, and researching services to a number of businesses other than MHC.  (¶ 69.)  Lewin's website claims that he provides such services to at least 37 clients.  (*Id.*)  MHC is not listed as one of those clients, even though Lewin has been providing consulting services to MHC since at least 2003.  (¶¶ 69-70.)  In March 2003, Lewin purchased a regional subscription to Reed Connect, purportedly as an agent for Northern Construction Development Company ("NCDC").  (*Id.*)  NCDC was not an actual company.  Rather, as it did with Lorenz, MHC paid the subscription costs and used the subscription to access the regional Reed Connect service directly.  (¶ 71.)  In September 2005, Lewin purchased another regional subscription to Reed Connect, this time for a business named Central Business Services ("CBS").  (¶ 72.)  MHC again paid the cost of the subscription to Reed Connect and used the subscription to access Reed Connect directly.  (¶ 73.)

On February 14, 2006, less than one month after RCD terminated Lorenz's national subscription to Reed Connect, CBS expanded its regional subscription to a national subscription.  (¶ 74.)  MHC paid Lewin the cost of the subscription and a monthly fee for his services to pose as a customer of RCD and obtain the subscription under false pretenses.  (¶ 75.)  The contract Lewin signed, purportedly on behalf of CBS, prohibits Lewin from sharing access to Reed Connect with MHC.  Specifically, the contract states:

> **NONDISCLOSURE**:  The Information [available through the subscription] constitutes proprietary, confidential and trade secret information belonging to RCD.  Customer agrees not to disclose or otherwise make the Information available to any person other than employees of Customer required to have such knowledge in the normal course of Customer's business.  Customer agrees not to

copy, disclose, publish, distribute or disseminate the Information to any third party, directly or indirectly.  (¶ 76.)

On March 10, 2006, Lewin sent RCD a letter under the alias "John Carlson."  The letter stated that CBS had been acquired by NCDC, and that NCDC would assume the subscription to Reed Connect.  (¶ 77.)  The letter further stated that NCDC's "principal line of business is assisting manufacturers in developing new clients and new market opportunities for their products."  (*Id.*)  The letter identifies John Carlson as NCDC's contact person.  (*Id.*)  Lewin changed his company's name from CBS to NCDC and began operating under the alias of John Carlson because Kubicka, who had been terminated by MHC, threatened to expose to RCD Lewin's relationship with MHC and MHC's access to Reed Connect.  (¶ 79.)

Because NCDC was purportedly a consultant to product manufacturers rather than a direct manufacturer, RCD contacted Lewin (who had informed RCD that he was still involved with NCDC) in December 2006 to inquire about NCDC's business and verify that it was not using its access to Reed Connect in an unauthorized manner.  (¶ 80.)  On or about December 20, 2006, during a phone call with one of RCD's Directors, Lewin represented that he did not work for any of RCD's competitors, explicitly denied any relationship with MHC, and represented that he was not providing information from Reed Connect to any RCD competitors.  (¶ 81.)

MHC continued its unauthorized access to Reed Connect under the fictitious name of NCDC through the end of 2007.  (¶ 82.)  In January 2008, Lewin purchased a national subscription under a new fictitious name: Arrington Partners.  (¶ 83.)  To purchase the subscription, Lewin again used the alias John Carlson.  (*Id.*)  In the subscription agreement signed by Lewin (as John Carlson), Lewin acknowledged that the information available through access to Reed Connect constitutes the proprietary, confidential, and trade secret information of RCD and the agreement contains a nondisclosure provision similar to the one set forth above.

(¶¶ 84-85.)  However, the subscription agreement also contains a direct representation that

Arrington Partners was not subscribing under a fictitious name in order to provide RCD's

competitors with access to Reed Connect.  Specifically, the agreement provides:

> **NONDISCLOSURE RESTRICTIONS:**   Customer agrees not to disclose or
> otherwise make the Information available to any person other than employees of
> Customer required to have such knowledge in the normal course of Customer's
> business and authorized to access the Information hereunder.  Customer agrees not
> to: (i) disclose, publish, distribute, transfer or disseminate the Information to any
> third party, directly or indirectly; (ii) use the Information, directly or indirectly to
> compete with any products or services of RCD or its affiliates; (iii) use the
> Information as a basis for providing project leads in any product or service
> disseminated to any third party (a "Competitive Product"), directly or indirectly, or
> otherwise use the Information to compete with RCD or its affiliates; or (iv) use the
> Information, directly or indirectly, to provide data or competitive information to any
> provider of Competitive Products or affiliate thereof.   ***Customer represents,
> warrants and covenants to RCD that: (i) it is not, and shall not be during the
> Term, a supplier of Competitive Products, nor is it subscribing to the Information,
> directly or indirectly, for the purpose of providing data or competitive information
> to a supplier of Competitive Products or any affiliate thereof: and (ii) it has
> entered into this Agreement under its true name and is not, directly or indirectly,
> impersonating any real or fictitious person or entity or otherwise acting so as to
> deceive RCD as to the actual identity of Customer.***  (¶ 87 (emphasis added).)

Similar to NCDC, Arrington Partners was not a real business.  Rather, MHC used Arrington

Partners' subscription to access Reed Connect without authorization and contrary to the

representations made by Lewin.  (¶ 88.)  MHC paid Lewin the cost of the subscription as well as

a monthly fee for his services in obtaining the subscription under false pretenses.  (¶ 89.)

MHC continued its unauthorized access to Reed Connect under the fictitious name of

Arrington Partners through the end of 2008.  (¶ 90.)  In January 2009, Lewin again changed the

name of his fictitious company, this time purchasing a national subscription under the company

name Site Amenities.  (¶ 91.)  The contact person for Site Amenities was listed as Andy

Anderson, another of Lewin's aliases.  (*Id.*)  As with the previous contract, Site Amenities is not

a real company, and Andy Anderson is not an actual person.  (¶ 92.)   MHC once again paid Lewin the cost of the subscription and a monthly fee for obtaining the subscription.  (¶ 93.)

MHC directly accessed Reed Connect on a regular basis using Lewin's account information from 2006 to 2009.  Over that period, MHC ran numerous searches for project information in Reed Connect.  (¶ 95.)  RCD has traced the IP addresses for the computers which conducted these searches to an area within five city blocks of MHC's office in New York.  (*Id.*)

C.    RCD's Discovery of MHC's Unauthorized Access to Reed Connect and Lewin's Admissions of Misconduct.

In connection with RCD's investigation of an internal employment issue concerning the sales representative who sold the subscriptions to Lewin, RCD sent Site Amenities a letter dated July 14, 2009, notifying Site Amenities of its intent to conduct an audit of Site Amenities' business and its use of Reed Connect.  (¶ 96.)  Even after RCD sent Lewin the letter, MHC continued to access Reed Connect using Lewin's account information.  MHC used Lewin's account information to run searches in Reed Connect on July 21 and 23, 2009.  (¶ 97.)

On August 4, 2009, in connection with the audit referenced above, Lewin admitted his wrongful conduct to RCD.  (¶ 98.)  Among other things, Lewin admitted that: he worked for MHC; NCDC, Arrington Partners, and Site Amenities were all fictitious companies Lewin used to subscribe to Reed Connect on MHC's behalf; John Carlson and Andy Anderson were aliases used to hide Lewin's identity; MHC paid for all of the Reed Connect subscriptions; MHC accessed Reed Connect directly through Lewin's subscriptions; MHC paid Lewin approximately $2,000 per month to serve as the "straw man" for its access to Reed Connect; and MHC used other "consultants" to access Reed Connect prior to using him.  (¶¶ 99-101.)  Lewin further admitted that he had been in direct contact with MHC's President, Norbert Young, who, as

discussed below, "left" MHC shortly after RCD's Complaint was filed.  (¶ 102.)  After the

conversation with Lewin, RCD terminated his subscription to Reed Connect.  (¶ 104.)

III.   **MHC's Use of its Unauthorized Access to Reed Connect to Compete Unfairly with RCD.**

MHC has used its access to Reed Connect to compete unfairly and unlawfully in a variety

of ways to preserve its monopoly.

      A.    Presentations on Reed Connect's Purported "Weaknesses."

As described briefly above, MHC has held presentations using its unauthorized access to

Reed Connect in which MHC falsely informed its sales agents of supposed weaknesses in Reed

Connect and allowed them to view information in Reed Connect in order to compete for

accounts with RCD.  (¶ 108.)  RCD believes that MHC also used the information it obtained

about Reed Connect's software and programming to develop and alter Network.  (¶ 109.)

      B.    Creation of the Roper Report and Other Misleading Data Comparisons.

The differences between Reed Connect and Network and the manner in which RCD and

MHC list available information for their projects, as discussed above, has enabled MHC to use

its access to Reed Connect to manipulate search parameters that can be run in Network and Reed

Connect to generate far more results using Network than Reed Connect (even in situations where

the actual number of projects in MHC's and RCD's database are very similar), thereby giving the

false impression that Network is far superior to Reed Connect.  (¶ 110.)  MHC used these

manipulated search parameters to create misleading comparisons between the number of projects

available in its database and the number available in RCD's, which MHC presented to a

consulting firm, Roper Public Affairs & Media ("Roper").  (¶¶ 110-12.)  Roper "verified" the

misleading comparisons provided by MHC in a report (the "Roper Report") which purportedly

contains an unbiased, third-party comparison of the amount of project information available on

Network and Reed Connect.  Specifically, the Roper Report compares the number of projects available on Network and Reed Connect in every state.  (¶¶ 113-14.)

Because the information in the Roper Report is compiled using the misleading comparisons created by MHC, the results of the Roper Report are demonstrably false and misleading in that they misrepresent the ratio of projects available on Network as compared to Reed Connect.  (¶¶ 115-16.)  In fact, when customers of RCD or MHC have performed direct comparisons of Reed Connect and Network in circumstances in which representatives of both RCD and MHC have been available, and MHC has not been able to use its misleading search parameters, Reed Connect has consistently performed as well or better than Network.  (¶ 117.)

The Roper Report was first issued in or about 2004.  Since 2004, the Roper Report was regularly "updated" using misleading comparison information provided by MHC.  (¶ 118.) Contrary to MHC's assertions, MHC could not have had the Roper Report created without unauthorized access to Reed Connect.  As explained in Section II.C.1.b below, Roper would not have validated the comparisons if MHC had simply fabricated the numbers.  Rather, MHC needed access to Reed Connect to identify the search parameters that would create misleading results.  Using those parameters, MHC was able to present Roper with data comparisons that were accurate in the sense that the search parameters generated the number of projects MHC said they did -- and the numbers could therefore be verified by Roper -- but the comparisons were ultimately misleading due to the nature of the search parameters.  (¶ 119.)

MHC has regularly issued the Roper Report to its national account sales representatives for use in competitive situations with RCD and has instructed them regarding the "rules" for the use of the report.  (¶ 120.)  In an attempt to prevent RCD from discovering the report's existence and the fact that MHC was accessing Reed Connect without authorization, MHC instructed all of

its representatives to never leave copies of the Roper Report with their customers.  MHC's rules

governing the use of the Roper Report (entitled "Rules for NOPWorld/Roper Report") state:

> [T]he [Roper Report] is available for use with customers…. The analysis should
> be used with extreme caution and **should not** be left with a customer…. [A]ll
> information contained in the study should be noted as confidential and is
> proprietary information only meant for the client/prospect and redistribution
> outside their organization is prohibited. (¶ 121 (emphasis in original).)

MHC's sales representatives have regularly shown the Roper Report to MHC's existing and

potential customers and RCD's existing and potential customers since at least 2004. (¶ 122.)

In addition to the comparisons in the Roper Report, MHC's sales representatives have

also instructed MHC's and RCD's existing and potential customers to make impromptu

comparisons between Reed Connect and Network using the misleading search parameters

developed by MHC in order to give customers the false impression that MHC's information was

far superior to RCD's. (¶ 124.) For instance, MHC has used its access to Reed Connect to

identify regions of the country in which MHC generally has more projects available than RCD.

MHC's sales representatives have then directed potential customers who were attempting to

decide whether to subscribe to MHC's services or RCD's to compare the projects available from

the two competitors in those specific regions, with the goal of making it seem as though MHC's

nationwide project information is much better than RCD's, when in fact it is not. (¶ 125.)

C. <u>Misappropriation of RCD's Project Information.</u>

In its Original Motion, MHC focused on the fact that RCD's Original Complaint did not

allege that MHC used its access to Reed Connect to directly misappropriate project information.[4]

After filing the Original Complaint, however, RCD uncovered substantial evidence showing that

MHC did, in fact, directly misappropriate project information from Reed Connect.  RCD has

---

[4] MTD at 1-2 ("The gravamen of RCD's Complaint is that MHC accessed Reed Connect, *not* to misappropriate data…, but to formulate misleading comparisons….") (emphasis in original).

been able to track MHC's search history from September 2007 through July 2009.  During that time period, MHC used its access to Reed Connect through Lewin to view the project details for 3,438 specific projects in RCD's database.  (¶ 131.)  Of these, MHC tracked 1,174 projects as "Active," meaning that MHC received automatic notification whenever RCD updated the information in its database regarding those projects.  (*Id.*)  MHC searched for a number of these projects using the project identification codes assigned to the projects by RCD, demonstrating that MHC had identified certain projects as being of interest from prior searches, then used RCD's identification codes to view the detailed information for those projects.  (*Id.*)  MHC also downloaded hundreds of documents relating to specific projects available on Reed Connect during the same time period, including the plans and specifications for those projects.  (¶ 132.)

RCD believes and alleges that MHC used this information and the downloaded documents to populate its own project database, either by directly copying RCD's information into its database or by using Reed Connect to identify projects that were available in RCD's database but not MHC's, then contacting the appropriate builder, architect, contractor, or other source to obtain the information for such projects.  (¶ 134.)  By effectively stealing RCD's project information in this manner, MHC was able to improperly increase the number of projects in its database and, thus, eliminate the competitive advantage RCD should have enjoyed by having such projects exclusively available on Reed Connect.  (*Id.*)  RCD now believes MHC has stolen its information in this manner since it first gained access to Reed Connect in 2002.[5]

## IV.    RCD's Injury as a Result of MHC's Misconduct.

As a result of the above misconduct, a number of RCD's national account customers have terminated or chosen not to renew their subscription agreements with RCD to subscribe instead

---

[5] The search history which RCD has reviewed only spans 22 months of a scheme that was conducted for more than seven years.  RCD therefore has little doubt that discovery will show that MHC ultimately misappropriated the project information for hundreds, if not thousands, of projects in addition to the 3,438 identified thus far.

to MHC's products and services.  (¶ 136.)  Further, a number of RCD's prospective customers

who were actively comparing RCD's products and services with those of MHC have chosen to

subscribe with MHC instead of RCD.  (¶ 137.)  RCD believes and alleges that these customers

and prospective customers, 221 of whom are identified by name in RCD's Complaint, selected

MHC after its sales representatives presented them, in the Roper Report or in impromptu

sessions, with false or misleading information regarding the superiority of MHC's products as

compared to RCD's, including comparisons showing the number of projects available on

Network as compared to Reed Connect.  (¶¶ 136-37, 211, 217, 225-26.)  Moreover, even if the

customers were shown accurate project count comparisons between Reed Connect and Network,

the comparisons would have unfairly favored MHC due to the fact that MHC misappropriated a

number of the projects in its database from RCD.  (¶ 138.)  By inducing these customers to

choose Network over Reed Connect on the basis of false and misleading information, MHC has

tricked them into paying for a subscription to Network that is more expensive than a subscription

to Reed Connect, even though Reed Connect is a superior product to Network.  (¶ 140.)

**V.     MHC Cannot and Will Not Deny the Material Allegations in the Complaint.**

MHC is careful to state that it "intends to vigorously dispute RCD's allegations and

expects the evidence to show that RCD's claims are without merit," but it does not expressly

deny any of the material allegations in RCD's Complaint.  RCD has carefully investigated the

claims in its Complaint and confirmed their validity.  In fact, Lewin has already admitted much

of the alleged wrongdoing.  Further, immediately after the Complaint was filed and MHC

investigated the allegations, MHC placed both Young and Major -- who were at the time the only

individuals named in the Complaint still employed by MHC -- on suspension without pay.  MHC has since apparently terminated Young or forced him to resign.[6]

The simple fact is that the alleged misconduct in the Complaint actually happened. MHC's instant Motion is an attempt to divert attention from its misdeeds and escape liability for its criminal conduct on the basis of supposed pleading deficiencies that simply are not borne out by the law or alleged facts.  For the reasons discussed below, MHC's Motion should be denied.

## ARGUMENT

**I.      Standard for MHC's Motion to Dismiss.**

A motion to dismiss should only be granted where the plaintiff has failed to plead sufficient factual allegations to make the challenged claim "plausible on its face."[7]  "A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently 'raise a right to relief above the speculative level.'"[8]  "The task of the court in ruling on a motion to dismiss is to 'assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"[9]  Finally, in deciding a motion to dismiss, "[t]he court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor."[10]

**II.     RCD Has Adequately Pled Its RICO Claims.**

A.      RCD's RICO Claim is Appropriate in this Case.

By its extended discussion of the "[j]udicial [h]ostility" and "[a]ntagonism" towards civil RICO claims in general, MHC implicitly suggests that any civil RICO claim should be dismissed regardless of how adequately the claim is pled -- but that is obviously not the law.  While it may

---

[6] See Sean Callahan, *Young leaves McGraw-Hill Construction*, BTOB MEDIA BUSINESS, available at http://www.btobonline.com/apps/pbcs.dll/article?AID=/20091110/MEDIABUSINESS/911109990/1001.
[7] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
[8] *Gross v. Waywell*, 628 F. Supp. 2d 475, 485 (S.D.N.Y. 2009) (quoting *Twombly*, 550 U.S. at 555.)
[9] *Id.* (quoting *In re Initial Publ. Offer. Secs. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005)).
[10] *Id.*

be true that RICO is often abused by plaintiffs with garden-variety tort claims, such as plaintiffs in "actions relating to divorce, trespass, legal and accounting malpractice, inheritance…, employment benefits, and sexual harassment…,"[11] that fact does not foreclose relief for a plaintiff who has been truly harmed by a violation of 18 U.S.C. § 1962(c).

RCD's allegations against MHC fall precisely within the province of 18 U.S.C. § 1962(c). RCD has alleged that MHC was associated with a clearly defined enterprise made up of legitimate and, as discussed below, legally distinct consultants and contractors, and that MHC conducted and participated in the enterprise's affairs through a clear, long-running pattern of racketeering activity.  RCD's Complaint sets forth in exacting detail numerous instances of mail and wire fraud conducted by MHC and its conspirators over a period of at least seven years. MHC directed its conspirators to use fake names and fictitious companies, dubbed the conspirators with monikers such as The Spy and Mr. X, and paid them in cash to hide the money trail.  Such conduct is not commonplace in Corporate America; indeed, it is difficult to distinguish MHC's actions from the organized criminal activity referenced in the Congressional testimony underlying the legislative history of RICO.

This case, therefore, is not merely a garden-variety fraud or breach of contract case that RCD is trying to "stretch" into a RICO claim.  The facts, as alleged, fit perfectly within the confines of RICO, and the United States Supreme Court has made it clear that such claims should survive despite the fact that plaintiffs in other cases have attempted to abuse the statute.

> RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach,…, but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes," Pub. L. 91-452, § 904(a), 84 Stat. 947.  The statute's "remedial purposes" are nowhere more evident than in the provision of a private action for those injured by racketeering activity.…
> …

---

[11] William H. Rehnquist, DIVERSITY JURISDICTION AND CIVIL RICO, 21 St. Mary's L.J. 5, 11 (1989).

- 18 -

Underlying the Court of Appeals' holding was its distress at the "extraordinary, if not outrageous," uses to which civil RICO has been put. … Instead of being used against mobsters and organized criminals, [RICO] has become a tool for everyday fraud cases brought against "respected and legitimate 'enterprises.'" … Yet Congress wanted to reach both "legitimate" and "illegitimate" enterprises. … **_The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences._** The fact that § 1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued. … "[The] fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth."[12]

RCD respectfully submits that, if MHC's participation in an enterprise that used a repeated pattern of such criminal conduct to victimize RCD does not give rise to a civil RICO claim, then no conduct by any mainstream business ever could.

Rhetoric aside, MHC has only enunciated two justifications for dismissing RCD's claims in this case, neither of which is valid. First, MHC's contention that RCD has not pled distinctness between MHC and the alleged Enterprise mischaracterizes the applicable law as it should be applied to the facts alleged in this case. Second, MHC's contention that RCD has not adequately pled causation relies upon a gross mischaracterization of the facts in the Complaint. Neither of these contentions justifies the dismissal of RCD's claim.

B.     RCD Has Adequately Pled an Enterprise.

It is true that "[a] corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c),"[13] but, contrary to MHC's assertions, that is *not* what RCD has pled. As discussed below, RCD's First Amended Complaint pleads that MHC associated with a number of other legally distinct corporations and individuals to form a distinct enterprise. Even the case most heavily relied upon by MHC recognizes that "a corporate entity [may be] held

---

[12] *Sedima v. Imrex Co.*, 473 U.S. 479, 498-500 (1985).
[13] *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. N.Y. 1994).

liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself."[14]

In *Cedric Kushner Promotions, Ltd. v. King*,[15] the Supreme Court took an expansive view on what constitutes sufficient distinctness under RICO, holding that a corporate defendant is sufficiently distinct from the enterprise for RICO purposes if the two are legally distinct.  Indeed, *Kushner* held that a corporate officer who is also the sole shareholder of a corporation is sufficiently distinct from that corporation for purposes of RICO -- even if the officer was carrying out the regular affairs of the corporation -- because the shareholder and the corporation are separate legal entities.[16]  The Court explained that "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that."[17]  The Second Circuit has interpreted the rule announced in *Kushner* as follows: "the RICO 'person' and alleged 'enterprise' must be only legally, and not necessarily actually, distinct."[18]

It is undisputed that the RICO persons making up the Enterprise in this case are legally distinct from MHC.  Both NE14T and Roper[19] are corporations that are completely independent

---

[14] *Id.*
[15] 533 U.S. 158 (2001).
[16] *Id.* at 163.
[17] *Id.*
[18] *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 448 (2d Cir. 2008)
[19] MHC mischaracterizes RCD's Complaint as alleging that Roper was an "unwitting instrumentality" in the scheme to defraud RCD who did not have "any hand in creating allegedly misleading comparisons."  (MHC's Motion at 17-18.)  In fact, the Complaint alleges that Roper created the misleading Roper Report, that Roper knew that the misrepresentations made to RCD to permit the Enterprise to access Reed Connect were false, and that Roper shared the other co-conspirators' common purpose of defrauding RCD.  (*See* Complaint at ¶¶ 113-15, 260, and 266.)  Discovery will show whether and to what extent Roper knew that the comparisons contained in the reports it created were misleading, but at the very least Roper knew or should have known that the comparisons were created using unauthorized access to Reed Connect and that the Roper Report was being used by MHC to attempt to harm RCD in the marketplace.  This situation is therefore clearly distinguishable from the case cited by MHC, *Crab House of Douglaston, Inc. v. Newsday, Inc.*, 418 F. Supp. 2d 193 (E.D.N.Y. 2006), in which the alleged RICO co-conspirator

of MHC.  They are not subsidiaries, divisions, or even affiliates of MHC -- they are separate

legal entities.  Similarly, Lewin and Lorenz are natural persons who are distinct from MHC; they

are not even employees of MHC.  Finally, while certain of the John Doe Defendants were

officers of MHC, *Kushner* made it clear that officers are legally independent from the

corporation for which they work.

Further, not only are these persons legally distinct from MHC, but they are also *actually*

distinct (even though, as the Second Circuit pointed out, actual distinction is not necessary for a

RICO claim to survive).[20]   NE14T, Roper, Lewin, and Lorenz are all business consultants who

provide consulting and other services to a wide range of clients other than MHC.[21]  They are

obviously distinct from MHC, and their association together for purposes of defrauding RCD

thus forms an enterprise that is also distinct from MHC.

MHC's attempt to limit *Kushner's* application to this case on the basis that RCD has sued

MHC, rather than one of MHC's officers, must be rejected.  Even before *Kushner* was decided,

the Second Circuit had already held that a RICO claim can lie against a defendant corporation

where it was legally distinct from the other members of the alleged enterprise, despite the fact

that some of those members were the corporation's agents.[22]  In *Securitron*, the plaintiff asserted

RICO claims against two one-man corporations and the individual owner of the corporations,

and the plaintiff alleged that the enterprise was made up solely of the two corporations and their

owner.  Like MHC, the defendant claimed that the plaintiff had not pled a sufficiently distinct

enterprise.[23]  However, the court denied the defendant's motion and held that the distinctness

---

did not share in the alleged lawful or unlawful purposes of the enterprise, and was actually alleged in the complaint
to have been a *victim* of the enterprise's scheme.  *Id.* at 203-205.
[20] *Smokes-Spirits.com*, 541 F.3d at 448.
[21] Complaint at ¶¶ 39-40, 69.
[22] *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 263 (2d Cir. 1995).
[23] *Id.* at 263.

principle was satisfied.[24]   The court noted that the two corporations were in distinct lines of

business and, *although the corporations' owner was an agent of both businesses and both*

*businesses benefited from his alleged criminal conduct*, each corporation was also legally distinct

from the owner.[25]

      Because the alleged co-conspirators in this case are legally distinct from MHC, RCD has

adequately pled the existence of an association-in-fact enterprise that is distinct from MHC.

MHC's assertion that RCD has failed to plead a distinct enterprise because several of the other

members of the enterprise are alleged to have been the agents of RCD is based upon a complete

mischaracterization of applicable law and should be rejected.   MHC misstates *Riverwoods*

*Chappaqua Corp. v. Marine Midland Bank, N.A.*[26] as holding that a corporate defendant and its

agents can *never* form an enterprise, regardless of whether the acts undertaken by the agents

were within the scope of their agency in carrying out the defendant's ordinary course of business

or were instead taken on behalf of the enterprise.   *Riverwoods*, however, did not go nearly so far.

*Riverwoods* held that the distinctness requirement is only violated where the corporation's agents

were alleged to have been acting within the scope of their agency *in carrying on the ordinary*

*business of the corporation*: "[B]y alleging a RICO enterprise that consists merely of a corporate

defendant associated with its own employees or agents **carrying on the regular affairs of the**

**defendant,** the distinctness requirement may not be circumvented."[27]   The Second Circuit

reiterated this point a year later by explaining that *Riverwoods* stands for the proposition that,

"Where employees associate with their corporate employer **solely** *for the purpose of carrying on*

---

[24] *See id.*

[25] *Id.* at 263-64 ("[E]ven if [the owner] owned 100% of the shares of each corporation, the corporations would be separately existing legal entities capable of constituting an association-in-fact enterprise. ... Both corporations benefited from the illicit activities of their agent[], [the owner]....").

[26] 30 F.3d 339, 344 (2d Cir. 1994).

[27] *Id.* at 344 (emphasis added).

*the regular affairs of the employer*, it cannot be said that the corporation is a separate enterprise."[28]

The alleged enterprise at issue in *Riverwoods* consisted only of a bank and the bank's **employees** who were acting within the scope of their employment and carrying out the bank's ordinary business: "[A]ll of the actions taken by the [enterprise], such as negotiating and executing the restructured loan and exacting personal guarantees…, were undertaken on behalf of the [bank] and were directly related to the bank's business."[29] The plaintiff even admitted in its appellate brief that "'the racketeering activity alleged was a "regular way of conducting" [the corporate defendant's] business.'"[30] At most, *Riverwoods* stands for the principle that a corporate defendant and its employees carrying out the defendant's regular course of business cannot constitute an enterprise for purposes of RICO.

Accordingly, *Riverwoods* does <u>not</u> apply in situations where, as here, a corporation's third-party agents act in a manner that goes beyond the regular affairs of the corporation and is instead conducted on behalf of an independent enterprise. This Court recognized as much in *G-I Holdings v. Baron & Budd*,[31] a case in which the corporate defendant was alleged to have used various third parties as agents to perpetrate a fraudulent scheme. Specifically, the defendant, a law firm, allegedly participated in an association-in-fact enterprise made up of doctors, trade unions, and local counsel, the purpose of which was to secure large settlements from a particular asbestos manufacturer by, among other things, locating potential plaintiffs and fabricating

---

[28] *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 263 (2d Cir. 1995).
[29] *Riverwoods*, at 344-45; *see also De Falco v. Bernas*, 244 F.3d 286, 307 (2d Cir. 2001) ("In *Riverwoods*, this Court applied the distinctness requirement to hold that a bank - the RICO enterprise and the sole defendant - could not be liable under section 1962(c) when the RICO persons identified were the bank and bank employees *acting within the scope of their employment*.") (emphasis added.)
[30] *Id.* at 345.
[31] 238 F. Supp. 2d 521 (S.D.N.Y. 2002) (Sweet, J.).

evidence.[32]  The plaintiff alleged that the entire enterprise "operate[d] under the overall

direction" of the corporate defendant, which led the defendant to argue, as MHC does here, that

the other members of the enterprise were agents of the defendant and therefore not distinct.[33]

This Court held that, even if the members of the enterprise were agents of the defendant, the

claim did not fail under *Riverwoods* because the acts of the defendant law firm and its agents

"went beyond conducting the normal affairs of [the firm]," and were instead conducted on behalf

of the enterprise to further the enterprise's purpose.[34]

      This necessarily must be the rule.  MHC's strained interpretation of *Riverwoods* would

negate the application of all Section 1962(c) RICO claims to corporations who conduct the

affairs of an enterprise through racketeering activity.  A corporation can only act through its

agents.  Accordingly, whenever a corporation conducts an enterprise through a pattern of

racketeering (the sine qua non of a Section 1962(c) claim), the enterprise's members will always

be acting as the corporation's agents.  In short, MHC's mischaracterization of *Riverwoods* proves

too much and leads to a conclusion directly contrary to the intent of the statute.

      As in *G-I Holdings*, even if all of the members of the Enterprise in the instant case acted

as MHC's agents, their actions went far beyond the regular affairs of MHC's business.  MHC is

a national provider of construction project information to consumers in the construction

information industry.  Its regular affairs include the provision of construction project information

to consumers -- not the use of mail and wire fraud to steal competitors' project information and

disseminate misleading product comparisons in order to force its primary competitor out of the

marketplace.  When the co-conspirators such as Lewin, Lorenz, and NE14T subscribed to Reed

Connect under false pretenses for the direct purpose of misappropriating RCD's information,

---

[32] *Id.* at 546.
[33] *Id.*
[34] *Id*. at 547.

they "went beyond conducting the normal affairs" of MHC and were instead acting on behalf of the enterprise whose purpose, as alleged in the Complaint, was to "defraud[] RCD and obtain[] unauthorized access to Reed Connect and RCD's confidential and proprietary information." Accordingly, under the rubric of *Riverwoods*, RCD has pled an enterprise that is sufficiently distinct from MHC.

>    C.    RCD Was Injured as a Proximate Result of the Enterprise's RICO Violations.

"In order to establish standing to undertake a civil action under RICO, it must be shown that plaintiff's harm was proximately caused by the RICO predicate acts alleged, i.e. that there was a direct relationship between plaintiff's injury and the defendant's conduct."[35]

Here, the Enterprise's RICO violations were the direct cause of RCD's injuries. MHC's assertion in its Original Motion (which is referenced in its revised motion) that there is a "gap in the causal chain" because "[MHC's] misrepresentations [to customers] could have been made even *without* MHC having access to Reed Connect" is a complete misstatement of the facts alleged in RCD's Complaint and, moreover, ignores the obvious direct injury to RCD's business caused by MHC's misrepresentations to customers and its theft of RCD's project information.

>    1.    *MHC's Use of its Access to Steal Project Information.*

RCD alleges that MHC used the Enterprise's access to Reed Connect to effectively steal RCD's project information, thereby improperly augmenting MHC's database with projects that were previously available exclusively on Reed Connect and eliminating RCD's competitive advantage.[36] This is even more egregious than providing customers with misleading comparisons. By stealing RCD's information, MHC was able to combine the projects that were

---

[35] *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 583 (S.D.N.Y. 1995); *see also Hemi Group, LLC v. City of New York*, No. 08-969, 2010 U.S. LEXIS 768 at *14 (U.S. Jan. 25, 2010) ("[P]roximate cause…requires 'some direct relation between the injury asserted and the injurious conduct alleged.'") (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).
[36] Complaint at ¶¶ 130-34, 260.

exclusively in its database with those that were exclusively available in RCD's to potentially have more projects available than RCD.[37]  Thus, in certain situations, customers who performed valid comparisons between the programs without using MHC's manipulated search parameters were led to believe that Network legitimately had more projects than Reed Connect.[38]

RCD was injured by MHC's theft of its project information: it lost the competitive advantage of having the projects exclusively available on Reed Connect and it lost customers who chose Network due to its inflated project count.  As alleged in the Complaint, certain of RCD's customers and prospective customers "selected MHC because of the number of projects available in its database, which included the projects MHC misappropriated from RCD."[39]  The predicate acts set forth in the Complaint were the direct cause of this injury; the Enterprise's acts of mail and wire fraud were necessary to obtain access to Reed Connect, and MHC was only able to steal RCD's projects because of that access.  Thus, contrary to the causal chain set out in MHC's Motion, here there were no "intervening and superseding steps."[40]  The predicate acts of mail and wire fraud were thus the direct and proximate cause of RCD's injury.

2. *MHC's Use of its Access to Create Misleading Comparisons.*

RCD's injury resulting from MHC's use of misleading comparisons also was directly caused by the predicate acts alleged in the Complaint.  RCD alleges that MHC used its access to, and resulting familiarity with, Reed Connect to manipulate search parameters which produced misleading data comparisons to make it appear as though Reed Connect had far fewer projects than Network, when in fact it did not.  It was the creation of these manipulated search parameters

---

[37] It should be noted that, despite potentially having more projects in its database due to stealing RCD's project information, MHC still used the misleading comparisons described above to further inflate the difference between the two databases.

[38] These valid comparisons would not be skewed in the same sense as the misleading comparisons discussed above, but would show that Network had an inflated project count due to its MHC's theft of RCD's information.

[39] Compaint at 226.

[40] MHC's Motion at 20.

which ultimately allowed MHC to mislead the marketplace.  While MHC could have, as it suggested in its Original Motion, simply fabricated the comparisons to misrepresent that Network had more projects than it actually did, MHC's scheme was different and much more cunning.  Roper would have never validated MHC's data comparisons if the numbers were simply made up.  Rather, MHC was able to present Roper with data comparisons that appeared to be accurate because they generated the number of projects MHC claimed -- thereby providing an ostensible basis for Roper to "verify" the numbers -- but the comparisons were ultimately misleading due to the manner in which the search parameters were created.  By obtaining Roper's validation of the data comparisons, MHC was able to lend credibility to the Roper Report comparisons, which were then presented to customers.[41]

Further, MHC used the manipulated search comparisons to create impromptu comparisons for certain customers.  Sophisticated customers would not simply take MHC's word for its program's superiority; they would want to actually see comparisons between the project counts on Network and Reed Connect.  As alleged in the Complaint, MHC informed these customers to run comparisons using the misleading parameters it had created, and the customers were thus able to see for themselves that the project counts in Network were superior to Reed Connect -- as long as the customers used the exact parameters they were given by MHC.[42]  Based on the claims in the Roper Report and the outcomes of these impromptu comparisons, these customers chose Network over Reed Connect, thereby harming RCD's business.

Without accessing Reed Connect, MHC would have been unable to use the Roper Report or impromptu data comparisons to mislead customers and injure RCD.  This is therefore not a

---

[41] Discovery will show whether Roper knew, or had reason to know, that the search parameters were manipulated. As discussed above in footnote 19, at a minimum Roper knew or should have known that it was unlawfully accessing Reed Connect and that the Roper Report was being used by MHC to attempt to harm RCD in the market.
[42] Customers who compared the programs using their own search parameters reported that Network's comparisons were extremely misleading.

case in which the injury to RCD "happened or could have happened independently of the [predicate] act."[43]  Rather, MHC was <u>only</u> able to mislead RCD's customers and prospective customers regarding the superiority of its products because it had unauthorized access to Reed Connect, and the predicate acts were essential to obtaining such access.  Accordingly, those acts directly caused RCD's injuries.

### 3. MHC's Communications to Customers.

In addition to the various acts of mail and wire fraud directed toward it, RCD also alleges that MHC transmitted via email and the internet certain documents containing fraudulent misrepresentations -- including misleading data comparisons between Network and Reed Connect and misrepresentations that MHC legitimately obtains all of its project information -- to consumers in the construction data industry.[44]  The Complaint alleges that MHC intended for the consumers who received the documents to rely upon the misrepresentations and that the consumers did, in fact, rely upon them "by subscribing to MHC's products and services rather than RCD's."[45]  These acts of wire fraud also directly and proximately caused RCD's injuries.[46]

In *Bridge v. Phoenix Bond & Indem. Co.*,[47] the Supreme Court held that a party such as RCD can be sufficiently injured by a pattern of mail or wire fraud to have standing to assert a civil RICO claim even if the pattern of mail or wire fraud was directed toward third parties, such

---

[43] *Red Ball*, 874 F. Supp. at 587.
[44] Complaint at ¶ 259(f).)
[45] Complaint at ¶ 261.
[46] Contrary to MHC's assertions, RCD has pled these acts of wire fraud with sufficient particularity pursuant to Rule 9(b).  RCD alleges the approximate dates that MHC transmitted the offending documents (including the specific date -- February 15, 2008 -- for one of the documents), the title of each of the documents, the recipients of the documents (MHC's customers), and the manner in which each of the documents was misleading.  (Complaint at ¶ 259(f).)  The documents at issue are all alleged to contain misleading data comparisons taken from the Roper Report, and two of the documents allegedly contain misrepresentations that MHC legitimately obtains all of the project information in its database.  (*Id.*)  RCD's Complaint explains in detail how the Roper Report comparisons are misleading and why MHC does <u>not</u> legitimately obtain its project information.  (*See id.* at 110-19, 130-35.)  These allegations are sufficient to put MHC on notice as to the basis of RCD's claim, as required by Rule 9(b).  *See Bhandari v. Bittner*, No. 03-CV-0012E(Sc), 2004 U.S. Dist. LEXIS 29356 at *9 (W.D.N.Y. Oct. 5, 2004).
[47] 553 U.S. 639, 128 S. Ct. 2131 (2008).

as RCD's customers.[48]   Indeed, the Court strongly implied that a business which is the primary

and intended victim of a fraudulent scheme by a competitor and is injured by that competitor's

actions in the manner RCD alleges in the Complaint, *i.e.* by losing customers and prospective

customers due to the competitor's fraudulent misrepresentations, has standing to assert a RICO

claim against the competitor:

> [S]uppose an enterprise that wants to get rid of rival businesses mails
> misrepresentations about them to their customers and suppliers, but not to the
> rivals themselves.  If the rival businesses lose money as a result of the
> misrepresentations, it would certainly seem that they were injured in their
> business "by reason of" a pattern of mail fraud, even though they never received,
> and therefore never relied on, the fraudulent mailings.[49]

As set forth in the Complaint, RCD was the direct and intended target of the Enterprise's

fraudulent scheme; indeed, the predicate acts of wire fraud directed toward RCD's customers and

prospective customers only contained misleading comparisons between the products of MHC

and RCD.  Thus, under *Bridges*, the injury suffered by RCD when those customers did, in fact,

subscribe to Network instead of Reed Connect was proximately caused by the predicate acts.

The Supreme Court's recent holding in *Hemi* makes *Bridges'* application to this case

even clearer.  In *Hemi*, the Court recognized the "zero-sum nature of the auction" at issue in

*Bridges*: whenever one party won a bid by fraud, the bid was necessarily lost by the party's

competitor and the competitor was thereby injured as a proximate result of the fraud.[50]  Similarly,

RCD and MHC are the only competitors in the national construction project information market,

so their competition for customers is a zero-sum game: every account that MHC wins by fraud is

necessarily an account lost by RCD.  Accordingly, RCD's injury as a result of losing customers

who relied on MHC's misrepresentations was proximately caused by MHC's acts of wire fraud.

---

[48] *Id.*, 553 U.S. at --, 128 S. Ct. at 2145.
[49] *Id.* 553 U.S. at --, 128 S. Ct. at 1239.
[50] *See Hemi*, No. 08-969, 2010 U.S. LEXIS 768 at *22-23.

### III.   RCD's RICO Conspiracy Claim Should Not Be Dismissed.

The only basis upon which MHC asserts that RCD's RICO conspiracy claim should be dismissed is its argument that the RICO claim should be dismissed. Because, as shown above, RCD's claim should not be dismissed, neither should the RICO conspiracy claim.

### IV.   RCD Has Adequately Pled Misappropriation of Confidential Information.

MHC's contention that RCD's claim for misappropriation of confidential information *against MHC* is precluded by its contracts with *Lorenz and Lewin* mischaracterizes the law. First, the rule upon which MHC relies only applies where the plaintiff and defendant are both parties to a contract.[51] RCD has not alleged that MHC was a party to its subscription agreements with Lorenz or Lewin, nor has it sued MHC for breach of those agreements. Similarly, MHC has also not alleged that it was a party to RCD's agreements with Lorenz and Lewin. Accordingly, the rule cited by MHC does not have any application to RCD's misappropriation claim against MHC.

Moreover, even if MHC were a party to the subscription agreements, the rule would still not bar RCD's misappropriation claim. Where the plaintiff and defendant are both parties to a contract, the plaintiff may sue the defendant in tort if its actions violated a duty that is "independent" of the contract.[52] In such a case, "the focus is on whether a noncontractual duty was violated; a duty imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contractual agreement."[53] In other words, if the defendant's conduct would have violated a common-law duty to the plaintiff absent the contract, the

---

[51] *Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003) (discussing the rule applicable "[w]here the plaintiff and defendant are parties to a contract, and the plaintiff seeks to hold the defendant liable in tort"); *see also Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S.2d 279, 281-82, 137 A.D.2d 50, 55 (N.Y. App. Div. 1st Dep't 1988) (discussing the rule governing the circumstances under which "a party to a contract may be held liable in tort to another party thereto").

[52] *Carvel*, 350 F.3d at 16 ("Where the plaintiff and defendant are parties to a contract, and the plaintiff seeks to hold the defendant liable in tort, the plaintiff must prove that the defendant breached a duty 'independent' of its duties under the contract.").

[53] *Apple Records*, 529 N.Y.S.2d at 282, 137 A.D.2d at 55.

defendant may be held liable for the tort regardless of whether a contract exists between the parties.[54]  This is true even if the defendant's tortious conduct "arise[s] from and [is] inextricably intertwined with that conduct which also constitutes a breach of contractual obligations."[55]

Accordingly, in situations such as this, where the defendant has done more than simply fail to comply with the terms of a contract and has undertaken affirmative steps to intentionally harm the plaintiff -- thereby violating a common-law duty to the plaintiff -- the plaintiff may sue the defendant in tort despite the existence of a contract.  As the Second Circuit held in *Carvel* (one of the primary cases relied upon by Defendants), "[w]hen a defendant breaches its contract with a plaintiff, that defendant may also breach an independent duty in tort if the defendant goes beyond a mere breach of the contract and acts in such a way that a trier of fact could infer ***that it willfully intended to harm the plaintiff***."[56]  As explained by New York's Court of Appeals in the "the **leading case** on the subject," *Rich v. New York C. & H. R. R. Co.*:[57]

> a breach of contract may be so intended and planned; so purposely fitted to time, and circumstances and conditions; so in woven into a scheme of oppression and fraud; so made to set in motion innocent causes which otherwise would not operate, as to cease to be a mere breach of contract, and become, in its association with the attendant circumstances, a tortious and wrongful act or omission.
>
> It may be granted that an omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty. But such legal duty may arise, not merely out of certain relations of trust and confidence, inherent in the nature of the contract itself, … but may spring from extraneous circumstances, not constituting elements of the contract as such, although connected with and dependent upon it, and ***born of that wider range of legal duty which is due from***

---

[54] *See id.*; *see also Albemarle Theatre, Inc. v. Bayberry Realty Corp.*, 277 N.Y.S.2d 505, 509, 27 A.D.2d 172, 175 (N.Y. App. Div. 1st Dep't 1967).

[55] *Apple Records*, 529 N.Y.S.2d at 282, 137 A.D.2d at 55.

[56] *Carvel*, 350 F.3d at 16 (emphasis added).  *See also Albemarle*, 277 N.Y.S.2d at 509, 27 A.D.2d at 175 ("'Where the defendant has done something more than remain inactive, and is to be charged with a 'misfeasance' the possibility of recovery in tort is considerably increased * * * Here again the duty is an incident of the relation rather than the contract.'") (quoting Prosser, Torts, [3d ed.], pp. 637-38); *Boyce v. Greeley Square Hotel Co.*, 228 N.Y. 106, 111, 126 N.E. 647, 649 (N.Y. 1920) (holding that the defendant could be liable in tort, regardless of its contract with the plaintiff, where "the acts of the defendant were wrongful and violative of the duty imposed by law. They were committed in virtue of a deliberate intent and design and were willful and not merely negligent.").

[57] *Albemarle*, 277 N.Y.S.2d at 509, 27 A.D.2d at 175 (emphasis added).

>*every man to his fellow, to respect his rights of property and person, and refrain from invading them by force or fraud.* [58]

Under this rule, courts have found the existence of the requisite independent duty in a number of situations similar to the case at hand.[59]

In its Complaint, RCD alleges that MHC used its unauthorized access to Reed Connect through Lorenz and Lewin to willfully and maliciously misappropriate its confidential information, including, among other things, RCD's project information and proprietary search algorithms -- which were the property of RCD.[60]  RCD alleges that MHC used RCD's information to compete with it by misleading its customers and prospective customers, thereby harming RCD's business and preventing it from reaping the full profits of its own information.[61]  MHC's misappropriation in this manner breached a number of its common-law duties to RCD that are independent of RCD's subscription agreements with Lorenz and Lewin, including: the duty to "respect [RCD's] rights of property…, and refrain from invading them by force or

---

[58] *Rich v. New York C. & H. R. R. Co.*, 87 N.Y. 382, 398-99, 1882 N.Y. LEXIS 13, 31-33 (N.Y. 1882).  *See also Merrin Jewelry Co. v. St. Paul Fire & Marine Ins. Co.*, 301 F. Supp. 479, 481 (S.D.N.Y. 1969) ("[W]hen the breach of the contract is but part of a course of conduct aimed at destroying plaintiff's business for the benefit of its competitors … plaintiff may sue in tort for wrongful interference with its business.").

[59] *See Carvel*, 350 F.3d at 17 (holding that the defendant's decision to institute a program that it knew would damage the plaintiff's relationship with its customers, and which also constituted a breach of the parties' agreement, was sufficient to give rise to tort liability because it violated "the duty to not interfere with [the plaintiff's] prospective contractual relations and thereby destroy their businesses"); *Albemarle*, 277 N.Y.S.2d at 511, 27 A.D.2d at 177 (holding that the defendants' intentional failure to perform its contract with the plaintiff as part of a scheme to damage the plaintiff's competitive position in the market  "constituted…a violation of their legal common-law duty extraneous to the contract not to act wilfully to destroy the property of another, including the plaintiff"); *Apple Records*, 529 N.Y.S.2d at 283, 137 A.D.2d at 58 (holding that the defendants could be liable in tort for violating "their duty to respect plaintiffs' property rights" and their duty as bailees of the defendant's property where the defendants allegedly misappropriated property belonging to the plaintiffs); *Kaleida Health v. Medtronic Sofamor Danek USA, Inc.*, No. 05-CV-0675C(F), 2006 U.S. Dist. LEXIS 92295 at *20-21 (W.D.N.Y. Dec. 21, 2006) (holding that the defendant could be held liable in tort where it, among other things, concealed information from the plaintiff regarding its sales representatives' misconduct concerning the plaintiff's account, thereby violating "the duty not to conceal information about its sales representatives' misconduct"); *Shen v Signature Dev. Corp.*, No. 35803/04, 2009 NY Slip Op 52627U at 10 (N.Y. Sup. Ct. Dec. 29, 2009) (holding that, by alleging the defendants entered the agreement solely to misappropriate the plaintiffs' expertise, the plaintiffs adequately "alleged that 'a legal duty independent of the contract itself has been violated'") (quoting *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389, 516 N.E.2d 190, 193 (N.Y. 1987)).

[60] *See* Verified Complaint at ¶¶ 180-81, 183, and 191.

[61] *Id.* at 136-39, 185-86.

fraud;"[62] the duty not to interfere with RCD's relationship with its customers and attempt to destroy RCD's business;[63] the duty not to conceal information about Lorenz's and Lewin's affiliations with MHC and to disclose its use of RCD's information;[64] and, quite simply, the duty not to misappropriate the property of another.[65]

Indeed, MHC's use of deceit to obtain access to Reed Connect and steal RCD's property in the form of its confidential and proprietary information, and its use of the same to compete with RCD in complete disregard of RCD's property rights and in a blatant attempt to harm RCD's business, would give rise to a claim against MHC for misappropriation of confidential information even if there were no subscription agreements between RCD and Lorenz and Lewin. Accordingly, the existence of the agreements does not preclude RCD's misappropriation claim.

## V.   RCD Adequately Pled Its Tortious Interference Claim.

In its Original Motion, MHC asserted that RCD's claim for tortious interference with prospective economic advantage should be dismissed because RCD did not specifically identify the relationships with its former or prospective customers with which MHC allegedly interfered,[66] even though RCD is arguably under no requirement to identify those customers by name at this stage in the litigation.[67]   RCD's Original Complaint identified the customers

---

[62] *Rich*, 87 N.Y. at 398, 1882 N.Y. LEXIS 13, 32.  *See also Albemarle*, 277 N.Y.S.2d at 511, 27 A.D.2d at 177 (recognizing the "common-law duty extraneous to the contract not to act wilfully to destroy the property of another, including the plaintiff"); *Apple Records*, 529 N.Y.S.2d at 283, 137 A.D.2d at 58 (recognizing the duty not to misappropriate the property of another in "total disregard" of the parties' property rights).

[63] *Carvel*, 350 F.3d at 17.

[64] *See Kaleida*, No. 05-CV-0675C(F), 2006 U.S. Dist. LEXIS 92295 at *20-21.

[65] *See Shen*, No. 35803/04, 2009 NY Slip Op 52627U at 10.

[66] MHC's Original Motion at 23-26.

[67] *See, e.g., Leadsinger, Inc. v. Cole*, No. 05 Civ. 5606, 2006 U.S. Dist. LEXIS 55638 (S.D.N.Y. Aug. 10, 2006) ("[I]n the context of a tortious interference with prospective economic advantage claim, plaintiff is not required at the pleading stage 'to identify with sufficient specificity the prospective contractual relationships in question.'") (quoting *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 335 (S.D.N.Y. 2003)); *Reading Int'l*, 317 F. Supp. 2d at 335; *Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228, 237 (S.D.N.Y. 2002) ("The fact that the complaint fails to identify the relationships that were interfered with is of no consequence."); *SLM, Inc. v. Shelbud Products Corp.*, No. 92 Civ. 3073, 1993 U.S. Dist. LEXIS 5171, *12-13

generally as being either former RCD customers who subsequently became MHC customers or prospective RCD customers who were actively comparing RCD's products and services with those of MHC.[68]  Because there is a finite number of national accounts and RCD and MHC are the only competitors for those accounts, and because all of the customers at issue in RCD's claim are now customers of MHC, RCD's Original Complaint placed MHC on sufficient notice as to those customers' identities.[69]

Nevertheless, to address MHC's concerns, RCD's Amended Complaint identifies by name 221 of the customers at issue in its claim, arranged by the year in which MHC tortiously interfered with RCD's relationships with them.  RCD has sufficiently alleged that it had a business relationship and reasonable expectancy of entering into a contractual relationship with each of these customers, either on the basis of RCD's prior relationships with former customers or its active negotiations with prospective customers, and that MHC knew of those relationships and intentionally interfered with them.  While RCD may uncover additional customers during the course of discovery to be added to its claim, the identification of 221 specific relationships is more than sufficient to satisfy RCD's pleading requirements at this stage of the litigation.[70]

Incredibly, MHC now asserts that RCD has named *too many* customers in its Amended Complaint.  MHC contends, without any factual basis whatsoever, that RCD's Amended Complaint lists "*every* national account customer that has 'terminated or chosen not to renew' its subscription agreement with RCD and *every* purported 'prospective customer' since 2006 that

(S.D.N.Y. Apr. 19, 1993) ("[P]laintiff fails to identify by name the prospective business relationships that it alleges have been interfered with…. [P]laintiff need not identify these parties by name at this stage of the litigation.")
[68] Complaint at 220, 224.
[69] *See SLM*, at *13 (holding that the plaintiff's pleading "sufficiently identifies the prospective business relationships as being with inventors, SLM employees, and others in the toy industry."); *see also Reading Int'l*, 317 F. Supp. 2d at 335 ("It would be unreasonable to require more specific pleadings prior to discovery.")
[70] *See Jim Mazz Auto, Inc. v. Progressive Cas. Ins. Co.*, Nos. 08-CV-00494, 00541, 00566, and 00583, 2009 U.S. Dist. LEXIS 27687 at *3-4 (W.D.N.Y. Mar. 31, 2009) (denying defendants' motion to dismiss tortious interference claim where the plaintiff identified by name only one business relationship in each of its four amended complaints).

has chosen MHC over RCD."[71]  That is simply not true.  In fact, RCD went to great efforts to identify in its Amended Complaint only those customers and prospects who selected MHC over RCD for reasons related to the amount of construction project information available through Network as compared to Reed Connect -- either because the customers were provided with misleading comparisons by MHC or because MHC actually had more project information of interest to the customers as a result of stealing project information from RCD.

Since 2006, RCD has maintained an ongoing report of all customers who have terminated or not renewed their subscriptions with RCD and have subscribed instead to MHC and all prospective customers who have selected MHC over RCD after actively comparing the two competitors' systems.  As part of the report, the sales representatives in charge of each customer or prospect have been required to list the reason or reasons provided by each customer for its decision to choose MHC over RCD.  For the vast majority of these customers, the reason provided for their decision to choose MHC over RCD relates to the customers' perception of the amount of project information available on Network as opposed to Reed Connect.  In selecting the customers identified in the Amended Complaint, RCD verified the information in its report with its sales managers and representatives and, to the best of its ability at this stage in the case, only identified those customers and prospective customers who selected MHC over RCD due to the customers' perceptions regarding the amount of project information available on the competing systems.  In doing so, RCD omitted from its Complaint every customer that provided a reason for choosing MHC over RCD that was unrelated to the amount of project information on the two systems.  As a result of this rigorous investigation, RCD believes that it will be able to prove that all 221 of the customers identified in its Complaint chose MHC over RCD due to

---

[71] MHC's Motion at 25 (quoting the Amended Complaint at ¶¶ 210-11, 224-25.)

their reliance on MHC's misleading comparisons or due to the amount of project information on

Network -- which was inflated as a result of MHC's theft of information from RCD.

Accordingly, MHC's assertion that RCD has violated Rule 11 by naming the 221

customers is baseless.  As shown above, RCD clearly has "evidentiary support" or is "likely to

have evidentiary support after a reasonable opportunity for further investigation or discovery" for

its contentions concerning each of those customers.  By accusing RCD and its attorneys of

violating Rule 11, without so much as inquiring of RCD as to how it identified the customers in

the Complaint, MHC has gone too far.  "'Rule 11 is not a toy.' … A Rule 11 violation is … 'a

serious thing, and an accusation of such wrongdoing is equally serious.'"[72]  Such an accusation

must have a reasonable basis in law or fact, and here MHC has none.[73]

Further, MHC's contention that there are "'obvious alternative explanation[s]' for the

identified customers' choices," and that RCD's claim must therefore be dismissed,

mischaracterizes the Supreme Court's statements in *Bell Atl. Corp. v. Twombly*[74] and *Ashcroft v.

Iqbal*.[75]  In those cases the Supreme Court held that where there are multiple explanations for a

defendant's conduct, one of which is illegal and one of which is lawful, and the lawful

explanation is more likely than the unlawful explanation proposed by the plaintiff, the plaintiff's

claim may be dismissed.[76]  The Court's pronouncement thus relates to alternative explanations

---

[72] *Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 421 (S.D.N.Y. 2003) (quoting *Draper and Kramer, Inc. v. Baskin-Robbins, Inc.*, 690 F. Supp. 728, 732 (N.D. Ill. 1988)).

[73] In *Draper*, the court sanctioned a party for accusing the opposing party of violating Rule 11 without any basis in law or fact for the accusation.  *See Draper*, 690 F. Supp. at 732 ("That [the accusing party] did not separately move for Rule 11 sanctions, but instead invoked the rule as part of its argument on the merits, makes no difference.  This court appreciates that attorneys involved in heated litigation often employ rhetoric stronger than necessary, and the court can tolerate arguments harsher in tone than appropriate.  This tolerance ends, however, when arguments turn into accusations of professional misconduct.").

[74] 550 U.S. 544 (2007).

[75] --- U.S. ---, 129 S. Ct. 1937 (2009).

[76] *See Twombly*, 550 U.S. at 567 (holding that there was an obvious alternative explanation to the defendant's conduct than that presented in plaintiff's claim of antitrust conspiracy); *Iqbal*, --- U.S. ---, 129 S. Ct. at 1951-52 (holding that the arrests at issue were more likely the result of the "lawful … nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed

*for the defendant's conduct* which may show that it was not tortious or illegal, <u>not</u>, as MHC contends, to alternative explanations for the plaintiff's injury.

Moreover, even if MHC's analysis of the law were correct -- which it is not -- there are no alternative explanations for the customers' choices of MHC over RCD that are more likely than the explanation presented in RCD's Complaint.  RCD has already weeded out those customers who selected MHC for a reason unrelated to the project information available on the two systems, so the 221 customers identified chose MHC specifically because of their misconceptions regarding project information.[77]  As alleged in the Complaint, those misconceptions either came from: (1) their reliance upon the misleading comparisons in the Roper Report; (2) their reliance upon the impromptu misleading comparisons performed by MHC; or (3) the fact that MHC's project information in some situations *may have* exceeded RCD's because MHC inflated its own information by stealing the information from RCD.[78] MHC has been stealing RCD's project information and using that information to compete with RCD for years, and it has been providing misleading product comparisons to customers for years. Such widespread dissemination of misleading information has saturated the market with misrepresentations regarding MHC's superiority to RCD in construction project information -- so MHC's misconduct is the *most likely* cause of *any* customer's decision to choose MHC over RCD based on the quantity of project information available.  If MHC is now concerned about the large number of customers who were affected by its misconduct, MHC only has itself to blame.

---

terrorist acts" than "the purposeful, invidious discrimination respondent asks us to infer"); *see also Willets Point Indus. & Realty Ass'n v. City of New York*, No. 08-cv-1453, 2009 U.S. Dist. LEXIS 110181 at *9-10 (E.D.N.Y. Nov. 25, 2009) ("Factual allegations do not 'plausibly give rise to an entitlement of relief' where those factual allegations, taken as true, are 'merely consistent with a defendant's liability,' … but are also 'not only compatible with, but indeed . . . more likely explained by, lawful . . . behavior'"….) (quoting *Iqbal*, 129 S. Ct. at 1951-52).

[77] Because MHC's assertion that RCD's Complaint identifies "*every* customer who chose MHC over RCD" is wrong, its assertion that "it is utterly implausible for RCD to allege that every customer who left RCD for MHC did so because of purported misrepresentations by MHC" is misplaced.  *See* MHC's Motion at 27-28.

[78] Complaint at ¶¶ 136-37, 211, 217, 225-26.

**VI.   RCD's Section 349 Claim Has Been Sufficiently Pled.**

As even MHC concedes, New York law is settled that corporate competitors "have

standing to bring a claim under [Section 349] … so long as some harm to the public at large is at

issue."[79]  Indeed, as the Second Circuit has explained, "[t]he critical question…is whether the

matter affects the public interest in New York, not whether the suit is brought by a consumer or a

competitor."[80]

Contrary to MHC's assertions, the conduct alleged in the Complaint directly affects the

public interest in New York.  "*[F]alse comparative advertising [is] a matter **certainly** affecting

the public at large*."[81]  RCD has alleged that MHC has roundly deceived consumers in the New

York market by providing them with false information regarding MHC's products and

misleading comparisons between Network and Reed Connect.  This conduct has continued for at

least seven years and has caused consumers in New York to subscribe to Network instead of

Reed Connect on the basis of misleading information.  These consumers have been injured by

paying approximately twice as much for a subscription to Network than a comparable

subscription to Reed Connect, even though Reed Connect is a superior product to Network.  This

type of injury to New York consumers falls precisely within the ambit of Section 349.[82]

*Lockformer* is directly analogous to the present case.  The defendants in *Lockformer*

allegedly distributed a memorandum to consumers which, like the Roper Report, "'misled

prospective purchasers into believing that the [defendant's product] was competitively superior

---

[79] *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (quoting *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 786 F. Supp. 182 (E.D.N.Y. 1992)).
[80] *Id.*
[81] *Construction Technology v. Lockformer Co.*, 704 F. Supp. 1212, 1222 (S.D.N.Y. 1989).
[82] "[D]irect deception against ordinary consumers where the chief injury is to the consumer rather than competitors, would appear clearly within the scope of Gen. Bus. §§ 349-350….  Inquiry in such cases thus need focus only on whether deception was practiced, not on any separate "public interest" question. And either the consumer or an injured competitor may sue."  R. Givens, PRACTICE COMMENTARIES ON GEN. BUS. §§ 349, 350 at 569 (McKinney 1988).

to the [plaintiff's product] and resulted in a diversion of sales from [plaintiff] to defendants.'"[83]
The court held that the defendant's distribution of misleading comparisons to consumers
sufficiently affected the public at large to grant the plaintiff (a competitor) standing under
Section 349.[84]

On the other hand, the cases primarily relied upon by MHC are easily distinguishable.  In
*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,[85] the counterclaim plaintiff sold authentic Gucci
products to consumers, who were informed that the products were authentic (which they were).[86]
However, if those consumers later tried to return the products to a Gucci store without a receipt,
Gucci employees allegedly questioned the authenticity of the products.  In asserting a Section
349 claim against Gucci, the counterclaim plaintiff alleged that the harm to the consuming public
was that those consumers who had already purchased authentic Gucci products from the
counterclaim plaintiff, but who were led to believe they were not authentic, may be forced to
return the products to the counterclaim plaintiff's store and purchase them instead from a Gucci
store, potentially paying a higher price.[87]  The court held that such an attenuated "harm" to the
public would not suffice for purposes of a Section 349 claim.[88]  In doing so, however, the court
expressly stated that the facts in *Gucci* were "clearly distinguishable" from cases such as
*Lockformer*, which addressed false comparative advertising.  Indeed, in *Gucci* consumers were
actually getting what they paid for -- authentic Gucci products -- whereas in *Lockformer,* and the
present case, consumers are paying for products on the basis of false and misleading promises
about the products' superiority.

---

[83] *Lockformer*, 704 F. Supp. at 1217 (quoting Plaintiff's Complaint.)
[84] *Id.* at 1222.
[85] 277 F. Supp. 2d 269 (S.D.N.Y. 2003).
[86] *Id.* at 274.
[87] *Id.*
[88] *Id*. at 275

Similarly, in the other case relied upon by Defendants, *Kforce, Inc. v. Alden Pers., Inc.*,[89] the "'public still received its [product],'" because the defendant was only alleged to have misrepresented that its competitor (an information technology ("IT") staffing service) was out-of-business, and consumers were still able to obtain IT staffing from the defendant.[90] There were apparently no allegations that consumers were led to believe that the defendant's staffing services were superior to the plaintiff's or that consumers overpaid for staffing services by purchasing from the defendant.[91]

In this case, unlike *Gucci* and *Kforce*, the consuming public has been directly injured by MHC's misrepresentations, as they have been misled into paying nearly twice as much for Network even though it is an inferior product to Reed Connect. Accordingly, RCD has sufficiently pled harm to the public interest, and its Section 349 claim should not be dismissed.

## CONCLUSION

For the foregoing reasons, RCD respectfully requests that the Court deny MHC's Motion to Dismiss Counts Three, Five, Six, Seven and Eight of the Complaint.

Respectfully submitted this 26th day of February, 2010.

TROUTMAN SANDERS LLP

   /s/  Matthew J. Aaronson
Aurora Cassirer
Matthew J. Aaronson
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Tel: (212) 704-6000
aurora.cassirer@troutmansanders.com
matthew.aaronson@troutmansanders.com

---

[89] 288 F. Supp. 2d 513 (S.D.N.Y. 2003).
[90] *Id.* at 518-19 (quoting *Something Old, Something New, Inc. v. QVC, Inc.*, No. 98 Civ. 7450, 1999 U.S. Dist. LEXIS 18878 at *39 (S.D.N.Y. Dec. 7, 1999)).
[91] *See id.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
REED CONSTRUCTION DATA INC.,          :      Case No. 09-cv-8578 (RWS) (HP)
                                       :
                    Plaintiff,         :
                                       :
            v.                         :
                                       :
THE MCGRAW-HILL COMPANIES, INC.,      :
JOHN DOES One through Five; and        :
JOHN DOE ENTITIES One through Five,    :
                                       :
                    Defendant.         :
--------------------------------------------------------X

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the within and foregoing *PLAINTIFF REED CONSTRUCTION DATA INC.'S RESPONSE TO DEFENDANT THE MCGRAW-HILL COMPANIES, INC.'S MOTION TO DISMISS COUNTS THREE, FIVE, SIX, SEVEN AND EIGHT OF THE COMPLAINT* upon the opposing party via U.S. Mail with adequate first class postage affixed thereto addressed as follows:

Saul B. Shapiro
Michelle Waller Cohen
Joshua Aaron Goldberg
James Luke Kerwin
Abja Uttam Midha
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY  10036

This 26th day of February, 2010.

_____
CHARLES R. BURNETT