UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

REED CONSTRUCTION DATA INC.,

                Plaintiff,           09 Civ. 8578

   - against -                <u>OPINION</u>

THE MCGRAW-HILL COMPANIES, INC.,
JOHN DOES ONE THROUGH FIVE, and
JOHN DOE ENTITIES ONE THROUGH FIVE,

                Defendants.

------------------------------------X

A P P E A R A N C E S:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/14/10

        <u>Attorneys for Plaintiff</u>

        TROUTMAN SANDERS LLP
        The Chrysler Building
        405 Lexington Avenue
        New York, NY  10174
        By:  Aurora Cassirer, Esq.
            Matthew J. Aaronson, Esq.


        Attorneys for Defendant
        <u>The McGraw-Hill Companies, Inc.</u>

        PATTERSON BELKNAP WEBB & TYLER LLP
        1133 Avenue of the Americas
        New York, NY  10036
        By:  Saul B. Shapiro, Esq.
            Joshua A. Goldberg, Esq.

**Sweet, D.J.**


Defendant The McGraw-Hill Companies, Inc. ("Defendant"
or "MHC") has moved, pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure, to dismiss Counts Three, Five, Six,
Seven and Eight of Plaintiff Reed Construction Data Inc.'s
("Plaintiff" or "RCD") Amended Complaint.  These counts allege,
respectively, misappropriation of confidential information
(Count Three), tortious interference with prospective economic
advantage (Count Five), violation of New York General Business
Law ("GBL") Section 349 (Count Six), violation of the Racketeer
Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C.
§ 1962(c) (Count Seven), and conspiracy to violate RICO (Count
Eight).  Upon the facts and conclusions set forth below, the
motion is granted as to the RICO claims (Counts Seven and Eight)
and the GBL § 349 claim (Count Six), and denied as to Counts
Three and Five.


**Prior Proceedings**


RCD filed its original Complaint on October 8, 2009,
alleging fraud (Count One), misappropriation of trade secrets
(Count Two), misappropriation of confidential information (Count
Three), unfair competition (Count Four), tortious interference

with prospective economic advantage (Count Five), violation of GBL § 349 (Count Six), violation of RICO (Count Seven), RICO conspiracy (Count Eight), monopolization, pursuant to 15 U.S.C. §§ 15 and 26 (Count Nine), attempted monopolization (Count Ten), and unjust enrichment (Count Eleven).  On November 20, 2009, MHC moved to dismiss five of the eleven counts.  RCD filed an Amended Complaint on December 10, 2009, and, on January 22, 2010, MHC moved to dismiss Counts Three, Five, Six, Seven and Eight of the Amended Complaint.[1]

The instant motion was heard and marked fully submitted on March 24, 2010.

**The Facts**

RCD and MHC are competing providers of national, regional, and local construction project news and information to the construction industry.  (Am. Compl. ¶¶ 12, 13, 23.)  The project information, which often includes building plans and specifications, is used by customers such as building manufacturers and contractors to identify projects for which they may seek specification of their product within the plans or

---

[1]     MHC states in its opening memorandum that RCD's remaining claims "are without merit, but are not subject to dismissal at this point."  (MHC Br. 3.)

seek to submit bids for products or services.  (Id. ¶ 13.)   RCD
and MHC are the only providers of such information on a national
scale.  (Id. ¶ 23.)


RCD provides its customers a web-based subscription
service known as "Reed Connect," which permits subscribers to
search RCD's database for construction projects and related data
nationwide.  (Id. ¶¶ 14, 15.)  MHC offers its customers an
online search program similar to Reed Connect, described as the
"Dodge Network."  (Id. ¶¶ 1, 24.)  RCD alleges that an annual
subscription to the Dodge Network costs "generally twice as much
as . . . a subscription to Reed Connect," and that MHC maintains
an "80-90% share of the market for national online
subscription[s]."  (Id. ¶¶ 32, 291.)


RCD alleges that employees in MHC's "Competitive
Intelligence" unit hired several contractors to subscribe to
Reed Connect by posing as customers of RCD between 2002 and
2009.  (Id. ¶¶ 34-37.)  One contractor identified by RCD is an
individual named Henning Lorenz, who allegedly subscribed to
Reed Connect between 2002 and 2006 by representing that he was
the President and CEO of a business named NE14T Corporation,
Inc. ("NE14T") and that NE14T was a consultant for Hager Hinge
Company ("Hager Hinge"), a legitimate building product

3

manufacturer.  (Id. ¶¶ 38-43.)  When Hager Hinge subscribed to
Reed Connect in December 2005, RCD determined that Lorenz did
not work for the real Hager Hinge and cancelled his
subscription.  (Id. ¶¶ 62-64.)

       Reed alleges that MHC hired another contractor named
Glenn Lewin to subscribe to Reed Connect, paying Lewin the cost
of the subscription and a monthly fee for his services.  (Id. ¶¶
67-68, 73-75.)  Between March 2003 and January 2009, Lewin
purchased at least three subscriptions to Reed Connect under his
name and under an alias, John Carlson, by claiming that he
worked for Northern Construction Development Company ("NCDC"),
Central Business Services ("CBS"), and Arrington Partners
("Arrington"), all allegedly fictitious entities.  (Id. ¶¶ 68-
95.)  Each time Lewin purchased a subscription he signed an
agreement with RCD containing a nondisclosure provision
prohibiting him from sharing the information obtained from Reed
Connect with any person other than employees of the company for
which he claimed to work.  (Id. ¶¶ 76, 87.)  The nondisclosure
provision in Arrington's agreement with RCD also contained a
direct representation that Arrington was not subscribing under a
fictitious name to provide RCD's competitors with access to Reed
Connect.  (Id. ¶ 87.)  RCD alleges that Lewin regularly shared

his access to Reed Connect with MHC, in violation of these nondisclosure provisions.

In January 2009, Lewin is alleged to have purchased a national subscription to Reed Connect through another fictitious company, Site Amenities, under another alias, Andy Anderson. (Id. ¶¶ 90-92.)  In July or August of 2009, in connection with an audit of Site Amenities conducted by RCD, Lewin allegedly admitted that he worked for MHC, that NCDC, CBS, Arrington and Site Amenities were all fictitious companies, that John Carlson and Andy Anderson were aliases, that MHC paid for the subscriptions and Lewin's services and regularly accessed Reed Connect through Lewin's subscriptions, and that MHC had used other consultants prior to Lewin.  (Id. ¶¶ 99-101.)  RCD then terminated Lewin's subscription to Reed Connect.  (Id. ¶¶ 101-104.)

RCD alleges that MHC used its unauthorized access to Reed Connect to compete unfairly in several ways.  First, MHC allegedly shared information obtained from Reed Connect with its sales agents and "manipulated" that information to create "misleading" and favorable comparisons between the Dodge Network and Reed Connect for use in competition for customer accounts. (Id. ¶¶ 107-110.)  Second, RCD alleges that MHC used this

5

information to develop and alter the Dodge Network. (Id. ¶ 109.) Third, RCD claims that MHC presented its misleading comparisons to Roper Public Affairs & Media ("Roper"), an independent consulting firm that issues a report comparing the number of projects available in Reed Connect and the Dodge Network (the "Roper Report"), resulting in the publication of "demonstrably false and misleading" information. (Id. ¶ 110-116.) Finally, RCD alleges that MHC used its access to Reed Connect to misappropriate project information and populate its own project database, either by directly copying RCD's information or by using Reed Connect to identify projects that were available in RCD's database but not in MHC's and then contacting the source to obtain the information for such projects. (Id. ¶¶ 130-134.)

RCD asserts that at least 221 existing and prospective national account customers have switched from RCD to MHC or chosen to subscribe with MHC instead of RCD as a result of MHC's alleged misconduct. (Id. ¶ 136-137.)

## The 12(b)(6) Standard

On a motion to dismiss pursuant to Rule 12, all factual allegations in the complaint are accepted as true, and

all inferences are drawn in favor of the pleader.  Mills v.
Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).  The
issue "is not whether a plaintiff will ultimately prevail but
whether the claimant is entitled to offer evidence to support
the claims."  Villager Pond, Inc. v. Town of Darien, 56 F.3d
375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S.
232, 235-36 (1974)).

    To survive a motion to dismiss pursuant to Rule
12(b)(6), "a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible
on its face.'"  Ashcroft v. Iqbal, -- U.S. --, 129 S. Ct. 1937,
1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,
570 (2007)).  Though the court must accept the factual
allegations of a complaint as true, it is "not bound to accept
as true a legal conclusion couched as a factual allegation."
Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555).
Plaintiffs must allege sufficient facts to "nudge[] their claims
across the line from conceivable to plausible."  Twombly, 550
U.S. at 570.

**The Amended Complaint has Failed to Establish the**
**RICO Claims Alleged in Counts Seven and Eight**

To establish a RICO violation under 18 U.S.C.
§ 1962(c), a plaintiff must allege and prove four elements:
"(1) conduct (2) of an enterprise (3) through a pattern (4) of
racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S.
479, 496 (1985).  In addition, under § 1964(c), a civil RICO
claimant "must plead, at a minimum, '(1) the defendant's
violation of § 1962, (2) an injury to the plaintiff's business
or property, and (3) causation of the injury by the defendant's
violation.'" Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d
Cir. 2003) (quoting Commercial Cleaning Servs., L.L.C. v. Colin
Serv. Sys., Inc., 271 F.3d 374, 380 (2d Cir. 2001)).

A.   RCD's RICO Allegations

RCD alleges that MHC violated and conspired to violate
RICO by forming an association-in-fact RICO enterprise with
Lorenz, Lewin, Roper, and various other unnamed entities and
employees (the "John Does" and "John Doe Entities") for the
purpose of "defrauding RCD and obtaining unauthorized access to
Reed Connect and RCD's confidential and proprietary
information." (Am. Compl. ¶¶ 255-56.)  MHC and other members of

8

the enterprise allegedly engaged in the following activities
related to MHC's obtaining subscriptions to Reed Connect:
misrepresenting to RCD their true business affiliations; sending
false and misleading subscription agreements to RCD; sending
funds to RCD; sending funds to members of the enterprise;
sending consulting agreements to RCD; instructing co-
conspirators to make misrepresentations; and communicating
amongst themselves.  (Id. ¶ 259.)   RCD alleges that these acts
constituted mail and wire fraud, in violation of 18 U.S.C.
§§ 1341 and 1343, and that RCD was "the direct target and actual
victim of the Enterprise's fraudulent scheme."  (Id. ¶¶ 262-63.)
RCD also alleges that MHC and other entities sent documents that
contained misleading comparisons to customers.  (Id. ¶ 259(f).)
As a result of the alleged racketeering activity, RCD claims
that it lost "prospective and existing customers, and the
resultant revenues and profits associated with those customers."
(Id. ¶ 268.)


      B.   RCD Has Not Alleged Distinctness


      To establish liability under § 1962(c) one must allege
and prove the existence of a "person" that is distinct from the
alleged "enterprise."  See Riverwoods Chappaqua Corp. v. Marine
Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir. 1994); see also

Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161
(2001).  The distinctness requirement may not be circumvented
"by alleging a RICO enterprise that consists merely of a
corporate defendant associated with its own employees or agents
carrying on the regular affairs of the defendant."  Riverwoods,
30 F.3d at 344; see City of New York v. Cyco.net, Inc., 383 F.
Supp. 2d 526, 551 (S.D.N.Y. 2005) (dismissing RICO claim for
lack of distinctness where defendant was corporation and alleged
"enterprise" consisted of corporation and its officers and
employees); cf. Stolow v. Greg Manning Auctions, Inc., 258 F.
Supp. 2d 236, 247 (S.D.N.Y.), aff'd, 80 Fed. Appx. 722 (2d Cir.
Nov. 17, 2003) (applying Riverwoods and Kushner, but finding
that plaintiff alleged an enterprise distinct from the defendant
corporations and their employees or agents).

       Here, RCD has failed to allege that MHC, the "person"
named as Defendant, is distinct from the alleged "enterprise" in
the Amended Complaint.

       The Amended Complaint alleges that the case involves
misconduct "committed by a sophisticated corporate entity," (Am.
Compl. ¶ 1) and that "[t]he actions of [MHC] and its agents are
at issue in this case" (id. ¶ 3.)  The gravamen of RCD's Amended
Complaint is the alleged misconduct of MHC, the only named

                              10

defendant.  All additional persons and entities identified in
the Amended Complaint, other than Roper, are expressly described
as "agents" of MHC.

McGraw-Hill Construction, the division of MHC that
managed the Dodge Network, cannot be considered distinct from
the parent corporation.  See Panix Promotions, Ltd. v. Lewis,
No. 01-Civ. 2709, 2002 WL 72932, at *6 (S.D.N.Y. Jan. 17, 2002)
(holding that "such a construct, where a division or subsidiary
of an enterprise is alleged to also constitute a distinct
person, can not constitute a RICO claim" (internal quotations
omitted)).

RCD expressly alleges that "[a]t all times relevant
herein, Lorenz and Lewin . . . acted as [MHC's] agents."  (Am.
Compl. ¶ 142; see id. ¶¶ 88, 166, 181, 195.)  As such, they
cannot be considered distinct from MHC.  See Riverwoods, 30 F.3d
at 344.  For the same reason, the "John Does One through Five,"
described as "individual current and/or former officers,
employees, contractors or agents of [MHC]," (id. ¶ 4) are not
distinct from MHC.  See Riverwoods, 30 F.3d at 344.

None of the allegedly fictitious companies can be
considered "persons," and even if they were real entities, they

11

would not meet the distinctness test because RCD has alleged

that they participated only by virtue of their agency

relationships with MHC.  See Mayfield v. Gen. Elec. Capital

Corp., No. 97 CIV. 2786, 1999 WL 182586, at *8 (S.D.N.Y. Mar.

31, 1999) ("[T]he distinctness requirement is not met simply

because the agent is a separate corporation rather than an

individual person.").  The same is true of NE14T, which is

alleged to have participated in the enterprise only by virtue of

Lorenz's participation.  (See Am. Compl. ¶¶ 39, 45, 256,

259(a)(i).)  The "John Does Entities One through Five," which

are described as "legal entities who contracted or conspired

with [MHC] to perform or participate in the acts and omissions

described," (Am. Compl. ¶ 5) cannot satisfy the distinctness

test for the same reasons that NE14T and the other companies

cannot do so, namely that they participated only by virtue of

their agency relationships with MHC.  See Mayfield, 1999 WL

182586, at *8.


RCD added Roper, an independent third party hired by

MHC, to the RICO allegations in its Amended Complaint.  However,

Roper is not alleged to have intended to participate in any

racketeering scheme or to have shared a common fraudulent

purpose with the other alleged members of the enterprise, a

requirement under RICO.

12

"[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004); see Cullen v. Paine Webber Group, Inc., 689 F. Supp. 269, 273 (S.D.N.Y. 1988).  Individuals or entitles that do not share such a common purpose cannot be considered part of a RICO enterprise as a matter of law.  See, e.g., Crab House of Douglaston, Inc. v. Newsday, Inc., 418 F. Supp. 2d 193, 203-04 (E.D.N.Y. 2006); Godlewska v. Human Dev. Ass'n, No. CIV A CV-03-3985DGT , 2005 WL 1667852, at *7 (E.D.N.Y. Jul. 18, 2005).

Nothing in the allegations in the Amended Complaint indicate that Roper intended to create allegedly misleading data comparisons, manipulate any search terms or data, or participate in any other fraudulent conduct.  At most, Roper unwittingly "validated" misleading data comparisons submitted to Roper by MHC when it published them with the imprimatur of an "unbiased, third-party."  (Am. Compl. ¶¶ 112, 113, 119.)  Based on the allegations in the Amended Complaint, Roper is nothing more than "an innocent instrument" used by MHC.  See Crab House, 418 F. Supp. 2d at 204-05.

13

In its opposition brief, RCD contends that Roper "knew
or should have known" that MHC's comparisons were based on
unauthorized access to Reed Connect and that such comparisons
were being used to harm RCD in the marketplace.  (Opp. Br. 20,
n.19.)  Even if this were true, it would not make Roper a
participant in the alleged enterprise, because a party cannot be
considered a part of a RICO enterprise unless it intended to
participate.  See Satinwood, 385 F.3d at 174; United States v.
Turkette, 452 U.S. 576, 583 (1981) (distinctness cannot be shown
simply by tacking on entities to an enterprise that do not in
fact operate as a "continuing unit" or share a "common
purpose").

RCD also argues in its opposition brief that it has
alleged an enterprise that is "distinct" and "independent" of
MHC.  (See Opp. Br. 19, 23.)  To support its argument, RCD cites
Kushner for the proposition that distinctness is established
when an enterprise involves both a corporation and a corporate
officers, because "the two are legally distinct."  (Opp. Br.
20.)  In Kushner, the Supreme Court acknowledged the
distinctness rule set forth in Riverwoods, but held that it did
not bar a claim where the defendant was an individual and the
corporation was the enterprise.  533 U.S. at 163.  In such a

14

case, the individual is considered to be legally separate from
the corporation.  Id.  Here, however, the corporation is the
defendant, and therefore is not distinct from the alleged
"enterprise."  See id. at 164 (acknowledging the Riverwoods rule
and noting that Riverwoods "concerned a claim that a corporation
was the 'person' and the corporate, together with all its
employees and agents, were the 'enterprise'").  Courts in this
District continue to apply Riverwoods to cases such as this, in
which the defendant is a corporation and the enterprise is the
same corporation, together with its employees and agents.  See,
e.g., Cyco.net, 383 F. Supp. 2d at 548; Stolow, 258 F. Supp. 2d
at 247.  Moreover, the allegations in the Amended Complaint
repeatedly describe MHC – rather than an "independent
enterprise" – as the sole beneficiary of the alleged co-
conspirators' actions.  (See, e.g., Am. Compl. ¶¶ 1, 34.)


          RCD also argues that Riverwoods only applies where the
corporation's agents were alleged to have been acting within the
scope of their agency in "carrying on the regular affairs of the
defendant."  (Opp. Br. 22 (citing Riverwoods, 30 F.3d at 344).)
RCD argues that Riverwoods therefore does not apply here,
because the agents' conduct "goes beyond the regular affairs of
the corporation."  (Opp. Br. 23.)  However, there is no
requirement that the "regular affairs" described in Riverwoods

be limited to lawful conduct or conduct officially sanctioned by the corporation.  Indeed, in Riverwoods, as in any case in which a plaintiff alleges a violation of RICO, the conduct alleged was unlawful.  See, e.g., R.C.M. Executive Gallery Corp. v. Rols Capital Co., 901 F. Supp. 630, 640-41 (S.D.N.Y. 1995) (dismissing RICO claims for lack of distinctness and noting that "an alleged association-in-fact does not have an existence apart from the [corporation] merely because the alleged racketeering activities are not legitimate [corporate] activities").  Here, RCD alleges that MHC competed with RCD for customers in the normal course of its business and that its regular activities included compiling data and updating its database, creating comparisons between the parties' databases, publishing those comparisons through the Roper Report, and using the comparisons to solicit customers.  (See Am. Comp. ¶¶ 24, 107-29, 136-39.) This alleged racketeering activity constituted MHC's "regular way of conducting" its business, and did not go beyond the regular affairs of the corporation.  See Riverwoods, 30 F.3d at 345.

RCD has not alleged that any of the consultants or entities associated with them had any relationship to the alleged enterprise beyond their consulting agreements with MHC. It has also failed to allege that any unrelated party who was

16

not an agent of MHC participated in the alleged enterprise with intent to further its allegedly unlawful purpose.  Accordingly, the Amended Complaint fails as a matter of law to state a valid RICO claim under the distinctness rule.[2]

RCD's RICO conspiracy claim is derivative of its substantive RICO claim, and is dismissed for the same reasons. See, e.g., Allen v. New World Coffee, Inc., No. 00 CIV. 2610, 2002 WL 432685, at *6 (S.D.N.Y. Mar. 19, 2002) ("The dismissal of all of plaintiffs' [substantive] RICO claims leaves the conspiracy cause of action without a leg to stand on.").

**RCD has Adequately Pled its Claim of
Misappropriation of Confidential Information**

To state a claim for misappropriation of confidential information, a plaintiff must allege that the defendant used the plaintiff's confidential information for the purpose of securing a competitive advantage.  See Bender Ins. Agency, Inc. v. Treiber Ins. Agency, Inc., 729 N.Y.S.2d 142, 144-45 (App. Div. 2001); B-S Indus. Contractors Inc. v. Burns Bros. Contractors Inc., 681 N.Y.S.2d 897, 899 (App. Div. 1998).  Where the

---

[2]    Since RCD's RICO claims fail as a matter of law under the Riverwoods distinctness rule, it is not necessary to address MHC's argument that RCD has not alleged injuries that were proximately caused by any alleged RICO violation.

17

plaintiff and defendant are both parties to a contract, the plaintiff must allege a breach of "a duty 'independent' of [the] duties under the contract." Carvel Corp. v. Noonan, 350 F.3d 6, 16 (2d Cir. 2003); see Clark-Fitzpatrick Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (1987). In such a case, "the focus is on whether a noncontractual duty was violated; a duty imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contractual agreement." Apple Records, Inc. v. Capitol Records, Inc., 529 N.Y.S.2d 279, 282 (App. Div. 1988). A claim of misappropriation "'must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." Productivity Software Int'l, Inc. v. Healthcare Techs., Inc., No. 93 Civ 6949, 1995 WL 437526, at *8 (S.D.N.Y. Jul. 25, 1995) (quoting Clark-Fitzpatrick, 70 N.Y.2d at 389).

MHC contends that RCD's misappropriation claim is premised primarily on the violation of the terms and conditions of RCD's subscription agreements with Lewin and Lorenz, which included various provisions restricting Lewin's and Lorenz's use of the Reed Connect data. However, RCD has not alleged that MHC was a party to its subscription agreements with Lorenz or Lewin, nor has it sued MHC for breach of those agreements. Moreover,

18

even if MHC were a party to the agreements, RCD has pled
sufficient facts to indicate that MHC has done more than simply
fail to comply with the terms of the agreement, but rather has
undertaken affirmative steps to intentionally harm RCD.  In
Carvel, the Second Circuit held that a defendant's breach of a
contract may also breach an independent duty in tort "if the
defendant goes beyond a mere breach of the contract and acts in
such a way that a trier of fact could infer that it willfully
intended to harm the plaintiff."  350 F.3d at 16.

In the Amended Complaint, RCD alleges that MHC used
its unauthorized access to Reed Connect through Lorenz and Lewin
to willfully misappropriate RCD's confidential information,
including, among other things, RCD's project information and
proprietary search algorithms.  (Am. Compl. ¶¶ 180, 181, 183,
191.)  RCD alleges that MHC used this information to its
competitive advantage by misleading RCD's customers and
prospective customers, thereby harming RCD's business and
preventing it from reaping the full profits of its own
information.  (Id. ¶¶ 136-39, 185, 186.)

Accepting RCD's allegations as true, MHC's use of
deceit to access Reed Connect and steal RCD's confidential
information and its subsequent use of that information to

19

compete with RCD "spring from circumstances extraneous to, and
not constituting elements of," the subscription agreements with
Lewin and Lorenz.  Productivity Software, 1995 WL 437526, at *8.
This conduct violated a legal duty independent the subscription
agreements with Lewin and Lorenz, namely the duty not to
misappropriate the property of another.  See Shen v. Signature
Dev. Corp., No. 35803/04, 2009 WL 5126355, at *10-11 (N.Y. Sup.
Ct. Dec. 29, 2009).

        Accordingly, RCD's has adequately pled its claim for
misappropriation of confidential information.

## RCD has Adequately Pled Tortious Interference

        To state a claim for tortious interference with
economic advantage under New York law, "four conditions must be
met:  (1) the plaintiff had business relations with a third
party; (2) the defendant interfered with those business
relations; (3) the defendant acted for a wrongful purpose or
used dishonest, unfair, or improper means; and (4) the
defendant's acts injured the relationship."  Catskill Dev., LLC
v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008),
cert. denied, 129 S. Ct. 1908 (2009) (citations omitted).  With
respect to the first element, a plaintiff must "specify some

20

particular, existing relationship" with which a defendant
interfered.  <u>Krepps v. Reiner</u>, 588 F. Supp. 2d 471, 484
(S.D.N.Y. 2008).  The Second Circuit has recognized that this
tort has a causation element in that it "'requires an allegation
that plaintiff would have entered into an economic relationship
but for the defendant's wrongful conduct.'"  <u>Premium Mortgage</u>
<u>Corp. v. Equifax, Inc.</u>, 583 F.3d 103, 107 (2d Cir. 2009)
(quoting  <u>Vigoda v. DCA Prods. Plus Inc.</u>, N.Y.S.2d 20, 23 (App.
Div. 2002)).

          RCD's Amended Complaint identifies by name 221 of the
customers at issue in its claim, all of which are national
accounts for which RCD and MHC are the only competitors.  RCD
has sufficiently alleged that it had a business relationship and
reasonable expectancy of entering into a contractual
relationship with each of these customers, either on the basis
of RCD's prior relationships with former customers or its active
negotiations with prospective customers, and that MHC knew of
those relationships and intentionally interfered with them.  <u>See</u>
<u>Jim Mazz Auto, Inc. v. Progressive Cas. Ins. Co.</u>, Nos. 08-CV-
00494, 08-CV-00541, 08-CV-00566, 08-CV-00583, 2009 WL 910969, at
*1-2 (W.D.N.Y. Mar. 31, 2009) (denying motion to dismiss
tortious interference claim where the plaintiff identified by

name only one business relationship in each of its four amended
complaints).

MHC contends that this allegation fails to satisfy the
particularity requirement, because the 221 customers comprise
"every 'lost' customer since 2006," (Opp. 25) rather than a list
of customers who actually chose MHC over RCD based on any
alleged misrepresentation.  MHC also contends that this approach
violates Fed. R. Civ. P. 11(b)(3), because RCD's factual
representations neither "have evidentiary support" nor are
"likely to have evidentiary support after a reasonable
opportunity for further investigation or discovery."  However,
in the Amended Complaint, RCD identified only those customers
and prospective customers who selected MHC over RCD based on
misleading comparisons in the Roper Report, MHC's presentation
of allegedly misleading information to those customers, or the
customers' perceptions regarding the amount of project
information available on the competing systems, including
information obtained by MHC's misappropriation of RCD's
information.  Even if such allegations lack evidentiary support,
they are sufficiently likely to have evidentiary support after a
reasonable opportunity for further investigation or discovery to
satisfy the requirements of Rule 11.

22

MHC also argues that there are "'obvious alternative explanation[s]' for the identified customers' choices," (Opp. 27) and that the claim must therefore be dismissed pursuant to Twombly and Iqbal.  However, Twombly and Iqbal held that a claim may be dismissed when a lawful explanation for defendant's conduct is more likely than an unlawful explanation, but do not address alternative explanations for the plaintiff's injury. See Twombly, 550 U.S. at 567; Iqbal, 129 S. Ct. at 1951-52. Moreover, because the 221 customers identified by RCD exclude customers who selected MHC for a reason unrelated to the project information available on the two systems, it is plausible that these customers chose MHC specifically because of their misconceptions regarding project information.

For these reasons, RCD has pled its tortious interference claim with sufficient particularity and MHC's motion to dismiss Count Five of the Amended Complaint is denied.

**RCD has Failed to State a Claim under New York GBL § 349**

A claim for a violation of New York GBL § 349 "has three elements:  (1) the defendant's challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way, and (3)

23

the plaintiff must have sustained injury as a result." <u>Cohen v.</u>

<u>JP Morgan Chase & Co.</u>, 498 F.3d 111, 126 (2d Cir. 2007).

Section 349 "'is, at its core, a consumer protection device,'

not a tool to resolve disputes between private parties." <u>SMJ</u>

<u>Group, Inc. v. 417 Lafayette Rest. LLC</u>, No. 06 Civ. 1774, 2006

WL 2516519, at *4 (S.D.N.Y. Aug. 30, 2006) (quoting <u>Securitron</u>

<u>Magnalock Corp. v. Schnabolk</u>, 65 F.3d 256, 264 (2d Cir. 1995)).

Therefore, a business competitor bringing a claim under Section

349 "must establish that the alleged deceptive act or practice

was directed to the consuming public at large." <u>Bangkok Crafts</u>

<u>Corp. v. Capitolo di San Pietro in Vaticano</u>, 331 F. Supp. 2d

247, 256 (S.D.N.Y. 2004).


RCD's only allegation regarding public harm is that

consumers in the New York construction data market may have

overpaid to subscribe to the Dodge Network when Reed Connect is

a superior product.  (<u>See</u> Am. Compl. ¶¶ 243-44.)  Even accepting

this allegation as true, it does not state a claim under New

York GBL § 349.  <u>Kforce, Inc. v. Alden Personnel, Inc.</u>, 288 F.

Supp. 2d 513, 519 (S.D.N.Y. 2003) ("[A]s long as the public

receives the product or service, a loss of business by plaintiff

is not considered a public harm."); <u>see</u> <u>Gucci America, Inc. v.</u>

<u>Duty Free Apparel, Ltd.</u>, 277 F. Supp. 2d 269, 274-75 (S.D.N.Y.

2003) (finding that "the business does not have a cognizable

24

cause of action under § 349" where alleged public harm consisted of consumers' being forced to "pay much higher prices to purchase the same items" from a competitor).

In this case, RCD's Amended Complaint focuses on harm to its business interest, not consumer injury or harm to the public interest.  The limited public harm alleged, that construction data consumers paid more for an allegedly inferior product, is incidental in nature and insufficient to support a claim under § 349.  See Kforce, 288 F. Supp. 2d at 519; Gucci America, 277 F. Supp. 2d at 274 (dismissing § 349 claim where "gravamen of the complaint" was harm to counterclaimant's business).

**Conclusion**

Based upon the facts and conclusions set forth above, Defendant's motion to dismiss is granted as to Counts Six, Seven and Eight and denied as to Counts Three and Five.

It is so ordered.

New York, NY
September /3, 2010

_____
**ROBERT W. SWEET**
**U.S.D.J.**

25