UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------

REED CONSTRUCTION DATA INC.,                :        Case No. 09 Civ. 8578 (JPO)

                  Plaintiff,        :        **DEFENDANT/COUNTERCLAIM**
                                     **PLAINTIFF THE MCGRAW-HILL**
       - v. -        :        **COMPANIES, INC.'S THIRD**
                                       **AMENDED ANSWER WITH**
THE MCGRAW-HILL COMPANIES, INC.;        :        **COUNTERCLAIM**
JOHN DOES One through Five; and
JOHN DOE ENTITIES One through Five,        :

                  Defendants.        :

                                            :

----------------------------------------------------------------

## ANSWER AND AFFIRMATIVE DEFENSES
## TO PLAINTIFF'S THIRD AMENDED COMPLAINT

      Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill"), by its attorneys

Patterson Belknap Webb & Tyler LLP, hereby answers the Third Amended Complaint

("Complaint") of Plaintiff Reed Construction Data Inc. ("Reed") as follows:

### NATURE OF ACTION

      1.     McGraw-Hill admits that McGraw-Hill Construction ("MHC")—

erroneously referred to in the Complaint as "McGraw-Hill Construction Dodge" or "Dodge"—is

a division of McGraw-Hill and otherwise denies the allegations in paragraph 1 of the Complaint.

### PARTIES

      2.     McGraw-Hill denies knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 2 of the Complaint.

      3.     McGraw-Hill admits that it is a New York corporation with its principal

place of business at 1221 Avenue of the Americas, New York, New York 10020, that MHC is a

division of McGraw-Hill and that Plaintiff's Complaint erroneously refers to McGraw-Hill and

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

REED CONSTRUCTION DATA INC.,

                 Plaintiff,

      - v. -

THE MCGRAW-HILL COMPANIES, INC.;
JOHN DOES One through Five; and
JOHN DOE ENTITIES One through Five,

                 Defendants.

-----------------------------------------------------------------

   :   Case No. 09 Civ. 8578 (JPO)

   :   **DEFENDANT/COUNTERCLAIM PLAINTIFF THE MCGRAW-HILL**

   :   **COMPANIES, INC.'S THIRD AMENDED ANSWER WITH**

   :   **COUNTERCLAIM**

   :

   :

### ANSWER AND AFFIRMATIVE DEFENSES
### TO PLAINTIFF'S THIRD AMENDED COMPLAINT

Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill"), by its attorneys Patterson Belknap Webb & Tyler LLP, hereby answers the Third Amended Complaint ("Complaint") of Plaintiff Reed Construction Data Inc. ("Reed") as follows:

### NATURE OF ACTION

1.     McGraw-Hill admits that McGraw-Hill Construction ("MHC")— erroneously referred to in the Complaint as "McGraw-Hill Construction Dodge" or "Dodge"—is a division of McGraw-Hill and otherwise denies the allegations in paragraph 1 of the Complaint.

### PARTIES

2.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Complaint.

3.     McGraw-Hill admits that it is a New York corporation with its principal place of business at 1221 Avenue of the Americas, New York, New York 10020, that MHC is a division of McGraw-Hill and that Plaintiff's Complaint erroneously refers to McGraw-Hill and

MHC collectively as "Dodge."  McGraw-Hill denies the remaining allegations in paragraph 3 of the Complaint.

4.       McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 of the Complaint.

5.       McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 of the Complaint.

## JURISDICTION AND VENUE

6.       The allegations in paragraph 6 of the Complaint are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied.

7.       The allegations in paragraph 7 of the Complaint are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied.

8.       The allegations in paragraph 8 of the Complaint are legal conclusions to which no response is required.  To the extent a response is deemed required, McGraw-Hill admits that it does business in New York and otherwise denies the allegations in paragraph 8.

9.       McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint.

10.      The allegations in paragraph 10 of the Complaint are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied.

MHC collectively as "Dodge."  McGraw-Hill denies the remaining allegations in paragraph 3 of the Complaint.

4.      McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 of the Complaint.

5.      McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 of the Complaint.

## <u>JURISDICTION AND VENUE</u>

6.      The allegations in paragraph 6 of the Complaint are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied.

7.      The allegations in paragraph 7 of the Complaint are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied.

8.      The allegations in paragraph 8 of the Complaint are legal conclusions to which no response is required.  To the extent a response is deemed required, McGraw-Hill admits that it does business in New York and otherwise denies the allegations in paragraph 8.

9.      McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint.

10.     The allegations in paragraph 10 of the Complaint are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied.

11.     The allegations in paragraph 11 of the Complaint are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied.

## FACTUAL ALLEGATIONS

12.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint.

13.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint.

14.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint.

15.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint.

16.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint.

17.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint.

18.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Complaint.

19.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Complaint.

20.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint.

21.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Complaint.

22.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Complaint.

23.     McGraw-Hill admits that there are a number of competitors in the market for construction project information.  McGraw-Hill denies the remaining allegations in paragraph 23 of the Complaint.

24.     McGraw-Hill admits that it provides comprehensive construction project information and other data to its customers through a web-based service commonly referred to as the "Dodge Network" that was launched in or around 2003.  McGraw-Hill denies the remaining allegations in paragraph 24 of the Complaint.

25.     McGraw-Hill admits that Reed Connect and the Dodge Network are different in a number of material respects and avers that the Dodge Network is a demonstrably superior product.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 25 of the Complaint.

26.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the Complaint.

27.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 of the Complaint.

28.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 of the Complaint.

29.     McGraw-Hill denies the allegation that it "has a lag time of several weeks or months after [the bidding phase on a project ends] before it removes projects in its database

from the 'bid' phase." McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 29 of the Complaint.

30.     McGraw-Hill denies the allegation that it "lists [the] projects in its database as having either the value on the high end of [a] range . . . or the average value in the range." McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 30 of the Complaint.

31.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 of the Complaint, except that McGraw-Hill admits that it provides its customers with valuable construction project information across a large number of building categories, including information concerning single-family residential housing projects.

32.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 of the Complaint.

33.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 of the Complaint.

34.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 of the Complaint.

35.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35 of the Complaint.

36.     McGraw-Hill denies the allegations that "Reed Connect is a superior product to Dodge Network" and that customers have chosen to subscribe to Reed Connect over the Dodge Network "due to [Reed Connect's alleged] superiority." McGraw-Hill denies

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36 of the Complaint.

37.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegation that Reed took "efforts to prevent unauthorized access to Reed Connect."  McGraw-Hill denies the remaining allegations in paragraph 37 of the Complaint.

38.     McGraw-Hill admits that former MHC employee Eric Kubicka held the title Director of Competitive Intelligence from approximately 1996 until approximately December 2005 and that former MHC employee Pat Major reported to Kubicka during a portion of that time.  McGraw-Hill denies the remaining allegations in paragraph 38 of the Complaint.

39.     McGraw-Hill denies the allegations in paragraph 39 of the Complaint.

40.     McGraw-Hill admits that in order to research the competitive landscape and accurately compare the Dodge Network to Reed Connect, MHC used login information to Reed Connect obtained by third parties.  McGraw-Hill denies the remaining allegations in paragraph 40 of the Complaint.

41.     McGraw-Hill admits that MHC engaged an individual named Henning Lorenz to research the competitive environment and otherwise denies the allegations in paragraph 41 of the Complaint.

42.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 of the Complaint.

43.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 of the Complaint.

44.     McGraw-Hill denies the allegations in paragraph 44 of the Complaint.

45.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations that "Lorenz represented to [Reed] that NE14T was a consultant for Hager Hinge Company . . . a legitimate building product manufacturer," that Lorenz "[p]os[ed] as a consultant for Hager Hinge" or that the Reed Connect product was launched shortly before December 2002.   McGraw-Hill admits that NE14T/Lorenz purchased a subscription to a Reed product in or around December 2002 for competitive research purposes. McGraw-Hill denies the remaining allegations in paragraph 45 of the Complaint.

46.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 46 of the Complaint.

47.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 of the Complaint.

48.     McGraw-Hill admits that MHC reimbursed Lorenz for the cost of the subscription and paid him a fee for his work researching the competitive environment.  McGraw-Hill denies the remaining allegations in paragraph 48 of the Complaint.

49.     McGraw-Hill admits that some payments were made to Lorenz through the McGraw-Hill Federal Credit Union.  McGraw-Hill denies the remaining allegations in paragraph 49 of the Complaint.

50.     The allegations in paragraph 50 describe the contents of a document.  Any such document speaks for itself and no response is required.

51.     To the extent the allegations in paragraph 51 describe the contents of a document, any such document speaks for itself and no response is required.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 51 of the Complaint.

52.     To the extent the allegations in paragraph 52 describe the contents of a document, any such document speaks for itself and no response is required.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 52 of the Complaint.

53.     McGraw-Hill admits that NE14T/Lorenz purchased a subscription to Reed Connect in or around January 2004 for competitive research purposes.  To the extent the allegations in paragraph 53 describe the contents of a document, any such document speaks for itself and no response is required.

54.     To the extent the allegations in paragraph 54 describe the contents of a document, any such document speaks for itself and no response is required. McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 54 of the Complaint.

55.     McGraw-Hill admits that NE14T/Lorenz purchased subscriptions to Reed Connect in 2003 and 2005 for competitive research purposes.  To the extent the allegations in paragraph 55 describe the contents of any renewal agreement, any such document speaks for itself and no response is required.  McGraw-Hill denies the remaining allegations in paragraph 55 of the Complaint.

56.     McGraw-Hill denies the allegations in paragraph 56 of the Complaint.

57.     McGraw-Hill denies the allegations in paragraph 57 of the Complaint.

58.     McGraw-Hill denies the allegations in paragraph 58 of the Complaint.

59.     McGraw-Hill admits that Major performed accurate statistical comparisons of the project information available on Reed Connect and the Dodge Network as part of her research of the competitive environment.  McGraw-Hill admits that in order to create

accurate competitive comparisons, Major counted and analyzed the projects reports available on Reed Connect using login information obtained by Lorenz.  McGraw-Hill denies the remaining allegations in paragraph 59 of the Complaint.

60. McGraw-Hill denies the allegations in paragraph 60 of the Complaint.

61. McGraw-Hill denies the allegations in paragraph 61 of the Complaint.

62. McGraw-Hill admits that images of Reed Connect were shown to members of MHC's sales force.  McGraw-Hill denies the remaining allegations in paragraph 62 of the Complaint.

63. McGraw-Hill admits that demonstrations of Reed Connect were shown to members of MHC's sales force.  McGraw-Hill denies the remaining allegations in paragraph 63 of the Complaint.

64. McGraw-Hill admits that the Hager Hinge Company has been a customer of MHC.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 64 of the Complaint.

65. McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 65 of the Complaint.

66. McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 66 of the Complaint.

67. McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 67 of the Complaint.

68. McGraw-Hill denies the allegations in paragraph 68 of the Complaint.

69. McGraw-Hill denies the allegations in paragraph 69 of the Complaint.

70.     McGraw-Hill admits that Glenn Lewin purchased a subscription to Reed Connect in or around February 2006 for competitive research purposes.  McGraw-Hill denies the remaining allegations in paragraph 70 of the Complaint.

71.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 of the Complaint.

72.     McGraw-Hill admits that prior to February 2006, Lewin was occasionally engaged by MHC to research the competitive environment since at least 2003.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegation that Lewin provided consulting services to other clients.  McGraw-Hill admits that Lewin purchased a subscription to a Reed product in or around 2003 for competitive research purposes.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 72 of the Complaint.

73.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegation that "Northern Construction was not an actual company." McGraw-Hill admits that MHC reimbursed Lewin for the cost of the subscription and that in order to research the competitive landscape and accurately compare the Dodge Network to Reed's product, MHC used login information obtained by Lewin.

74.     McGraw-Hill admits that Lewin purchased a subscription to Reed Connect Illinois in or around 2005 for competitive research purposes.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 74 of the Complaint.

75.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegation that "Central Business Services was . . . not an actual company."

McGraw-Hill admits that MHC reimbursed Lewin for the cost of the subscription and that in order to research the competitive landscape and accurately compare the Dodge Network to Reed Connect, MHC used login information obtained by Lewin.

76.     McGraw-Hill admits that Glenn Lewin purchased a subscription to Reed Connect in or around February 2006 for competitive research purposes.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegation that February 14, 2006 was less than one month after Reed terminated a subscription purchased by Lorenz. McGraw-Hill denies the remaining allegations in paragraph 76 of the Complaint.

77.     McGraw-Hill admits that MHC reimbursed Lewin for the cost of the subscription and paid him a fee for his work researching the competitive environment.  McGraw-Hill denies the remaining allegations in paragraph 77 of the Complaint.

78.     To the extent the allegations in paragraph 78 describe the contents of a document, any such document speaks for itself and no response is required.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 79 of the Complaint.

79.     To the extent the allegations in paragraph 79 describe the contents of a document, any such document speaks for itself and no response is required.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 80 of the Complaint.

80.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80 of the Complaint.

81.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81 of the Complaint.

82.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82 of the Complaint.

83.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83 of the Complaint.

84.     McGraw-Hill admits that in order to research the competitive landscape and accurately compare the Dodge Network to Reed Connect, MHC used login information obtained by Lewin through the end of 2007.  McGraw-Hill denies the remaining allegations in paragraph 84 of the Complaint.

85.     McGraw-Hill admits that Glenn Lewin purchased a subscription to Reed Connect in or around January 2008 for competitive research purposes.  To the extent the allegations in paragraph 85 describe the names listed on a Reed Connect subscription agreement, any such document speaks for itself and no response is required.  McGraw-Hill denies the remaining allegations in paragraph 85 of the Complaint.

86.     To the extent the allegations in paragraph 86 describe the contents of a document, any such document speaks for itself and no response is required.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 86 of the Complaint.

87.     To the extent the allegations in paragraph 87 describe the contents of a document, any such document speaks for itself and no response is required.

88.     To the extent the allegations in paragraph 88 describe the contents of a document, any such document speaks for itself and no response is required.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 89 of the Complaint.

12

89.     To the extent the allegations in paragraph 89 describe the contents of a document, any such document speaks for itself and no response is required.

90.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegation that "[s]imilar to Central Business Services and northern Construction, Arrington Partners was not a real business."  McGraw-Hill admits that in order to research the competitive landscape and accurately compare the Dodge Network to Reed Connect, MHC used login information obtained by Lewin.  McGraw-Hill denies the remaining allegations in paragraph 90 of the Complaint.

91.     McGraw-Hill admits that MHC reimbursed Lewin for the cost of a subscription to Reed Connect purchased by Lewin in or around January 2008 and paid him a fee for his work researching the competitive environment.  McGraw-Hill denies the remaining allegations in paragraph 91 of the Complaint.

92.     McGraw-Hill admits that in order to research the competitive landscape and accurately compare the Dodge Network to Reed Connect, MHC used login information obtained by Lewin through the end of 2008.  McGraw-Hill denies the remaining allegations in paragraph 92 of the Complaint.

93.     McGraw-Hill admits that Glenn Lewin purchased a subscription to Reed Connect in or around January 2009 for competitive research purposes.  To the extent the allegations in paragraph 93 describe the names listed on a Reed Connect subscription agreement, any such document speaks for itself and no response is required.  McGraw-Hill denies the remaining allegations in paragraph 93 of the Complaint.

94.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 94 of the Complaint.

95.     McGraw-Hill admits that MHC reimbursed Lewin for the cost of a subscription to Reed Connect purchased by Lewin in or around January 2009 and paid him a fee for his work researching the competitive environment.  McGraw-Hill denies the remaining allegations in paragraph 95 of the Complaint.

96.     McGraw-Hill admits that in order to research the competitive landscape and accurately compare the Dodge Network to Reed Connect, MHC used login information obtained by Lewin.  McGraw-Hill denies the remaining allegations in paragraph 96 of the Complaint.

97.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegation that "[Reed] has traced the IP address of [a] computer . . . to an area within five city blocks of [MHC's] corporate office."   McGraw-Hill admits that in order to create accurate competitive comparisons, MHC counted and analyzed the projects available on Reed Connect using login information obtained by Lewin.  McGraw-Hill denies the remaining allegations in paragraph 97 of the Complaint.

98.     McGraw-Hill admits that Reed sent a letter addressed to Site Amenities dated July 14, 2009.  To the extent the allegations in paragraph 98 describe the contents of that letter, the letter speaks for itself and no response is required.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 98 of the Complaint.

99.     McGraw-Hill admits that in order to perform accurate competitive comparisons, MHC researched Reed Connect projects using login information obtained by Lewin on July 21 and 23, 2009.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegation that "[Reed] has traced the IP address for [a]

computer . . . to an area within five city blocks of [MHC's] corporate office."   McGraw-Hill

denies the remaining allegations in paragraph 99 of the Complaint.

100.    McGraw-Hill denies knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 100 of the Complaint.

101.    McGraw-Hill denies knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 101 of the Complaint.

102.    McGraw-Hill denies knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 102 of the Complaint.

103.    McGraw-Hill denies knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 103 of the Complaint.

104.    McGraw-Hill denies knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 104 of the Complaint.

105.    McGraw-Hill denies knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 105 of the Complaint.

106.    McGraw-Hill denies knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 106 of the Complaint.

107.    McGraw-Hill admits that Plaintiff purports to sue unnamed persons and

entities as John Doe Defendants.  McGraw-Hill admits that MHC has researched the competitive

environment and created accurate competitive comparisons using data obtained through the

subscriptions of third parties including Lorenz and Lewin to Reed products.  McGraw-Hill

denies the remaining allegations in paragraph 107 of the Complaint.

108.    McGraw-Hill denies the allegations in paragraph 108 of the Complaint.

109.    McGraw-Hill denies the allegations in paragraph 109 of the Complaint.

110.    McGraw-Hill denies the allegations in paragraph 110 of the Complaint.

111.    McGraw-Hill denies the allegations in paragraph 111 of the Complaint.

112.    McGraw-Hill denies the allegations in paragraph 112 of the Complaint.

113.    McGraw-Hill denies the allegations in paragraph 113 of the Complaint.

114.    McGraw-Hill admits that Roper Public Affairs & Media ("Roper"), a division of GfK NOP, LLC., is a market research firm that is independent of MHC.  McGraw-Hill denies the remaining allegations in paragraph 114 of the Complaint.

115.    McGraw-Hill admits that Roper created accurate unbiased comparisons of the project data available on the Dodge Network and Reed Connect which were sometimes referred to as the "Roper Report."  McGraw-Hill denies the remaining allegations in paragraph 115 of the Complaint.

116.    McGraw-Hill admits that the Roper Report compared the number of construction projects meeting certain stated criteria available on the Dodge Network and Reed Connect in each State.  McGraw-Hill denies the remaining allegations in paragraph 116 of the Complaint.

117.    McGraw-Hill incorporates by reference its answers to paragraphs 29, 30 and 31 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answers to paragraphs 29, 30 and 31 of the Complaint, McGraw-Hill denies the allegations in paragraph 117 of the Complaint.

118.    McGraw-Hill denies the allegations in paragraph 118 of the Complaint.

119.    McGraw-Hill denies the allegations in paragraph 119 of the Complaint.

120.    McGraw-Hill denies the allegations in paragraph 120 of the Complaint.

121.    McGraw-Hill denies the allegations in paragraph 121 of the Complaint.

122.    McGraw-Hill admits that the Roper Report was first issued in or about 2004.  McGraw-Hill denies the remaining allegations in paragraph 122 of the Complaint.

123.    McGraw-Hill admits that in order to research the competitive landscape and accurately compare the Dodge Network to Reed Connect, MHC used login information to Reed Connect obtained by third parties.  McGraw-Hill denies the remaining allegations in paragraph 123 of the Complaint.

124.    McGraw-Hill admits that MHC's sales representatives have used the Roper Report in competitive situations with Reed and that MHC has provided instruction to its sales representatives concerning the use of materials including the Roper Report.  McGraw-Hill denies the allegations in paragraph 124 of the Complaint.

125.    To the extent the allegations in paragraph 125 describe the contents of a document, any such document speaks for itself and no response is required.  McGraw-Hill denies the remaining allegations in paragraph 125.

126.    McGraw-Hill admits that MHC's sales representatives have used the Roper Report in competitive situations with Reed.  McGraw-Hill denies the remaining allegations in paragraph 126 of the Complaint.

127.    McGraw-Hill admits that MHC's sales representative have used the Roper Report.  McGraw-Hill denies the remaining allegations in paragraph 127 of the Complaint.

128.    McGraw-Hill denies the allegations in paragraph 128 of the Complaint.

129.    McGraw-Hill denies the allegations in paragraph 129 of the Complaint, except that McGraw-Hill admits that, on occasion, MHC created accurate comparisons of the information available on the Dodge Network and Reed Connect for specific customers.

130.    McGraw-Hill denies the allegations in paragraph 130 of the Complaint,

except that McGraw-Hill admits that, on occasion, MHC accurately identified to prospective customers certain projects that were available on the Dodge Network and not on Reed Connect.

131.    McGraw-Hill denies the allegations in paragraph 131 of the Complaint.

132.    McGraw-Hill denies the allegations in paragraph 132 of the Complaint.

133.    McGraw-Hill admits that in order to research the competitive landscape and accurately compare the Dodge Network to Reed Connect, MHC has used login information to Reed Connect obtained by third parties.  McGraw-Hill denies the allegations in paragraph 133 of the Complaint.

134.    McGraw-Hill lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134 of the Complaint concerning an unnamed MHC sales representative and an unnamed Reed customer.  McGraw-Hill otherwise denies the allegations in paragraph 134 of the Complaint.

135.    McGraw-Hill lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 135 of the Complaint concerning an unnamed MHC sales representative and an unnamed Reed customer.  McGraw-Hill otherwise denies the allegations in paragraph 135 of the Complaint.

136.    McGraw-Hill denies the allegations in paragraph 136 of the Complaint.

137.    McGraw-Hill denies the allegations in paragraph 137 of the Complaint.

138.    McGraw-Hill denies the allegations in paragraph 138 of the Complaint.

139.    McGraw-Hill denies the allegations in paragraph 139 of the Complaint.

140.    McGraw-Hill admits that in order to create accurate comparisons of the information available on the Dodge Network and Reed Connect, MHC viewed Reed Connect

project reports.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 140 of the Complaint.

141.    McGraw-Hill admits that in order to create accurate comparisons of the information available on the Dodge Network and Reed Connect, MHC analyzed documents contained in Reed Connect project reports.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 141 of the Complaint

142.    McGraw-Hill admits that in order to create accurate comparisons of the information available on the Dodge Network and Reed Connect, MHC viewed Reed Connect project reports.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 142 of the Complaint.

143.    McGraw-Hill denies the allegations in paragraph 143 of the Complaint.

144.    McGraw-Hill denies the allegations in paragraph 144 of the Complaint.

145.    McGraw-Hill denies the allegations in paragraph 145 of the Complaint.

146.    McGraw-Hill denies the allegations in paragraph 146 of the Complaint.

147.    McGraw-Hill denies the allegations in paragraph 147 of the Complaint.

148.    McGraw-Hill denies the allegations in paragraph 148 of the Complaint.

149.    McGraw-Hill denies the allegations in paragraph 149 of the Complaint.

150.    McGraw-Hill denies the allegations in paragraph 150 of the Complaint.

## **COUNT ONE - FRAUD**

151.    McGraw-Hill incorporates by reference its answers to paragraphs 1 through 150 above as if fully restated herein.

152.     The allegations in paragraph 152 of the Complaint are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied.

153.     McGraw-Hill denies the allegations in paragraph 153 of the Complaint.

154.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 154 of the Complaint.

155.     McGraw-Hill denies the allegations in paragraph 155 of the Complaint.

156.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 156 of the Complaint.

157.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 157 of the Complaint.

158.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning statements or representations made by Lorenz, Lewin or unnamed John Doe Defendants.  McGraw-Hill denies the remaining allegations in paragraph 158 of the Complaint.

159.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegation that  Lorenz, Lewin and the John Doe Defendants made misrepresentations.  McGraw-Hill denies the remaining allegations in paragraph 159 of the Complaint.

160.     McGraw-Hill denies the allegations in paragraph 160 of the Complaint.

161.     To the extent the allegations in paragraph 161 of the Complaint describe the contents of documents, any such documents speak for themselves and no response is required.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 161 concerning oral communications involving Lorenz or Lewin on the one hand and Reed employees on the other.  McGraw-Hill denies the remaining allegations in paragraph 161 of the Complaint.

162.   McGraw-Hill denies the allegations in paragraph 162 of the Complaint.

163.   To the extent the allegations in paragraph 163 of the Complaint describe the contents of documents, any such documents speak for themselves and no response is required.  McGraw-Hill denies the allegation that "[Reed] exercised due diligence in attempting to discover the claims . . . asserted [in the Complaint]."  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 163 of the Complaint.

164.   McGraw-Hill denies the allegations in paragraph 164 of the Complaint.

165.   McGraw-Hill denies the allegations in paragraph 165 of the Complaint.

166.   McGraw-Hill denies the allegations in paragraph 166 of the Complaint.

167.   McGraw-Hill denies the allegations in paragraph 167 of the Complaint.

168.   McGraw-Hill denies the allegations in paragraph 168 of the Complaint.

169.   McGraw-Hill denies the allegations in paragraph 169 of the Complaint.

170.   McGraw-Hill denies the allegations in paragraph 170 of the Complaint.

171.   McGraw-Hill denies the allegations in paragraph 171 of the Complaint.

172.   McGraw-Hill denies the allegations in paragraph 172 of the Complaint.

173.   McGraw-Hill denies the allegations in paragraph 173 of the Complaint.

174.   McGraw-Hill denies the allegations in paragraph 174 of the Complaint.

## COUNT TWO: MISAPPROPRIATION OF TRADE SECRETS

175.     McGraw-Hill incorporates by reference its answers to paragraphs 1 through 174 above as if fully restated herein.

176.     McGraw-Hill denies the allegations in paragraph 176 of the Complaint.

177.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of allegations concerning statements or representations made by Lorenz or Lewin. McGraw-Hill denies the remaining allegations in paragraph 177 of the Complaint.

178.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 178 of the Complaint.

179.     McGraw-Hill denies the allegations in paragraph 179 of the Complaint.

180.     McGraw-Hill denies the allegations in paragraph 180 of the Complaint.

181.     McGraw-Hill denies the allegations in paragraph 181 of the Complaint.

182.     McGraw-Hill denies the allegations in paragraph 182 of the Complaint.

183.     McGraw-Hill denies the allegations in paragraph 183 of the Complaint.

184.     McGraw-Hill denies the allegations in paragraph 184 of the Complaint.

185.     McGraw-Hill incorporates by reference its answer to paragraph 161 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 161 of the Complaint, McGraw-Hill denies the allegations in paragraph 185 of the Complaint.

186.     McGraw-Hill incorporates by reference its answer to paragraph 163 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 163 of the Complaint, McGraw-Hill denies the allegations in paragraph 186 of the Complaint.

187.    McGraw-Hill denies the allegations in paragraph 187 of the Complaint.

188.    McGraw-Hill denies the allegations in paragraph 188 of the Complaint.

189.    McGraw-Hill denies the allegations in paragraph 189 of the Complaint.

190.    McGraw-Hill denies the allegations in paragraph 190 of the Complaint.

**COUNT THREE: MISAPPROPRIATION OF CONFIDENTIAL INFORMATION**

191.    McGraw-Hill incorporates by reference its answers to paragraphs 1 through 190 above as if fully restated herein.

192.    McGraw-Hill denies the allegations in paragraph 192 of the Complaint.

193.    McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of allegations concerning statements or representations made by Lorenz or Lewin. McGraw-Hill denies the remaining allegations in paragraph 193 of the Complaint.

194.    McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 194 of the Complaint.

195.    McGraw-Hill denies the allegations in paragraph 195 of the Complaint.

196.    McGraw-Hill denies the allegations in paragraph 196 of the Complaint.

197.    McGraw-Hill denies the allegations in paragraph 197 of the Complaint.

198.    McGraw-Hill denies the allegations in paragraph 198 of the Complaint.

199.    McGraw-Hill denies the allegations in paragraph 199 of the Complaint.

200.    McGraw-Hill denies the allegations in paragraph 200 of the Complaint.

201.    McGraw-Hill incorporates by reference its answer to paragraph 161 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 161 of the Complaint, McGraw-Hill denies the allegations in paragraph 201 of the Complaint.

202.     McGraw-Hill incorporates by reference its answer to paragraph 163 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 163 of the Complaint, McGraw-Hill denies the allegations in paragraph 202 of the Complaint.

203.     McGraw-Hill denies the allegations in paragraph 203 of the Complaint.

204.     McGraw-Hill denies the allegations in paragraph 204 of the Complaint.

205.     McGraw-Hill denies the allegations in paragraph 205 of the Complaint.

206.     McGraw-Hill denies the allegations in paragraph 206 of the Complaint.

## COUNT FOUR: UNFAIR COMPETITION

207.     McGraw-Hill incorporates by reference its answers to paragraphs 1 through 206 above as if fully restated herein.

208.     McGraw-Hill admits that MHC has researched the competitive environment and created accurate competitive comparisons using data obtained through the subscriptions of third parties including Lorenz and Lewin.  McGraw-Hill denies the remaining allegations in paragraph 208 of the Complaint.

209.     McGraw-Hill denies the allegations in paragraph 209 of the Complaint.

210.     McGraw-Hill denies the allegations in paragraph 210 of the Complaint.

211.     McGraw-Hill denies the allegations in paragraph 211 of the Complaint.

212.     McGraw-Hill denies the allegations in paragraph 212 of the Complaint.

213.     McGraw-Hill denies the allegations in paragraph 213 of the Complaint.

214.     McGraw-Hill denies the allegations in paragraph 214 of the Complaint.

215.     McGraw-Hill denies the allegations in paragraph 215 of the Complaint.

216.     McGraw-Hill denies the allegations in paragraph 216 of the Complaint.

217.    McGraw-Hill incorporates by reference its answer to paragraph 161 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 161 of the Complaint, McGraw-Hill denies the allegations in paragraph 217 of the Complaint.

218.    McGraw-Hill incorporates by reference its answer to paragraph 163 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 163 of the Complaint, McGraw-Hill denies the allegations in paragraph 218 of the Complaint.

219.    McGraw-Hill denies the allegations in paragraph 219 of the Complaint.

220.    McGraw-Hill denies the allegations in paragraph 220 of the Complaint.

221.    McGraw-Hill denies the allegations in paragraph 221 of the Complaint.

222.    McGraw-Hill denies the allegations in paragraph 222 of the Complaint.

### COUNT FIVE: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

223.    McGraw-Hill incorporates by reference its answers to paragraphs 1 through 222 above as if fully restated herein.

224.    McGraw-Hill admits that a number of Reed Connect customers have terminated or chosen not to renew their subscription agreements with Reed and have chosen to subscribe to the Dodge Network.  McGraw-Hill denies the remaining allegations in paragraph 224 of the Complaint.

225.    McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 225 of the Complaint.

226.    McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 226 of the Complaint.

227.    McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 227 of the Complaint.

228.    McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 228 of the Complaint.

229.    McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 229 of the Complaint.

230.    McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 230 of the Complaint.

231.    McGraw-Hill denies the allegations in paragraph 231 of the Complaint.

232.    McGraw-Hill denies the allegations in paragraph 232 of the Complaint.

233.    McGraw-Hill denies the allegations in paragraph 233 of the Complaint.

234.    McGraw-Hill denies the allegations in paragraph 234 of the Complaint.

235.    McGraw-Hill denies the allegations in paragraph 235 of the Complaint.

236.    McGraw-Hill denies the allegations in paragraph 236 of the Complaint.

237.    McGraw-Hill denies the allegations in paragraph 237 of the Complaint.

238.    McGraw-Hill denies the allegations in paragraph 238 of the Complaint.

239.    McGraw-Hill denies the allegation that "[s]ince at least 2002, . . . [MHC] began accessing Reed Connect without authorization to compete unfairly with [Reed]." McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 239 of the Complaint.

240.    McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 240 of the Complaint.

241.    McGraw-Hill denies the allegations in paragraph 241 of the Complaint.

242.     McGraw-Hill denies the allegation that MHC's sales representatives presented prospective Reed customers with misleading information.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 242 of the Complaint.

243.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 243 of the Complaint.

244.     McGraw-Hill denies the allegations in paragraph 244 of the Complaint.

245.     McGraw-Hill denies the allegations in paragraph 245 of the Complaint.

246.     McGraw-Hill denies the allegations in paragraph 246 of the Complaint.

247.     McGraw-Hill denies the allegations in paragraph 247 of the Complaint.

248.     McGraw-Hill denies the allegations in paragraph 248 of the Complaint.

249.     McGraw-Hill denies the allegations in paragraph 249 of the Complaint.

250.     McGraw-Hill denies the allegations in paragraph 250 of the Complaint.

251.     McGraw-Hill incorporates by reference its answer to paragraph 161 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 161 of the Complaint, McGraw-Hill denies the allegations in paragraph 251 of the Complaint.

252.     McGraw-Hill incorporates by reference its answer to paragraph 163 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 163 of the Complaint, McGraw-Hill denies the allegations in paragraph 252 of the Complaint.

253.     McGraw-Hill denies the allegations in paragraph 253 of the Complaint.

254.     McGraw-Hill denies the allegations in paragraph 254 of the Complaint.

255.    McGraw-Hill denies the allegations in paragraph 255 of the Complaint.

256.    McGraw-Hill denies the allegations in paragraph 256 of the Complaint.

### COUNT SIX: VIOLATION OF SECTION 349 OF THE
### NEW YORK GENERAL BUSINESS LAW

257 – 269.    Pursuant to the Opinion and Order of the United States District
Court for the Southern District of New York dated September 13, 2010, Count Six of the
Complaint has been dismissed for failure to state a claim upon which relief can be granted.
Accordingly, no response is required to the allegations in paragraphs 257 to 269 of the
Complaint.  To the extent a response is deemed required, McGraw-Hill denies the allegations in
paragraphs 257 to 269 of the Complaint.

### COUNT SEVEN: VIOLATION OF RICO, 18 U.S.C. § 1962(c)

270 – 290.    Pursuant to the Opinion and Order of the United States District
Court for the Southern District of New York dated September 13, 2010, Count Seven of the
Complaint has been dismissed for failure to state a claim upon which relief can be granted.
Accordingly, no response is required to the allegations in paragraphs 270 to 290 of the
Complaint.  To the extent a response is deemed required, McGraw-Hill denies the allegations in
paragraphs 270 to 290 of the Complaint.

### COUNT EIGHT: RICO CONSPIRACY, 18 U.S.C. § 1962(d)

291 – 299.    Pursuant to the Opinion and Order of the United States District
Court for the Southern District of New York dated September 13, 2010, Count Eight of the
Complaint has been dismissed for failure to state a claim upon which relief can be granted.
Accordingly, no response is required to the allegations in paragraphs 291 to 299 of the
Complaint.  To the extent a response is deemed required, McGraw-Hill denies the allegations in
paragraphs 291 to 299 of the Complaint.

## COUNT NINE: MONOPOLIZATION, 15 U.S.C. §§ 15 and 26

300.     McGraw-Hill incorporates by reference its answers to paragraphs 1 through 299 above as if fully restated herein.

301.     McGraw-Hill admits that Plaintiff purports to bring a claim under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

302.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 302 of the Complaint.

303.     McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 303 of the Complaint.

304.     McGraw-Hill denies the allegations in paragraph 304 of the Complaint.

305.     McGraw-Hill admits that MHC's products are available and sold to consumers across North America.  McGraw-Hill admits that MHC and Reed engage in activities that are in the flow of and affect interstate commerce.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 305 of the Complaint.

306.     McGraw-Hill denies the allegations in paragraph 306 of the Complaint.

307.     McGraw-Hill admits that consumers who have purchased national subscriptions to the Dodge Network include but are not limited to manufacturers of building products, financial services companies, building contractors, subcontractors and trade unions. McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegation that certain types of customers have purchased national subscriptions to Reed Connect.  McGraw-Hill denies the remaining allegations in paragraph 307 of the Complaint.

308.   McGraw-Hill denies the allegations in paragraph 308 of the Complaint.

309.   McGraw-Hill denies the allegations in paragraph 309 of the Complaint.

310.   McGraw-Hill denies the allegations in paragraph 310 of the Complaint.

311.   McGraw-Hill denies the allegations in paragraph 311 of the Complaint.

312.   McGraw-Hill denies the allegations in paragraph 312 of the Complaint.

313.   McGraw-Hill denies the allegations in paragraph 313 of the Complaint.

314.   McGraw-Hill denies the allegations in paragraph 314 of the Complaint.

315.   McGraw-Hill denies the allegations in paragraph 315 of the Complaint.

316.   McGraw-Hill incorporates by reference its answer to paragraph 161 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 161 of the Complaint, McGraw-Hill denies the allegations in paragraph 316 of the Complaint.

317.   McGraw-Hill incorporates by reference its answer to paragraph 163 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 163 of the Complaint, McGraw-Hill denies the allegations in paragraph 317 of the Complaint.

318.   McGraw-Hill denies the allegations in paragraph 318 of the Complaint.

## COUNT TEN: ATTEMPTED MONOPOLIZATION, 15 U.S.C. §§ 15 and 26

319.   McGraw-Hill incorporates by reference its answers to paragraphs 1 through 318 above as if fully restated herein.

320.   McGraw-Hill admits that Plaintiff purports to bring a claim under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

321.    McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 321 of the Complaint.

322.    McGraw-Hill admits that MHC's products are available and sold to consumers across North America.  McGraw-Hill admits that MHC and Reed engage in activities that are in the flow of and affect interstate commerce.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 322 of the Complaint.

323.    McGraw-Hill denies the allegations in paragraph 323 of the Complaint.

324.    McGraw-Hill denies the allegations in paragraph 324 of the Complaint.

325.    McGraw-Hill admits that consumers who have purchased national subscriptions to the Dodge Network include but are not limited to manufacturers of building products, financial services companies, building contractors, subcontractors and trade unions.  McGraw-Hill denies knowledge or information sufficient to form a belief as to the truth of the allegation that certain types of customers have purchased national subscriptions to Reed Connect.  McGraw-Hill denies the remaining allegations in paragraph 325 of the Complaint.

326.    McGraw-Hill denies the allegations in paragraph 326 of the Complaint.

327.    McGraw-Hill denies the allegations in paragraph 327 of the Complaint.

328.    McGraw-Hill denies the allegations in paragraph 328 of the Complaint.

329.    McGraw-Hill denies the allegations in paragraph 329 of the Complaint.

330.    McGraw-Hill denies the allegations in paragraph 330 of the Complaint.

331.    McGraw-Hill denies the allegations in paragraph 331 of the Complaint.

332.    McGraw-Hill incorporates by reference its answer to paragraph 161 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's

answer to paragraph 161 of the Complaint, McGraw-Hill denies the allegations in paragraph 332 of the Complaint.

333.    McGraw-Hill incorporates by reference its answer to paragraph 163 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 163 of the Complaint, McGraw-Hill denies the allegations in paragraph 333 of the Complaint.

334.    McGraw-Hill denies the allegations in paragraph 334 of the Complaint.

## COUNT ELEVEN: UNJUST ENRICHMENT

335.    McGraw-Hill incorporates by reference its answers to paragraphs 1 through 334 above as if fully restated herein.

336.    McGraw-Hill denies the allegations in paragraph 336 of the Complaint.

337.    McGraw-Hill denies the allegations in paragraph 337 of the Complaint.

338.    McGraw-Hill denies the allegations in paragraph 338 of the Complaint.

339.    McGraw-Hill denies the allegations in paragraph 339 of the Complaint.

340.    McGraw-Hill incorporates by reference its answer to paragraph 161 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 161 of the Complaint, McGraw-Hill denies the allegations in paragraph 340 of the Complaint.

341.    McGraw-Hill incorporates by reference its answer to paragraph 163 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 163 of the Complaint, McGraw-Hill denies the allegations in paragraph 341 of the Complaint.

342.    McGraw-Hill denies the allegations in paragraph 342 of the Complaint.

343.    McGraw-Hill denies the allegations in paragraph 343 of the Complaint.

## COUNT TWELVE: FALSE ADVERTISING, 15 U.S.C. § 1125(a)

344.    McGraw-Hill incorporates by reference its answers to paragraphs 1 through 344 above as if fully restated herein.

345.    McGraw-Hill denies the allegations in paragraph 345 of the Complaint, except that McGraw-Hill admits that MHC commissioned Roper to create accurate unbiased comparisons of the project data available on the Dodge Network and Reed Connect which were sometimes referred to as the "Roper Report."

346.    McGraw-Hill denies the allegations in paragraph 346 of the Complaint.

347.    McGraw-Hill incorporates by reference its answers to paragraphs 112 through 120 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answers to paragraphs 112 through 120 of the Complaint, McGraw-Hill denies the allegations in paragraph 347 of the Complaint.

348.    McGraw-Hill incorporates by reference its answer to paragraph 126 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 126 of the Complaint, McGraw-Hill denies the allegations in paragraph 348 of the Complaint.

349.    McGraw-Hill incorporates by reference its answer to paragraph 129 of the Complaint above as if fully restated herein.  To the extent not addressed in McGraw-Hill's answer to paragraph 129 of the Complaint, McGraw-Hill denies the allegations in paragraph 349 of the Complaint.

350.    McGraw-Hill denies the allegations in paragraph 350 of the Complaint.

351.    McGraw-Hill denies the allegations in paragraph 351 of the Complaint.

352.    McGraw-Hill denies the allegations in paragraph 352 of the Complaint.

353.    McGraw-Hill denies the allegations in paragraph 353 of the Complaint.

354.    McGraw-Hill denies the allegations in paragraph 354 of the Complaint.

355.    McGraw-Hill denies the allegations in paragraph 355 of the Complaint.

356.    McGraw-Hill denies the allegations in paragraph 356 of the Complaint.

357.    McGraw-Hill denies the allegations in paragraph 357 of the Complaint.

358.    McGraw-Hill denies the allegations in paragraph 358 of the Complaint.

359.    McGraw-Hill denies the allegations in paragraph 359 of the Complaint.

360.    McGraw-Hill denies the allegations in paragraph 360 of the Complaint.

361.    McGraw-Hill denies the allegations in paragraph 361 of the Complaint.

362.    McGraw-Hill denies the allegations in paragraph 362 of the Complaint.

363.    McGraw-Hill denies the allegations in paragraph 363 of the Complaint.

364.    McGraw-Hill denies the allegations in paragraph 364 of the Complaint.

365.    McGraw-Hill denies the allegations in paragraph 365 of the Complaint.

366.    McGraw-Hill denies the allegations in paragraph 366 of the Complaint.

367.    McGraw-Hill denies the allegations in paragraph 367 of the Complaint.

368.    McGraw-Hill denies the allegations in paragraph 368 of the Complaint.

369.    McGraw-Hill denies the allegations in paragraph 369 of the Complaint.

370.    McGraw-Hill denies the allegations in paragraph 370 of the Complaint.

## **JURY DEMAND**

371.    McGraw-Hill admits that Reed demands that this case be tried by jury.


## **FIRST AFFIRMATIVE DEFENSE**

The Complaint and each separate cause of action asserted therein fails to state a claim

upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Some or all of Plaintiff's claims are barred under the doctrines of waiver, estoppel, laches, acquiescence, or *in pari delicto*.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff lacks standing to assert some or all of the claims set forth in the Complaint.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's alleged damages are the result of acts or omissions committed by persons over whom McGraw-Hill has no responsibility or control.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's alleged damages are the result of acts or omissions committed by the Plaintiff.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's alleged damages are too remote from any alleged conduct of McGraw-Hill to be the basis of recovery against McGraw-Hill.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to mitigate its alleged losses.

## EIGHTH AFFIRMATIVE DEFENSE

Some or all of Plaintiff's claims are barred by the applicable statutes of limitations.

## NINTH AFFIRMATIVE DEFENSE

Some or all of Plaintiff's claims are barred because Plaintiff has unclean hands.

## TENTH AFFIRMATIVE DEFENSE

Some or all of Plaintiff's claims are barred by the First Amendment to the Constitution of the United States.

## ELEVENTH AFFIRMATIVE DEFENSE

Some or all of Plaintiff's claims are barred by the pro-competitive business justification doctrine.

## TWELFTH AFFIRMATIVE DEFENSE

Some or all of Plaintiff's claims are barred by Ga. Code Ann. § 10-1-767(a).

WHEREFORE, McGraw-Hill respectfully prays that the Complaint be dismissed in its entirety, that McGraw-Hill be awarded its costs and attorney's fees, and that the Court order such other and further relief as it deems just and proper.

## COUNTERCLAIM[1]

And as for its Counterclaim against Reed, McGraw-Hill hereby alleges the following:

## INTRODUCTION

1.     McGraw-Hill recently discovered that since at least the mid-2000s, Reed has systematically recruited and hired numerous former employees of McGraw-Hill Construction ("MHC") for the purpose of obtaining valuable trade secrets and confidential customer information belonging to MHC that Reed then used to solicit MHC's customers.  Reed's campaign of misappropriation has been so central to its business that for several years, the top positions in Reed's national sales organization were occupied by former MHC employees, each of whom provided Reed with confidential information about MHC's customers.

2.     In one particularly egregious case, Reed recruited high-level MHC executives to obtain detailed downloads of information from MHC's databases, including exact

_____

[1] For the sake of consistency in the pleadings, McGraw-Hill hereby restates its Counterclaim, which has not been modified since it was last set forth in response to Reed's Second Amended Complaint.

pricing and other highly valuable customer data for over $120 million of MHC's business.  After leaving MHC and joining Reed, the former MHC executives then distributed MHC's confidential customer data to Reed's sales force, frequently attempting to cover their tracks by claiming that the information—which contained thousands upon thousands of detailed entries— was recreated "████████,"[2] which was an obvious lie.  Reed used this information and other trade secrets to identify potential customers and points of contact, to target customers as their MHC subscriptions were expiring, and to craft cut-rate subscription prices, all in a coordinated effort to lure away MHC's customers.

        3.     Reed was able to conceal its wrongful conduct for years.  Indeed, Reed's campaign of misappropriation only came to light very recently and only because Reed was compelled to turn over in discovery an electronic computer file containing thousands of lines of detailed MHC customer information that was stolen from MHC by Reed employees.  Forensic analysis has established that the file in Reed's possession was created by former McGraw-Hill employees shortly before they left McGraw-Hill to take senior executive positions at Reed and was taken to Reed upon their departure.  As detailed below, the file contains a treasure trove of MHC's trade secret and confidential information.  Incredibly, many of the companies listed in the file stolen from MHC are identified in Reed's Complaint as customers that MHC took from Reed.

        4.     Reed's use of improperly obtained confidential MHC information is part of a larger strategy by Reed to compete for customers based on something other than the

─────────────

[2]     Pursuant to the parties' Stipulated Joint Protective Order [Dkt. 33], Reed has designated certain documents it produced in discovery that support McGraw-Hill's Counterclaim as "Highly Confidential."  Accordingly, McGraw-Hill has prepared two versions of the Counterclaim—one in which direct citations to documents that Reed claims are "Highly Confidential" have been redacted that is appropriate for public filing and another unredacted version to be filed under seal for the Court's *in camera* review.

deficient quality and value of its products.  Reed knows that its products are vastly inferior to MHC's but has made deliberate and conscious decisions not to invest the resources required to expand its coverage of the construction industry or to otherwise improve its products.  Instead, looking to compete on the cheap, Reed has resorted to stunts like the instant lawsuit (which it has repeatedly trumpeted in the press and attempted to use as a sales tool) and tortious conduct like the campaign of misappropriation detailed in this Counterclaim.

5.  Reed's improper behavior has yielded it an unfair competitive advantage by helping to offset the fundamental weakness of its products, resulting in damage to MHC.

## JURISDICTION AND VENUE

6.  This Court has supplemental jurisdiction over McGraw-Hill's state law Counterclaims pursuant to 28 U.S.C. § 1367 because Reed's claims set forth in Counts Nine and Ten of the Complaint arise under the laws of the United States.  The allegations set forth herein arise from the same nucleus of operative facts.

7.  In addition, this Court has jurisdiction over McGraw-Hill's state law Counterclaims under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8.  Venue in this district is proper pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to McGraw-Hill's claims occurred in this district and a substantial part of property that is the subject of the action is situated in this district.

## THE PARTIES

9.  McGraw-Hill is a New York corporation with its principal place of business at 1221 Avenue of the Americas, New York, New York  10020.  MHC is a division of

McGraw-Hill.

10.     Reed is a wholly owned subsidiary of Reed Elsevier Inc. and is part of Reed Elsevier Inc.'s Reed Business Information division.  Reed is a Delaware corporation with its principal place of business at 30 Technology Parkway South, Suite 100, Norcross, Georgia 30092.

## FACTS

## OVERVIEW

11.     MHC is the leading provider in North America of construction project information, building product information, construction plans and specifications, industry news, market research and industry trends and forecasts.  Among other products and services, MHC operates an online subscription service called the "McGraw-Hill Construction Network" or the "Dodge Network," which provides customers comprehensive, accurate and timely construction project information for virtually all substantial construction activity in North America.  MHC has been in the business of gathering, synthesizing and analyzing construction industry information for over one hundred years and its resources and experience are second to none.  Simply put, MHC's coverage of the construction industry is far more comprehensive than the coverage offered by any of its competitors.  In addition to the Dodge Network, MHC provides a suite of other products that are vital to players in the construction industry, including the industry-leading Sweets Network catalog of construction product information and numerous Industry Analytics products that provide actionable market research.

12.     In addition to MHC, numerous competitors provide various levels of information and coverage regarding the construction industry in North America.  One such competitor is Reed, which operates an internet-based construction project listing service called

"Reed Connect."  Reed entered the construction information business in or around 2002.  Reed's resources and experience dedicated to gathering, synthesizing and analyzing construction industry information are inferior to MHC's.  Accordingly, although Reed purports to provide nationwide coverage of the construction industry to its Reed Connect subscribers, its coverage is far less extensive than Dodge Network.  Moreover, even for the fraction of the construction industry that it covers, Reed struggles to provide its customers with information that is accurate and timely.

### THE SUPERIORITY OF MHC'S PRODUCTS & SERVICES

13.     In its internal communications, Reed itself regularly recognizes the inferiority of its products and the superiority of MHC's.  Indeed, there is a stark difference between what Reed says publicly and what it concedes in private.  While Reed publicly proclaims (including in this case) that Reed Connect is a "superior product" to Dodge Network, *see* Am. Compl. ¶¶ 33 , 140, in private it acknowledges that Reed Connect is inferior, both in terms of content and functionality.  In public, Reed has boasted on its website that Reed Connect offers the "most active collection of public and private construction projects available," but in private Reed regularly receives customer complaints about the lack of project information available on Reed Connect.  In public, Reed has described itself as a "leading provider of project information," but in private its sales force bemoans the difficulty of marketing an inferior product.  In public, Reed has asserted that Reed Connect delivers "the most comprehensive, timely and reliable project information," but in private Reed has suppressed evidence— ***including third-party comparisons commissioned by Reed***—that shows that Reed Connect has substantially fewer project listings than Dodge Network.  In public, Reed markets Reed Connect as a viable alternative to Dodge Network, but in private Reed officials, including Reed's chief

executive officer, have tried to discourage customers from comparing Reed Connect and Dodge Network for themselves.

14.     On numerous occasions, Reed has performed its own studies comparing Reed Connect to its competitors' offerings, including Dodge Network, which have regularly shown Reed's products to be inferior.  Indeed, Reed's consistent failure to measure up to its competitors led its one-time Senior Director of Research Operations—the person in charge of gathering the construction project information used to populate the Reed Connect database—to exclaim in frustration that asking him to perform comparisons of Reed and Dodge "████████ ██████████████████████."

15.     On a separate occasion during which Reed's own internal comparison of its data against the data offered by a competitor demonstrated yet again that Reed was inferior, Reed's CEO Iain Melville complained that the comparison "██████████████████████ ██████████████."

16.     On yet another occasion, Melville explicitly acknowledged the superiority of MHC's products, writing that "t███████████████████████████ ██████████████████████████████████████████ ██████████████."  Melville's statement that Reed's data gathering abilities were ██% inferior was, if anything, an underestimation.

17.     Aside from Reed's internal comparisons, the inferiority of Reed's products has been confirmed on scores of occasions by the experiences and comparisons of customers.

18.     Customers that subscribe to Dodge Network, Reed Connect or other competitors' services generally are sophisticated and well-informed about the services they are purchasing.  Subscriptions to the various databases can cost tens or even hundreds of thousands

of dollars and generally entail long-term commitments of a year or more.  Accordingly, prospective subscribers to products such as the Dodge Network and Reed Connect research their purchasing decisions carefully and frequently perform their own head-to-head comparisons of the two services during trial subscription periods.  As Reed knows, these customer-driven comparisons overwhelmingly demonstrate that Dodge Network is superior to Reed Connect.

19.     Although Reed has alleged in this case that customers who compare Reed Connect and Dodge Network for themselves are somehow unable to perform accurate comparisons free from MHC's influence, Reed knows this to be untrue.  Indeed, Reed acknowledges just the opposite in its internal communications.  For one example, in a recent email, a Reed representative discussed a customer-driven comparison that revealed that the coverage offered by Dodge Network was vastly superior to the coverage offered by Reed Connect.  The Reed representative validated the methodology used by the customer, calling the comparison "███████████████████████████," and vented his frustration over the near-impossible task of selling Reed's inferior product, exclaiming, "████████████████████ ███████████!"

20.     Aside from Reed's internal comparisons and assessments as well as the experiences and comparisons of customers—all of which confirm the superiority of MHC's products—a third-party research firm named Upper Quadrant that was hired by Reed specifically to compare the parties' services has also confirmed the superiority of Dodge Network.

21.     Acting as Reed's agent, Upper Quadrant used a series of misrepresentations to obtain access to Dodge Network data for use in a study comparing Dodge Network and Reed Connect.  Ironically, Reed has alleged in this lawsuit that consultants hired by MHC similarly obtained Reed Connect subscriptions through misrepresentations in order to

42

facilitate product comparisons by MHC.  Reed has alleged that MHC's consultants engaged in
"industrial espionage" for essentially the same conduct that Reed engaged in through Upper
Quadrant.

22.     Having obtained Dodge Network data through improper means, Upper
Quadrant and Reed then compared the quality of Reed Connect and Dodge Network.  The results
of Upper Quadrant's analyses were disastrous for Reed and confirmed what Reed already knew:
Dodge Network had vastly more and higher-quality project reports than Reed Connect.

23.     Because the results of the Upper Quadrant comparisons were so bad for
Reed, it suppressed the results and did not make them known to the public.

24.     Reed's inability to provide its customers comprehensive, accurate and
timely construction industry information—confirmed by its own internal analyses, the
experiences of customers and a third-party hired by Reed specifically for comparative
purposes—is the result both of MHC's superior resources and experience as well as deliberate
decisions by Reed not to invest the resources necessary to approach MHC's quality.  Instead,
Reed has made the deliberate decision to attempt to compete cheaply.  Reed has recognized the
consequences of its decision, explicitly acknowledging that it loses competitive ground, not
because of the Roper Report or other MHC comparisons (as it has alleged in this lawsuit), but
because Reed made deliberate decisions to "███████████████████████████████████
███████████████████████████."  According to Reed's own internal analysis,
its decisions not to invest in its products leads directly to "████████████████████████
████████████████████████████████████."

## REED'S NEED FOR MHC'S TRADE SECRETS AND CONFIDENTIAL INFORMATION

25.     Because of the self-inflicted chronic deficiencies of its products, Reed

generally must compete with MHC based on price, not quality.  By offering a low-cost alternative—albeit for an inferior product—Reed has been able to successfully market Reed Connect to certain subscribers and, in some cases, convince customers to switch from Dodge Network to Reed Connect.  Reed's record of retaining former MHC customers is unimpressive, however, with many returning to Dodge Network due to dissatisfaction with Reed Connect.  Put simply, as explained above, when customers have access to both companies' products and are able to evaluate those products themselves, they generally prefer Dodge.

26.     Because Reed emphasizes price at the expense of quality, its ability to market its products depends disproportionately on knowing details of prospective customers' historical rates of spending on information services, the scope and terms of the services they previously purchased, their particular construction industry information needs, and other private information.

27.     A competitor such as Reed that had access to confidential information about an MHC customer's needs, when the customer's subscription to MHC's products was expiring and how much the customer was paying for its individualized subscriptions and services would be able to tailor its marketing efforts as to timing, price and service.  This would, for example, permit Reed to craft a discount bid for a customer's business below what the customer was paying for Dodge Network, while still maximizing Reed's own profits.  The access to confidential information would provide important guidance for how to price Reed's products.  Accordingly, access to confidential information regarding MHC's customers would play an especially significant role for Reed in the competition for customers.

**REED'S CAMPAIGN TO COMPETE BY OBTAINING MHC'S TRADE SECRETS AND CONFIDENTIAL INFORMATION**

28.     In or about the mid-2000s, unable or unwilling to compete with MHC on

quality, Reed began a systematic campaign of recruiting MHC employees and executives to work for Reed for the purpose of obtaining MHC's confidential and trade secret customer information, including price, subscription details, and renewal information for thousands of MHC customers.  Having convinced MHC's employees to breach their duties to MHC by misappropriating this data or through other misconduct, Reed then used the information to solicit MHC's customers at discount rates when their subscriptions to MHC's products were expiring. In some cases, Reed successfully obtained business from these customers (at least for a short period of time); in other instances, MHC was forced to discount its own rates to counter Reed's tactics.  High-level Reed executives have been directly involved in Reed's campaign of misappropriation.

### MHC's Trade Secrets and Confidential Information

29.     In connection with its ongoing business, MHC maintains compilations of detailed customer information, including information concerning the identity of its customers; the scope, duration and terms of their subscriptions and purchases; sales notes; and comprehensive information about each customer's business information needs.

30.     Over at least the last several decades, MHC has expended considerable time and resources to collect this confidential customer information.  MHC's customer information is not known or available to the public and derives independent value from not being generally known.  The information is also not readily ascertainable through proper means by persons outside of MHC who could benefit from its use.  A competitor who had access to the information would gain the benefit of MHC's efforts and gain an undue competitive advantage in soliciting customers.

31.     MHC's customer information is held in strict confidence and is not

disclosed outside MHC.  Moreover, even within MHC, this information is maintained in strict confidence and is not accessible to MHC employees, except as needed to perform their professional functions.  MHC restricts access to its confidential customer information by, among other things, storing it in internal password-protected databases and prohibiting employees from disclosing to anyone outside the company the minimal confidential or proprietary information to which they are given access as necessary for their employment.  Moreover, all MHC employees are required to sign agreements to hold trade secrets, confidential information and proprietary information in strict confidence.  Further, an MHC employee who leaves MHC is not permitted to have access to confidential customer information after his or her departure.

33.    If MHC learns that a former employee has been hired by a competitor, it reminds the former employee of his or her obligation to maintain the secrecy of all confidential or proprietary information received while employed at MHC.  MHC also has been active in providing notice to competitors such as Reed that they are prohibited from using or soliciting MHC's confidential or proprietary information from former MHC employees or otherwise.  MHC also demands the return of any files, memoranda, notes or other documents that an ex-employee may have under his or her possession or control.

### *Reed's Campaign to Gain Access to MHC's Trade Secret and Confidential Information through MHC Employees*

33.    Reed has repeatedly induced current and former MHC employees to breach their duties to MHC by misappropriating MHC's trade secret and confidential information for Reed's use and benefit.  Reed has regularly filled the ranks of its personnel with ex-MHC employees for the purpose of obtaining MHC's information, causing serious damage to MHC and unjustly enriching Reed in the process.

34.    While MHC is aware that former MHC employees join Reed from time to

time, it was not aware and could not have reasonably been aware until recently—when Reed produced documents in connection with this ongoing litigation—that Reed has misappropriated MHC's trade secrets and induced MHC's employees to breach their job-related duties.

35.     Former MHC employees who were recruited from MHC to Reed include, but are not limited to, former MHC sales directors Dean Paulson and Craig Fuss, former MHC sales managers Brian Hare, Nick Kovacs, Peter Lum, Greg Marchione, and Rick Thomas, and former director of sales for MHC's Analytics products Louis Centorcelli.  Reed's focus on converting MHC employees has been so important to Reed's business that at one point, four of the top five executives in Reed's national accounts organization were former MHC employees or affiliates.

### Former MHC Sales Executives Dean Paulson & Craig Fuss

36.     An early episode in Reed's campaign of misappropriation came in or around April or May 2005 when Reed recruited then-current MHC sales directors Dean Paulson and Craig Fuss to resign from MHC and work for Reed.  At that time, both Paulson and Fuss were high-level MHC executives with managerial responsibilities over dozens of employees and tens of millions of dollars worth of MHC business.  Because of their positions, Paulson and Fuss had access to highly sensitive and confidential customer information belonging to MHC.

37.     While they were still employed by MHC, Paulson and Fuss were engaged in secret discussions with Reed to depart from MHC and to join Reed's management team.  On information and belief, one of the principal reasons Reed sought to hire Paulson and Fuss away from MHC was to gain access to the sensitive and confidential customer information to which they were privy.  On information and belief, Reed offered employment to Paulson and Fuss on the condition that they bring with them customer information belonging to MHC, and they

agreed.

38.      While still employed by MHC and prior to announcing their intention to join Reed, Paulson and Fuss compiled detailed customer information belonging to MHC for the purpose of taking the information to Reed upon their departure.

39.      For example, in connection with this litigation, McGraw-Hill has recently learned that in April 2005, Fuss obtained a computer file containing thousands of lines of customer information for over $120 million worth of MHC business.  The file was stolen from a restricted-access MHC database and contained detailed information concerning MHC's customer accounts including details regarding the products purchased, the customers' identities, the precise dollar amounts spent by the customers and other confidential sales information.  As explained below, McGraw-Hill recently found the file among the documents produced by Reed in discovery.

40.      In addition to the file described above, Paulson and Fuss secretly compiled other confidential customer information prior to leaving MHC.

41.      After compiling MHC's customer information, Fuss and Paulson departed from MHC and, within days, were given positions as the top sales executives in Reed's national accounts organization reporting directly to Reed's CEO.  No sooner had they begun working for Reed than Paulson and Fuss began secretly distributing MHC's confidential customer information to Reed sales representatives who were in competition with MHC for customer accounts.

42.      Discovery produced by Reed in this litigation has revealed that after leaving MHC, Fuss and Paulson divulged misappropriated confidential MHC customer information to Reed sales representatives on scores of occasions.  The misappropriated data

included information concerning the identities of MHC's customers, the products purchased by MHC's customers, their precise subscription start, end and renewal dates, the precise amount spent on various MHC products and other highly sensitive and valuable information.

43.     At the same time, Paulson and Fuss were careful to cover their tracks and attempted to prevent evidence of their misappropriation from coming to light. For example, shortly after leaving MHC for Reed, Fuss sent to Paulson a copy of the file containing confidential MHC customer information described above as an email attachment. In the cover email, Fuss wrote: "████████████████████████████████████████ ████." (Emphasis added).

44.     Fuss' assertion that the attached file of detailed customer information was ████████████████████ was obviously false. First, the file attached to the email contained over four thousand entries detailing over $120 million worth of MHC business and could not possibly have been put together from memory. Second, after finding the file in Reed's document production, McGraw-Hill was able to use forensic analysis to locate the same file on an MHC computer used by Paulson during the period immediately prior to his departure from MHC, demonstrating beyond doubt that the information in question was taken from MHC's protected database of customer information while Paulson and Fuss were still employed by MHC.

45.     Reed has itself recognized the tremendous value and sensitivity of the information it misappropriated from MHC. In its document production, Reed designated the file described above as deserving of the highest level of protection available under the parties' joint confidentiality stipulation, classifying MHC's data as "Highly Confidential -- Attorneys' Eyes Only." Reed's admission that MHC's information is "Highly Confidential" is quite appropriate– the detailed data in the file concerning thousands of MHC's customers constitutes trade secret

information belonging to MHC.

46.   On numerous occasions over the ensuing years, Paulson and Fuss repeated the falsehood that information they were distributing to Reed sales representative was ████ ████████████.″ On each occasion, the information that was disclosed ████████ ██████ was actually derived from confidential information compiled by Paulson and Fuss during their employment with MHC.  On information and belief, Reed knew at all times that Paulson's and Fuss' representations regarding ████████████ were false.

47.   The purpose and effect of Paulson's and Fuss's repeated misstatements that they were providing competitive information to Reed's sales representatives "██████ ██████," was to conceal their misappropriation of MHC's confidential information.

### *Former MHC Sales Manager Nick Kovacs*

48.   Around the same time that Reed induced Paulson and Fuss to breach their duties to MHC and misappropriate MHC's trade secrets and confidential customer information, Reed also engaged in secret negotiations with then-current MHC sales manager Nick Kovacs.

49.   McGraw-Hill has recently learned through documents produced by Reed in discovery that while he was still employed by MHC and in a position to directly sabotage MHC's sales efforts, Kovacs not only compiled confidential customer information to take with him to Reed upon his departure, but also intentionally undermined MHC's active sales efforts with customers.  Kovacs' conduct was undertaken at the behest and for the benefit of Reed.

50.   For example, in or around May or June 2005, while still employed as an MHC sales manager, Kovacs had several discussions with Reed about switching companies. During these discussions, Kovacs informed Reed that he was "████████████████████ ███████████████████████," in obvious derogation of his duties as a

then-current MHC employee.  On information and belief, Reed encouraged and directed Kovacs to "█████████" renewing MHC's customer accounts.  Unfazed by Kovacs' breach of his employment duties to MHC, Reed hired him within days.

51.    Like Paulson and Fuss had previously done, Kovacs brought with him trade secret and confidential customer information belonging to MHC.  Also like Paulson and Fuss, Kovacs covered his tracks when subsequently distributing MHC's information within the Reed sales organization by falsely claiming that ████████████████████████████."

52.    The confidential MHC customer information misappropriated by Nick Kovacs was highly valuable to Reed and enabled it to take numerous customers from MHC (at least temporarily).  Indeed, almost immediately after joining Reed, Kovacs became one of its top three sales representatives for new business through his misuse of confidential MHC customer information.  Reed itself has acknowledged the value of the information misappropriated by Kovacs, calling the decision to hire him "████████████!"

### Former MHC Sales Manager Peter Lum

53.    In or around early 2007, Reed recruited Peter Lum, a former MHC sales manager who had recently left MHC, to perform what Reed euphemistically called "consulting services."  In reality, Reed sought to obtain from Lum confidential and trade secret information that Lum had taken with him upon his departure from MHC.

54.    At Reed's instruction, Lum provided Reed's sales representatives with confidential and trade secret information regarding MHC customers on several occasions.  For example, according to a document Reed produced in discovery, in or around January 2007, Lum took his MHC customer files to Reed's offices and spent time reviewing the "████████████" of certain "███" MHC customers, which were MHC customers that Lum believed were ripe for the

picking based on MHC's confidential and trade secret information.  Reed's access to information about MHC's customers' "███████████" and other confidential customer information enabled it to tailor its sales pitches and (at least temporarily) to obtain customers at MHC's expense.

55.     Lum was paid a bounty by Reed for each MHC customer that Reed was able to take away from MHC on the basis of confidential and trade secret information.

56.     On several occasions, Reed acknowledged that the confidential and trade secret information it obtained through Lum was extremely valuable.  For example, in a document produced in discovery, Reed credited Lum with being "████████████████████████████████ ████████████████████████████████████████."  In another document, a Reed sales executive assessed the value of Lum's "consultations" during their initial year and wrote that Lum had allowed Reed to ██████████████████████████████████████ ██████████████.

57.     In 2007, MHC became suspicious that Lum was in contact with Reed and, as it regularly does upon learning that its ex-employees are involved with competitors, MHC took active steps to remind Lum and Reed of their duties with regard to MHC's confidential and trade secret information.  To that end, on or about April 2007, McGraw-Hill's legal counsel wrote parallel letters to Lum and Reed CEO Iain Melville reminding them that Lum had had access to a considerable amount of proprietary and confidential information, including confidential customer information, while employed by MHC and demanding that Lum and Reed refrain from using any confidential information belonging to MHC.  Counsel also demanded that Reed and Lum return any MHC documents or materials in their possession and refrain from sharing such information with others.

58.     In response, Reed and Lum took steps to conceal the fact that Lum had

already provided substantial trade secret and confidential information to Reed and would continue to do so in the future.  For example, despite the fact that Lum had already shared "█████████" with Reed, Lum's counsel falsely asserted in a letter to McGraw-Hill that "Mr. Lum has confirmed that he does not have any files, memoranda, notes or other documents that are the property of McGraw-Hill."  Similarly, Reed wrote a letter falsely assuring McGraw-Hill that it respected MHC's trade secrets and confidential information.

59.     The efforts by Reed and Lum to conceal their misappropriation of MHC's trade secret and confidential information were successful.  Indeed, McGraw-Hill only recently learned through documents produced in discovery in this action that Reed's and Lum's representations were false and that Lum was engaged in misappropriating MHC's trade secret and confidential customer information.

60.     Reed's unlawful activities and access to MHC's confidential and trade secret information through Paulson, Fuss, Kovacs, Lum and others have provided it with an unfair competitive advantage and have allowed it to tailor pitches to potential customers resulting in lost sales for MHC and/or lost revenue resulting from MHC being forced into price reductions to fend off Reed's competitive assaults.  Reed has also been unjustly enriched because of its unlawful conduct.

## FIRST CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

61.     McGraw-Hill repeats and realleges paragraphs 1 through 60 above as if set forth fully herein.

62.     As set forth above, MHC's confidential customer information, including details regarding customer identities, points of contact, customer needs, terms of subscriptions, pricing details, scope of service, and renewal dates constitutes MHC's trade secret information.

63.     Indeed, Reed has admitted that MHC's confidential customer information constitutes trade secret information by designating documents it produced in discovery that contained such information as "Highly Confidential – Attorneys' Eyes Only."

64.     MHC protects its trade secret information by, among other things, maintaining the information in internal password-protected databases, restricting access to such information to current employees, requiring employees to sign agreements to hold all such trade secrets and other confidential or proprietary information in strict confidence, forbidding departing employees from taking or retaining such information, reminding ex-MHC employees of their confidentiality obligations and notifying competitors who hire ex-MHC employees of those employees' confidentiality obligations.

65.     As set forth above, Reed obtained and used MHC's trade secret information through improper means, including through the recruitment and hiring of former MHC employees for the purpose of obtaining confidential customer information to use in the solicitation of MHC's customers.  In so doing, Reed both misappropriated trade secret information itself and also caused the misappropriation of trade secret information by former MHC employees who had a continuing obligation to maintain such information in strict confidence.

66.     Reed knew and had reason to know that the confidential customer information that it obtained from former MHC employees was trade secret information and had been acquired by improper means.  Reed further knew and had reason to know that the former MHC employees who were recruited and hired by Reed had acquired the trade secret information by virtue of their employment with MHC and under circumstances giving rise to a duty to maintain the secrecy of the information and restrict its use.

67.     As set forth above, Reed used MHC's trade secret information to compete with MHC and to gain an unfair competitive advantage.

68.     As a result of Reed's misappropriation and use of MHC's trade secret information, Reed has deprived MHC of the ability to reap the full profits of its trade secret information.

69.     McGraw-Hill has suffered damages as a proximate result of Reed's misappropriation of MHC's trade secret information.  Among other things, as a result of Reed misappropriation and use of trade secret information, McGraw-Hill has suffered damages in connection with the loss of customers and reduced profits as a result of being forced to discount subscription rates to offset Reed's actions.

70.     As set forth above, Reed knowingly, intentionally and wrongfully prevented McGraw-Hill from learning facts regarding Reed's misappropriation of trade secret information and made misrepresentations and material omissions intended to prevent McGraw-Hill from discovering Reed's tortious conduct.  Reed's fraudulent concealment further prevented McGraw-Hill from discovering that it had been damaged by Reed's tortious conduct and that the injury to McGraw-Hill's business had been caused by Reed's misconduct.  McGraw-Hill did not learn of Reed's misappropriation of trade secrets until recently when it saw documents produced in connection with this litigation.

71.     McGraw-Hill has been injured as a result of the foregoing by, among other things, direct diversion of sales, loss of good will, and reduction in profits.  McGraw-Hill is entitled to recover damages against Reed in an amount to be determined at trial.

72.     Reed acted willfully, wantonly and maliciously in obtaining MHC's trade secret information through improper means and using MHC's trade secret information to gain a

competitive advantage against MHC.  By obtaining and using MHC's trade secrets, Reed also

acquired confidential, inside information that permitted it to solicit customers and set

subscription prices at a level that it knew would undercut MHC's prices, while maximizing

Reed's own profits.  By so doing, Reed convinced customers to buy inferior products and also

obtained subscriptions at higher prices that Reed might have otherwise obtained, thereby hurting

customers in the market.

       73.     As a result of Reed's willful, wanton and malicious conduct, McGraw-Hill

is entitled to recover punitive damages against Reed in an amount to be determined at trial.

       74.     McGraw-Hill is also entitled to a permanent injunction preventing Reed

from misappropriating MHC's trade secrets or using such trade secrets in the future, and

requiring Reed to destroy all such trade secrets in its possession, custody or control.

## SECOND CAUSE OF ACTION
### (Misappropriation of Confidential Information)

       75.     McGraw-Hill repeats and realleges paragraphs 1 through 74 above as if set

forth fully herein.

       76.     As set forth above, MHC's customer information, including details

regarding customer identities, points of contact, customer needs, terms of subscriptions, pricing

details, scope of service, and renewal dates constitutes MHC's confidential information.

       77.     Indeed, Reed has admitted that MHC's customer information constitutes

highly valuable and confidential information by designating documents it produced in discovery

that contained such information as "Highly Confidential – Attorneys' Eyes Only."

       78.     MHC protects its confidential information by, among other things,

maintaining the information in internal password-protected databases, restricting access to such

information to current employees, requiring employees to sign agreements to hold all such

confidential information and other confidential or proprietary information in strict confidence, forbidding departing employees from taking or retaining such information, reminding ex-MHC employees of their confidentiality obligations and notifying competitors who hire ex-MHC employees of those employees' confidentiality obligations.

79.     As set forth above, Reed obtained and used MHC's confidential information through improper means, including through the recruitment and hiring of former MHC employees for the purpose of obtaining confidential customer information to use in the solicitation of MHC's customers.  In so doing, Reed both misappropriated confidential information itself and also caused the misappropriation of confidential information by former MHC employees who had a continuing obligation to maintain such information in strict confidence.

80.     Reed knew and had reason to know that the customer information that it obtained from former MHC employees was confidential information and had been acquired by improper means.  Reed further knew and had reason to know that the former MHC employees who were recruited and hired by Reed had acquired the confidential information by virtue of their employment with MHC and under circumstances giving rise to a duty to maintain the secrecy of the information and restrict its use.

81.     As set forth above, Reed used MHC's confidential information to compete with MHC and to gain an unfair competitive advantage.

82.     As a result of Reed's misappropriation and use of MHC's confidential information, Reed has deprived MHC of the ability to reap the full profits of its confidential information.

83.     McGraw-Hill has suffered damages as a proximate result of Reed's

misappropriation of MHC's confidential information. Among other things, as a result of Reed misappropriation and use of confidential information, McGraw-Hill has suffered damages in connection with the loss of customers and reduced profits as a result of being forced to discount subscription rates to offset Reed's actions.

84. As set forth above, Reed knowingly, intentionally and wrongfully prevented McGraw-Hill from learning facts regarding Reed's misappropriation of confidential information and made misrepresentations and material omissions intended to prevent McGraw-Hill from discovering Reed's tortious conduct. Reed's fraudulent concealment further prevented McGraw-Hill from discovering that it had been damaged by Reed's tortious conduct and that the injury to McGraw-Hill's business had been caused by Reed's misconduct. McGraw-Hill did not learn of Reed's misappropriation of confidential information until recently when it saw documents produced in connection with this litigation.

85. McGraw-Hill has been injured as a result of the foregoing by, among other things, direct diversion of sales, loss of good will, and reduction in profits. McGraw-Hill is entitled to recover damages against Reed in an amount to be determined at trial.

86. Reed acted willfully, wantonly and maliciously in obtaining MHC's confidential information through improper means and using MHC's confidential information to gain a competitive advantage against MHC. By obtaining and using MHC's confidential information, Reed gained knowledge allowing it to solicit customers and set subscription prices at a level that it knew would undercut MHC's prices, while maximizing Reed's own profits. By so doing, Reed convinced customers to buy inferior products and also obtained subscriptions at higher prices that Reed might have otherwise obtained, thereby hurting customers in the market.

87. As a result of Reed's willful, wanton and malicious conduct, McGraw-Hill

is entitled to recover punitive damages against Reed in an amount to be determined at trial.

88.    McGraw-Hill is also entitled to a permanent injunction preventing Reed from misappropriating MHC's confidential information or using such confidential information in the future, and requiring Reed to destroy all such confidential information in its possession, custody or control.

## THIRD CAUSE OF ACTION
### (Unfair Competition)

89.    McGraw-Hill repeats and realleges paragraphs 1 through 88 above as if set forth fully herein.

90.    As set forth above, Reed has knowingly and intentionally misappropriated MHC's trade secret and confidential information for the purpose of using such information to solicit MHC's actual and prospective customers.  Reed's bad faith misappropriation of MHC's trade secrets and its use of MHC's confidential and proprietary information has deprived MHC of a commercial advantage.

91.    Reed's misconduct, as detailed above, constitutes unfair competition.

92.    Among other things, as a result of Reed unfair competition, McGraw-Hill has suffered damages in connection with the loss of customers and reduced profits as a result of being forced to discount subscription rates to offset Reed's actions.

93.    McGraw-Hill has been injured as a result of the foregoing by, among other things, direct diversion of sales, loss of good will, and reduction in profits.  McGraw-Hill is entitled to recover damages against Reed in an amount to be determined at trial.

94.    In addition, as set forth above, as a result of Reed's willful, wanton and malicious conduct, McGraw-Hill is entitled to recover punitive damages against Reed in an amount to be determined at trial.

95.     McGraw-Hill is also entitled to a permanent injunction preventing Reed from misappropriating MHC's trade secrets or using such trade secrets in the future, and requiring Reed to destroy all such trade secrets in its possession, custody or control.

## FOURTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty)

96.     McGraw-Hill repeats and realleges paragraphs 1 through 95 above as if set forth fully herein.

97.     As set forth above, former MHC employees recruited by Reed had fiduciary duties and duties of confidentiality to MHC not to use or disclose MHC's trade secrets, confidential information or proprietary information for their own benefit or the benefit of others.

98.     Through improper action without privilege, Reed knowingly and intentionally induced former MHC employees to breach their duties to MHC by misappropriating MHC's trade secrets and confidential information for their own and Reed's benefit.  Reed knew that MHC's former employees owed fiduciary duties and duties of confidentiality to MHC.  Reed acted purposely and with malice and the intent to injure MHC. Reed's inducement caused MHC's former employees to breach their fiduciary duties and duties of confidentiality to MHC.

99.     Among other things, as a result of Reed's procurement and inducement of the breach of MHC's former employees' fiduciary duties and duties of confidentiality, McGraw-Hill has suffered damages in connection with the loss of customers and reduced profits as a result of being forced to discount subscription rates to offset Reed's actions.

100.     McGraw-Hill has been injured as a result of the foregoing by, among other things, direct diversion of sales, loss of good will, and reduction in profits.  McGraw-Hill is entitled to recover damages against Reed in an amount to be determined at trial.

101.     In addition, as set forth above, as a result of Reed's willful, wanton and malicious conduct, McGraw-Hill is entitled to recover punitive damages against Reed in an amount to be determined at trial.

## JURY DEMAND

102.     McGraw-Hill hereby demands that its Counterclaims be tried by jury.

## PRAYER FOR RELIEF

WHEREFORE, McGraw-Hill respectfully requests the following relief:

A.     Entry of judgment in favor of McGraw-Hill and against Reed on all Causes of Action;

B.     An award to McGraw-Hill of damages sustained due to Reed's unlawful conduct in an amount to be determined at trial;

C.     An award to McGraw-Hill of damages sufficient to disgorge Reed of the amounts to which it has been unjustly enriched as a result of its tortious conduct in an amount to be determined at trial;

D.     An award to McGraw-Hill of punitive damages in an amount to be determined at trial;

E.     A permanent injunction requiring Reed to purge from all of its records and databases all confidential information belonging to MHC, including all customer information, and any information derived therefrom, forbidding Reed from using any such information for any purposes, and enjoining Reed from misappropriating MHC's trade secrets in the future;

F.     An award of costs and reasonable attorneys fees; and

G.     Such other and further relief as the Court may deem just and

proper.

Dated:      New York, New York                  Respectfully submitted,
            April 5, 2013
                                                PATTERSON BELKNAP WEBB & TYLER LLP

                                                By: _____
                                                    Saul B. Shapiro
                                                    Joshua A. Goldberg
                                                    *Attorneys for Defendant The McGraw-Hill*
                                                    *Companies, Inc.*
                                                    1133 Avenue of the Americas
                                                    New York, New York  10036
                                                    Tel:  (212) 336-2000