UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REED CONSTRUCTION DATA INC.,

Plaintiff,

- v. -

THE MCGRAW-HILL COMPANIES, INC.,
JOHN DOES One through Five, and
JOHN DOE ENTITIES One through Five,

Defendants.

09 Civ. 8578 (JPO)

**REDACTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
MCGRAW HILL FINANCIAL, INC.'S MOTION FOR SUMMARY JUDGMENT**

PATTERSON BELKNAP WEBB
& TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Defendant McGraw Hill
Financial, Inc.*

OF COUNSEL:
    Saul B. Shapiro
    Joshua A. Goldberg
    Michelle W. Cohen

1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................5

I.    The Parties and Their Business................................................................5

    A.    MHC's Industry-Leading Products and Services .........................5

    B.    Reed's Business ...........................................................7

    C.    MHC Offers Vastly Superior Products......................................7

    D.    Reed Refused to Invest Resources to Improve its Products .......................8

II.    The Parties Accessed Each Other's Products for Comparative Purposes...............9

III.    Reed Knew about MHC's Comparisons and the Access Required for Many Years Before Filing Suit ........................................................11

IV.    MHC Used its Access to Reed Connect to Perform Project Count Comparisons ...........................................................................14

    A.    The Roper Report..............................................................15

    B.    Other Data Comparisons.......................................................17

    C.    Other Product Comparisons....................................................18

    D.    Other Competitive Intelligence Activities ...............................18

V.    MHC's Comparisons Were Accurate ............................................18

    A.    The Comparisons Were Validated by Third-Party Consultants Hired by Reed ..........................................................19

    B.    Reed's Own Internal Assessments Validated the Comparisons ...............20

    C.    The Comparisons Were Validated by Customers' Experiences with Reed's Inferior Product..........................................................21

    D.    Even Reed's Expert Concedes that the Roper Tallies Were Accurate ......23

i

E.     All of the Witnesses with Direct Knowledge of the Comparisons Testified the Comparisons Were Intended to Be and Were in Fact Accurate ........................................................................23

VI.    Customers Did Not Make Decisions on the Basis of MHC's Comparisons ...............................................................24

A.     Sales Were Individually Negotiated by Sophisticated Parties..................24

B.     Potential Customers Had a Number of Ways to Assess the Companies' Products and Typically Performed Their Own Comparisons....................25

C.     MHC's Comparisons Were Too Generalized to Have an Impact..............27

D.     Negative Experiences with Reed Connect and Reed's Deceptive Sales Practices Drove Customers to MHC ........................................................28

PROCEDURAL HISTORY.........................................................................................30

SUMMARY JUDGMENT STANDARD.....................................................................35

ARGUMENT ...............................................................................................................36

POINT I  McGraw Hill Did Not Violate the Lanham Act ...............................................39

A.     The Project Counts in the Roper Report Did Not Violate the Lanham Act.....................................................................................40

1.  There Is No Genuine Issue of Fact as to Falsity ....................................40

a.  There Is No Evidence that the Roper Report Was Literally False ...............................................................................40

b.  There Is No Evidence that the Roper Report Was Misleading......43

2.  Any Alleged Misrepresentations Would Have Been Immaterial to Consumers.......................................................................46

3.  The Roper Report Did Not Cause Actual Consumer Deception or Harm to Reed .......................................................................................48

B.     No Other Aspect of MHC's Consumer Communications Violated the Lanham Act...................................................................................48

1.  MHC's Representations Regarding the Roper Report's Origins Did Not Violate the Lanham Act.........................................................49

ii

2.   The Timeliness of the Reports Does Not Provide a Basis for Reed to Proceed on its Lanham Act Claim ............................................. 50

3.   MHC's Non-Roper Comparisons Did Not Violate the Lanham Act ...... 50

C.   Reed's Claim for Disgorgement of MHC's Profits Should Be Dismissed ........................................................................................... 53

POINT II   Reed's Antitrust Claims Should Be Dismissed Because There Is No Evidence That MHC's Conduct Harmed Competition .......................................... 54

A.   Antitrust Claims Based on Tortious Conduct Are Disfavored ................. 54

B.   Antitrust Claims Based on Disparagement Are Presumed to Have a *De Minimis* Effect on Competition ........................................................... 55

1.   MHC's Project Counts Were Not Clearly False .................................... 57

2.   MHC's Comparisons Were Not Clearly Material ................................. 58

3.   MHC's Comparisons Were Not Clearly Likely to Induce Reasonable Reliance .............................................................................. 58

4.   Customers Typically Have Direct Personal Knowledge of the Subject Matter of MHC's Comparative Information .............................. 59

5.   MHC's Competitive Statements Were Susceptible to Neutralization by Reed .......................................................................... 61

C.   MHC's Other Conduct Was Also Not Anticompetitive ........................... 62

POINT III   Reed's State Law Claims Fail Under the Laws of its Home State of Georgia ........................................................................................... 64

A.   Georgia Law Applies to Reed's Common Law Claims ............................ 65

B.   GTSA Is the Only Avenue to Bring a Claim Based on Misappropriation of Information ................................................................ 68

C.   GTSA Bars Reed's Fraud Claim ............................................................... 70

D.   GTSA Bars Reed's Misappropriation of Trade Secrets or Confidential Information Claims .............................................................. 71

E.   Reed's Unfair Competition Claim Does Not Exist in Georgia and Would be Partially Preempted if it Did .................................................... 72

iii

F.      Reed's Tortious Interference Claim Is Partially Preempted and Fails
        to the Extent it is Based on Separate Conduct ...........................................73

G.      Reed's Unjust Enrichment Claim Is Partially Preempted and Fails
        to the Extent it is Based on Separate Conduct ...........................................74

POINT IV   Reed's Claims Would Also Fail Under New York Law..............................75

A.      Reed Cannot Prove Fraud Because it Did Not Suffer Actual
        Pecuniary Loss as a Direct and Independent Result of Fraud .................75

        1.  Reed's Alleged Lost Profits Are Not "Actual Pecuniary Loss" ............75

        2.  Reed's Alleged Damages Are Not the Direct and Independent
            Result of Any Misrepresentation to Reed...............................................76

B.      Reed Cannot Prove Misappropriation of Trade Secrets or
        Misappropriation of Confidential Information Because Reed Connect
        Was Not a Trade Secret ..........................................................................77

        1.  The Information in Reed Connect Was Not Secret ...............................78

        2.  The Information in Reed Connect Was Reed's Product.........................78

C.      Reed's Unfair Competition Claim Fails Because Reed Cannot
        Establish Product Disparagement or Misappropriation of a
        Proprietary Interest.................................................................................79

        1.  MHC Did Not Commit Tortious Product Disparagement ....................80

        2.  Unfair Competition by Misappropriation Fails Because Reed
            Did Not Have a Property Interest in Project Counts.............................82

D.      Tortious Interference with Prospective Economic Advantage Fails
        Because Reed Did Not Lose Business Prospects Based on Tortious
        Conduct ...................................................................................................84

E.      Unjust Enrichment Fails Because McGraw Hill Did Not Receive
        Anything of Value at Reed's Expense ......................................................85

POINT V   Portions of Each of Reed's State-Law and Antitrust Claims also Are
        Barred on Statute-of-Limitations Grounds ............................................87

A.      Reed's State Law Claims Must Meet the Statutes of Limitations of
        Both Georgia and New York ...................................................................87

B.      Four-Year Statutes of Limitations Apply to Reed's Fraud and
        Antitrust Claims......................................................................................88

iv

C.      Three-Year Statutes of Limitations Apply to Reed's Tortious Interference, Misappropriation, and Unjust Enrichment Claims ..............88

D.      Unfair Competition Has a One-Year Statute of Limitations ....................89

E.      Reed's Claims Accrued—at the Latest—at the Time of Injury................89

F.      Portions of Reed's State Law and Antitrust Claims Are Barred Because Reed Has Long Known the Basis for These Claims ..................90

G.      The Doctrine of Fraudulent Concealment Does Not Save Reed's Untimely Claims ....................................................................................91

POINT VI   Reed's Claims Against John Doe Defendants Should be Dismissed ............94

CONCLUSION ...............................................................................................................95

6402259v.1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

AD/SAT Div. of Skylight, Inc. v. Assoc. Press,
    181 F.3d 216 (2d Cir. 1999)..................................................................................63

Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.,
    04-cv-3531, 2009 U.S. Dist. LEXIS 130133 (S.D.N.Y. Aug. 5, 2009)..................................88

AFA Protective Sys., Inc. v. Am. Tel. and Tel. Co., Inc.,
    57 N.Y.2d 912 (1982) ....................................................................................76

Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric
Surgery, Inc.,
    323 F.3d 366 (6th Cir. 2003) ........................................................................57, 62

Am. Home Prods. Corp. v. Johnson & Johnson,
    654 F. Supp. 568 (S.D.N.Y. 1987)....................................................................53

Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,
    108 F.3d 1147 (9th Cir. 1997) ..................................................................... passim

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)....................................................................................36

Anti-Monopoly, Inc. v. Hasbro, Inc.,
    94-cv-2120, 1995 U.S. Dist. LEXIS 8822 (S.D.N.Y. June 27 1995) ......................................79

Applera Corp. v. MJ Res. Inc.,
    349 F. Supp. 2d 338 (D. Conn. 2004)..............................................................56, 57

Ashland Mgmt. Inc. v. Janien,
    82 N.Y.2d 395 (1993) ..................................................................................78

Atl. Int'l Movers, LLC v. Ocean World Lines, Inc.,
    914 F. Supp. 2d 267 (E.D.N.Y. 2012) ..............................................................89

Auscape Int'l v. Nat'l Geographic Soc'y,
    409 F. Supp. 2d 235 (S.D.N.Y. 2004)..............................................................46

Balance Dynamics Corp. v. Schmitt Indus.,
    204 F.3d 683 (6th Cir. 2000) ........................................................................54

*Barbagallo v. Marcum LLP,*
   820 F. Supp. 2d 429 (E.D.N.Y. 2011) ........................................................81

*Barr Lab. v. Quantum Pharmics, Inc.,*
   827 F. Supp. 111 (E.D.N.Y. 1993) ............................................................87

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
   603 F.2d 263 (2d Cir. 1979)......................................................................63

*Borden, Inc. v. Kraft, Inc.,*
   224 U.S.P.Q. 811, 1984 U.S. Dist. LEXIS 23179 (N.D. Ill. 1984) ..........47

*Borghese Trademarks, Inc. v. Borghese,*
   10-cv-5552, 2013 U.S. Dist. LEXIS 39827 (S.D.N.Y. Jan. 14, 2013) ......53

*Boyle v. Stephens, Inc.,*
   97-cv-1351, 1997 U.S. Dist. LEXIS 12780 (S.D.N.Y. Aug. 25, 1997) .....79

*Bracco Diagnostics, Inc., v. Amersham Health, Inc.,*
   627 F. Supp. 2d 384 (D.N.J. 2009))..........................................................46

*Broadcom Corp. v. Qualcomm Inc.,*
   501 F.3d 297 (2d Cir. 2007)......................................................................55

*Brooke Grp. v. Brown & Williamson Tobacco Corp.,*
   509 U.S. 209 (1993)...................................................................................55

*Burndy Corp. v. Teledyne Indus., Inc.,*
   748 F.2d 767 (2d Cir. 1984)......................................................................53

*Cantor Fitzgerald v. Lutnick,*
   313 F.3d 704 (2d Cir. 2002)......................................................................87

*Carvel Corp. v. Noonan,*
   3 N.Y.3d 182 (2004) .................................................................................84

*Catskill Dev., LLC v. Park Place Entm't Corp.,*
   547 F.3d 115 (2d Cir. 2008)......................................................................85

*Chudasama v. Mazda Motor Corp.,*
   123 F.3d 1353 (11th Cir. 1997) ................................................................77

*Ciccolo v. Chicago Research & Trading Grp.,*
   161 A.D.2d 364 (1st Dep't 1990) .............................................................84

*City of Atlanta v. Hotels.com,*
   710 S.E.3d 766, 771 (Ga. 2011)................................................................74

vii

*City of Groton v. Conn. Light & Power Co.*,
  662 F.2d 921 (2d Cir. 1981)...................................................................................63

*Cobalt Multifam. Investors I, LLC v. Shapiro*,
  857 F. Supp. 2d 419 (S.D.N.Y. 2012).....................................................................65

*Cochran Mill Assocs. v. Stephens*,
  648 S.E.2d 764 (Ga. Ct. App. 2007).......................................................................88

*Coleman & Co. Secs., Inc. v. Giaquinto Fam. Trust*,
  236 F.Supp.2d 288 (S.D.N.Y. 2002).......................................................................91

*Convolve, Inc. v. Compaq Computer Corp.*,
  00-cv-5141, 2006 U.S. Dist. LEXIS 13848 (S.D.N.Y. Mar. 28, 2006)..................71

*Curley v. AMR Corp.*,
  153 F.3d 5 (2d Cir. 1988) .......................................................................................67

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993)................................................................................................34

*Dayco Products LLC v. Dorman Products, Inc.*,
  09-cv-13139, 2010 U.S. Dist. LEXIS 102785 (E.D. Mich. Sept. 28, 2010) ..........47

*Delville v. Firmenich Inc.*,
  08-cv-10891, 2013 U.S. Dist. LEXIS 17461 (S.D.N.Y. Jan. 31, 2013) .................82

*Diamond Power Int'l, Inc. v. Davidson*,
  540 F. Supp. 2d 1322 (N.D. Ga. 2007) ........................................................ passim

*Document Sec. Sys., Inc. v. Coupons.com, Inc*,
  11-cv-6528, 2012 U.S. Dist. LEXIS 117249 (W.D.N.Y. Aug. 20, 2012)..........66, 67

*Dow Jones & Co. v. Int'l Sec. Exch., Inc.*,
  451 F.3d 295 (2d Cir. 2006).....................................................................................82

*Duty Free Am., Inc. v. Estée Lauder Cos.*,
  12-cv-60741, 2013 U.S. Dist. LEXIS 75186 (S.D. Fl. May 9, 2013)......................58

*Eagle Comtronics, Inc. v. Pico, Inc.*,
  89 A.D.2d 803 (4th Dep't 1982)..............................................................................78

*Eatoni Ergonomics, Inc. v. Research in Mot. Corp.*,
  486 F. App'x 186 (2d Cir. 2012) .............................................................................63

*Edelman v. Starwood Capital Grp.*,
  70 A.D.3d 246 (1st Dep't 2009) ..............................................................................86

viii

*Ediciones Quiroga, S.L. v. Fall River Music, Inc.*,
93-cv-3914, 1995 U.S. Dist. LEXIS 2641 (S.D.N.Y. Mar. 7, 1995)........................................89

*Ekstedt v. Charter Med. Corp.*,
384 S.E.2d 276 (Ga. Ct. App. 1989) ........................................................................................77

*Emamian v. Rockefeller Univ.*,
07-cv-3919, 2008 U.S. Dist. LEXIS 79019 (S.D.N.Y. Sept. 25, 2008) ..................................85

*Envirosource, Inc. v. Horsehead Res. Dev. Co.*,
95-cv-5106, 1996 U.S. Dist. LEXIS 9099 (S.D.N.Y. July 1, 1996)........................................85

*Eon Labs Mfg., Inc. v. Watson Pharm., Inc.*,
164 F. Supp. 2d 350 (S.D.N.Y. 2001)......................................................................................56

*Euro-Pro Operating LLC v. TTI Floor Care N. Am.*,
12-cv-10568, 2012 U.S. Dist. LEXIS 95744 (D. Mass. July 11, 2012) ..................................42

*Fada Int'l Corp. v. Cheung*,
57 A.D.3d 406 (1st Dep't 2008) ...............................................................................................78

*Fed. Express Corp. v. United Parcel Serv., Inc.*,
765 F.Supp.2d 1011 (W.D. Tenn. 2010)...................................................................................50

*Filtration Solutions Worldwide, Inc. v. Gulf Coast Filters, Inc.*,
08-cv-0102, 2010 U.S. Dist. LEXIS 2130 (W.D. Mo. Jan. 12, 2010).....................................45

*Fin. One Pub. Co. v. Lehman Bros. Special Fin.*,
414 F.3d 325 (2d Cir. 2005)......................................................................................................65

*Flight Sci., Inc. v. Cathay Pac. Airways Ltd.*,
647 F. Supp. 2d 285 (S.D.N.Y. 2009).......................................................................................90

*Frink Am. Inc. v. Champion Rd. Mach. Ltd.*,
48 F. Supp. 2d 198 (N.D.N.Y. 1999) ........................................................................................67

*Gate Techs., LLC v. Delphix Capital Mkts., LLC*,
12-cv-7075, 2013 U.S. Dist. LEXIS 95368 (S.D.N.Y. July 9, 2013)......................................86

*Gen. Sec., Inc. v. APX Alarm Sec. Solutions, Inc.*,
647 F. Supp. 2d 207 (N.D.N.Y. 2009) ......................................................................................90

*George Basch Co. v. Blue Coral, Inc.*,
968 F.2d 1532 (2d Cir. 1992)............................................................................................ passim

*Global Fin. Corp. v. Triarc Corp.*,
93 N.Y.2d 525 (1999) ...............................................................................................................88

*Golden Pac. Bancorp v. F.D.I.C.*,
    273 F.3d 509 (2d Cir. 2001)...........................................................................86, 89

*Green v. White*,
    494 S.E.2d 681 (Ga. Ct. App. 1997) ..........................................................89

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
    277 F. Supp. 2d 269 (S.D.N.Y. 2003).......................................................80, 82

*Gun Hill Road Serv. Station v. ExxonMobil Oil Corp.*,
    08-cv-7956, 2013 U.S. Dist. LEXIS 14199 (S.D.N.Y. Feb. 1, 2013) ....................88

*H.L. Hayden Co. v. Siemens Med. Sys, Inc.*,
    879 F.2d 1005 (2d Cir. 1989)......................................................................83

*Heerwagen v. Clear Channel Comm.*,
    435 F.3d 219 (2d Cir. 2006)........................................................................54

*Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*,
    665 F. Supp. 2d 239 (S.D.N.Y. 2009).........................................................85

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
    12 N.Y.3d 132 (2009) ................................................................................86

*In re Seagate Tech.*,
    497 F.3d 1360 (Fed. Cir. 2007) ..................................................................71

*Innov. Ventures, LLC v. N.V.E., Inc.*,
    694 F.3d 723 (6th Cir. 2012) ...............................................................61, 62

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
    299 F.3d 1242 (11th Cir. 2002) ..................................................................46

*Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms.Inc.*,
    19 F.3d 125 (3d Cir. 1994) ........................................................................45

*Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*,
    960 F.2d 294 (2d Cir. 1992).............................................................. passim

*Kearse v. Kaplan, Inc.*,
    692 F. Supp. 2d 398 (S.D.N.Y. 2010)........................................................88

*Kirby v. Wildenstein*,
    784 F. Supp. 1112 (S.D.N.Y. 1992).............................................................81

*Kregos v. Assoc. Press*,
    3 F.3d 656, 665 (2d Cir. 1993)....................................................................76

x

*Kytel Int'l Grp. v. Total Tel-Carrier Servs., Inc.*,
   47 A.D.3d 448 (1st Dep't 2008) ........................................................................91

*Lama Holding Co. v. Smith Barney Inc.*,
   88 N.Y.2d 413 (1996) ........................................................................................76

*Lehman v. Dow Jones & Co.*,
   783 F.2d 285 (2d Cir. 1986).................................................................................78

*Leshinsky v. Telvent GIT, S.A.*,
   10-cv-4511, 2013 U.S. Dist. LEXIS 62364 (S.D.N.Y. May 1, 2013) ....................36

*Liberman v. Gelstein*,
   80 N.Y.2d 429 (1992) ........................................................................................80

*Licci v. Lebanese Can. Bank*,
   672 F.3d 155 (2d Cir. 2012).................................................................................66

*LinkCo, Inc., v. Fujitsu Ltd.*,
   230 F. Supp. 2d 492 (S.D.N.Y. 2002)........................................................66, 78, 79

*Lively v. McDaniel*,
   522 S.E.2d 711 (Ga. Ct. App. 1999) ....................................................................73

*Madison Oslin, Inc. v. Interstate Res., Inc.*,
   11-cv-01343, 2012 U.S. Dist. LEXIS 142082 (N.D. Ala. Sept. 30, 2012)............71

*Meadowcraft, Inc. v. Bland*,
   95-cv-2219, 1997 U.S. Dist. LEXIS 22923 (N.D. Ga. Apr. 18, 1997)..................73

*Mercatus Grp. v. Lake Forest Hosp.*,
   641 F.3d 834 (7th Cir. 2011) ...............................................................................56

*Mesa v. City of New York*,
   09-cv-10464, 2013 U.S. Dist. LEXIS 1097 (S.D.N.Y. Jan. 3, 2013) ....................94

*Millennium Import Co. v. Sidney Frank Importing Co.*,
   03-cv-5145, 2004 U.S. Dist. LEXIS 11871 (D. Minn. June 11, 2004) ..................50

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,
   745 F. Supp. 2d 1359 (S.D. Fla. 2010) ................................................................45

*Multiple Listing Serv., Inc. v. Metropo. Multi-List, Inc.*,
   116 S.E.2d 356 (Ga. 1969)...................................................................................72

*Multivideo Labs, Inc. v. Intel Corp.*,
   99-cv-3908, 2000 U.S. Dist. LEXIS 110 (S.D.N.Y. Jan. 7, 2000) ........................58

xi

*N.Y. Times v. Sullivan*,
   376 U.S. 254 (1964)............................................................................80

*Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Labs.*,
   850 F.2d 904 (2d Cir. 1988)............................................................ passim

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
   105 F.3d 841 (2d Cir. 1997)............................................................ passim

*Nat'l Westminster Bank v. Ross*,
   130 B.R. 656 (S.D.N.Y. 1991)............................................................85

*Neumeier v. Kuehner*,
   31 N.Y.2d 121 (1972).......................................................................68

*New York v. Hendrickson Bros., Inc.*,
   840 F.2d 1065 (2d Cir. 1988)............................................................91

*Nat'l Football League v. Governor of Del.*,
   435 F. Supp. 1372 (D. Del. 1977)......................................................83

*On-Line Technologies, Inc. v. Bodenseewerk Perkin-Elmer GmbH*,
   386 F.3d 1133, 1146 (Fed. Cir. 2004)................................................71

*Opteum Fin. Servs., LLC v. Spain*,
   406 F. Supp. 2d 1378, 1380 (N.D. Ga. 2005)......................................68

*P&G v. Ultreo, Inc.*,
   574 F. Supp. 2d 339 (S.D.N.Y. 2008)............................................43, 45

*Payrolls & Tabulating, Inc. v. Sperry Rand Corp.*,
   22 A.D.2d 595 (2d Dep't 1965)..........................................................81

*Penalty Kick Management, Ltd. v. Coca Cola Co.*,
   318 F.3d 1284 (11th Cir. 2003).............................................69, 71, 74

*PHA Lighting Design, Inc. v. Kosheluk*,
   08-cv-01208, 2010 U.S. Dist. Lexis 30752 (N.D. Ga. Mar. 30, 2010)....................74

*Pope v. Saget*,
   29 A.D.3d 437 (1st Dep't 2006).........................................................75

*Prof'l Energy Mgmt. v. Necaise*,
   684 S.E.2d 374 (Ga. Ct. App. 2009)...................................................72

*Raymond Tate Liberty Fuels, Inc. v. Pac. Gas & Elec. Co.*,
   230 F. Supp. 2d 1072 (N.D. Cal. 2002)..........................................59, 62

xii

*Redeye Grill, L.P. v. Rest. Opportunities Ctr. of N.Y.*,
   13 Misc. 3d 1212A (N.Y. Sup. Ct. 2006) ............................................................80

*Reliable Carriers, Inc. v. Excellence Auto Carriers, Inc.*,
   11-cv-15326, 2012 U.S. Dist. LEXIS 73798 (E.D. Mich. May 29, 2012) ............................47

*Res. Developers v. Statue of Liberty-Ellis Island Found.*,
   926 F.2d 134 (2d Cir 1991)............................................................48

*Robbins v. Supermkt. Equip. Sales, LLC*,
   722 S.E.2d 55 (Ga. 2012)............................................................ passim

*Roy Exp. Co. v. Columbia Broad. Sys., Inc.*,
   672 F.2d 1095 (2d Cir. 1982)............................................................82

*RPR v. Marion Merrell Dow, Inc.*,
   93 F.3d 511 (8th Cir. 1996) ............................................................394

*Ruder & Finn, Inc. v. Seaboard Sur. Co.*,
   52 N.Y.2d 663 (1981) ............................................................79, 81, 89

*S.C. Johnson & Son v. Clorox Co.*,
   930 F. Supp. 753 (E.D.N.Y. 1996) ............................................................43

*Sachs v. Cantwell*,
   10-cv-1663, 2012 U.S. Dist. LEXIS 125335 (S.D.N.Y. Sept. 4, 2012) ............................94

*Sanderson v. Culligan Int'l Co.*,
   415 F.3d 620 (7th Cir. 2005) ............................................................63

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
   249 F. Supp. 2d 463 (E.D. Pa. 2003) ............................................................60, 62

*Santana Prods. Inc. v. Bobrick Washroom Equip., Inc.*,
   401 F.3d 123 (3d Cir. 2005)............................................................56, 60

*Savin Corp. v. Savin Grp.*,
   391 F.3d 439 (2d Cir. 2004)............................................................44

*Schandler v. New York Life Ins. Co.*,
   2011 U.S. Dist. LEXIS 46322 (S.D.N.Y. Apr. 26, 2011)............................................................91

*Smith v. Rail Works Corp.*,
   10-cv-3980, 2012 U.S. Dist. LEXIS 31514 (S.D.N.Y. Mar. 6, 2012)....................................65

*Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Co.*,
   198 F. Supp. 2d 59 (D. Mass. 2002) ............................................................39, 42

xiii

*State of N.Y. v. Barclays Bank of N.Y.*,
   76 N.Y.2d 533, 540 (1990) ..................................................................................86

*State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*,
   374 F.3d 158 (2d Cir. 2004)................................................................................84

*Stichting Ter Behartiging Van de Belangen Van Oudaan Deelhounders in het Kapital van
   Saybolt Int'l B.V v. Schreiber*,
   407 F.3d 34 (2d Cir. 2005)..............................................................................65, 66

*Synergetics USA, Inc. v. Alcon Labs., Inc.*,
   08-cv-3669, 2009 U.S. Dist. LEXIS 58899 (S.D.N.Y. Jul. 9, 2009)......................................87

*The David Aldridge Co. v. Microsoft Corp.*,
   995 F. Supp. 728 (S. D. Tex. 1998) ......................................................................62

*Thermal Design v. Indoor Cts. of Am.*,
   03-cv-249, 2004 U.S. Dist. LEXIS 6341 (W.D. Wis. Apr. 9, 2004)......................................42

*Thome v. The Alexander & Louisa Calder Found.*,
   70 A.D.3d 88 (1st Dep't 2009) ............................................................................80

*Tiffany (NJ) Inc. v. eBay, Inc.*,
   04-cv-4607, 2010 U.S. Dist. LEXIS 96596 (S.D.N.Y. Sept. 10, 2010) ........................ passim

*Tiffany (NJ) Inc. v. Ebay, Inc.*,
   600 F.3d 93 (2d Cir. 2009)................................................................................39, 44, 49

*Time Warner Cable, Inc. v. DirecTV, Inc.*,
   497 F.3d 144 (2d Cir. 2007)................................................................................ passim

*Time Warner, Inc. v. Kao-Sung Liu*,
   11-cv-2870, 2013 U.S. Dist. LEXIS 56816 (S.D.N.Y. Apr. 19, 2013) ..................................89

*Tri-State Consumer Ins. Co. v. LexisNexis Risk Solutions Inc.*,
   823 F. Supp. 2d 1306 (N.D. Ga. 2011) ................................................................72

*Tronitec, Inc. v. Shealy*,
   547 S.E.2d 749 (Ga. Ct. App. 2001) ....................................................................68

*Urtz v. N.Y. Cent. & Hudson River R.R. Co.*,
   202 N.Y. 170 (1911) ........................................................................................75

*Util. Metal Research, Inc. v. Coleman*,
   03-cv-1463, 2008 U.S. Dist. LEXIS 25095 (E.D.N.Y. Mar. 28, 2008)....................................85

*Vacold, L.L.C. v. Cerami*,
  545 F.3d 114 (2d Cir. 2008) ................................................................................................35

*Van-Go Transp. Co. v. New York City Bd. of Educ.*,
  971 F. Supp. 90 (E.D.N.Y. 1997) .......................................................................................81

*Walgreen Co. v. Astrazeneca Pharm., L.P.*,
  534 F. Supp. 2d 146 (D.D.C. 2008) ....................................................................................60

*Walker v. Lorch*,
  12-cv-9282, 2013 U.S. Dist. LEXIS 93764 (S.D.N.Y. July 12, 2013) .................................91

*Warren v. John Wiley & Sons*,
  No. 12-cv-5070, 2013 U.S. Dist. Lexis 93040 (S.D.N.Y. July 2, 2013) ....................75, 76, 77

*Watts v. Jackson Hewitt Tax Serv.*,
  675 F. Supp. 2d 274 (E.D.N.Y. 2009) .................................................................................78

*Weinstock v. Columbia Univ.*,
  224 F.3d 33 (2d Cir. 2000) ................................................................................................36

*Williams Gen. Corp. v. Stone*,
  614 S.E.2d 758 (Ga. 2005) ...............................................................................................68

*Wultz v. Bank of China Ltd.*,
  811 F. Supp. 2d 841 (S.D.N.Y. 2011) ................................................................................65

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971) .........................................................................................................90

## STATUTES

15 U.S.C. § 15(b) ................................................................................................................88

15 U.S.C. § 1117(a) ............................................................................................................53

15 U.S.C. § 1125(a) ............................................................................................................39

Ga. Code Ann. § 9-3-31 *et seq.* ..........................................................................................88

Ga. Code Ann. § 10-1-760 *et seq.* ............................................................................... passim

Ga. Code Ann. § 10-1-761 *et seq.* ...............................................................................64, 68

Ga. Code Ann. § 10-1-767 *et seq.* ..........................................................................37, 65, 68

N.Y. C.P.L.R. § 202 ............................................................................................................87

xv

N.Y. C.P.L.R. § 214 ................................................................................................88

N.Y. C.P.L.R. § 215 ................................................................................................89

N.Y. Gen. Bus. Law § 349 ......................................................................................31

**OTHER AUTHORITIES**

Areeda and Hovenkamp, *Antitrust Law*, ¶ 782(g) (2013) .....................................55

Fed. R. Civ. P. 56(a) ...............................................................................................35

Fed. R. Evidence 702 ..............................................................................................23

Restatement 3d of Unfair Competition § 38 ...............................................79, 80, 81

6402259v.1

**PRELIMINARY STATEMENT**

Reed Construction Data Inc. ("Reed" or "RCD") brought this action almost four years ago on the theory that it was damaged by McGraw-Hill Construction's ("MHC")[1] use of consultants to purchase subscriptions to Reed's construction project listing service, Reed Connect.  According to Reed, the consultants' contracts prohibited MHC from buying Reed Connect.  Although Reed breathlessly refers to these alleged contractual breaches as "industrial espionage," as discovery has confirmed, MHC did not "hack" into Reed's computers, steal secret algorithms, or do anything else that might qualify as espionage.  Instead, it is undisputed that MHC had the same access to Reed Connect as thousands of other companies and used that access solely to compare Reed Connect with MHC's own product, the Construction Network (the "Dodge Network").  MHC sales representatives sometimes provided these product comparisons to customers—usually in the form of a simple chart of project "counts" called the Roper Report—mixed in with all of the other materials exchanged during what is typically a lengthy and complex sales negotiation with sophisticated buyers.

Without minimizing the significance of any contractual breaches that resulted from MHC employees' access to Reed Connect, subscribing to a competitor's service is the kind of "stuff [that] happens in the world of business."  Oetken, J. December 15 2011 Hr'g Tr. 9:15-16.  Indeed, Reed knew for the better part of a decade that MHC was accessing Reed Connect to perform product comparisons, but did not bring a lawsuit.  Instead, Reed hired its own consultant to secretly obtain access to MHC's data and conduct its own comparisons.  Perhaps this is why when a Reed sales representative identified one of her customers as an MHC consultant, her supervisors told her to "shut up and keep selling," rather than stop MHC's access.  Ex. 1 (Jordan

---

[1] MHC is a division of McGraw Hill Financial, Inc., ("McGraw Hill"), formerly The McGraw-Hill Companies, Inc.

Tr. 13:11-14:8).[2]  In fact, the only substantive difference between the parties' access to each other's services is that MHC did not suppress the resulting comparisons, which confirmed what the industry already knew—MHC's data is vastly superior to Reed's.  Even Reed's former top executive admitted under oath that he had called Reed's claims "**Redacted**" and had said that this lawsuit was "**Redacted**" and "**Redacted**" Ex. 2 (Catalonello Tr. 79:20-80:9, 92:15-94:7).  Reed's former Director of Quality Control Brian Mulligan was even more blunt, calling this case a "**Redacted**" Ex. 3 (Mulligan Tr. 286:22-287:3).

Instead of being based in any purported "espionage," Reed's alleged damages all flow from MHC's use of the Roper Report and other marketing materials, which Reed alleges were misleading and caused customers to make purchasing and pricing decisions they otherwise would not have made.  In the alternative, Reed asserts that even if the comparisons were accurate, they were based on information that was off-limits to MHC (though not to thousands of other companies with Reed Connect subscriptions) and therefore should have been kept from the marketplace.  Neither of Reed's theories can survive summary judgment.

First, Reed's claims based on the premise that MHC's comparisons were misleading should be dismissed because there is no genuine issue of fact as to the accuracy of the comparisons.  The comparisons were validated time and again by customers, third parties and Reed itself.  Indeed, Reed's expert conceded **Redacted**.  Accordingly, Reed has been reduced to suggesting that other comparisons *could* have been prepared to downplay MHC's strengths and highlight Reed's.  But

---

[2] Exhibit numbers refer to exhibits to the Declaration of Saul B. Shapiro in Support of Defendant McGraw Hill Financial, Inc.'s Motion for Summary Judgment.

showing that a different or even better comparison could have been designed does not raise a

genuine issue of fact as to whether the ones that MHC actually used were false or misleading.

Indeed, even Reed's expert's **Redacted**

████████████████████████████.  Moreover, after three years of discovery, there

is no evidence that customers actually were deceived into making purchasing or pricing

decisions on the basis of false beliefs about the companies' products.  Absent proof that MHC's

comparisons were false or that customers were misled, Reed's claims based on the distribution of

allegedly false or misleading marketing materials should be dismissed.

Reed also presents a laundry list of claims based on its theory that MHC's

comparisons (whether true or not) should not have been distributed because they were based on

trade secret or "confidential" information about Reed Connect that MHC misappropriated

through fraudulent means.  Those claims are all subject to dismissal as well.  As an initial matter,

common law claims based on this theory are preempted by Georgia's Trade Secret Act

("GTSA"), which provides the exclusive remedy for misappropriation of competitively sensitive

or proprietary information in Reed's home state.

On the merits, Reed cannot show that MHC's project counts entailed a

misappropriation of any trade secrets, whether defined by GTSA or the common law.  Even if

Reed's standard subscription agreements prevented MHC's consultants from sharing their login

information with MHC, this is not enough to make facts about a publicly available database like

Reed Connect trade secrets.  Reed stripped its product of any possible "secret" status by

regularly distributing free trials to thousands of companies without any restrictions or

subscription agreements whatsoever.  Each and every one of those companies had the ability to

run searches on Reed Connect, count the number of projects meeting the search criteria, and

discuss with whomever they pleased the resulting numbers—just as MHC did in the Roper

Report and other comparisons.  Reed's failure to treat information in its database as confidential

dooms its alternative claims for distribution of "secret," albeit truthful, information.

Moreover, any attempt by Reed to use its "misappropriation" theory to argue that

the distribution of accurate comparisons was harmful to consumers or competitively unfair fails

because truthful information about customer-facing features of a product like Reed Connect can

only help the workings of a competitive and efficient market and can only benefit consumers.

There is no cause of action for "malicious distribution of the truth," which is all that Reed's

theory amounts to in the end.

All of Reed's theories fail for the additional reasons that the evidence does not

show that MHC's comparisons were material to customers, that customers relied on the

comparisons in making purchasing or pricing decisions, or that Reed was damaged as a result.

Indeed, not a single customer has testified in this case that the comparisons had any impact on its

purchasing decisions.  To the contrary, these customers—all of whom Reed alleged were swayed

by MHC's comparisons—described Reed's allegations as "**Redacted**" and an "**Redacted**

**Redacted**."  Ex. 4 (Welch Tr. 39:24-40:22); Ex. 5 (Chester Tr. 70:4-19).  This is not surprising:

The customers in this case are highly sophisticated national firms in the construction industry.

These firms carefully consider purchases of expensive products like Reed Connect or the Dodge

Network (which can cost upwards of $**Redacted** per year) and base their decisions on many

factors, including most importantly their own analysis and assessment of which service best

serves their particular needs.  There is no evidence that MHC's marketing pieces  drove customer

decisions.  Reed did not conduct any customer surveys or perform any empirical analyses to

determine if the Roper Report was material or even what message consumers took from it.  The

fact that Reed cannot prove the Roper Report was important to the sales process dooms all of Reed's claims whatever the theory of liability.

Finally, even if any of Reed's claims could survive summary judgment, many are partially time-barred because there is no dispute that Reed knew about MHC's competitive comparisons—and the access that made them possible—for the better part of a decade before bringing this action.  Although Reed now asserts that it was somehow prevented from suing because it did not know the specific *identity* of MHC's consultants, it cannot deny that it long knew that MHC was disseminating comparisons that could only have been created using access to Reed's service.  Moreover, the undisputed evidence shows that Reed knew exactly how MHC obtained access to Reed Connect for many years before bringing suit.  That Reed waited almost a decade to bring this case speaks volumes about the validity (or lack thereof) of its claims.

## STATEMENT OF FACTS

### I.      The Parties and Their Business

#### A.      MHC's Industry-Leading Products and Services

McGraw-Hill Construction and its predecessor F.W. Dodge have been collecting and publishing construction project information ("CPI") for more than 100 years.  Ex. 6 (MHC05297896).  A Dodge Report includes details of a construction project's location, the type of building(s), the value of the project, the availability of plans and specifications, owner and architect contact information, and other necessary details.  Dodge Reports have evolved from their handwritten format in the 1890s (*see id.*) to the electronic version used today, but the fundamentals have remained the same.  *See* Ex. 7 (PX 865 at '568).

MHC's customers are architects, building product manufacturers ("BPMs"), insurance companies, equipment rental firms, contractors and other entities that need to know

about upcoming construction projects.  Ex. 8 (MHC00118270 at slide 5).  Since the 1980s, MHC

has been the exclusive provider of data for the federal government's construction reports,

reflecting MHC's status as the undisputed leader in the industry.  Ex. 9 (Press Release: United

States Census Bureau Chooses McGraw-Hill Construction as Sole Provider of Dodge

Construction Analysis in Multi-Million Dollar Deal (Oct. 25, 2011)).  As Reed's internal

documents acknowledge, the reason the federal government purchases data from MHC rather

than Reed is the "**Redacted**."  Ex. 10

(RCD00381562).  MHC's customers are loyal and many have been with the company for

decades.  Ex. 11 (Franklin Tr. 12:10-13 (Dodge customer since at least 1966)); Ex. 12 (Roach Tr.

12:22-13:12 (customer since 1973)).

Since the 1890s, MHC has maintained a corps of professional reporters who

gather information from sources such as architects, developers, engineering firms and real estate

holding companies.  Ex. 6 (MHC05297896); Ex 13 (Mr. Dodge & Mr. Sweet: A Bit of History

(F.W. Dodge Corp., May 1957)).  MHC invests significantly in its data reporting operations

because it knows that one of the most important things it can provide customers is timely,

accurate and comprehensive information.  Ex. 14 (PX 533 at MHC03955238).  At any given

time, the Dodge database tracks hundreds of thousands of projects nationwide.  Ex. 15

(http://construction.com/network/editorialcenter/default.asp).

MHC has always been at the forefront of the CPI industry.  MHC was the first

company to use microfilm in the 1960s.  Ex. 6 (MHC05297896).  In the 1980s, MHC was the

first company to provide an online service.  *Id*.  And, in the early 2000s, MHC was the first

company to place plans and specifications online.  *Id*.  Around 2003, MHC launched the Dodge

Network, the product at issue in this lawsuit.

**B.      Reed's Business**

Reed's offices are in Atlanta, Georgia.  Third Amended Complaint ("TAC"), Dkt.

114 ¶ 2.  Like MHC and other competitors, Reed's core business is providing construction

project information to customers such as BPMs and general contractors.  TAC ¶ 13.  In the 1980s

and 1990s, Reed's predecessor, Construction Market Data ("CMD") provided local CPI in

Atlanta, Georgia.  Ex. 16 (RCD01916683 at '687-688).  In the 1990s, CMD began expanding its

coverage area and announced an intention to provide national coverage.  *Id.*; *see also* Ex. 17 (DX

106 at '105).  In the early 2000s, Reed Elsevier acquired CMD and, in 2002, Reed launched

Reed Connect, a product—modeled after existing MHC products—that allows users to log in

over the internet to search Reed's CPI database.  Ex. 18 (Johnson Tr. 24:11-22); Ex. 2

(Catalonello Tr. 80:17-81:6).

**C.      MHC Offers Vastly Superior Products**

By all accounts MHC provides its customers far more robust, timely and accurate

information.  There is no genuine dispute about this fact.  Michael Catalonello, Reed's former

Chief Operating Officer, testified that comparing Reed Connect to the Dodge Network is like

**Redacted**.  Ex. 2 (Catalonello Tr. 22:15-24:14).  Similarly, Mr.

Catalonello's successor and Reed's CEO at the time this action was filed, Iain Melville, wrote in

an internal company memorandum that "**Redacted**

" Ex. 19 (DX 202 at '818-819) (emphasis

added).

Reed's documents show that, in addition to suffering from inferior data, Reed Connect lagged in other key respects.  For example, **Redacted**

**Redacted**

**Redacted**

**Redacted** . Ex. 20 (DX 266 at '689).  Reed's then-Vice President of National Sales Dean Paulson aptly summarized some of the key problems with Reed Connect when he wrote that it was "**Redacted**" Ex. 21 (RCD00632447).

### D.   Reed Refused to Invest Resources to Improve its Products

Reed's executives repeatedly declined to invest the resources necessary to elevate its product to MHC's level.  Ted Boone, Reed's Director of Research and the person directly responsible for Reed's data, **Redacted**

**Redacted** ."  Ex. 22 (RCD02272499).  In 2005, Mr. Boone noted that Reed still "**Redacted**" and had, in fact, **Redacted** . Ex. 23 (RCD01943485).

In 2006, after noting that **Redacted** Ex. 24 (RCD00184848), Reed CEO Mr. Melville **Redacted**

**Redacted** ."  Ex. 25 (RCD01912101).  The calculus was simple: **Redacted**

**Redacted** . Ex. 24 (RCD00184848).  As Mr. Mulligan explained, this "**Redacted**

**Redacted** ."  Ex. 16 (RCD01916687).

In contrast, MHC continued to invest resources in its products.  Mr. Paulson, who had previously worked as an MHC sales executive and had first-hand knowledge of MHC's superior operations, **Redacted** Ex. 27 (RCD00579799).  Similarly, **Redacted**

. Ex. 28 (RCD01944503).

Predictably, the result of Reed's disinvestment was degradation in quality and a loss of customers to MHC.  Although Reed continued to falsely assert to customers (as it does in its pleadings and before the Court) that its product was as good or better than MHC's, in private Reed acknowledged that "**Redacted**" Ex. 29 (RCD00390241).  Of course, customers were not fooled for long and, as the complaints began to pile up, Reed's employees were forced to admit that "**Redacted**" Ex.30 (RCD01241505).  Reed national sales representative Nicholas Kovacs summed up the impact of Reed's inferior data: **Redacted** Ex. 31 (DX 134).

## II.    The Parties Accessed Each Other's Products for Comparative Purposes

Although Reed Connect and Dodge Network subscriptions are sold with restrictive terms and conditions, Ex. 160 (MHC01102446); Ex. 33 (DX 762), each party has found ways to obtain the other's products for comparative purposes.

For its part, Reed accessed MHC's data both through third parties and its own

employees. **Redacted**

█████████████████████████████████████. Ex. 34 (Paulson Tr.

239:18-241:7); *see also* Statement of Facts at 19.  **Redacted**

████████████████████████████████████████████

██████████████████████████████████

████████████████████████  *See* Ex. 16 (RCD01916683); Ex. 3 (Mulligan Tr.

15:5-12, 74:18-75:8, 93:22-97:5).

Reed also obtained secret access to MHC's and other competitors' information

through its own employees, **Redacted**

████████████████████████████████████████████

████████████████████████████████████

██████  *See, e.g.*, Ex. 35 (Windsor Tr. 136:14-137:21 (**Redacted**

████████████████████████████████), 137:22-138:17 (**Redacted**

████████████████████████████████████

███████████████████), 196:25-198:11 (**Redacted**

██████████████████████████████)); Ex. 36

(RCD02272815 (**Redacted**

██████████████████████)); Ex. 37 (Duggan Tr. 75:4-77:24 (**Redacted**

██████████████████████)); Ex. 38

(RCD00476672 (**Redacted**

██████████████████████████)); Ex. 39 (RCD02922419).

Similarly, MHC employees obtained usernames and passwords to Reed Connect through two third-party consultants: Henning Lorenz and Glenn Lewin.  MHC used their log-ins to create project count comparisons including the Roper Report, a marketing piece created in conjunction with the research firm GfK Roper Public Affairs and Media ("Roper"), as well as various *ad hoc* comparisons.  McGraw Hill has never condoned its employees' improper access

**Redacted**

.  Ex. 40 (Goldberg Tr. 143:11-144:15, 146:11-16).  By contrast, **Redacted**

.  Ex. 41 (Royster Tr. 44:25-46:5), Ex. 42 (Melville Tr. 428:24-429:10); Ex. 43 (Cater Tr. 213:25-214:6); Ex. 37 (Duggan Tr. 115:17-23).

## III.  Reed Knew about MHC's Comparisons and the Access Required for Many Years Before Filing Suit

According to its own documents, Reed knew by at least 2002 that MHC was distributing "**Redacted**" from Reed's database.  Ex. 45 (RCD02650151). Likewise, Reed obtained copies of Roper comparisons almost immediately after they were first distributed in 2004.  Ex. 46 (RCD01659908).  Knowledge of the studies was widespread within the Reed organization, **Redacted**

.  Ex. 47 (RCD02452909).  **Redacted**

.  Ex. 2 (Catalonello Tr. 66:14-23).  Mr. Catalonello's successor, Mr. Melville, was continually aware of MHC's competitive

comparisons during his entire tenure as CEO and even **Redacted**

**Redacted**. *See* Ex. 48 (DX 217); Ex. 49 (DX 222).[3]

It was not lost on Reed that MHC's comparisons could only have been created via extra-contractual access to Reed Connect. For example, in a 2003 email to several top Reed executives, **Redacted**

**Redacted**. Ex. 50 (RCD02272438). Reed itself pointed out **Redacted**

**Redacted**. Ex. 51 (DX 40); Ex. 52 (DX 612). This left only one possibility—that a "**Redacted**

**Redacted**" Ex. 53 (DX 83).

In addition, around May 2005, Reed recruited MHC's top sales managers Dean Paulson and Craig Fuss to join Reed as co-Vice Presidents of National Sales, **Redacted**

**Redacted**. Ex. 55 (DX 51); Ex. 56 (Fuss Tr. 74:19-75:5, 89:11-18, 91:2-20 (MHC "obviously" had access to Reed Connect)); Ex. 34 (Paulson Tr. 183:15-184:22, 187:16-188:9).[4] Other former MHC employees also joined Reed during this period, **Redacted**

**Redacted**. Ex. 59 (Marchione Tr.

---

[3] Although MHC's head of competitive intelligence developed so-called "Roper Rules" that prohibited sales representatives from leaving copies of the Roper Report with customers, MHC's sales representatives provided customers with copies and customers provided them to Reed. Ex. 57 (RCD00133087 at '088 **Redacted** **Redacted**; Ex. 46 (RCD01659908); Ex. 58 (RCD00712660 & RCD00712661). Accordingly, the "Roper Rules" did not prevent Reed from learning about MHC's access to Reed Connect. Similarly, the fact that MHC logged on to Reed Connect primarily through a computer connected to a dedicated Digital Subscriber Line ("DSL") rather than MHC's main internet gateway presented no obstacle to Reed learning about the Roper Report.

[4] As detailed in McGraw Hill's counterclaim, Mr. Fuss, Mr. Paulson and other MHC executives Reed recruited around this time also brought with them MHC's confidential customer pricing and renewal information, including thousands of lines of detailed and highly confidential MHC customer details, that was stolen from MHC by Reed employees. Reed used that trade secret information to compete for MHC's customers. (Third Am. Answer with Countercl., Dkt. 137 Countercl. ¶¶ 28-60).

64:23-65:2); Ex. 2 (Catalonello Tr. 139:8-140:9).  For these, and other reasons, numerous Reed employees admitted in discovery **Redacted**

██████████████████████.  *See, e.g.*, Ex. 56 (Fuss Tr. 74:19-75:5, 89:11-18, 91:2-20);

Ex. 34 (Paulson Tr. 183:15-184:6, 187:16-188:9); Ex. 3 (Mulligan Tr. 146:4-150:21, 154:19-

155:5); Ex. 60 (Roberts Tr. 41:20-53:23); Ex. 59 (Marchione Tr. 64:5-64:8, 269:8-270:21); *see*

*also* Ex. 42 (Melville Tr. 220:10-222:9 (testifying that it was a "**Redacted**" that MHC

had access to Reed to create comparisons)).

   Despite knowing that MHC was accessing Reed Connect since at least the early

2000s, Reed did little or nothing to stop it.  *See* 56.1 Statement[5] ¶¶ 79-118.  Reed's COO **Redacted**

████████████████████████████ in 2005.  Ex. 61

(RCD00928247 (explaining that he was "**Redacted**

████████████")).  At that time (**Redacted**

████████████████████████████████████████████

██████████████████.  Ex. 61  (RCD00928247); Ex. 2 (Catalonello Tr.

97:6-22).  In fact, Reed **Redacted**

██████████████████████.  Ex. 62 (RCD07639026).  Similarly,

in late 2005 or early 2006, Reed's sales representative Catherine Jordan **Redacted**

████████████████████████████.  Ex. 63 (DX 38); Ex. 64

(DX 258); Ex. 65 (RCD00668547); Ex. 66 (RCD02427393); Ex. 67 (RCD01795802).  In

response, Ms. Jordan's supervisors ordered her to "**Redacted**" Ex. 1 (Jordan Tr.

at 12:21-14:12).  These are hardly the acts of a party grievously injured through the panoply of

claims asserted in this case.

---

[5] Citations to the 56.1 Statement refer to the Statement of Undisputed Material Facts Under Local Civil Rule 56.1 in Support of Defendant/Counterclaim Plaintiff McGraw Hill Financial, Inc.'s Motion for Summary Judgment.

Reed finally raised the issue of MHC's access with McGraw Hill's in-house counsel in 2007, but only after MHC first complained about Reed's own deceptive sales practices.  Ex. 68 (DX 219).  After MHC contacted Reed about Reed's misconduct, the lawyers "**Redacted**

**Redacted**" Ex. 69 (Thomas-Yuille Tr. 24:7-11).  **Redacted**

**Redacted**

**Redacted**

**Redacted**, it was obvious to Reed that the access persisted because MHC's comparisons continued to show up in the marketplace.  For example **Redacted**

**Redacted**" Ex. 49 (DX 222).  Similarly, **Redacted**

**Redacted**

**Redacted**. Ex. 44 (RCD00637814).  Reed waited for more than another year before it finally sued in October 2009.

**IV.     MHC Used its Access to Reed Connect to Perform Project Count Comparisons**

It is undisputed that MHC used its Reed Connect access to perform project count comparisons.  Although Reed previously alleged that MHC also used the access to misappropriate and republish data and to perform a number of other bad acts, TAC ¶¶ 108-150, there is no evidentiary support for these allegations.  Indeed, it is undisputed that MHC had strict rules against using the Reed service for anything other than comparing the parties' products.  Ex. 72 (Young Tr. 56:13-57:7).  There is no evidence of any significant breach of MHC's policies.  Ex. 73 (Major Tr. 575:8-25 (projects were not copied from Reed Connect), 578:13-17 (product

features were not adopted from Reed), 578:18-21 (programing codes were not obtained), 579:3-5

(secret algorithms were not taken)); Ex. 74 (Ryan Tr. 211:3-20 (projects were not copied from

Reed)).[6]

> ### A.    The Roper Report

MHC's principal comparison was known as the Roper Report.  This comparison

consisted of state-level counts of projects falling into highly generalized building categories.

*See, e.g.*, Ex. 75 (PX 427).  Separate counts were provided for projects in the planning and

bidding phases.  The front page of the document explained that it consisted of "MHC/Reed

Comparison Tables" and set forth the criteria used for the comparison—that the projects had

reported values of $1 million or more; that they fell into three high-level building categories

("general building," "housing," and "utilities"); and that they met certain timeliness criteria.

The Roper Reports were compiled by MHC employee Pat Major with oversight

by a Roper project supervisor.  Ex. 73 (Major Tr. 247:25-250:18).  The process of tabulating the

data was neither difficult nor time consuming.  To generate the counts, Ms. Major logged on to

Reed Connect and ran searches for projects meeting the listed criteria while the Roper project

director did the same on the Dodge Network.  Ex. 73 (Major Tr. 253:23-254:4).  The Roper

project director compared the search criteria entered in the two systems to "**Redacted**

**Redacted**" Ex. 76 (T. Ritchie Tr. 91:23-92:2).  The **Redacted**

**Redacted**.  Ex. 76 (T. Ritchie Tr.

---

[6]After more than three years of discovery, Reed developed evidence of at most two or three isolated potential
violations of MHC's rules in which MHC may have used Reed Connect to obtain a source of project leads.  Ex. 77
(Brewis Tr. 206:22-212:12); Ex. 78 (MHC00090108).  There is no genuine dispute that these aberrant instances of
misconduct had no effect on customer choices whatsoever.  The parties' databases track hundreds of thousands of
projects at any given time and the conduct at issue, while a breach of MHC's internal rules, could not have had
anything more than a *de minimis* impact.  Reed similarly used its access to MHC's project listings **Redacted**
**Redacted**.  Ex. 79 (RCD00706883); Ex. 80 (DX 660); Ex. 81 (DX 659); Ex.  82 (RCD00222686).

66:15-67:18).  The comparisons did not "look behind" the project counts or audit the search results.  Ex. 73 (Major Tr. 250:19-251:19, 352:20-353:4, 367:10-24).  Ms. Major did not disqualify Reed projects from the tallies because the data was "suspect" or for any other reason, even if she believed she had a basis to do so.  Ex. 73 (Major Tr. 367:10-24, 572:23-573:15).  Instead, the Roper Report consisted of simple tallies and ratios of the raw numbers of projects returned to users searching the systems with the parameters set forth on the face of the Roper Report, without any manipulation.  Ex. 75 (PX 427)

The comparisons were snapshots in time showing that in almost all states, MHC customers would find significantly more project reports than Reed customers searching for the same specified types of projects.  *Id*.  The comparisons also provided national totals.  For example, on the date the March 2006 Roper Report was created, customers searching for nationwide planning-phase projects meeting the Roper criteria would have found 59,295 projects in the Dodge Network and 35,895 projects in Reed Connect (or 1.65 times as many projects in the Dodge Network).  *Id*.[7]

Six Roper Reports were prepared between May 2004 and March 2007.  Ex. 83 (PX 415); Ex. 84 (MHC07764391)); Ex. 85 (PX 426); Ex. 75 (PX 427); Ex. 86 (PX 428); Ex. 87 (PX 429).  A seventh Report, from March 2008, was compiled but never distributed.  Ex. 88 (MHC00071890).  The six published Reports were sometimes provided to customers mixed in with all of the other materials exchanged during what is typically a months-long sales cycle.  The Roper Reports were so inconsequential that **Redacted**

. Ex. 90 (Thomas Tr. 62:25-63:15); Ex. 4 (Welch Tr. 36:17-37:6); Ex. 5

---

[7]Because MHC continually adds new project reports to its database throughout the day, a Dodge customer who searched for the specified projects late in the evening might have found more projects than stated on face of the Roper Report.  Ex. 89 (Expert Report of Michael F. McGowan ("McGowan Rep.") 6 n.1).

(Chester Tr. 71:20-72:6); Ex. 91 (Bowman Tr. 38:18-39:3); Ex. 11 (Franklin Tr. 22:14-18); Ex.

92 (Dodge Tr. 22:14-18).  Roper statistics were also sometimes referenced as single bullet points

in lengthy presentations.  Ex. 93 (MHC00411486 at slide 18).  An MHC marketing brochure

called the "Executive Brief" also included a summary reference to a Roper comparison.  Ex. 94

(DX 700).  Customers did not recall seeing these either.

> **B.**     **Other Data Comparisons**

In addition to the Roper Report, Ms. Major created various *ad hoc* project count

comparisons on regional or local bases.  Ex. 73 (Major Tr. 180:8-12).  These comparisons were

performed in a similar manner to the Roper Report with Ms. Major running searches in Reed

Connect and the Dodge Network and tallying the results.  Also, from time to time, Ms. Major

identified projects ("exclusives") that appeared on the Dodge Network but not on Reed Connect.

Ex. 73 (Major Tr. 156:14-157:2).

MHC also occasionally included bullet points in lengthy contract proposals

stating that MHC had a "**Redacted**

" Ex. 95

(PX 823 at '446).  These ratios were generally not provided to customers as part of the sales

process, but were presented, if at all, in proposals for specific contract terms after the purchasing

decision had already been made.  Ex. 96 (Sherer Tr. 190:16-191:5).  Typically, the ratios were

buried at the end of lengthy contract documents.  Ex. 95 (PX 823 at '446).  On their face, the 5:1

and 3:1 ratios had no relationship to the numbers in the Roper Report, which were limited to

projects fitting certain category, valuation, and date-based thresholds and only provided a

comparison against Reed.  *See, e.g.*, Ex. 75 (PX 427).  There is no evidence in the record that any

customer ever noticed the 5:1 and 3:1 ratios, much less that such ratios ever impacted any

customer's purchasing decision.

### C.    Other Product Comparisons

Ms. Major also demonstrated the Reed user interface to MHC employees; on some occasions these demonstrations were performed via WebEx to a remote audience.  Ex. 73 (Major Tr. 173:22-174:15).  Reed **Redacted**

**Redacted**.  Ex. 41 (Royster Tr. 277:15-278:22); Ex. 98 (DX 392); Ex. 99 (DX 138).  Reed's sales managers admitted that **Redacted**

**Redacted**, Ex. 34 (Paulson Tr. 258:24-259:14), but testified that the propriety of Reed's access to Dodge "**Redacted**" at Reed.  Ex. 56 (Fuss Tr. 283:15-284:4).

### D.    Other Competitive Intelligence Activities

MHC employees and consultants involved in accessing Reed Connect also performed other competitive intelligence functions.  For example, MHC's consultant Glenn Lewin identified himself to Reed's employees as a business writer and on one occasion as a headhunter and asked questions about the business.  Ex. 100 (Lewin Tr. 122:3-17, 123:23-124:2, 128:4-20).  Reed does not bring any claims based on these activities and there is no evidence that this conduct harmed Reed in any way.

## V.    MHC's Comparisons Were Accurate

The Roper Report and other comparisons highlighted what everyone already knew—that MHC's data was superior.  The gravamen of Reed's lawsuit is that the Roper Report nevertheless "misled" customers or otherwise constituted false advertising.  But the evidence developed in discovery shows just the opposite:  MHC's comparisons were validated time and again by third parties, customers, and even Reed itself.

### A.    The Comparisons Were Validated by Third-Party Consultants Hired by Reed

After receiving copies of the Roper Report from customers, in 2005, **Redacted**

████████████████████████████████████. Ex. 101

(RCD01911339).  Although Reed hoped that the comparison would favor Reed and "**Redacted**

██████████████████" Ex. 102 (RCD00268809), the results were disastrous for

Reed.  Among other things, **Redacted**

███. Ex. 103 (DX 43 at slide 5); *see also* Ex. 2 (Catalonello Tr. 113:21-22 (the difference "**Redacted**

█████████████")).  Upper Quadrant also found that **Redacted**

███████████████████████. Ex. 103 (DX 43 at slide 6).

Overall, **Redacted**, Ex. 2

(Catalonello Tr. 69:19-70:2), and showed that MHC had **Redacted**

████, *id*. 113:15-22.  Reed **Redacted**. Ex. 104

(RCD02114421).  Although **Redacted**

████████████████████████. Ex. 105 (RCD00667539 ("**Redacted**

███████████████████████████████

██████████████████")).

Similarly, Reed **Redacted**

███████████████████████████████

████████████████. Ex. 16 (RCD01916683).  Looking at Reed and several other

competitors in the market, Mr. Mulligan found that MHC "**Redacted**" *Id.*; Ex. 3

(Mulligan Tr. 113:24-114:21).

**B.      Reed's Own Internal Assessments Validated the Comparisons**

Reed also performed several of its own internal comparisons.  Like the Roper Report, those comparisons found that "**Redacted** **Redacted**" Ex. 106 (RCD00619968).  For example, in 2007, Reed's Director of Quality, David Windsor, found that Reed was "**Redacted** **Redacted** **Redacted**." Ex. 107 (RCD02016815); *see also* Ex. 108 (RCD00445129 at 23 (April 2007 presentation estimated that Reed had "**Redacted**")).  For another example, Reed's Director of Research **Redacted** **Redacted**, and **Redacted** **Redacted**. Ex. 109 (RCD00272224). Mr. Catalonello admitted that **Redacted** **Redacted**. Ex. 2 (Catalonello Tr. 113:7-15).

In fact, **Redacted** **Redacted**. Ex. 35 (Windsor Tr. 244:24-247:22); Ex. 110 (DX 449).  Reed also had the ability to check the MHC bidding numbers because (unlike Reed) MHC allows anyone with an internet connection to query its database for bidding projects and makes its project counts (but not the project details) publicly available.  Ex. 111 (http://dodgeprojects.construction.com/); *see also* Ex. 37 (Duggan Tr. 75:11-76:10).

If Reed's comparisons had shown that the Roper numbers were false, or that there was a more favorable way to compare the services, it could have told customers at any time.

Instead, Reed responded to the Roper Report by considering various ways to manipulate its own project reporting so that Reed's counts would *appear* higher in comparisons.  In 2008, for example, Reed **Redacted**

**Redacted**.  Ex. 112 (RCD00589070).  Reed also began **Redacted**

**Redacted**."  Ex. 113 (RCD00554223); Ex. 112 (RCD00589070).  These attempts by Reed to increase the apparent number of projects only further degraded the accuracy and quality of its data.  *See, e.g.*, Ex. 114 (RCD02187496 (**Redacted**")).

C.     **The Comparisons Were Validated by Customers' Experiences with Reed's Inferior Product**

Comparisons performed by customers consistently validated the Roper Report.  Customers routinely received trial access to the parties' data to perform their own internal comparisons before making a purchase.  In almost every instance, customers came to the independent conclusion that MHC's data was vastly superior to Reed's.  *See also* 56.1 Statement ¶¶ 209-246.  For just a few examples, Reed's own documents detail the following customer comparisons:

- Josam found **Redacted**.  Ex. 115 (RCD00256019);

- KI found that "**Redacted**"  In addition, "**Redacted**."  Ex. 116 (RCD00503698);

- United Rentals found that the "**Redacted**."  Ex. 117 (RCD00156184)

- Tiffin Metals wrote: "**Redacted**

  ." Ex. 118 (RCD00287699).

- Reynolds Inliner determined that, "**Redacted**

  ." Ex. 119 (RCD00513352).

Reed's documents contain literally hundreds, if not thousands, of similar examples of customers deciding for themselves that Dodge was superior to Reed.

In addition, customer testimony established that **Redacted**

. Ex. 5 (Chester Tr. 52:13-53:23); Ex. 11 (Franklin Tr. 18:24-19:7); Ex. 90 (Thomas Tr. 44:11-46:2); Ex. 4 (Welch Tr. 27:21-28:11, 30:15-33:6). For example, Mark Thomas of Tnemec testified that his firm's independent comparisons showed that **Redacted**

. Ex. 120 (DX 694); Ex. 90 (Thomas Tr. 49:17-53:3). Reed understood its vulnerability to direct customer-led comparisons with Dodge. As late as September 2008, Reed's CEO Iain Melville removed from a marketing piece a suggestion that customers "**Redacted**" because he knew that Reed was "**Redacted**." Ex. 162 (RCD00229123). Although Reed's theory of the case is that the Roper Report misled customers into falsely believing that MHC had superior data, the evidence shows the opposite: Customers' own comparisons confirmed MHC's superiority time and again.

### D.     Even Reed's Expert Concedes that the Roper Tallies Were Accurate

Reed's sole basis for challenging the accuracy of the Roper Reports comes from Sonya Kwon, an e-discovery analyst retained by Reed to compare the Dodge Network and Reed Connect.[8]  Reed has offered no evidence other than Ms. Kwon's opinion as to the truth or falsity of any comparison in this case.  Ms. Kwon considered only three Roper Reports, and does not opine on any of the other competitive comparisons at issue in this case.  Ms. Kwon does *not* challenge the accuracy of the Roper Reports.  To the contrary, based on archived data exchanged in discovery, Ms. Kwon determined that ██████ **Redacted** █████████████████████

████████████████████████████████████████████████████████

████████████████.  Ex. 121 (Kwon Rep. at 15); Ex. 122 (Kwon Tr. 71:14-24, 73:23-74:2). Indeed, six years after the fact, Ms. Kwon was able to re-create the Roper results to a remarkable degree of accuracy, finding that the parties' archived data ███ **Redacted** ████████████

████████████████████.  Ex. 121 (Kwon Rep. at 15 & App'x L.1).[9]

Rather, Ms. Kwon ███ **Redacted** ███████████████████████

████████████████████████████████████████████████████████

█████.  Notably, ███ **Redacted** ██████████████████████████

█████████.  Ex. 121 (Kwon Rep. App'x L.2 & L.3).

### E.     All of the Witnesses with Direct Knowledge of the Comparisons Testified the Comparisons Were Intended to Be and Were in Fact Accurate

Ms. Major testified without contradiction that she endeavored to ensure the Roper

---

[8] For purposes of this motion only, McGraw Hill is treating Ms. Kwon's opinion as if it would be admissible under Federal Rule of Evidence 702.  If, however, this case were to proceed, McGraw Hill would anticipate filing a *Daubert* motion to preclude Ms. Kwon's testimony because her opinion is flawed, irrelevant and unhelpful, and because she is unqualified to give any opinion in this case.

[9] The trivial variance is due to the fact that, as Reed has recognized, inevitable data degradation and numerous technical issues make it "██ **Redacted** ██████████████████████████████████████████████████."  (Ex. 121 Kwon Rep. 14).

Report and other comparisons were objective, Ex. 73 (Major Tr. 569:24-570:20), and that she

and the Roper project supervisor used equivalent categories on both databases, *id.* at 571:16-20.

Roper project supervisor Thompson Ritchie similarly testified that **Redacted**

████████████████████████████  Ex. 76 (T. Ritchie Tr. 245:6-22).  Moreover, both Ms.

Major and Mr. Ritchie testified without contradiction that **Redacted**

████████████████████████████.  *Id.*; Ex. 73 (Major Tr. 367:10-24).

## VI.    Customers Did Not Make Decisions on the Basis of MHC's Comparisons

The evidence shows MHC's comparisons had no appreciable impact on

customers' purchasing decisions.  *See* 56.1 Statement ¶¶ 209-246.  Indeed, not a single customer

who testified in this case said that MHC's competitive comparisons had any impact whatsoever

on their purchasing decisions.  *See* 56.1 Statement ¶¶ 269-281.  To the contrary, they made

decisions based on their own assessments and analyses.  These were customers that ***Reed***

selected, specifically alleging—often in the face of Reed's own internal documents—that these

customers would have subscribed to Reed Connect but for MHC's marketing materials.  These

customers have universally rejected Reed's allegations.  Wayne Chester of Tectum Inc. provided

a typical response to Reed's allegations:



Ex. 5 (Chester Tr. 75:10-18).

### A.    Sales Were Individually Negotiated by Sophisticated Parties

Reed's allegations focus on customers who purchased national subscriptions to

MHC or Reed Connect.  During the period covered by the complaint, a nationwide subscription

to Reed Connect or the Dodge Network cost as much as $**Redacted** per year.  Ex. 59 (Marchione Tr. 56:5-21).  Customers interested in such subscriptions were typically **Redacted** **Redacted**.  Ex. 2 (Catalonello Tr. 26:5-19); Ex. 123 (S. Ritchie Tr. 54:7-20).  As one would expect, for those customers who considered subscribing to MHC and Reed (many construction-industry businesses are long-time MHC customers who never even considered switching to Reed), the sales process was lengthy and many factors went into purchasing decisions, including  price, data quality, data timeliness, product functionality, the availability of plans and specifications, product design, customer service, and intangibles like the quality of the individual sales representatives negotiating the deals or a customer's sense of loyalty.  *See, e.g.*, Ex. 34 (Paulson Tr. 47:18-50:12, 51:8-16).

B. **Potential Customers Had a Number of Ways to Assess the Companies' Products and Typically Performed Their Own Comparisons**

Companies are loath to spend upwards of $**Redacted** on products they have never seen or tried, and the customers at issue in this lawsuit were no different.  The vast majority were given direct first-hand knowledge of the parties' services and data prior to purchase.  Greg Marchione, a former MHC and Reed national sales representative explained, "**Redacted** **Redacted** **Redacted**."  Ex. 59 (Marchione Tr. 61:11-62:18).  The principal way that customers did this was through trial subscriptions that allowed them to test drive the products.  *See, e.g.*, Ex. 5 (Chester Tr. 52:13-24); Ex. 92 (Dodge Tr. 33:14-34:4); Ex. 12 (Roach Tr. 40:11-24); Ex. 124 (Borglum Tr. 25:17-26:13); Ex. 125 (Sloan Tr. 26:12-20); Ex. 91 (Bowman Tr. 24:15-25); Ex. 4 (Welch Tr. 27:21-28:3); Ex. 11 (Franklin Tr. 17:13-19).  In many cases, potential customers also drew on direct experiences with Reed Connect or the Dodge

Network as current or former paid subscribers. *See, e.g.*, Ex. 90 (Thomas Tr. 26:13-22, 55:14-56:8).

Both companies gave out trial subscriptions to their products as a matter of course. *See* 56.1 Statement ¶¶ 187-202. MHC believed the best way to win a customer was to let the customer itself access the Dodge Network. *See, e.g.*, Ex. 126 (Hoffman Rebuttal Rep. at 11-12 & Ex. C (MHC gave out tens of thousands of free trials during the time period at issue)); Ex. 127 (Noble Tr. 107: 15-24); Ex. 128 (Sherwood Tr. 143:13-20); Ex. 59 (Marchione Tr. 43:17-44:11). The trials lasted anywhere from one week to several months. Ex. 129 (Pao Tr. 272:16-273:22); Ex. 2 (Catalonello Tr. 29:14-30:5). Mr. Marchione explained that while ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████. Ex. 59 (Marchione Tr. 122:18-123:22).

Reed likewise gave trial subscriptions to potential customers **Redacted** Ex. 1 (Jordan Tr. 42:23-43:6); *see also* Ex. 42 (Melville 363:13-364:12); Ex. 41 (Royster Tr. 70:10-71:22). Reed's trials **Redacted** ████████████████████████. Ex. 130 (Dempsey Tr. 27:9-28:5). Just as with a Dodge Network trial subscription, a Reed trial **Redacted** ███████████████████████. *Id.* **Redacted** ████████████████████████████████████████████████████████████ ███████ Ex. 130 (Dempsey Tr. 27:23-28:5); Ex. 41 (Royster Tr. 73:10-75:5). **Redacted** ████████████████████████████████████████████████████████████ ████████████████ Ex. 123 (S. Ritchie Tr. 197:11-18).

The purpose of trial access was to allow prospective customers to see and evaluate the products for their specific businesses.  Ex. 127 (Noble Tr. 107:15-108:7); Ex. 42 (Melville Tr. 363:22-364:12).  Prospective customers regularly obtained simultaneous access to both parties' data to perform direct head-to-head comparisons of their own.  Ex. 129 (Pao 272:16-273:22).  Mr. Marchione estimated that **Redacted**

. Ex. 59 (Marchione Tr. 43:17-44:22).  Reed's former COO Mr. Catalonello acknowledged that **Redacted**

, Ex. 2 (Catalonello Tr. 29:14-30:10), not marketing pieces like the Roper Report.  Customers who have testified in the case said the same thing.  Ex. 90 (Thomas Tr. 49:12-54:10); Ex. 4 (Welch Tr. 27:21-28:11); Ex. 5 (Chester Tr. 52:13-56:16).

In its July 23, 2013 letter to the Court responding to McGraw Hill's request for a pre-motion conference (Ex. 131, "Pre-Motion Letter"), Reed referred to emails that MHC marketing personnel solicited from certain of their colleagues to justify their work on Roper and other comparisons.  These emails—in which MHC employees appear to credit the Roper Report with helping them retain or gain certain customers—are not only self-serving but also belied by the testimony customers gave about the irrelevance of the comparisons to their decision-making.  *See* 56.1 Statement ¶¶ 269-281; Ex. 125 (Sloan Tr. 38:4-39:7); Ex. 12 (Roach Tr. 23:24-24:4); Ex. 4 (Welch Tr. 36:9-38:22);  Ex. 91 (Bowman Tr. 42:24-43:8);  Ex. 124 (Borglum Tr. 30:3-32:2);  Ex. 132 (Martin Tr. 32:6-25).  Indeed, any close look at the decisions made by particular customers referenced in the emails would show that the comparisons made no difference.

### C.   MHC's Comparisons Were Too Generalized to Have an Impact

Although the Roper Report has loomed large in the minds of Reed's lawyers and executives in charge of this litigation, the customers Reed claimed to have lost as a result of the

Roper Report did not even remember seeing it.  Ex. 91 (Bowman Tr. 38:18-39:3); Ex. 90

(Thomas Tr. 63:12-19); Ex. 4 (Welch Tr. 36:9-37:23); Ex. 5 (Chester Tr. 71:20-72:12); Ex. 11

(Franklin Tr. 22:14-18).  Former Reed sales representative Ms. Jordan testified that **Redacted**

███████████████████████████████████████████████████████████████████

███████████████████████.  Ex. 1 (Jordan Tr. 41:17-23, 42:13-17).  **Redacted**

████████████████████████████████████████████████████████████████████

█████████████████████████  Ex. 133 (RCD00150138).  No wonder, then, that customers

who testified in the case called Reed's allegations "**Redacted**         ," "**Redacted**" and

"**Redacted**         ."  Ex. 4 (Welch Tr. 37:7-38:2, 39:24-40:7-8).

### D.   Negative Experiences with Reed Connect and Reed's Deceptive Sales Practices Drove Customers to MHC

Reed's own failure to field a quality product did much more than MHC's

marketing efforts to drive customers toward MHC.  In private, Reed employees at all levels of

the company right up to the CEO **Redacted**

██████████.  But in public, including in its pleadings in this case and representations to the

Court, Reed has sung a different tune.  In fact, the record is replete with **Redacted**

████████████████████████████████████████████████████████████████████

█████████████████.  *See, e.g.*, Ex. 90 (Thomas Tr. 29:3-13); Ex. 134 (RCD10333815

**(Redacted**

████████████████████████████████████)); Ex. 109 (RCD00272224).  When customers

learned **Redacted**

███████████████, as exemplified in the following examples from Reed's own documents:

- "**Redacted**



**Redacted**

" Ex. 135 (RCD01639514) (emphasis added);

- "**Redacted**

  " Ex. 136 (RCD06467771) (emphasis added);

- "**Redacted**

  " Ex. 137 (RCD08487937) (emphasis added);

- "**Redacted**

  " Ex. 138 (RCD08552963) (emphasis added);

- "**Redacted**

  " Ex. 139 (RCD22434981) (emphasis added).

*See also* 56.1 Statement ¶¶ 255-260.  **Redacted**

. As Mr. Marchione explained:



Ex. 140 (RCD01803432) (emphasis added).

The net effect of all of these factors—Dodge's clear superiority in data quality and quantity, Reed's failure to invest in its product or its research operations, Dodge's long-standing reputation in the industry as the gold standard, Reed's misrepresentations to the marketplace—was that customers regularly chose MHC over Reed.  As Reed's COO testified,



. Ex. 2 (Catalonello Tr. 79:20-80:9, 92:15-94:7).  Indeed, **Redacted**

, Ex. 2 (Catalonello Tr. 79:20-25), and Mr. Mulligan, its former Director of Quality Control, **Redacted**. Ex. 3 (Mulligan Tr. 287:2-3).

**PROCEDURAL HISTORY**

Reed filed its original complaint on October 8, 2009, alleging that employees and agents of MHC improperly accessed Reed Connect to compare the number of reports in the parties' databases.  Dkt. 1.  Reed concocted an eleven-count complaint asserting claims under the

federal anti-racketeering statute (RICO), the antitrust laws, and state statutory and common law.[10]  *Id.*

McGraw Hill moved to dismiss several of the claims in the original complaint. Dkt. 15.  Among other things, McGraw Hill moved to dismiss Reed's tortious interference claim because Reed had failed to identify any specific customers who were allegedly induced to switch on the basis of MHC's comparisons.  Dkt. 15 at 23-26.  Rather than defend its original pleading, Reed amended its Complaint to add a list of 221 customers who allegedly purchased Dodge instead of Reed Connect because of a comparison.  Dkt. 20 ¶¶ 211, 225.  Reed represented to the Court that these 221 customers had been identified after a "rigorous investigation" and that Reed had a good faith basis to believe that each customer on the list had relied on the Roper Report or some other MHC comparison in making a purchasing decision.  Dkt. 28 at 35.  As explained below, this representation to the Court was false.

McGraw Hill moved to dismiss five of the claims asserted in the amended complaint.  Dkt. 24.  On September 14, 2010, the Court granted McGraw Hill's motion in part, dismissing Reed's RICO claims, and its claim for a violation of N.Y. Gen. Bus. Law § 349.  Dkt. 35.  In dismissing these claims, Judge Sweet found that "[n]othing in the allegations in the Amended Complaint indicate that Roper intended to create allegedly misleading data comparisons, manipulate any search terms or data, or participate in any other fraudulent conduct."  *Id.* at 14.  Judge Sweet further found that Reed's allegations did not suggest that MHC's conduct had caused meaningful "consumer injury or harm to the public interest."  *Id.* at 25.

The ensuing fact discovery focused in significant part on determining the true

---

[10] Reed subsequently added five "John Doe" defendants.  Dkt. 20.  Reed later added a twelfth count alleging violation of the Federal Lanham Act.  Dkt. 66.

reasons that the 221 listed customers made purchasing decisions.  McGraw Hill initially deposed

four of the customers on Reed's list, every one of which testified that [Redacted]

[Redacted]. Ex. 5 (Chester Tr. at 71:20-76:3); Ex. 4

(Welch Tr. 35:13-40:22); Ex. 11 (Franklin Tr. 22:11-26:8); Ex. 90 (Thomas Tr. 61:20-65:8).

This testimony was corroborated by documents produced in discovery, which showed that

customers did not rely on the Roper Report in deciding what product to buy.  It also became

clear during discovery that Reed's prior representation to the Court regarding the 221 named

customers was false.  [Redacted]

[Redacted]

[Redacted]. Ex. 42 (Melville Tr. 196:16-197:8, 193:11-194:7); Ex. 41 (Royster Tr.

181:9-12, 188:10-189:12, 231:9-232:21).  Reed's former CEO, Mr. Melville, testified [Redacted]

[Redacted]

[Redacted]

[Redacted]. Ex. 42 (Melville Tr. 197:20-23).  Customers who

testified similarly expressed surprise (and understandable annoyance) that Reed had made these

allegations without even attempting to interview them.  [Redacted]

[Redacted]. Ex. 125 (Sloan Tr. 39:14-

41:3); Ex. 5 (Chester Tr. 71:14-19, 74:25-75:18, 77:4-9); Ex. 90 (Thomas Tr. 65:18-66:2); Ex.

124 (Borglum Tr. 38:14-23); *see also* 56.1 Statement ¶¶ 269-281.

During document discovery, Reed also produced a copy of an electronic computer

file containing thousands of lines of detailed and highly confidential MHC customer information

that was stolen from MHC by Reed employees.  Ex. 141 (DX 55).  Forensic analysis established

that the file in Reed's possession was created by former MHC employees before they left MHC

for senior executive positions at Reed and was taken to Reed upon their departure.  The spreadsheet was then used by Reed's sales force to solicit MHC's customers.  Having discovered the theft by Reed of this and other MHC trade secret and confidential information that Reed used to compete for MHC's customers, McGraw Hill filed its counterclaims on June 7, 2011.  Dkt. 64.  McGraw Hill's counterclaims are not at issue on this motion.

In September 2012, Reed served a damages report from its hired economist, Dr. Frederick Warren-Boulton.  Instead of attempting to calculate damages based on Reed's theory that it lost customers as a result of MHC's competitive comparisons, Dr. Warren-Boulton said that he could not **Redacted**.  Ex. 142 (Warren-Boulton Damages Rep. at 23 n.44).  Instead, he offered a highly speculative model based on purported price indices created from statistically flawed regressions to opine that Redacted

Dr. Warren-Boulton conceded **Redacted**.  Ex. 143 (Warren-Boulton Tr. 70:4-13, 83:19-84:2).  He also conceded that his model **Redacted** and that that his **Redacted**.  *Id.* at 751:20-753:24, 766:9-23, 770:10-22.  And Dr. Warren-Boulton conceded that the **Redacted** .  *Id.* 686:14-688:8.  Dr. Warren-Boulton's so-called "price

effect" model includes no calculation of damages related to customers who were allegedly induced to switch because of the Roper Report.  Instead, the entire basis of his calculation is the ██████████████████████████████████████████████████████████████████ Redacted ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████.  Based on these theories, Dr. Warren-Boulton asserts that Reed is entitled (before trebling) to (1) up to $██████ Redacted in lost revenue damages ("Price Effect Lost Profits") and (2) $██████ Redacted in disgorgement of MHC's allegedly enhanced profits ("Price Effect Disgorgement").  Ex. 144 (Second Supplemental Damage Report of Frederick R. Warren-Boulton, Ph.D. ("Sec. Supp. Warren-Boulton Damage Report") at Exs. SS-D-9, SS-D-10).  Dr. Warren-Boulton's analysis suffers from methodological errors—including what appear to be deliberate attempts to conceal unfavorable evidence.  Accordingly, McGraw Hill will separately move to exclude Dr. Warren-Boulton's testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny.

Apparently undeterred by Dr. Warren-Boulton's concession ██████ Redacted ██████ ████████████████████████████████████████████████████████, many months after the close of fact discovery and the exchange of expert damages reports, Reed issued a "supplemental" response to McGraw Hill's January 2010 interrogatories that purported to revive Reed's lost customer theory of damages.  Ex. 145 (Feb. 1, 2013 First Supp. Responses to The McGraw-Hill Companies, Inc.'s First Set of Interrogatories ("First Supp. Interrog. Resps.")); Ex. 146 (Mar. 1. 2013 Sec. Supp. Responses to The McGraw-Hill Companies, Inc.'s First Set of Interrogatories ("Sec. Supp. Interrog. Resps.")).  This time, however, in frank recognition that discovery had disproved its prior representations, Reed dropped 198 of the original 221

customers, leaving a list of just 23.[11]  To put this into context, after more than three years of

discovery, Reed can point to only 23 customers who **might** have made purchasing decisions as a

result of the Roper Report out of the tens of thousands of customers the parties dealt with during

the relevant period.  In contrast to the wildly speculative and overblown price effect damages

asserted by its expert, Reed claims around $**Redacted** in damages from the loss of these 23

customers.  Even for these customers, however, Reed's claim fails.  Decision-makers at all six of

the 23 customers that McGraw Hill was permitted to depose testified that Reed's allegations that

they chose MHC over Reed based on competitive comparisons were "**Redacted**" Ex.

125 (Sloan Tr. 38:4-39:7); *see also* 56.1 Statement ¶¶ 269-277; Ex. 12 (Roach Tr. 23:24-24:4);

Ex. 92 (Dodge Tr. 25:20-25);  Ex. 91 (Bowman Tr. 42:10-43:17);  Ex. 124 (Borglum Tr. 30:3-

15);  Ex. 132 (Martin Tr. 32:6-25).

        Reed has had almost four years to prove its case.  During that time, the parties

have engaged in voluminous and extremely costly discovery, made all the more burdensome by

Reed's attempt to turn a relatively straightforward contract action into the case of the century.

Now that fact and expert discovery have closed and Reed's theories have proven unfounded, the

case is ripe for summary adjudication dismissing all of Reed's claims.

## SUMMARY JUDGMENT STANDARD

        Summary judgment is appropriate where the evidence demonstrates "that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see also Vacold, L.L.C. v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008).

---

[11]At the same time, Reed attempted to add 26 newly disclosed customers to its damages list.  Because Reed had
failed to name these customers during the discovery period, documents related to their purchasing decisions were
not searched or exchanged and relevant questions were not asked during depositions.  Given that Reed's
unwarranted delay in identifying the customers resulted in an impoverished record, Judge Pitman granted McGraw
Hill's motion to preclude the new customers from Reed's case.  Dkt. 141 at 7-11.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).  A fact is not "material" unless it "might affect the outcome of the suit under the governing law." *Leshinsky v. Telvent GIT, S.A.*, 10-cv-4511, 2013 U.S. Dist. LEXIS 62364 (S.D.N.Y. May 1, 2013) (Oetken, J.) (*quoting Anderson*, 477 U.S. at 248, ).

## ARGUMENT

There are three fatal defects running through all of Reed's claims. First, MHC's competitive comparisons were accurate.  Indeed, even Reed concedes that the Roper Report faithfully listed the results of searches MHC ran in each database.  Second, Reed regularly allowed unrestricted access to Reed Connect.  Third, Reed cannot prove that it suffered the kind of injury each of its claims was designed to address.  Here is a brief summary of the argument:

Point 1.  Reed's Lanham Act claim (Count Twelve) fails because Reed has no evidence that (1) MHC's comparisons were false or misleading; (2) any misstatement was material; or (3) Reed was injured as a result of consumer deception.  Reed cannot prove that MHC's comparisons were false or misleading because they accurately reported the results of MHC's searches in both databases, and Reed has not presented any basis, in the form of consumer surveys or otherwise, to substantiate the message consumers received from the comparisons or to prove that a statistically significant percentage of consumers would have been misled by the comparisons.  Reed cannot establish materiality because there is no evidence that any alleged misstatements influenced purchasing decisions.  Finally, there is no evidence that consumers were actually deceived by MHC's comparisons, and Reed therefore cannot show that

it was injured by any alleged misrepresentations.

Point 2.        The gravamen of Reed's monopolization (Count Nine) and attempted monopolization (Count Ten) claims is that MHC used its access to Reed Connect to produce marketing materials comparing the number of projects in its database to projects available through Reed Connect.  The antitrust laws were not designed to reach this conduct. This is why courts in this and other Circuits hold that antitrust claims, such as Reed's, based on supposedly disparaging comments about a competitor should be ***presumptively rejected***.  *Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).  Reed has failed to overcome this presumption, or show that MHC's conduct harmed competition.

Point 3.        Reed's common law claims are barred by the law of Georgia, Reed's principal place of business.  The Georgia Trade Secret Act ("GTSA") provides a uniform remedy for all claims based on misappropriation of intangible information.  Ga. Code Ann. § 10-1-767.  To achieve this uniformity, GTSA preempts any claims based "on the same allegations as those underlying the plaintiff's claim for misappropriation of a trade secret." *Robbins v. Supermkt. Equip. Sales, LLC*, 722 S.E.2d 55, 58 (Ga. 2012).  Reed's common law claims are therefore preempted by GTSA to the extent they are based on misappropriation of information.  To the extent they are based instead on supposedly misleading marketing, Reed's common law claims fail for the same reasons as Reed's Lanham Act claim.

Point 4.        Even if the Court determines that New York law applies to Reed's common law claims, summary judgment should be granted because Reed cannot prove the elements of those claims:

A.        Reed's fraud claim (Count One) fails under New York law because Reed cannot prove out-of-pocket damages proximately caused by the alleged fraud.  The only injury

Reed alleges on its fraud claim is that it purportedly lost profits from customers who switched to MHC because of MHC's comparisons.  However, New York law bars fraud plaintiffs from recovering lost profits.  Further, any representations MHC's consultants made *to Reed* were not the independent cause of these supposed injuries.  Any alleged lost profits resulted from customers' own purchasing and pricing decisions.

   B. Reed's trade secret (Count Two) and misappropriation of confidential information (Count Three) claims fail because, like GTSA, New York common law requires trade secrets to, in fact, be secret.  Further, under New York law, Reed Connect cannot be a trade secret because it is a product.

   C. Reed's unfair competition claim (Count Four) fails under New York law for the same reasons as the Lanham Act claim and also because Reed cannot establish special damages.  Further, to the extent it is based on misappropriation, Reed cannot establish that MHC used its access to Reed Connect to free ride off of Reed's efforts to develop its own product.

   D. Reed's tortious interference claim (Count Five) fails under New York law because Reed cannot prove that customers decided to forgo purchasing Reed Connect because of tortious conduct by MHC.

   E. Reed's unjust enrichment claim (Count Eleven) fails under New York law because Reed cannot establish that McGraw Hill was enriched at Reed's expense.

   Point 5. In addition to being defective for the reasons stated above, each of Reed's claims is also partially barred by the applicable statutes of limitations because Reed failed to bring its claims in a timely manner despite knowing for almost a decade that MHC was accessing Reed Connect to produce competitive comparisons.

   Point 6. Reed's claims against "John Doe" defendants must be dismissed

because Reed has failed to identify, name or serve these defendants.

## POINT I
## MCGRAW HILL DID NOT VIOLATE THE LANHAM ACT

In Count Twelve of its Complaint, Reed claims false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  To prove a claim for damages under Section 43(a), Reed must show that: (1) MHC made a statement in its advertising or promotions that was either literally false or, while literally true, nevertheless conveyed a misleading message to a substantial portion of the intended audience, *Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007); (2) the statement was material, *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) ("*NBA*"); and (3) Reed was injured as a result of "actual consumer confusion or deception," *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992).  Reed bears the burden of proof on each element.  *See Tiffany (NJ) Inc. v. Ebay, Inc.*, 600 F.3d 93, 112 (2d Cir. 2009).  "To ensure vigorous competition and to protect legitimate commercial speech, courts . . . should give advertisers a fair amount of leeway, at least in the absence of a clear intent to deceive or substantial consumer confusion." *Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Co.*, 198 F. Supp. 2d 59, 69 (D. Mass. 2002) (alteration in original, quoting *RPR v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515 (8th Cir. 1996)).

Reed's claim fails as a matter of law because the literal statements in the Roper Report were indisputably true and Reed has presented no survey or other extrinsic evidence to show that customers were misled by implicit messages in the comparisons.  Reed's claim also fails because Reed cannot show that any conceivable misstatements in the comparisons would have been material to customers or caused harm to Reed.

**A.       The Project Counts in the Roper Report Did Not Violate the Lanham Act**

The Lanham Act precludes advertising statements that are literally false as well as claims that, although not false on their face, mislead consumers into erroneous conclusions about a product.  Either way, "before a court can determine the truth or falsity of an advertisement's message, it must first determine what message was actually conveyed to the viewing audience." *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) ("*J&J v. Smithkline*").  "[O]nly an unambiguous message can be literally false." *Time Warner Cable,* 497 F.3d at 158 (quotations omitted).  If the message "is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false," *id.*, and a claim under the Lanham Act would only exist if the plaintiff could prove the advertisement is misleading.

**1.       There Is No Genuine Issue of Fact as to Falsity**

*a.       There Is No Evidence that the Roper Report Was Literally False*

Reed can proffer no evidence that the Roper Report was literally false.  The Roper Report was simply a series of tables listing the numbers of projects in Reed Connect and the Dodge Network that met certain stated criteria, along with a calculation of the corresponding ratios.  The Roper Report specified that the tables were generated by "recording the number of planning projects, bidding projects and electronic plans and specifications in each state (and Washington, D.C.) from comparable McGraw-Hill Construction and Reed electronic listings." *See, e.g.*, Ex. 87 (PX 429).  In other words, the Roper Report simply transcribed the raw "hits" from searches run in Reed Connect and the Dodge Network, and the proposition asserted by the Roper Report was that searches in Reed Connect and the Dodge Network produced the listed number of projects.  The evidence produced in discovery makes plain that those tabulations were

accurate.

**Redacted**

**[Redacted]**

**[Redacted]**.  Ex 147 (RCD06071085); Ex. 89 (McGowan Rep. at 6).  An employee of

Roper did the same on the Dodge Network.  Ex. 73 (Major Tr. 253:24-254:4).  Ms. Major

testified that the comparisons were always intended to be, and in fact were, accurate tallies of the

search results.  Ex. 73 (Major Tr. 367:10-24, 569:24-570:20, 571:16-20).  There is nothing in the

record to contradict this testimony, to suggest that Ms. Major or Roper mis-transcribed the

number of "hits," or to show that MHC inaccurately calculated the Dodge to Reed project count

ratios.

Moreover, the Roper Report results were consistent with the results Reed reached

in its own internal comparisons of the parties' products, as well as the results customers found

when they compared the products.  *See* 56.1 Statement ¶¶ 154-166, 209-241.  As discussed in

greater detail above in the Statement of Facts at 19-21, Reed's own contemporaneous

assessments and competitive comparisons proved that MHC's data was vastly superior to Reed's

and in line with the results shown in the Roper Report.  *See, e.g.*, Ex. 103 (DX 43 (**Redacted**

**[Redacted]**)); Ex. 19 (DX 202

**(Redacted**

**[Redacted]**)); Ex. 16 (RCD01916683 **Redacted**

**[Redacted]**)).  Customer experiences with the parties' data (too numerous to

list here) proved the same thing.  *See, e.g.*, Ex. 90 (Thomas Tr. 52:24-53:3 (**Redacted**

**[Redacted]**)); Ex. 148 (RCD00254989 (**Redacted**

**[Redacted]**)); *see also* Statement of Facts at 21-22; 56.1

Statement ¶¶ 209-241.

Indeed, Reed's own expert, Ms. Kwon, confirmed that the numbers in the Roper Report were accurate.[12] Six years after the fact, she re-tabulated the Roper results—obviously with an eye toward finding errors—**Redacted**

**▓▓▓**. Ex. 121 (Kwon Rep. at 7, 15); Ex. 122 (Kwon Tr. 71:14-73:10, 73:23-74:2).

In the face of this undisputed evidence, Reed can point only to Ms. Kwon's speculative opinion that a **Redacted**

**▓▓▓▓**. Ex. 121 (Kwon Rep. at 32, 33, 36). Ms. Kwon's opinion does not raise a genuine issue of material fact regarding literal falsity because the mere fact that a different method of comparison could have been used does not render the comparison that was actually performed false. *See Spalding Sports Worldwide*, 198 F. Supp. 2d at 69 (while plaintiff's alternate "manner of testing may give the results more meaning for a typical player" that alternate test could not prove that defendant's ad was literally false because the defendant's own tests supported the ad and plaintiff's tests "incorporated a different methodology"); *see also Euro-Pro Operating LLC v. TTI Floor Care N. Am.*, 12-cv-10568, 2012 U.S. Dist. LEXIS 95744, at *34-35 (D. Mass. July 11, 2012) (evidence that demonstrations did not fairly compare parties' products or conform to industry testing standards was irrelevant because the ads in question did not convey any literal message); *Thermal Design v. Indoor Cts. of Am.*, 03-cv-249, 2004 U.S. Dist. LEXIS 6341, at *24 (W.D. Wis. Apr. 9, 2004) (evidence offered "to support [plaintiffs'] position that the advertisement does not offer a fair comparison" was irrelevant to

---

[12] Ms. Kwon analyzed only two published Roper Reports created on September 7, 2006 and March 20, 2007, as well as a Report created on March 13, 2008 that was never published to customers. Ex. 121 (Kwon Report App'x B); Ex. 74 (Ryan Tr. 162:6-163:10). As she has acknowledged, her opinions are limited to those three Roper Reports and provide no basis to evaluate any other materials. Ex. 122 (Kwon Tr. 77:15-78:7).

literal falsity claim because defendant's ad accurately stated the basis for the comparison).

Notably, Ms. Kwon's opinion concerning **Redacted** does not reflect how customers actually use Reed Connect or the Dodge Network. *See S.C. Johnson & Son v. Clorox Co.*, 930 F. Supp. 753, 783-85 (E.D.N.Y. 1996) (rejecting studies that failed to replicate "real-world . . . conditions" of a product's use). Unlike Ms. Kwon, customers have access to project reports only through the Reed Connect and Dodge Network search engines. *See, e.g.*, Ex. 149 (RCD08094688). Instead of searching the customer-facing systems the way that users do (and the way that the Roper Report did), Ms. Kwon's approach **Redacted**

**Redacted**

. Ms. Kwon admitted that her **Redacted**

." Ex. 122 (Kwon Tr. 40:15-41:21, 99:23, 141:22-146:7, 177:5-21, 183:20, 191:6-194:10, 207:21-208:10, 250:21-257:3). As such, it provides no basis to challenge the literal truthfulness of the message conveyed by the Roper Report.

### b.  There Is No Evidence that the Roper Report Was Misleading

Because Reed has failed to adduce evidence that the Roper Report was literally false, Reed's Lanham Act claim can proceed only if it can prove that an implicit message conveyed by the Roper Report misled or confused consumers. *See J&J v. Smithkline*, 960 F.2d at 297. Reed has the burden of proving both (1) what the implicit message was and (2) that a "substantial percentage" of the audience took away that message. *P&G v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 345 (S.D.N.Y. 2008). Where, as here, an advertisement's intended audience

consists of sophisticated professional purchasers knowledgeable about the subject matter, this

burden is especially heavy.  *See, e.g.*, *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 461 (2d Cir.

2004) ("[T]he more sophisticated the purchaser, the less likely he or she will be confused.");

*P&G*, 574 F. Supp. 2d at 346 ("After a plaintiff has established that a substantial number of

consumers have taken away the purported message, the district court must then evaluate whether

the message is false or likely to mislead or confuse, and may consider factors such as the

commercial context, the defendant's prior advertising history, and the sophistication of the

advertising audience.").

       Here, Reed cannot offer any evidence to prove either requirement for implied

falsity.  First, Reed has never identified any impliedly false message it believes was conveyed by

the Roper Report.  Second, presumably recognizing that any consumer survey would fail, Reed

has not offered survey evidence as required under the Lanham Act to show that consumers took

away any implied message from the Roper Report and were deceived by it.  *Id.*; *see also, e.g.*,

*J&J v. Smithkline*, 960 F.2d at 297; *Tiffany*, 600 F.3d at 112-113; *Tiffany (NJ) Inc. v. eBay, Inc.*,

04-cv-4607, 2010 U.S. Dist. LEXIS 96596, at *5-7 (S.D.N.Y. Sept. 10, 2010).  This lack of

evidence is fatal to Reed's claim.

       Whether an advertisement is "misleading" cannot be determined by subjective

assessments or "intuitive reaction[s]," *J&J v. Smithkline*, 960 F.2d at 297, but must be proved by

extrinsic evidence that the advertisement ***in fact*** conveyed to the audience the supposedly

misleading message.  *See, e.g.*, *id.* at 296-98.  This extrinsic evidence must generally be in the

form of a consumer survey, *see, e.g.*, *id.* at 297-98, *Tiffany*, 600 F.3d at 112-13; *P&G*, 574 F.

Supp. 2d at 345, and must show that "a ***substantial percentage*** of consumers are taking away the

message that the plaintiff contends the advertising is conveying."  *See P&G*, 574 F. Supp. 2d at

345 (emphasis added); *see also, e.g.*, *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 n.14 (3d Cir. 1994) ("*J&J v. Rhone-Poulenc*") (citing cases finding "deception rate" of 20% or more to be sufficient). Anecdotal evidence that a few members of the public were deceived is insufficient as a matter of law. *See J&J v. Smithkline*, 960 F.2d at 298*; see also, e.g.*, *Tiffany*, 2010 U.S. Dist. LEXIS 96596, at *5-7; *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 745 F. Supp. 2d 1359, 1373, 1377 (S.D. Fla. 2010).

Reed's claim fails as a matter of law because it has not presented a survey or any other extrinsic evidence suggesting that ***any*** consumers, let alone a substantial percentage of the audience, took away anything other than the literal message of the Roper Report. "Absent such a threshold showing, an implied falsehood claim must fail." *J&J v. Smithkline*, 960 F.2d at 298; *see also, e.g.*, *Time Warner Cable*, 497 F.3d at 153 ("[A] district court ***must*** rely on extrinsic evidence of consumer deception or confusion to support a finding of an implicitly false message.") (citations, alterations and quotation omitted).

Instead of offering a survey, Reed again relies solely on the opinion of its purported expert Ms. Kwon, but the law is clear that a plaintiff may not evade the consumer survey requirement with expert testimony. *See J&J v. Rhone-Poulenc*, 19 F.3d at 136 (an expert's personal opinion "is not the legal standard by which the courts . . . determine whether consumers were misled"); *see also Filtration Solutions Worldwide, Inc. v. Gulf Coast Filters, Inc.*, 08-cv-0102, 2010 U.S. Dist. LEXIS 2130, at *8 n.3 (W.D. Mo. Jan. 12, 2010) ("[P]roof of a public reaction to an advertisement[] usually turns on the results of a consumer survey, not on a supposed expert's say-so."). In *Bracco Diagnostics, Inc., v. Amersham Health, Inc.*, the court, applying Second Circuit precedent, held the plaintiff "[could] not rely on [its expert's] testimony

as a substitute for its failure to conduct an adequate survey" of the "relevant purchasing group" and excluded the opinion as irrelevant.  627 F. Supp. 2d 384, 439-440 (D.N.J. 2009).

Here, Ms. Kwon admits **Redacted**

**[Redacted]**

**[Redacted]**.  Ex. 122 (Kwon Tr. at 29:10-18, 42:19-43:1, 126:2-22, 141:19-142).  Moreover, Ms. Kwon has never identified a supposedly false implicit message conveyed by the Roper Report. Nor has she performed any customer survey to determine what customers understood the Roper Report to mean; she never even met with or spoke to any actual end-users of Reed Connect.  *Id.* 63:14-19, 81:2-20.  All that Ms. Kwon offers is her personal opinion that a **Redacted**

**[Redacted]**.  This is not enough to create a genuine issue of material fact as to the truth or falsity of the Roper Report.

2.      **Any Alleged Misrepresentations Would Have Been Immaterial to Consumers**

Reed's Lanham Act claim also fails for the independent reason that there is no evidence that any discrepancy in the Roper Report counts would have been material to consumers.  Materiality under the Lanham Act depends on whether a plaintiff can prove that a misrepresentation was "likely to influence purchasing decisions."  *NBA*, 105 F.3d at 855. Materiality cannot be presumed and must be shown through record evidence.  *See*, *e.g.*, *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002); *Auscape Int'l v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 235, 251-52 (S.D.N.Y. 2004).  Here, Reed cannot meet this burden for two reasons.

First, even if Reed could show that there were errors in the Roper Report (which it cannot do), the only conceivable effect would be to exaggerate MHC's superiority in data quantity.  But, as numerous courts have held, under the Lanham Act, a modest exaggeration of

an undisputed product advantage is presumptively immaterial to customers' purchasing

decisions.  *See, e.g.*, *Reliable Carriers, Inc. v. Excellence Auto Carriers, Inc.*, 11-cv-15326, 2012

U.S. Dist. LEXIS 73798, at *7-9 (E.D. Mich. May 29, 2012).  For example, in *Dayco Products*

*LLC v. Dorman Products, Inc.*, the defendant was accused of falsely claiming its products

comprised 80% of sales in a certain market when, in fact, they represented only 70% of sales.

09-cv-13139, 2010 U.S. Dist. LEXIS 102785, at *30-31 (E.D. Mich. Sept. 28, 2010).  The court

dismissed the claim on materiality grounds because it was unreasonable to infer that this "10%

[overstatement of] market coverage would influence [a customer's] decision to purchase"

defendant's products over plaintiff's products.  *Id*. at *30; *see also Borden, Inc. v. Kraft, Inc.*,

224 U.S.P.Q. 811, 1984 U.S. Dist. LEXIS 23179, at *32 (N.D. Ill. 1984) (difference between 5

ounces of milk in each slice of cheese and 4.6 ounces is not material).  So too here, any

conceivable overstatement of MHC's data superiority in the Roper Report would be immaterial

to customers since there is no dispute that the Dodge Network carried far more project listings

than Reed Connect.  Indeed, **Redacted**

.

      Second, as set forth in detail above, customers uniformly testified that high-level

project counts like Roper were irrelevant to their purchasing decisions because what matters is

the timeliness, accuracy and comprehensiveness of the ***specific data*** relevant to each customer's

business.  *See, e.g.*, Ex. 90 (Thomas Tr. 62:3-16 (testifying that **Redacted**

")); Ex. 150 (Mager

Tr. 218-219); *see also* 56.1 Statement ¶¶ 248-254.  Reed cannot identify any evidence from

customers to counter this testimony.

3.      **The Roper Report Did Not Cause Actual Consumer Deception or Harm to Reed**

Reed's claim for damages also fails for another reason:  it did not suffer actual losses caused by consumer deception.

> [I]t is well settled that in order for a Lanham Act plaintiff to receive an award of damages the plaintiff must prove either [1] actual consumer confusion or deception resulting from the violation, or [2] that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion.

*George Basch Co.*, 968 F.2d at 1537 (internal citations and quotation omitted).

To show actual customer deception, a plaintiff must adduce extrinsic evidence that consumers were deceived into taking actions harmful to the plaintiff.  *Res. Developers v. Statue of Liberty-Ellis Island Found.*, 926 F.2d 134, 140 (2d Cir 1991); *see also George Basch*, 968 F.2d at 1537.  As noted above in Point I.A.3, Reed has presented no such extrinsic evidence.

There is also no evidence that MHC intended to deceive any customers.  To the contrary, the uncontroverted evidence is that Ms. Major did her best to compile accurate project counts.  Ex. 73 (Major Tr. 367:10-24, 569:24-570:20, 571:16-20).  Indeed, Ms. Kwon, [Redacted]

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.  Ex. 122

(Kwon Tr. 82:9-16).

B.      **No Other Aspect of MHC's Consumer Communications Violated the Lanham Act**

Apparently recognizing that its Lanham Act claim based on Roper Report project counts has disintegrated, in its July 23, 2013 Pre-Motion Letter, Reed deemphasized the Roper comparisons on which it brought suit and ran away from Ms. Kwon's opinions.  *See* Ex. 131 (Pre-Motion Letter).  Reed now asserts that the Roper Reports were misleading because they

misrepresented the level of Roper's involvement and because they were in circulation for too long after initial publication.  Reed also challenges a smattering of sporadic one-off communications with customers that were unrelated to the Roper Report.  Reed has no evidence that any of these communications were literally false.  As with all of its claims, Reed has offered no survey or other extrinsic evidence to show that a substantial number of consumers received any misleading message from any of these "also-ran" allegations.  *See, e.g.*, *Tiffany*, 600 F.3d at 112-13; *see also Tiffany*, 2010 U.S. Dist. LEXIS 96596, at *5-7.  Nor has Reed identified any evidence to show that these alleged representations were material to any customer's purchasing decisions.  Accordingly, these other one-off communications provide no basis for Reed to survive summary judgment on its Lanham Act claim.

1.      **MHC's Representations Regarding the Roper Report's Origins Did Not Violate the Lanham Act**

In its Pre-Motion Letter, Reed argued that MHC falsely represented that the Roper Reports were independent third-party comparisons overseen by a Roper project director.  According to Reed, these representations were misleading because (1) some of the Roper searches were executed by Ms. Major, while others were executed by the Roper project director, (2) the comparison process was relatively brief, and (3) Roper's degree of "involvement" was "minimal."  Ex. 131 (Pre-Motion Letter) at 2.  But these arguments by counsel do not create a material issue of fact as to the literal truthfulness of the Roper Report.  First, to the extent the Roper Report conveyed a literal message regarding Roper's involvement in the comparisons, this message was true.  The uncontroverted evidence is that a **Redacted** .  Ex. 76 (T. Ritchie Tr. 26:10-25); Ex. 73 (Major Tr. 248:3-10).  Moreover, that the searches were relatively easy and took only a few hours to complete proves nothing about Roper's involvement in the analysis or the Roper

Report's literal truth or falsity.  Accordingly, Reed has no basis to proceed on a claim that MHC's representations about Roper's involvement in the Reports were literally false.  *See, e.g.*, *Time Warner Cable*, 497 F.3d at 153.  Further, there is no evidence that any implied message about Roper's exact role in the comparisons was conveyed to consumers or that consumers were misled by who did what in connection with the Roper Report.

> **2.      The Timeliness of the Reports Does Not Provide a Basis for Reed to Proceed on its Lanham Act Claim**

Reed also argued in its Pre-Motion Letter that MHC circulated certain Roper Reports for too long after their original publication.  Ex. 131 (Pre-Motion Letter) at 2.  Reed does not clarify what Reports it is referring to or what qualifies as being "too long."  Reed's assertions concerning these so-called "out-of-date Roper Reports" do not give rise to Lanham Act liability. The mere fact a marketing piece is "old" does not prove it is literally false.  Indeed, courts have denied claims that advertisements are literally false even where the  ads continue to reference old studies that have been superseded by more recent conflicting results.  *See Fed. Express Corp. v. United Parcel Serv., Inc.*, 765 F.Supp.2d 1011, 1021-22 (W.D. Tenn. 2010) (ad claiming UPS was "just ranked" most reliable was not literally false even though it failed to disclose that a more recent study had reached contrary results); *Millennium Import Co. v. Sidney Frank Importing Co.*, 03-cv-5145, 2004 U.S. Dist. LEXIS 11871 at 18-19 (D. Minn. June 11, 2004). Further, there is no evidence in the record to support Reed's argument that consumers received a misleading message about the timeliness of the Reports.  Accordingly, the timeliness of the Roper Reports does not provide a basis for Reed to proceed with its Lanham Act claim.

> **3.      MHC's Non-Roper Comparisons Did Not Violate the Lanham Act**

In its Pre-Motion Letter, Reed also argued that certain sporadic communications unrelated to the Roper Report were false or misleading.  Specifically, Reed now focuses on

(1) certain contract proposals that included bullet points stating that MHC enjoyed a "5:1 ratio against [its] nearest competitor on 'exclusive' projects, those not reported by our competitors, and a 3:1 ratio against all competitors, on all projects"; and (2) one-off emails identifying specific projects on Dodge that were missing from Reed Connect.  Ex. 95 (PX 823 at '446); Ex. 131 (Pre-Motion Letter) at 1-2.  Reed cannot support a Lanham Act claim based on either type of communication.

Reed has no evidence that the 5:1 / 3:1 ratios were false.  Reed cannot rely on Ms. Kwon for this claim, since she did not offer any opinion regarding anything other than the three Roper Reports she reviewed, and she did not opine on the accuracy of these ratios.  *See* n.12 at 42.  Instead, in its Pre-Motion Letter, Reed ironically argues that the 5:1 / 3:1 ratios were false because they were ***inconsistent with the Roper Report***.  Ex. 131 (Pre-Motion Letter) at 1.  But the Roper counts concerned only subsets of the parties' data (projects with a reported value of at least $1 million, in the planning or bidding stage, and falling into the general building, housing and utilities categories), and had no necessary relationship to the 3:1 ratio of ***all projects*** against ***all competitors***.  Similarly, the Roper counts had absolutely nothing to say about the ratio of the parties' exclusive reports.[13]  Aside from its mistaken assertion that the ratios were inconsistent with the Roper Report, Reed has no evidence at all to support a literal falsity claim.  *See, e.g.*, *Time Warner Cable*, 497 F.3d at 153 (requiring proof of literal falsity).  Nor does Reed have customer surveys to support a misleading claim.  *See, e.g.*, *Tiffany*, 2010 U.S. Dist. LEXIS 96596, at *5-7.

In addition, these ratios could not have been material and Reed's new claim

---

[13] For a hypothetical example, if the Roper Report had stated that MHC had 500 projects while Reed had 400, the Roper ratio would have been 5:4.  To take the example further, if 390 of the underlying projects were covered by both parties, Reed would have 10 "exclusive" projects (400 – 390 = 10) and MHC would have 110 (500 – 390 = 110), for an "exclusive" ratio of 11:1 in MHC's favor.

should be dismissed on that basis as well.  *See* Point I.A.2 at 46.  There is no evidence whatsoever that any customers found the 5:1 / 3:1 ratios to be useful in making a purchasing decision.  Indeed, the 5:1 / 3:1 ratios have so little relevance to Reed's claims that neither of its experts even offered an opinion based on these numbers. Ex. 121 (Kwon Rep.); Ex. 151(Warren-Boulton Liability Rep.).

Reed also now focuses on so-called "exclusives lists" that MHC prepared on a few occasions identifying handfuls of specific projects that appeared on the Dodge Network but not Reed Connect.  Each list was unique and was based on contemporaneous searches in the parties' respective databases.  Ex. 73 (Major Tr. 156:19-157:10).  Reed now alleges that at least one of these lists mistakenly identified projects as exclusive to Dodge "when in fact RCD did have the projects."  Ex. 131 Pre-Motion Letter at 2.  Reed has not, however, identified which exclusive list it claims contained errors or whether RCD's project listings (if they were on Reed Connect at all) would have even been accessible to a user conducting a reasonable search.  Reed therefore cannot prove falsity based on the exclusives lists.  *See Time Warner Cable*, 497 F.3d at 153 (Lanham Act claim requires proof of specific false or misleading statements).  In addition, as with Reed's other new allegations, its claim here fails for the independent reason that there is no evidence of materiality or that Reed was harmed by any of MHC's exclusives lists.  *See* Point I. A.2, 3 at 46, 48 respectively.

Rounding out the laundry list of "also ran" Lanham Act allegations, Reed makes the nonsensical argument that MHC engaged in false advertising by accurately identifying MHC exclusives "without revealing that [Reed] had other projects that [MHC] did not." Ex. 131 (Pre-Motion Letter at 2).  But Reed cannot base a Lanham Act claim on the fact that MHC emphasized strengths of its own product, but did not tout possible advantages in Reed's product.

*See Am. Home Prods. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 580-81 (S.D.N.Y. 1987).

      **C.**     **Reed's Claim for Disgorgement of MHC's Profits Should Be Dismissed**

      For all of the foregoing reasons, Reed's Lanham Act claim is defective as a matter of law and should be dismissed.  Even if that were not the case, Reed would not be entitled to disgorgement of MHC's profits, which it seeks through its "Price Effect Disgorgement Theory."  Such "disgorgement" damages represent more than half of Reed's claimed price effect damages.  *See* Procedural History at 33-34.

      First, to obtain disgorgement of defendant's profits, a plaintiff must show that defendant willfully deceived customers.  *See, e.g.*, *George Basch*, 968 F.2d at 1534; *Borghese Trademarks, Inc. v. Borghese*, 10-cv-5552, 2013 U.S. Dist. LEXIS 39827, at *29 & n.6 (S.D.N.Y. Jan. 14, 2013) (Oetken, J.) (holding that willfulness remains a prerequisite for an award of profits after the 1999 amendments to the Lanham Act).  Reed cannot make that showing here, for all the reasons explained above.

      Second, disgorgement of profits is "limited to situations in which the defendant's profits represent unjust enrichment derived from diversion of business that ***clearly would otherwise have gone to the plaintiff*** . . . or otherwise infringed the plaintiff's rights rather than engaged simply in false advertising of the defendant's own product."  *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 772 (2d Cir. 1984) (emphasis added).  Through its "Price Effect Disgorgement" theory, Reed seeks disgorgement of the difference between the amount MHC's national customers paid for Dodge and the amount those same customers would have paid for Dodge if not for the comparisons.  *See* Procedural History at 33-34.  Reed cannot show that MHC's profits would have gone to Reed; to the contrary, Reed has separately calculated its own supposed lost profits.  Awarding MHC's allegedly enhanced prices to Reed would therefore

represent an improper penalty to McGraw Hill and a windfall to Reed.  *See* 15 U.S.C. § 1117(a)

(stating that damages under the Lanham Act "shall constitute compensation and not a penalty");

*Balance Dynamics Corp. v. Schmitt Indus.*, 204 F.3d 683, 693-94 (6th Cir. 2000).

**POINT II**
**REED'S ANTITRUST CLAIMS SHOULD BE DISMISSED BECAUSE THERE IS NO**
**EVIDENCE THAT MHC'S CONDUCT HARMED COMPETITION**

Reed brings claims for monopolization (Count Nine) and attempted

monopolization (Count Ten) of a putative "national" market it defines as consisting of

construction project information sold to customers who, among other things, seek to purchase

construction project listings in all fifty states.[14]  Reed's antitrust claims do not rely on allegations

of price fixing, predatory pricing, or exclusion.  Instead, Reed's claims are based on the same

supposedly tortious conduct that underpins its other claims:  the creation and distribution of the

allegedly misleading Roper Report and other comparative information.  *See* Ex. 151 (Warren-

Boulton Liability Rep. at 10); Ex. 143 (Warren-Boulton Tr. at 33:12-17).

But courts have repeatedly recognized that, while tortious conduct may harm

competitors, it rarely harms competition.  In fact, antitrust claims (such as Reed's) that are

premised on supposedly disparaging statements are presumed to have a *de minimis* effect on

competition and are therefore highly disfavored as a matter of law.

**A.      Antitrust Claims Based on Tortious Conduct Are Disfavored**

To establish a claim for monopolization or attempted monopolization, a plaintiff

must show that the defendant engaged in predatory or anticompetitive conduct.  *Heerwagen v.*

*Clear Channel Comm.*, 435 F.3d 219, 226-27 (2d Cir. 2006) (quoting *PepsiCo. v. Coca-Cola*

*Co.*, 315 F.3d 101, 105 (2d Cir. 2002)).  As the Second Circuit has explained, "Conduct that

---

[14] McGraw Hill does not concede that Reed has properly defined the relevant market, but does not challenge that market definition on this motion.

merely harms competitors, . . . while not harming the competitive process itself, is not

anticompetitive." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (2d Cir. 2007)

(citations omitted).

Because antitrust plaintiffs must show harm to competition, antitrust claims based

on tortious conduct are disfavored. The Supreme Court has held that, "[e]ven an act of pure

malice by one business competitor against another does not, without more, state a claim under

the federal antitrust laws; those laws do not create a federal law of unfair competition or purport

to afford remedies for all torts committed by or against persons engaged in interstate commerce."

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (citation and

quotation omitted). Indeed, even if Reed's claims could properly be characterized as

"[i]ndustrial espionage," they would not state a valid claim under the antitrust laws because, as

the leading antitrust treatise explains, "espionage" is about harm to competitors, not competition.

Areeda and Hovenkamp, *Antitrust Law*, ¶ 782(g) (2013).

> **B.**   **Antitrust Claims Based on Disparagement Are Presumed to Have a *De Minimis* Effect on Competition**

Reed's antitrust claims are primarily based on MHC's use of comparative

information with customers and prospects. *See* TAC ¶¶ 311, 327; Ex. 151 (Warren-Boulton

Liability Rep. at 10). Reed must show that these comparisons were anticompetitive, *i.e.*, that

they caused harm to the marketplace and not just harm to Reed. But this is a heavy burden for

Reed because courts in this Circuit and elsewhere have repeatedly held that disparaging

statements rarely harm competition; plaintiffs pursuing such a theory must overcome a strong

presumption that such conduct is not anticompetitive. As the Seventh Circuit reasoned:

> The genuine anticompetitive effects of false and misleading
> statements about a competitor are minimal, at best. . . .  As a

> result, . . . claims based on one competitor's disparagement of
> another should be presumptively ignored.

*Mercatus Grp. v. Lake Forest Hosp.*, 641 F.3d 834, 852 (7th Cir. 2011) (quotation and citations omitted). The Third Circuit has likewise explained that while disparagement can be anticompetitive where it "leaves the consumer with no input whatsoever," disparagement is not exclusionary if the decision "was always ultimately in the hands of the consumer." *Santana Prods. Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 133 (3d Cir. 2005).

The Second Circuit has similarly adopted a strict standard for these types of claims, holding that "a plaintiff asserting a monopolization claim based on misleading advertising must overcome a presumption that the effect on competition of such a practice was *de minimis*." *Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988) ("*Ayerst*"). This presumption can be overcome only by "cumulative proof that the representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or offset by rivals." *Ayerst*, 850 F.2d at 916 (quotation omitted).

Courts sitting in the Second Circuit and elsewhere have dismissed antitrust claims when even one of the *Ayerst* factors was not met. *See Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997) (a plaintiff "must satisfy ***all*** six elements to overcome the de minimis presumption."); *Applera Corp. v. MJ Res. Inc.*, 349 F. Supp. 2d 338, 345 (D. Conn. 2004) (Arterton, J.); *Eon Labs Mfg., Inc. v. Watson Pharm., Inc.*, 164 F. Supp. 2d 350, 361 (S.D.N.Y. 2001) (Buchwald, J.); *Multivideo Labs, Inc. v. Intel Corp.*, 99-cv-3908, 2000 U.S. Dist. LEXIS 110 at *41 (S.D.N.Y. Jan. 7, 2000) (Cote, J.). Here, Reed cannot show at least five of the *Ayerst* factors.

1.     **MHC's Project Counts Were Not Clearly False**

As explained in Point I.A.1 above at 40, the Roper Reports[15] were not false, let alone "clearly false," as Reed would have to show to overcome the *de minimis* presumption. Indeed, Ms. Kwon's analysis Redacted

. Ex. 121 (Kwon Rep. at 15); Ex. 122 (Kwon Tr. 71:14-24, 73:23-74:2).  Ms. Kwon's suggestion that Redacted

is irrelevant to the truth or falsity of the Roper Reports, and cannot be used as the basis for Reed's antitrust claims.

Because Reed cannot establish that any of MHC's comparative information was literally false, Reed is left with the argument that MHC's comparisons were misleading.  But the Second Circuit—like other courts—has explained that while the Lanham Act might "encompass[] more than literal falsehoods" the *de minimis* test under the antitrust laws requires "clearly false" statements.  *Ayerst*, 850 F.2d at 916-17; *see also Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 372 (6th Cir. 2003) (statements that are "true but misleading for the purposes of the Lanham Act" are insufficient to satisfy clear falsity prong of *de minimis* test); *Multivideo Labs.*, 2000 U.S Dist. LEXIS 110, at * 41 (statements that were true and, at most, only "implied that [plaintiff's product did] not work" were insufficient to satisfy *de minimis* test).

Reed's failure to establish that any of MHC's comparisons were clearly false alone warrants dismissal of Reed's antitrust claims.  *See Applera Corp.*, 349 F. Supp. 2d at 345

---

[15] As set forth above, because Reed's expert only examined three Roper Reports (one of which was never published) Reed has no evidence that any other comparative information, including any *ad hoc* comparison, exclusive or 5:1/3:1 document, was false.  *See* Point I.B.3 at 50.  Thus, these documents cannot sustain Reed's antitrust claims.

(dismissing antitrust claims at summary judgment because defendant's statements "fail[] to satisfy the first, most fundamental, element necessary to overcome the presumption against disparagement claims—that the publication be clearly false"); *Multivideo Labs*, 2000 U.S. Dist. LEXIS 110 at *41; *see also Duty Free Am., Inc. v. Estée Lauder Cos.*, 12-cv-60741, 2013 U.S. Dist. LEXIS 75186, at * 37 (S.D. Fl. May 9, 2013).

### 2. MHC's Comparisons Were Not Clearly Material

As explained in Point I.A.2 at 46, above, Reed cannot show that MHC's comparisons were material to customer decisions both because the comparisons, at most, exaggerated MHC's clear product superiority and because the comparisons were far too generalized to make a difference to customers.  Point I.A.2 at 46.  Because Reed cannot show that the comparisons were material, it necessarily also fails to meet the second prong of the *Ayerst* test: that the comparisons were "clearly material."

### 3. MHC's Comparisons Were Not Clearly Likely to Induce Reasonable Reliance

Reed faces a high hurdle in overcoming the third *Ayerst* factor and proving that MHC's comparative information was "clearly likely to induce reasonable reliance."  *See generally Am. Prof'l Testing Serv.*, 108 F.3d at 1152.  In *American Professional*, the plaintiff alleged that BARBRI had implemented "a campaign designed to disparage [plaintiff's] bar review courses . . . through the distribution of anonymous, false, and deceptive advertising fliers on law school campuses."  *Id.* at 1151-52.  To show reliance, the plaintiff proffered an expert survey that concluded that 53% of students believed that the plaintiff's bar review courses would be less beneficial because of the disparaging flyers, as well as evidence that registrations for plaintiff's service were down as a result.  The district court recognized that the flyers were particularly damaging to the plaintiff's business because they were posted at a "bad time" when

law school students had to pay tuition for bar review courses, locking in their choices.

Nevertheless, the district court granted judgment as a matter of law to the defendants.  The Ninth

Circuit affirmed, holding that the survey evidence was insufficient to show that students were

"clearly likely" to rely on the advertising.  *Id.* at 1152.

Reed does not have any evidence to show that customers were clearly likely to

reasonably rely on MHC's comparative information.  Indeed, as set forth above in Point I.A.2 at

46, Reed has no survey or evidence in any form showing that MHC's comparisons were

important to a meaningful portion of Reed's customers.  To the contrary, every customer who

testified explained that they did not rely on MHC's project counts and that this type of

information would not be "**Redacted**" to them.  Ex. 11 (Franklin, 22:14-23:11); *see also*

Statement of Facts at 27, Procedural History at 35.  Customers based their purchasing decisions

on their own assessment of their needs and their access to the parties' databases, often through

free trials, rather than on any marketing materials.  *See* Statement of Facts at 24-30.

### 4.  Customers Typically Have Direct Personal Knowledge of the Subject Matter of MHC's Comparative Information

When determining whether customers have knowledge of the subject matter, the

fourth *Ayerst* factor, courts consider whether customers are "sufficiently sophisticated so as not

to be fooled easily by [defendant's] misinformation."  *Raymond Tate Liberty Fuels, Inc. v. Pac.

Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1080 (N.D. Cal. 2002).  Reed's theory is that MHC

monopolized or attempted to monopolize the market for CPI sold to "national customers."  Ex.

142 (Warren-Boulton Damages Rep. at 1).  All of the parties' customers are sophisticated when

it comes to the construction information used in their businesses, and that is particularly true of

the large, so-called "national" customers that Reed claims were the victims of MHC's alleged

antitrust violation.  Moreover, these were not everyday purchases that might have been casually

made.  National subscriptions ranged in price from ███Redacted███.  Ex. 143 (Warren-Boulton Tr. 141:7-142:7); Ex. 59 (Marchione Tr. at 56:5-21).  Customers (including those that testified in this case) relied on their own access to the parties' databases through trial or existing subscriptions to make their purchasing decisions.  *See* Statement of Facts at 24-30.

Courts have recognized that customers like these are knowledgeable and savvy consumers.  *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 249 F. Supp. 2d 463, 516 n.47 (E.D. Pa. 2003) (recognizing that "architects and specifiers were knowledgeable purchasers who were skeptical of [defendant's] marketing"), *rev'd on other grounds*, 401 F.3d 123 (3d Cir. 2005).  In *Santana*, the plaintiff was a building product manufacturer who alleged that the defendants had embarked on a scare-tactic campaign to convince customers that the plaintiff's toilet partition did not meet fire safety codes.  *See id.* at 469.  The court granted summary judgment to the defendant, finding that the plaintiff had "failed to show that the challenged advertisements and other dissemination of information were made to unsophisticated buyers."  *Id.* at 516 n.47; *see also Ayerst*, 850 F.2d at 917 (pharmacists likely to have knowledge of the subject matter); *Walgreen Co. v. Astrazeneca Pharm., L.P.*, 534 F. Supp. 2d 146, 152 (D.D.C. 2008) (plaintiffs could not overcome the *de minimis* presumption because defendant's drug "sales necessarily depended on prescriptions written by medical professionals, that is, persons with knowledge of the subject matter").  Here, it is undisputed that the insiders who purchased expensive national subscriptions to the Dodge Network and Reed Connect were sophisticated businesses with deep knowledge of the construction industry as well as specific knowledge about the parties' services based on direct experience.  They were well-informed about the parties' products and in a unique position to make purchasing decisions based on their own information needs.  Accordingly, Reed cannot satisfy this *Ayerst* factor, as it must.

### 5. MHC's Competitive Statements Were Susceptible to Neutralization by Reed

To satisfy the final *Ayerst* factor, it is not sufficient for Reed to argue that it ***failed to*** neutralize MHC's comparisons; instead, Reed must show that MHC's comparisons were ***not capable of being neutralized***.  *See, e.g.*, *Am. Prof'l Testing Serv.*, 108 F.3d at 1152; *The David Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728, 751 (S. D. Tex. 1998) (granting summary judgment for defendant partly because plaintiff had known about the allegedly disparaging statements for years and taken no action).  Courts set a high bar for this *Ayerst* factor because "false advertising would not damage competition and hence be a violation of the Sherman Act unless it was so difficult for the plaintiff to counter that it could potentially exclude competition." *Innov. Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 741 (6th Cir. 2012) (quotation omitted) (false notice that competitor's product had been recalled was susceptible to neutralization because the competitor could and did alert retailers that its product had not been recalled).  Reed cannot come close to meeting that standard here.

Reed knew about MHC's project count comparisons for many years, *see* Statement of Facts at 11-13, and could have neutralized the basic factual information they contained at any time.  Reed could **Redacted** ██████████████████████████████████████████████████████, to rebut the Roper Report.  *See* Ex. 103 (DX 43).  **Redacted** ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████.

Reed also obviously had access to Reed Connect at all times and could have corrected any false Reed project counts contained in an MHC comparison.  Similarly, Reed could have used the public portion of MHC's website to check the Dodge bidding numbers and

could have corrected any false MHC project counts.  Reed **Redacted**

████████████████████████████████████████████████████████████████

██████████████████████. *See, e.g.*, Ex. 37 (Duggan Tr. at 75:4-25); Ex. 152

(RCD00689853); Ex. 123 (S. Ritchie Tr. 87:21-88:15).  Reed's ability to—and failure to—

publish corrections **Redacted** confirms both that the

Roper Reports were accurate and that, even if they were not accurate, they were susceptible to

neutralization.  Reed of course could have used these same means to explain why any of MHC's

claims regarding *ad hoc* comparisons or other supposedly disparaging statements were incorrect.

In fact, Reed did on occasion use its own marketing materials and sales tactics to

rebut MHC's comparisons and their significance.  For example, Reed disseminated a marketing

piece titled "Grain of Salt," which told customers (without foundation) that MHC's comparisons

were "90% inaccurate."  Ex. 97 (RCD00371692).  In short, MHC's comparisons were

susceptible to neutralization.  *See Innov. Ventures*, 694 F.3d at 740; *Am. Prof'l Testing Serv.*, 108

F.3d at 1152; *The David Aldridge Co.*, 995 F. Supp. at 751; *Santana Prods.*, 249 F. Supp. 2d at

517 n.47  (defendant's marketing was readily susceptible to neutralization because the plaintiff

acknowledged "that it was often able to convince architects to change their specifications back to

[the plaintiff's product.]"); *Podiatric Surgery*, 323 F.3d at 372; *Tate*, 230 F. Supp. 2d at 1080

(granting motion to dismiss partly because "[p]laintiffs were capable of defending their products

and winning over customers based on the merits").

### C.    MHC's Other Conduct Was Also Not Anticompetitive

While MHC's alleged disparagement of Reed Connect is the focus of Reed's

antitrust claims, at various times Reed has suggested that it might argue that other ancillary

allegations also support antitrust liability.  *See* Ex. 151 (Warren-Boulton Antitrust Report at 8-10

& 18-19).  But because the alleged ancillary acts were not independently anticompetitive, they

cannot serve as the bases for Reed's antitrust claims.  *See Eatoni Ergonomics, Inc. v. Research in*

*Mot. Corp.*, 486 F. App'x 186, 191 (2d Cir. 2012).  In *Eatoni*, the Second Circuit rejected a

similar attempt to premise antitrust liability on a hodge-podge of grievances.  The court reasoned

that, "[b]ecause these alleged instances of misconduct are not independently anti-competitive, we

conclude that they are not cumulatively anti-competitive either."  *Id.* (*citing City of Groton v.*

*Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981)).

     For example, Reed's antitrust expert has opined that **Redacted**

.  Ex. 143 (Warren-Boulton Tr. 49:23-51:7,

56:16-58:4).  But if misleading statements are not anticompetitive under *Ayerst*, truthful

information about customer-facing features of a consumer good like Reed Connect cannot be

anticompetitive.  Truthful statements ***can only help*** the workings of a competitive and efficient

market and can only benefit consumers.  "[W]hat producers say about each others' goods in an

effort to sway consumers is competition in action."  *Sanderson v. Culligan Int'l Co.*, 415 F.3d

620, 624 (7th Cir. 2005).  As the Second Circuit put it, "[a]dvertising that [truthfully] emphasizes

a product's strengths and weaknesses does not . . . constitute anticompetitive conduct violative of

§ 2."  *Ayerst*, 850 F.2d at 916; *see also AD/SAT Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d

216, 231 (2d Cir. 1999); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 287 (2d Cir.

1979) ("in its advertising, a producer is ordinarily permitted, much like an advocate at law, to

bathe his cause in the best possible light").  Similarly, there is no proof that any of Reed's

ancillary allegations, even if true, harmed competition and none of them provide a basis for its

antitrust claims to survive summary judgment.[16]

## POINT III
### REED'S STATE LAW CLAIMS FAIL UNDER THE LAWS OF ITS HOME STATE OF GEORGIA

In each of its state law claims, Reed alleges that MHC gave customers project counts based on searches MHC ran via the Reed Connect user interface. Reed would have preferred to keep that information from customers, and now claims that the project counts were wrongful either because they were based on "trade secrets" that MHC misappropriated through fraudulent means or because they were misleading. These allegations are the basis for Reed's six state law claims: (1) fraud (Count One); (2) misappropriation of trade secrets (Count Two); (3) misappropriation of confidential information (Count Three); (4) unfair competition (Count Four); (5) tortious interference (Count Five); and (6) unjust enrichment (Count Eleven).

Reed's misappropriation theory is barred under Georgia law no matter how Reed denominates the theory in its six common law claims. In Georgia, all claims based on misappropriation of information are channeled into a single statutory claim under the Georgia Trade Secrets Act, Ga. Code Ann. § 10-1-760 *et seq*., Georgia's version of the Uniform Trade Secret Act. Because of its strong public policy that information should "flow freely in the public domain," *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1345 (N.D. Ga. 2007), GTSA requires plaintiffs bringing misappropriation-based claims to prove that the information was both truly secret and carefully guarded. Ga. Code Ann. § 10-1-761(4). Reed has not asserted and could not prevail on a claim under GTSA because the information MHC allegedly

---

[16] Some of Reed's ancillary allegations also fail because Reed has no evidence that the alleged conduct occurred. For example, Reed has no evidence that MHC copied projects from Reed Connect and input them into the Dodge Network. *See* Statement of Facts at 14-15. Others, such as Reed's claim that MHC looked at Reed Connect's functionality with an eye toward copying it (but did not actually copy it), did not even affect Reed and certainly did not affect consumers. *See* Ex. 151 (Warren-Boulton Antitrust Rep. at 19).

misappropriated was shared freely with the public.  To prevent end runs around Georgia's statutory scheme, GTSA preempts common law claims—like Reed's—that are based on the same conduct and injury supporting an alleged trade secret claim.   Ga. Code Ann. § 10-1-767(a).

Further, to the extent Reed's common law claims are based in part on false advertising, they fail because MHC's marketing was not false, it was not material to customers, and customers were not deceived, as set forth above in Point I.

### A.  Georgia Law Applies to Reed's Common Law Claims

"[T]he first inquiry" in determining which law governs Reed's state law claims "is whether there is an actual conflict of laws on the issues presented."  *Smith v. Rail Works Corp.*, 10-cv-3980, 2012 U.S. Dist. LEXIS 31514, at *36 (S.D.N.Y. Mar. 6, 2012) (Oetken, J.).[17] Next, the court must "conduct an 'interest analysis,' assessing which of the competing jurisdictions has the greatest interest in seeing its laws applied to the matter at issue."  *Stichting Ter Behartiging Van de Belangen Van Oudaan Deelhounders in het Kapital van Saybolt Int'l B.V v. Schreiber*, 407 F.3d 34, 49 (2d Cir. 2005).[18]  An actual conflict of laws exists where "the applicable law from each jurisdiction provides different substantive rules."  *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 331(2d Cir. 2002).

Here the conflict is fundamental:  While New York would allow alternate pleading of different common law claims based on the same conduct allegedly giving rise to a

---

[17] Federal courts apply their forum state's choice of law rules.  *See, e.g.*, *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 331 (2d Cir. 2005).

[18] This is the first time the choice of law issue is before the Court.  At the motion to dismiss stage, the parties and the Court (Sweet, J.) all assumed without discussion that New York law applied to the state law claims adjudicated in that motion.  *See* Dkt. 24 (McGraw-Hill's Mot. to Dismiss); Dkt. 28 (Reed's Opp'n); Dkt. 35 (Op. and Order Granting in Part and Den. in Part Def.'s Mot. to Dismiss).  As the Court implicitly recognized in granting McGraw Hill's Motion to Amend, Order (Dkt. 135), an assumption about applicable law early in the case does not prevent the issue from being fully briefed and decided at a later stage of the litigation.  *See, e.g.*, *Cobalt Multifam. Investors I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 430 (S.D.N.Y. 2012) (permitting party to raise choice of law because court had not previously been asked to decide it); *Wultz v. Bank of China Ltd.*, 811 F. Supp. 2d 841, 845 (S.D.N.Y. 2011), *withdrawn on other grounds*, 865 F. Supp. 2d 425 (S.D.N.Y. 2012).

trade secret claim, Georgia provides a single statutory remedy for misappropriation of information by means of a misrepresentation, as well as for the subsequent use of that information.[19] *Compare* Ga. Code Ann. § 10-1-767(a) *with LinkCo, Inc., v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 503 (S.D.N.Y. 2002) (recognizing a New York cause of action based on "misappropriation of a competitor's [proprietary information], even if such property does not qualify as a trade secret.").

 This conflict should be resolved in favor of Georgia. "In tort-law disputes, interest analysis distinguishes between two sets of rules: conduct-regulating rules and loss allocating rules." *Licci v. Lebanese Can. Bank*, 672 F.3d 155, 158 n.6 (2d Cir. 2012). A "loss-allocating rule" is "one that prohibits, assigns, or limits liability after the tort occurs." *Stiching*, 407 F.3d at 50 (quotation omitted). GTSA's supersession provision "limits liability" to circumstances in which a plaintiff can sustain a claim under GTSA. The conflict between GTSA's supersession rule and New York common law is therefore loss allocating because the supersession rule "pertains to Plaintiff's ability to bring certain claims arising from the tortious conduct." *Document Sec. Sys., Inc. v. Coupons.com, Inc*, 11-cv-6528, 2012 U.S. Dist. LEXIS 117249, at *9 (W.D.N.Y. Aug. 20, 2012) (conflict between California UTSA and New York common law barring certain duplicative actions was loss allocating). As a result, the law of the place of injury applies unless "displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants." *See Neumeier v. Kuehner*, 31 N.Y.2d 121, 128-129 (1972).

---

[19] In addition, as set forth in more detail below (Point III.E at 72), New York and Georgia have different common law unfair competition torts. Therefore, even if the Court determines that GTSA does not apply to Reed's unfair competition claim, there is still a conflict under the common law.

Where the conflict concerns conduct regulating rules and "the defendant's . . . conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." *Frink Am. Inc. v. Champion Rd. Mach. Ltd.*, 48 F. Supp. 2d 198, 205 (N.D.N.Y. 1999) (quotation omitted). "Thus, the place of the occurrence of the tort will be 'where the plaintiff suffered the injury sued upon." *Id.* Therefore, even if the Court finds that the conflict created by GTSA's supersession provision is conduct-regulating, the ultimate question  is where Reed would have suffered its supposed injury. *See, e.g.*, *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1988).

Reed was injured (if at all) in Georgia, where its principal place of business is located and the majority of its employees work, including the personnel who sold subscriptions to MHC's consultants.[20] *See, e.g., Document Sec. Sys.,* 2012 U.S. Dist. LEXIS 117249, at *9 (any injury from trade secret misappropriation would have occurred in plaintiff's home state). Accordingly, the law of Georgia is presumptively applicable to Reed's claims.

Further, applying New York law would not "advance the relevant substantive law purposes without impairing the smooth working of the multistate system." *Neumeier*, 31 N.Y.2d at 128-29.  To the contrary, applying GTSA would advance the public policy of both Georgia and New York.  Georgia has a strong public policy of discouraging misappropriation-based suits unless the information at issue was truly secret, closely guarded and capable of meeting the stringent GTSA requirements. *Diamond Power Int'l*, 540 F. Supp. 2d at 1345.  New York also has an interest in applying Georgia's rule to discourage a Georgia plaintiff such as Reed from "forum shopping . . . to select a forum which could give him a larger recovery than the court of

---

[20] TAC ¶ 2; Ex. 1 (Jordan Tr. 8:22-24, 11:3-12:18).

his own domicile." *Neumeier*, 31 N.Y.2d at 129.  New York has no "legitimate interest in

ignoring the public policy of a foreign jurisdiction" to benefit a plaintiff "domiciled and injured

[in that foreign jurisdiction]." *Id.* at 125-26.  Therefore, the Court should apply Georgia law to

each of Reed's state law claims.

### B. GTSA Is the Only Avenue to Bring a Claim Based on Misappropriation of Information

Each of Reed's common law claims is based in whole or in part on

misappropriation of supposedly proprietary information.  To the extent they are based on

misappropriation, Reed's common law claims fail because Reed has not asserted a GTSA claim.

As Reed has acknowledged, "[t]he GTSA preserves a single tort cause of action . . . for

misappropriation and eliminates other state causes of action founded on allegations of trade

secret misappropriation."  Opp. to Mot. to Am., Dkt. 128, at 7 (quoting *Opteum Fin. Servs., LLC*

*v. Spain*, 406 F. Supp. 2d 1378, 1380 (N.D. Ga. 2005)).  Where a plaintiff's claims allege both

misappropriation of information and other conduct, GTSA bars the portion of the claim based on

misappropriation of information.  *See, e.g.*, *Tronitec, Inc. v. Shealy*, 547 S.E.2d 749, 755 (Ga. Ct.

App. 2001) (affirming dismissal of conversion and theft claims to the extent they were based on

misappropriation of information, even though claims could proceed to the extent they were based

on misappropriation of physical property or misuse of funds), overruled or other grounds by

*Williams Gen. Corp. v. Stone*, 614 S.E.2d 758  (Ga. 2005).

To state a claim under GTSA, a plaintiff must demonstrate that it had

competitively sensitive information that meets the statutory definition of a trade secret,  Ga.

Code Ann. § 10-1-761(4), and that this information was misappropriated by improper means,

Ga. Code Ann. § 10-1-761(1)-(2).  Reed has not asserted a claim under GTSA and could not

prevail on such a claim because "information that has been publicly disclosed, such as through

the sale or disclosure to customers, is not protected by GTSA." *Diamond Power Int'l*, 540 F.

Supp.2d at 1332-33.  Here, the information in Reed Connect was shared openly with the public,

including through free trials.  *See* Statement of Facts at 25-26.

      Regardless of how Reed captions its claims, GTSA bars Reed from pursuing its

misappropriation theory.  GTSA "supersede[s] conflicting tort, restitutionary, and other laws of

th[e] state [of Georgia] providing civil remedies for misappropriation of a trade secret."  Ga.

Code Ann. § 10-1-767(a).  In other words, as the Georgia Supreme Court recently held, GTSA

"preempts claims [that] rely on the same allegations as those underlying the plaintiff's claim for

misappropriation of a trade secret."  *Robbins*, 722 S.E.2d at 58.  As Reed concedes, "this position

has also been the majority view of courts construing similar UTSA [Uniform Trade Secret Act]

preemption provisions nationwide."  Dkt. 128 at 7.

      A plaintiff cannot avoid GTSA preemption by asserting a claim with a separate

legal basis because using a new legal theory "to provide [plaintiff] the same relief based on the

same allegations [that form the basis for a GTSA claim would] . . . undermine[] the exclusivity

of the GTSA."  *Robbins*, 722 S.E.2d at 58.  For example, in *Penalty Kick Management, Ltd. v.

Coca Cola Co.*, plaintiff asserted five separate claims, including breach of a confidential

relationship, unjust enrichment, and bad faith, alleging that defendant wrongfully acquired and

used plaintiff's information.  The Eleventh Circuit held that GTSA preempted plaintiff's claims

even though they were based on "distinct theories of civil remedies" and not "dependent on the

existence of a trade secret."  318 F.3d 1284, 1298 (11th Cir. 2003).

      To avoid GTSA preemption a plaintiff must therefore "***distinguish the proof of

conduct or injury it relies upon for its misappropriation claim from that required for***" its other

claims.  *Diamond Power Int'l*, 540 F. Supp. 2d at 1347 (emphasis added).  In *Diamond Power*,

the plaintiff's former employee accepted employment with a competitor, but falsely told plaintiff

he planned to retire.  The former employee used the time before his supposed retirement to

misappropriate plaintiff's alleged trade secret information, and then used that information to help

his new employer induce customers away from plaintiff.  The Northern District of Georgia found

that GTSA preempted plaintiff's breach of fiduciary duty, tortious interference with contract, and

tortious interference with business relations claims, even though the court found the trade secret

claim to lack merit:

> If a plaintiff could alternatively recover for misappropriation of
> non-proprietary information or misappropriation of unguarded
> proprietary information, the legislative judgment contained in the
> GTSA—that *such information should otherwise flow freely in the
> public domain*—would be subverted.  And it would make little
> sense to go through the rigamarole [sic] of proving information
> was truly a trade secret if a plaintiff could alternatively plead
> claims with less burdensome requirements of proof.

540 F. Supp. 2d at 1345 (emphasis added) (cited with approval in *Robbins*, 722 S.E.2d at 58).

**C.    GTSA Bars Reed's Fraud Claim**

GTSA preempts Reed's fraud claim, Count One, in its entirety because this claim

does no more than set forth Reed's allegations about the "misrepresentations" MHC allegedly

used to access the supposed trade secrets in Reed Connect.  In this claim, Reed alleges that Mr.

Lorenz and Mr. Lewin made misrepresentations to Reed to obtain Reed Connect subscriptions,

and that "[t]he very purpose of Lorenz's and Lewin's subscription agreements with RCD . . . was

to provide Dodge with unauthorized access to Reed Connect and the confidential and trade secret

information contained therein."  *See* TAC ¶ 155.  Reed does not allege that it suffered any other

injury, and in fact seeks the exact same damages through its fraud and common law trade secret

misappropriation claims.  Ex. 146 (Sec. Supp. Interrog. Resps. 14 and 15).  A properly pleaded

claim under GTSA would be based on "the same factual allegations of misappropriation" as

Reed's fraud claim.  *Robbins*, 722 S.E.2d at 58.  Reed's fraud claim is therefore preempted.

      Indeed, courts routinely hold that laws based on the Uniform Trade Secrets Act ("UTSA") preempt fraud claims—like Reed's—that allege a defendant made misrepresentations to obtain trade secrets.  For example, in *On-Line Technologies, Inc. v. Bodenseewerk Perkin-Elmer GmbH*, the plaintiff claimed that the defendant had, among other things, fraudulently obtained its proprietary and patented process through breach of a nondisclosure agreement.  386 F.3d 1133, 1146 (Fed. Cir. 2004).  The Federal Circuit rejected plaintiff's fraud claim, ruling that UTSA preempted the claim that "fraudulent actions allowed [defendant] to misappropriate [plaintiff's] trade secrets" because "the ultimate injury to which the alleged fraud was directed was the misappropriation of [plaintiff]'s trade secrets."  *Id.*; *see also, e.g.*, *Madison Oslin, Inc. v. Interstate Res., Inc.*, 11-cv-01343, 2012 U.S. Dist. LEXIS 142082 at *29 (N.D. Ala. Sept. 30, 2012) (applying *Penalty Kick* and *Diamond Power*, concluding that Alabama's UTSA preempted allegations that defendants used "misrepresentations . . . to persuade Plaintiffs to share their novel idea, trade secrets and/or confidential information with Defendants"); *Convolve, Inc. v. Compaq Computer Corp.*, 00-cv-5141, 2006 U.S. Dist. LEXIS 13848, at *25-27 (S.D.N.Y. Mar. 28, 2006) ("The California UTSA preempts Convolve's claims for . . . fraud . . . since those claims arise from the same nucleus of facts as Convolve's misappropriation of trade secrets cause of action."), *mandamus granted on other grounds*, *In re Seagate Tech.*, *LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc).

    **D.**    **GTSA Bars Reed's Misappropriation of Trade Secrets or Confidential Information Claims**

      In its common law claims for misappropriation of trade secrets (Count Two) and confidential information (Count Three), Reed alleges that MHC misappropriated proprietary information.  GTSA fully supersedes these claims.  *Prof'l Energy Mgmt. v. Necaise*, 684 S.E.2d

374, 377 (Ga. Ct. App. 2009) ("GTSA would be subverted if a plaintiff could state a claim for the misappropriation of proprietary information outside of the GTSA.").

### E.   Reed's Unfair Competition Claim Does Not Exist in Georgia and Would be Partially Preempted if it Did

In its unfair competition claim (Count Four), Reed alleges that MHC: (1) "misappropriate[d] all of the confidential and trade secret information available on Reed Connect," and used that information in a variety of ways; and (2) that McGraw-Hill created marketing materials that falsely compared Dodge and Reed Connect, TAC ¶ 211.  Reed asserts that MHC's supposed unfair competition caused the same damages it seeks through its trade secret misappropriation claim.  *See* Ex. 146 (Sec. Supp. Interrog. Resps. 15 and 16); Ex. 142 (Warren-Boulton Damages Rep. at 26).  This claim is therefore based in part on misappropriation of information and in part on false advertising.

Even without GTSA preemption, Reed's unfair competition claim cannot be sustained because Georgia has never recognized an unfair competition cause of action based on either misappropriation or false advertising.  *See Multiple Listing Serv., Inc. v. Metropo. Multi-List, Inc.*, 116 S.E.2d 356, 358 (Ga. 1969) ("It is the palming off by one of his goods as the goods of another, and ***nothing less*** than conduct tending to pass off one man's goods or business as the goods or business of another, that will constitute unfair competition." (emphasis added)).

Even if that were not the case, Georgia would not now recognize a new cause of action based on misappropriation of information because any such claim would be preempted under GTSA.  *Robbins*, 722 S.E.2d at 58.  And if Georgia were somehow to recognize a new cause of action based on false advertising, Reed's claim would fail for the same reasons as its Lanham Act claim, Point I at 39.  *See Tri-State Consumer Ins. Co. v. LexisNexis Risk Solutions Inc.*, 823 F. Supp. 2d 1306, 1326 (N.D. Ga. 2011).

**F.      Reed's Tortious Interference Claim Is Partially Preempted and Fails to the Extent it is Based on Separate Conduct**

In its tortious interference claim (Count Five), Reed alleges that MHC wrongfully took customers from Reed through the use of false project count comparisons based on information misappropriated from Reed Connect.  TAC ¶ 231.  This claim is therefore based in part on misappropriation of information and in part on false advertising.

The Northern District of Georgia rejected just such a claim in *Diamond Power* holding that, like other claims based on misappropriation of information, GTSA preempts a "tortious-interference-with-business-relations claim, [alleging] that [defendant] used confidential information to improperly induce customers and revenues away from [plaintiff]."  540 F. Supp. 2d at 1347.  Reed's tortious interference claim should meet the same end.

Reed also cannot sustain its tortious interference claim because customers that Reed identified as having made purchasing decisions based on the comparisons testified unequivocally that the comparisons played no role in their decision-making.  *See* Statement of Facts at 27, Procedural History at 35; *see also Meadowcraft, Inc. v. Bland*, 95-cv-2219, 1997 U.S. Dist. LEXIS 22923, at *49-50, *53 (N.D. Ga. Apr. 18, 1997) (requiring proof of lost customers); *see also Lively v. McDaniel*, 522 S.E.2d 711, 713 (Ga. Ct. App. 1999) (same). While Reed may point to documents that MHC personnel generated in an attempt to demonstrate that their efforts were effective, these documents cannot create a genuine issue of material fact as to whether the comparisons actually caused any customer to stop subscribing to Reed given the uniform testimony to the contrary from customers themselves.

Finally, to the extent it is based on false advertising, Reed's tortious interference claim is defective for the same reasons as its Lanham Act claim.  *See* Point I at 39.

**G.    Reed's Unjust Enrichment Claim Is Partially Preempted and Fails to the Extent it is Based on Separate Conduct**

In its unjust enrichment claim (Count Eleven), Reed alleges that "Dodge obtained and used its unauthorized access to RCD's confidential and trade secret information to deceive prospective and existing customers of Dodge and RCD regarding the superiority of the Dodge Network as compared to Reed Connect and to persuade those customers to purchase subscriptions to the Dodge Network rather than Reed Connect."  TAC ¶ 336.  Like Reed's unfair competition and tortious interference claims, this claim is based in part on misappropriation of information and in part on false advertising.

As with Reed's other common law claims, "[a]llowing Plaintiff to bring a claim for unjust enrichment and conversion based on [misappropriation of information] would subvert the purpose of the GTSA."  *PHA Lighting Design, Inc. v. Kosheluk*, 08-cv-01208, 2010 U.S. Dist. Lexis 30752, at *38 (N.D. Ga. Mar. 30, 2010); *see, also, e.g.*, *Penalty Kick Mgmt. Ltd.*, 318 F.3d at 1298 (same).  Accordingly, GTSA preempts the portion of Reed's unjust enrichment claim that is based on alleged misappropriation of information.  Reed's claim for unjust enrichment based on false advertising fails for the same reasons that its Lanham Act claim fails. *See* Point I at 39.

Reed has also failed to establish that McGraw Hill was enriched at Reed's expense.  Reed's demand for disgorgement of MHC's supposedly enhanced profits (its Price Effect Disgorgement theory) fails because, as set forth above, those profits do not represent a benefit MHC received from Reed.  *See* Procedural History at 33-34; *City of Atlanta v. Hotels.com*, 710 S.E.3d 766, 771 (Ga. 2011) (travel agents that collected hotel room taxes from customers in advance and kept them until they were due to city had not received a benefit *from the city*).

## POINT IV
## REED'S CLAIMS WOULD ALSO FAIL UNDER NEW YORK LAW

**A.**    **Reed Cannot Prove Fraud Because it Did Not Suffer Actual Pecuniary Loss as a Direct and Independent Result of Fraud**

In its fraud claim (Count One), Reed alleges that Mr. Lorenz and Mr. Lewin misrepresented that they did not work for Dodge and would not provide Dodge with access to Reed Connect.  TAC ¶ 153.  Reed claims it relied on these representations in deciding to enter into subscription agreements with Mr. Lorenz and Mr. Lewin, and that it suffered damages "in an amount to be proven at trial."  TAC ¶¶ 160, 165.  This claim fails under New York law because (1) Reed did not suffer an "actual pecuniary loss" as a result of the alleged fraud; and (2) Reed's supposed lost profit damages were not the direct and independent result of the alleged fraud.

### 1.    Reed's Alleged Lost Profits Are Not "Actual Pecuniary Loss"

Under New York law, "[t]he true measure of damage [for fraud] is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or what is known as the 'out-of-pocket' rule."  *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996) (quotation omitted).  "Under the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud."  *Id.*  "Pecuniary loss to the deceived party is absolutely essential to the maintenance of the [fraud] action," *Urtz v. N.Y. Cent. & Hudson River R.R. Co.*, 202 N.Y. 170, 173 (1911); *see also Pope v. Saget*, 29 A.D.3d 437, 441, 443 (1st Dep't 2006), and a failure of proof on direct out-of-pocket losses will subject a fraud claim to dismissal, *Warren v. John Wiley & Sons*, No. 12-cv-5070, 2013 U.S. Dist. Lexis 93040, at *30-31 (S.D.N.Y. July 2, 2013) (Oetken, J.).

There is no proof that Reed suffered pecuniary out-of-pocket loss as a direct result of the alleged fraud, and Reed does not seek any such damages.  Indeed, the only damages Reed

seeks are *lost profits* flowing from customer purchasing and pricing decisions allegedly made in reliance on MHC's competitive comparisons.  *See* Ex. 146 (Sec. Supp. Interrog. Resp. 14.)[21] These alleged damages cannot support a fraud claim, because they are not out-of-pocket losses. *Lama Holding Co.*, 88 N.Y.2d at 421; *AFA Protective Sys., Inc. v. Am. Tel. and Tel. Co., Inc.*, 57 N.Y.2d 912, 914 (1982)  ("[T]he rule in [New York]. . . is that all elements of profit are excluded from a computation of damages in an action grounded in fraud.").

>     2.    **Reed's Alleged Damages Are Not the Direct and Independent Result of Any Misrepresentation to Reed**

"[T]he alleged losses stemming from a fraud 'must be the ***direct, immediate, and proximate*** result of the misrepresentation.'  Moreover, the 'damages must [] be ***independent*** of other causes."  *Warren*, 2013 U.S. Dist. Lexis 93040, at *30-31 (quoting *Kregos v. Assoc. Press*, 3 F.3d 656, 665 (2d Cir. 1993)).  In *Warren*, several photographers alleged that a publishing company made fraudulent misrepresentations about past publications and plans for future publication of the photographers' work to obtain copyright license agreements.  2013 U.S. Dist. Lexis 93040, at *25-28.  Defendant had, in fact, already violated plaintiffs' copyright and made future publications in violation of the license agreements.  *Id.*  Plaintiff brought claims for copyright infringement and fraud seeking damages for misuse of the plaintiffs' photographs. The Court dismissed the plaintiffs' fraud claims because "[n]one of [plaintiffs'] complaints specifically allege a pecuniary loss stemming from fraud ***independent from the alleged***

---

[21] In its February 1, 2013 First Supplemental Interrogatory Responses, filed months after the close of fact discovery, Reed attempted to add a new category of fraud damages based on the assertion that it **Redacted** ████████████████████████████████████████████████████████████.  *See* Ex. 145 (First Supp. Interrog. Resp. 14).  Judge Pitman struck these claims because McGraw Hill did not have an opportunity to conduct discovery concerning these supposed damages.  Dkt. 141 at 11.  In any event, these license and seat fees would also constitute impermissible lost profits.

*copyright infringement*." *Id.* at *30-31.[22]

      Reed's supposed lost profits are not the "direct, immediate, and proximate result of the misrepresentation," *id.*, and do not constitute "a distinct harm stemming from the alleged fraudulent conduct," *Warren*, 2013 U.S. Dist. Lexis 93040, at *31. To the contrary, Reed's alleged lost profits have the most remote connection to any misrepresentations Mr. Lorenz or Mr. Lewin allegedly made to Reed. Instead, any lost profits were caused by individual customers' independent decisions about what construction project information service to use and how much to pay for it, as well as Reed's own negotiation strategy with each of those customers. *See* Statement of Facts at 24-30. Even if Reed could establish that MHC's comparisons played some role in customers' decision-making (which it has not), customers' reactions to those comparisons were not based on misrepresentations that Mr. Lorenz or Mr. Lewin made **to Reed**. These misrepresentations therefore were not the cause of Reed's alleged injuries, much less the proximate cause. Indeed, not only were customers' individual decisions the immediate cause of Reed's supposed injury, but as in *Warren*, Reed is seeking to remedy the exact same supposed injury through seven of its nine other claims. Ex. 142 (Warren-Boulton Damages Rpt. at 24-30); Ex. 146 (Sec. Supp. Interrog. Resps. 14-23); *Warren*, 2013 U.S. Dist. Lexis 93040, at *30-31. This it cannot do.

    **B.**     **Reed Cannot Prove Misappropriation of Trade Secrets or Misappropriation of Confidential Information Because Reed Connect Was Not a Trade Secret**

      Reed's claims for misappropriation of trade secret information (Count Two) and misappropriation of confidential information (Count Three) fail under New York law because, as

---

[22] Georgia similarly requires a fraud plaintiff to prove that he "sustained the alleged loss and damage as the proximate result of [the alleged misrepresentations] having been made." *Ekstedt v. Charter Med. Corp.*, 384 S.E.2d 276, 277 (Ga. Ct. App. 1989). Proving that plaintiff's injury would not have occurred "but for" the alleged fraud is not sufficient to meet this requirement. *See, e.g.*, *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, n.12 (11th Cir. 1997). Therefore, Reed's fraud claim also fails under Georgia law for the reasons set forth above in text.

in Georgia, both of these claims require Reed to prove that the information MHC viewed in Reed

Connect was a trade secret.  *See, e.g.*, *Fada Int'l Corp. v. Cheung*, 57 A.D.3d 406 (1st Dep't

2008) (affirming summary judgment on misappropriation of confidential information claim

because "the trade secret protection [did] not attach" to the information in question); *Watts v.*

*Jackson Hewitt Tax Serv.*, 675 F. Supp. 2d 274, 279 (E.D.N.Y. 2009).  Reed cannot meet this

burden for two reasons: (1) the information in Reed Connect was not secret; and (2) a product

like Reed Connect cannot be a trade secret under New York law.

> **1.      The Information in Reed Connect Was Not Secret**

"[T]he most important consideration [in determining whether a trade secret exists]

remains whether the information was secret."  *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298

(2d Cir. 1986) (Friendly, J.); *see also Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993)

("[A] trade secret must first of all be secret").  Information, such as the data on Reed Connect,

that has been distributed to the public cannot be a trade secret.  *Linkco*, 230 F. Supp. 2d at 498

("[T]here can be no trade secret protection, as a matter of law, if the secrecy is necessarily lost

when the design or product is placed on the market."); *see also Eagle Comtronics, Inc. v. Pico,*

*Inc.*, 89 A.D.2d 803 (4th Dep't 1982) (rejecting trade secret claim where plaintiff displayed

purportedly secret materials at trade shows).  That is the case here, meaning that Reed cannot

sustain these claims.

> **2.      The Information in Reed Connect Was Reed's Product**

A trade secret under New York law must be "a process or device for continuous

use in the operation of the business."  *Lehman*, 783 F.2d at 298 (quoting *Eagle Comtronics*, 89

A.D.2d at 803).  Information, like Reed Connect, that is sold as a ***product*** does not meet this

definition.  In *Lehman v. Dow Jones*, the plaintiff's business was to provide clients with

information about the availability and attractiveness of potential acquisition targets.  The Second

Circuit found that this information was not a trade secret under New York law because—unlike

secret information used for "running the business"—"the information at issue here was not used

to run Lehman's business but was its *product*: like the car that rolls off the production line, this

information was what Lehman had to sell."  783 F.2d at 298; *see also Boyle v. Stephens, Inc.*, 97-

cv-1351, 1997 U.S. Dist. LEXIS 12780, at *13-14 (S.D.N.Y. Aug. 25, 1997) (plans for creating

and marketing a new mutual fund were "unquestionably either a new marketing technique or a

new product concept" and "[a]s such . . . cannot be considered a trade secret under New York

law").  Reed Connect is indisputably Reed's product.  Reed's trade secret claim therefore fails

under New York law for this reason as well.

### C.    Reed's Unfair Competition Claim Fails Because Reed Cannot Establish Product Disparagement or Misappropriation of a Proprietary Interest

Reed's unfair competition claim (Count 4) is based on allegations that  (1) MHC

distributed marketing materials that falsely compared the Dodge Network and Reed Connect,

TAC ¶ 211; and (2) to do so, MHC "misappropriate[d] all of the confidential and trade secret

information available on Reed Connect."  TAC ¶ 211.

The New York tort of "unfair competition does not have boundless application as

a remedy for unfair trade practices" and "is not to be equated with the far more amorphous term

'commercial unfairness.'"  *Ruder & Finn, Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 671 (1981).

Unfair competition therefore "is not some amorphous catch-all claim to be appended to any

complaint involving claims that a competitor has injured a business rival."  *Anti-Monopoly, Inc.*

*v. Hasbro, Inc.*, 94-cv-2120, 1995 U.S. Dist. LEXIS 8822, at *21 (S.D.N.Y. June 27 1995).

Instead, unfair competition claims in New York must be based on an established theory.  *LinkCo*,

230 F. Supp. 2d at 503 (listing predicates for unfair competition); *see also* Restatement 3d of

Unfair Competition, § 38 (explaining potential predicates for unfair competition by "appropriation of trade values").

Here the only potentially applicable theories are product disparagement or misappropriation of a proprietary interest.  Reed has failed to establish a claim on either basis.

### 1.     MHC Did Not Commit Tortious Product Disparagement

Because Reed's unfair competition claim is based on harm it claims to have suffered as a result of MHC's supposedly false marketing materials, product disparagement is the unfair competition theory that best fits its allegations.  *See Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 277-78 (S.D.N.Y. 2003)  (harm stemming from the defendant's statements about the plaintiff's product "does not constitute misappropriation . . . and is, instead, more appropriately treated as [a claim] of product disparagement"); *Redeye Grill, L.P. v. Rest. Opportunities Ctr. of N.Y.*, 13 Misc. 3d 1212A (N.Y. Sup. Ct. 2006); *see also Thome v. The Alexander & Louisa Calder Found.*, 70 A.D.3d 88, 105 (1st Dep't 2009) (product disparagement is "an action to recover for words or conduct which tend to disparage or negatively reflect upon the condition, value, or quality of a product or property" (quotation omitted)).  To make out such a claim Reed must show: (1) falsity of the statement; (2) publication to a third person; (3) malice; and (4) special damages.  *See Thome*, 70 A.D at 105.  Reed cannot meet three of these elements: falsity, malice or special damages.

First, Reed cannot demonstrate that the Roper Report or any other comparisons MHC created were false.  *See* Point I at 40.

Second, Reed cannot establish that MHC acted with malice, whether it is defined as reckless disregard for the truth (actual malice) or spite (common law malice).  *See N.Y. Times v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Liberman v. Gelstein*, 80 N.Y.2d 429, 436 (1992).  As

set forth above, there is no evidence that MHC deliberately or recklessly published false information, or acted with spite.  *See* Statement of Facts at 23-24.

Finally, Reed cannot meet the stringent special damages requirement for a disparagement claim as it must here, where Reed alleges that MHC's statements disparaged its goods or services.  *See, e.g.*, *Van-Go Transp. Co. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 98-99 (E.D.N.Y. 1997); *Ruder & Finn*, 52 N.Y.2d at 670-671.  Special damages go to "the cause of action itself and not merely to the recovery,"  *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992), and require proof of "direct financial loss, lost dealings, or an accounting of the profits resulting from the anticompetitive acts at issue."  *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 446-447 (E.D.N.Y. 2011).

Where special damages are based on lost customers, those customers must be named.  *Payrolls & Tabulating, Inc. v. Sperry Rand Corp.*, 22 A.D.2d 595, 598  (2d Dep't 1965).  Reed's expert's theoretical model of "Price Effect Lost Profits"—that a regression model based on price indices suggests that Reed's price was depressed because of MHC's marketing—is insufficient to prove special damages because this model does not demonstrate that any particular customer paid less for Reed because of the comparisons.  Similarly, the customers Reed identified as having made decisions based on comparisons uniformly testified that they left Reed for reasons that have nothing to do with any supposedly false statements by MHC.  *See* Statement of Facts at 27; Procedural History at 35.

Because Reed cannot establish falsity, malice, or special damages, it cannot prevail on a claim of unfair competition by product disparagement.

      **2.**     **Unfair Competition by Misappropriation Fails Because Reed Did Not Have a Property Interest in Project Counts.**

Unfair competition by misappropriation is limited to "the allegation of facts that, if true, would constitute misuse of plaintiffs' ***property***." *Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 302 n.8 (2d Cir. 2006) (emphasis added); *Delville v. Firmenich Inc.*, 08-cv-10891, 2013 U.S. Dist. LEXIS 17461, at *61-62 (S.D.N.Y. Jan. 31, 2013) (Oetken, J.) (quoting *Dow Jones*).  Although New York recognizes a limited property interest in non-secret information that plaintiff develops through its labor and investment, "[w]hen the appropriation by the defendant does not interfere with the plaintiff's exploitation of the asset in its primary market, appeals to the [doctrine of unfair competition] are regularly rejected absent a violation of other protected interests."  Restatement 3d of Unfair Competition § 38.  As the Second Circuit has explained, a claim for misappropriation of that property interest is limited to situations where "defendant's use of the information constitutes free-riding on the plaintiff's efforts," *NBA*, 105 F.3d at 845, that threatens to "destroy the incentive" for plaintiff to develop the information, *id.* at 853.

Therefore, to prevail on a misappropriation claim under New York law a plaintiff must generally show ***both*** that it has a property interest in information ***and*** that the defendant impaired that property interest through "taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property . . ."  *Roy Exp. Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982).

A business does not "misappropriate" the labor or investment of a competitor by simply promoting its own product.  *Gucci*, 277 F. Supp. 2d at 277.  Nor is it sufficient to show that a defendant used plaintiff's information in a way that was collateral to plaintiff's primary business.  For example, in *NBA*, the NBA asserted an unfair competition claim based on

defendant's publication of NBA basketball scores.  105 F.3d at 853-54.  At the time, the NBA

itself was not in the score dissemination business, and those numbers were therefore collateral to

the NBA's "primary business" of putting on basketball games and transmitting broadcasts.  *Id.*;

*see also  Nat'l Football League v. Governor of Del.*, 435 F. Supp. 1372 (D. Del. 1977).  Because

defendant's use of the NBA's basketball scores did not constitute an alternative to watching a

basketball game, or allow defendant to create a directly competing product at a low cost, the

NBA's misappropriation claim failed.  *NBA*, 105 F.3d at 853.

Reed's business is selling project information.  Even if Reed could assert a

property interest in the publicly available project information in Reed Connect, there is simply

no evidence that MHC ever misappropriated the underlying data stored in Connect.  *See*

Statement of Facts at 14-15.  Nor is there evidence that MHC copied Reed's computer code,

search algorithms, or user interface.  *Id.*  The only thing MHC used from Reed Connect was

project counts, which MHC compiled itself.  Reed has no property interest in these project

*counts* because Reed invested no time or effort in creating them, and it did not monetize project

totals by selling them to customers.  Moreover, counts of the numbers of projects in its database

are merely collateral to Reed's primary business.  McGraw Hill is unaware of any decision

allowing an unfair competition by misappropriation claim under New York law based on

allegations like Reed's that a defendant viewed its competitor's product and published

information about it.  Because Reed has not demonstrated that MHC sold Reed's property as its

own, its unfair competition claim fails on this theory as well.  *See H.L. Hayden Co. v. Siemens*

*Med. Sys, Inc.*, 879 F.2d 1005, 1025 (2d Cir. 1989) (rejecting a "novel and interesting" theory of

unfair competition because it was not "grounded in any New York case . . . at all close on its

facts").

**D.    Tortious Interference with Prospective Economic Advantage Fails Because Reed Did Not Lose Business Prospects Based on Tortious Conduct**

In its tortious interference claim, (Count Five), Reed alleged that 221 (now 23) customers selected Dodge over Reed Connect on the basis of misleading project counts.  TAC ¶ 231.  Under New York law, to prove tortious interference with prospective economic advantage "four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."  *Catskill Dev., LLC v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).  McGraw Hill is entitled to summary judgment on Reed's tortious interference claim because Reed cannot establish that any customers chose Dodge over Reed Connect as a result of tortious conduct by MHC and Reed therefore cannot establish either the third or fourth element of tortious interference.

"[A]s a general rule, the defendant's conduct [that forms the basis for a tortious interference claim] must amount to a crime or an independent tort."  *See, e.g.*, *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004).  Moreover, "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."  *Id.* at 192.  A plaintiff must demonstrate "both wrongful means and that the wrongful acts were the proximate cause of the rejection of the plaintiff's proposed contractual relations."  *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171 (2d Cir. 2004) (quotation omitted).  To prevail on its tortious interference claim, Reed would therefore need to show that MHC's competitive comparisons—its only conduct with a possible proximate connection to customers— were misleading.  It cannot meet this burden for the reasons set forth above.  *See* Point I at 39.

Further, to prevail on its tortious interference claim, Reed would have to prove that it "had business relations with a third party." *Catskill Dev.*, 547 F.3d at 132. A "[p]laintiff's failure to offer any evidence of the existence of a ***specific, identifiable prospective business relationship*** that has been impaired by the defendants' conduct warrants dismissal of their claims." *Util. Metal Research, Inc. v. Coleman*, 03-cv-1463, 2008 U.S. Dist. LEXIS 25095, at *25 (E.D.N.Y. Mar. 28, 2008) (emphasis added); *see also, e.g.*, *Nat'l Westminster Bank v. Ross*, 130 B.R. 656, 678 (S.D.N.Y. 1991); *Ciccolo v. Chicago Research & Trading Grp*, 161 A.D.2d 364 (1st Dep't 1990). Indeed, a tortious interference claim cannot even survive a motion to dismiss unless plaintiff can "allege any particular business relationship with a third party or any Defendant that interfered with those relationships." *Emamian v. Rockefeller Univ.*, 07-cv-3919, 2008 U.S. Dist. LEXIS 79019, at *20 (S.D.N.Y. Sept. 25, 2008); *see also, e.g.*, *Envirosource, Inc. v. Horsehead Res. Dev. Co.*, 95-cv-5106, 1996 U.S. Dist. LEXIS 9099, at *38 (S.D.N.Y. July 1, 1996); *Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 252-53 (S.D.N.Y. 2009). As set forth above, customers chose the Dodge Network over Reed Connect for their own reasons, wholly unrelated to any MHC marketing materials at issue in this action. *See* Statement of Facts at 24-30. This was the unrefuted testimony offered by every customer who testified in this case. *See* Procedural History at 35. In the face of this evidence, Reed cannot show a genuine issue of fact that customers left Reed because of misleading messages in any of MHC's marketing materials.

### E. Unjust Enrichment Fails Because McGraw Hill Did Not Receive Anything of Value at Reed's Expense

Reed's unjust enrichment claim (Count Eleven) fails under New York law because MHC did not receive anything of value at Reed's expense.

"An unjust enrichment claim rests upon the equitable principle that a person shall

not be allowed to enrich himself unjustly at the expense of another." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 141 (2009) (quotation omitted).  Therefore, "[f]or a plaintiff to prevail on a claim of unjust enrichment, he must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Gate Techs., LLC v. Delphix Capital Mkts., LLC*, 12-cv-7075, 2013 U.S. Dist. LEXIS 95368, at *14-17 (S.D.N.Y. July 9, 2013) (Oetken, J.) (quoting *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 519 (2d Cir. 2001)).

Reed cannot proceed on its Price Effect Disgorgement theory because it concedes that the supposedly enhanced profits MHC earned would not otherwise have gone to Reed.  "The general rule is that [a] plaintiff [seeking recovery for unjust enrichment] ***must have suffered a loss*** and an action not based upon loss is not restitutionary." *Edelman v. Starwood Capital Grp.*, 70 A.D.3d 246, 250 (1st Dep't 2009) (alteration in original) (quoting *State of N.Y. v. Barclays Bank of N.Y.*, 76 N.Y.2d 533, 540 (1990)).  Therefore, a defendant's profits from sales to third parties do not constitute "unjust enrichment" unless the plaintiff would have made the sales itself in the absence of the alleged misconduct.  For example, in *Edelman*, plaintiffs sought disgorgement of profits the defendant earned from alleged misuse of information plaintiffs developed.  70 A.D. at 250.  The Appellate Division rejected plaintiffs' unjust enrichment claim because plaintiff could not have earned the profits itself.  *Id.*  Therefore "the alleged benefit to defendants of using the proprietary information and plan did not come at plaintiffs' expense, and plaintiffs did not suffer any loss in connection with that use for which restitution is an appropriate remedy." *Id.*; *see also IDT Corp.*, 12 N.Y.3d at 141.  MHC's profits from its supposedly enhanced prices do not constitute unjust enrichment at Reed's expense.  *See Barr*

*Lab. v. Quantum Pharmics, Inc.*, 827 F. Supp. 111, 119 (E.D.N.Y. 1993).

Nor can Reed show that MHC made sales that otherwise would have gone to

Reed.  Testimony from the customers Reed named proves conclusively that those customers did

not make purchasing decisions based on any of the alleged competitive comparisons.  *See*

Procedural History at 35.

## POINT V
## PORTIONS OF EACH OF REED'S STATE-LAW AND ANTITRUST CLAIMS ALSO ARE BARRED ON STATUTE-OF-LIMITATIONS GROUNDS

Reed has known about the facts giving rise to this lawsuit for almost a decade.

*See* Ex. 50 (RCD02272438); Statement of Facts at 11.  Indeed, Reed knew about the Roper

Report—the document at the heart of this litigation— **Redacted**          , but did not file this

lawsuit until October 2009.  *See* Ex. 46 (RCD01659908-09; RCD03061689).

**A.     Reed's State Law Claims Must Meet the Statutes of Limitations of Both Georgia and New York**

A federal court considering state law claims under supplemental jurisdiction or

diversity jurisdiction applies the choice of law principles of the state in which the court sits.

*Synergetics USA, Inc. v. Alcon Labs., Inc.*, 08-cv-3669, 2009 U.S. Dist. LEXIS 58899, at *5

(S.D.N.Y. Jul. 9, 2009) (supplemental jurisdiction); *Cantor Fitzgerald v. Lutnick*, 313 F.3d 704,

710 (2d Cir. 2002) (diversity jurisdiction).  New York's Borrowing Statute, N.Y. C.P.L.R.

Section 202, governs New York's choice-of-law rules for statute of limitations purposes.

Pursuant to Section 202, "a case filed by a non-resident plaintiff requires application of the

shorter statute of limitations period, as well as all applicable tolling provisions, provided by

either New York or the state where the cause of action accrued."  *Cantor Fitzgerald*, 313 F.3d at

710.  The choice of law analysis for application of statutes of limitations is independent of the

substantive choice of law analysis discussed above in Point III at 65.

"[A] cause of action accrues at the time and in the place of the injury." *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999). Here, Reed would have suffered any injury in Georgia, where its principal place of business is located, *see* TAC ¶ 2, and Reed's claims accrued in Georgia. Therefore, the shorter limitations period from either New York or Georgia applies to Reed's state-law claims.

**B.     Four-Year Statutes of Limitations Apply to Reed's Fraud and Antitrust Claims**

Georgia's four-year limitations period governs Reed's fraud claim (Count One). *See, e.g.*, *Cochran Mill Assocs. v. Stephens*, 648 S.E.2d 764, 765 (Ga. Ct. App. 2007) (citing Ga. Code Ann. § 9-3-31). Likewise, "[t]he statute of limitations governing private damage actions under the federal antitrust laws is four years." *See Kearse v. Kaplan, Inc.*, 692 F. Supp. 2d 398, 400 n.1 (S.D.N.Y. 2010) (citing 15 U.S.C. § 15b).

**C.     Three-Year Statutes of Limitations Apply to Reed's Tortious Interference, Misappropriation, and Unjust Enrichment Claims**

New York's three-year limitations period governs Reed's claims for: (1) tortious interference with prospective economic advantage (Count Five), *see Gun Hill Road Serv. Station v. ExxonMobil Oil Corp.*, 08-cv-7956, 2013 U.S. Dist. LEXIS 14199, at *52 (S.D.N.Y. Feb. 1, 2013) (citing N.Y. C.P.L.R. § 214(4)), (2) misappropriation of trade secrets (Count Two), *see Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 04-cv-3531, 2009 U.S. Dist. LEXIS 130133, at *60 (S.D.N.Y. Aug. 5, 2009) (citing N.Y. C.P.L.R. § 214(4)), and (3) misappropriation of confidential information (Count Three).[23]

New York's three-year limitations period also applies to Reed's unjust enrichment

---

[23]Reed's claim for misappropriation of confidential information is duplicative of its claim for misappropriation of trade secrets. *See* Point IV.B at 77-78. Accordingly, the same statute-of-limitations analysis should apply to both causes of action.

claim (Count Eleven) because Reed seeks monetary damages with respect to this claim.  *See Time Warner, Inc. v. Kao-Sung Liu*, 11-cv-2870, 2013 U.S. Dist. LEXIS 56816, at *44 (S.D.N.Y. Apr. 19, 2013) ("The statute of limitations for unjust enrichment is . . . three years where the plaintiff claims monetary relief." (citations omitted)).

### D.      Unfair Competition Has a One-Year Statute of Limitations

To determine the limitations period applicable to unfair-competition, courts "analogize the facts underlying the unfair competition claim to an appropriate cause of action and . . . use the corresponding statute of limitations."  *Ediciones Quiroga, S.L. v. Fall River Music, Inc.*, 93-cv-3914, 1995 U.S. Dist. LEXIS 2641, at *26 (S.D.N.Y. Mar. 7, 1995).

The crux of Reed's unfair-competition claim is that MHC used the Roper Report and other allegedly misleading marketing pieces to influence customers' purchasing decisions.  *See* TAC ¶¶ 211-213.  Because Reed principally complains that MHC's marketing "denigrat[ed] the quality of [its] goods or services," *Ruder & Finn*, 52 N.Y.2d at 670, the one-year limitations period applicable to product disparagement claims should govern Reed's unfair-competition claim.  *See, e.g.*, *Gen. Sec., Inc. v. APX Alarm Sec. Solutions, Inc.*, 647 F. Supp. 2d 207, 218 (N.D.N.Y. 2009) (citing N.Y.C.P.L.R. § 215(3)).

### E.      Reed's Claims Accrued—at the Latest—at the Time of Injury

Each of Reed's causes of action accrued—at the latest—when Reed was injured.  *See, e.g.*, *Green v. White*, 494 S.E.2d 681, 685 (Ga. Ct. App. 1997) ("[U]ntil [fraud] damages are sustained, the cause of action is not complete and the prescriptive period cannot run."); *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 520 (2d Cir. 2001) (unjust enrichment accrues "upon the occurrence of the wrongful act giving rise to a duty of restitution."); *Atl. Int'l Movers, LLC v. Ocean World Lines, Inc.*, 914 F. Supp. 2d 267, 279 (E.D.N.Y. 2012) (tortious interference

accrues at the time of injury); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) ("Generally, a[n antitrust] cause of action [under the Sherman Act] accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."); *Flight Sci., Inc. v. Cathay Pac. Airways Ltd.*, 647 F. Supp. 2d 285, 288 (S.D.N.Y. 2009) ("If a defendant misappropriates and discloses a trade secret, he becomes liable to plaintiff upon disclosure.") (quotation omitted); *Gen. Sec.*, 647 F. Supp. 2d at 218 (product disparagement claims accrue when statements are made). For the purposes of this motion only, MHC uses the date of injury—the date that allows the greatest portions of Reed's claims to be timely—as the accrual date for each of these causes of action.

### F. Portions of Reed's State Law and Antitrust Claims Are Barred Because Reed Has Long Known the Basis for These Claims

As discussed in the Statement of Facts at 11-12, Reed has known of the Roper Reports and MHC's access since at least 2004. Indeed, Reed specifically considered legal action on a number of occasions. Yet Reed did not file this action—in which it seeks damages going back all the way to the beginning of 2004—until October 8, 2009.

The statute of limitations has run on: (1) Reed's claims for fraud (Count One) and antitrust (Counts Nine and Ten) to the extent they are based on injury that occurred prior to October 8, 2005 (four years prior to the filing of the complaint); (2) Reed's claims for tortious interference (Count Five), misappropriation of trade secrets (Count Two), misappropriation of confidential information (Count Three), and unjust enrichment (Count Eleven) to the extent they are based on injury that occurred prior to October 8, 2006 (three years prior to the filing of the complaint); and (3) Reed's claim for unfair competition (Count Four) to the extent it is based on injury that occurred prior to October 8, 2008 (one year prior to the filing of the complaint).

### G. The Doctrine of Fraudulent Concealment Does Not Save Reed's Untimely Claims

Apparently recognizing that its long-time knowledge of the Roper Report and MHC's access to Reed Connect precludes it from bringing these long-stale claims, Reed alleged in its Complaint that MHC's "wrongful concealment of . . . material facts prevented" Reed from asserting its claims. *See, e.g.*, TAC ¶¶ 162, 185, 201. Now that the parties have completed discovery, it is clear that Reed's allegations of "wrongful concealment" cannot resuscitate its time-barred claims.

Fraudulent concealment "will stay the running of the statute of limitations only so long as the plaintiff has exercised reasonable care and diligence seeking to learn facts which would disclose fraud." *Coleman & Co. Secs., Inc. v. Giaquinto Fam. Trust*, 236 F.Supp.2d 288, 299 (S.D.N.Y. 2002); *see also Kytel Int'l Grp. v. Total Tel-Carrier Servs., Inc.*, 47 A.D.3d 448, 451 (1st Dep't 2008) (fraudulent concealment requires plaintiffs to exercise "due diligence to discover the facts"). But fraudulent concealment is unavailing if a plaintiff does not "remain in ignorance of [his] cause of action" within the applicable statutory period. *See New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1083 (2d Cir. 1988); *see also Schandler v. New York Life Ins. Co.*, 2011 U.S. Dist. LEXIS 46322, at *15 n.3 (S.D.N.Y. Apr. 26, 2011). In addition, "tolling ceases to work to a plaintiff's benefit when the plaintiff possesses sufficient facts that he must engage in some inquiry, and he fails to live up to that obligation." *See Walker v. Lorch*, 12-cv-9282, 2013 U.S. Dist. LEXIS 93764, at *14 (S.D.N.Y. July 12, 2013).

In its response to McGraw Hill's Pre-Motion Letter, Reed reiterated its claim that the limitations periods should be tolled because MHC allegedly attempted to conceal its conduct. Ex. 131 (Pre-Motion Letter) at 2-3. In that letter, Reed pointed to three events: (1) a December 2006 conversation between a Reed employee and Mr. Lewin, in which Mr. Lewin allegedly

convinced the Reed employee that he was not working for MHC; (2) a 2007 conversation between the parties' lawyers in which MHC's in-house counsel allegedly assured Reed's counsel that MHC would not access Reed Connect *in the future*; and (3) a July 28, 2008 letter in which Roper promised not to access Reed Connect *in the future*.  Pre-Motion Letter at 3.

As an initial matter, these events, beginning in December 2006, are irrelevant to the statute of limitations analysis for all of Reed's claims except its unfair competition claim. All of the other claims are barred to the extent they are based on events prior to October 2005 (fraud and antitrust) or October 2006 (misappropriation, tortious interference and unjust enrichment).  Events after those dates, such as those identified in Reed's Pre-Motion Letter, cannot erase Reed's prior knowledge that it had a cause of action based on MHC's distribution of competitive comparisons possible only through access to Reed Connect.

For this reason, the incidents discussed in Reed's Pre-Motion Letter are relevant (if at all) only to Reed's unfair competition claim because of its one-year statute of limitations. But this claim is barred as well to the extent it is based on injuries that occurred prior to October 2008 because Reed was aware throughout the preceding period that MHC was continuing to distribute competitive comparisons.  *Id.*  The incidents Reed points to in its Pre-Motion Letter cannot change this basic fact.

The December 2006 phone conversation with Mr. Lewin is irrelevant because, whether or not Reed knew that Mr. Lewin was working for MHC, there is no dispute that Reed knew that MHC was distributing marketing materials containing comparisons created via access to Reed Connect.  *See* Statement of Facts at 11-12.  For example, on July 2, 2008, **Redacted**

**Redacted**" Ex. 49 (DX 222).  Similarly, **Redacted**

**Redacted**

**Redacted** " *See* Ex. 44 (RCD00637814).

Reed's reliance on the 2007 conversation between the parties' respective in-house counsel is even less availing.  Reed's counsel acknowledged during the 2007 call that Reed knew about MHC's access to Reed Connect, but preferred to let bygones be bygones and focus on the parties' conduct going forward.  See Statement of Facts at 14.  Then, **Redacted**

**Redacted**

**Redacted**. Ex. 70 (DX 221); Ex. 71 (RCD00569579).  So there is no dispute that Reed knew about MHC's continuing alleged misconduct before, during and after the 2007 call.  Moreover, any later statement about how MHC would act *in the future* is irrelevant to Reed's prior knowledge about the existence of any legal claims.  As such, this conversation provides no basis whatsoever to toll the statute of limitations.

As for Roper's July 2008 letter, that letter relates solely to Roper's conduct—not MHC's—and says nothing about Roper's prior activities.  Ex. 70 (DX 221).  This letter therefore cannot have concealed from Reed the fact that it had a cause of action based on MHC's production or distribution of comparisons.  In any event, Reed was aware after it received Roper's letter that MHC was continuing to distribute competitive comparisons.  **Redacted**

**Redacted**

Ex. 71 (RCD00569579)**Redacted**

**Redacted**

**Redacted** Ex. 26 (RCD00363539, RCD00363540).

In sum, Reed has no excuse for waiting nearly a decade to bring this lawsuit. Reed had extensive knowledge about MHC's use of competitive comparisons and concomitant access to Reed Connect.  The fraudulent concealment doctrine provides no basis for tolling the applicable statutes of limitation, and Reed's claims, even if they survive summary judgment, are therefore barred to the extent described above.

**POINT VI**
**REED'S CLAIMS AGAINST JOHN DOE DEFENDANTS**
**SHOULD BE DISMISSED**

Reed's claims against John Does 1-5 and John Doe Entities 1-5 (the "John Doe Defendants") should be dismissed.  In February 2011, Reed represented in its Motion for Leave to Amend its First Amended Complaint that it "intended to name [the John Doe Defendants] after conducting additional discovery."  Dkt. 44 at 1.  In the years since then, Reed has failed to name, identify, or serve any of the John Doe Defendants.  *See Mesa v. City of New York*, 09-cv-10464, 2013 U.S. Dist. LEXIS 1097, at *23-24 (S.D.N.Y. Jan. 3, 2013) (Oetken, J.) (dismissing John Doe defendants at the summary judgment stage because plaintiffs had failed to name and serve them in the over two years since they were added to the complaint); *Sachs v. Cantwell*, 10-cv-1663, 2012 U.S. Dist. LEXIS 125335, at *32 (S.D.N.Y. Sept. 4, 2012) (Oetken, J.) (same).

## CONCLUSION

For the reasons set forth above, the Court should grant McGraw Hill's motion and dismiss Reed's complaint in its entirety.

Dated:      New York, New York
            September 6,  2013

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By:     _____

Saul B. Shapiro, Esq.
Joshua A. Goldberg, Esq.
Michelle W. Cohen, Esq.
*Attorneys for Defendant McGraw Hill Financial, Inc.*
1133 Avenue of the Americas
New York, New York  10036
Tel:  (212) 336-2000

6400152v.1

95