UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
REED CONSTRUCTION DATA INC.,       :    Case No. 09-cv-8578 (JPO)
                           :
         Plaintiff,          :
                           :
     v.                   :
                           :
THE MCGRAW-HILL COMPANIES, INC.;  :    **REDACTED**
JOHN DOES One through Five; and    :
JOHN DOE ENTITIES One through Five, :
                           :
         Defendants.      :
-----------------------------------------------------------X

### REED CONSTRUCTION DATA'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MCGRAW HILL FINANCIAL'S MOTION FOR SUMMARY JUDGMENT

TROUTMAN SANDERS LLP

Aurora Cassirer
Matthew J. Aaronson
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Tel: (212) 704-6000
aurora.cassirer@troutmansanders.com
matthew.aaronson@troutmansanders.com

William N. Withrow, Jr.
James A. Lamberth
Kevin G. Meeks
(Admitted *pro hac vice*)
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
Tel: (404) 885-3000
william.withrow@troutmansanders.com
james.lamberth@troutmansanders.com
kevin.meeks@troutmansanders.com

*Attorneys for Plaintiff Reed Construction Data Inc.*

21402408

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT................................................................................1

STATEMENT OF FACTS...................................................................................2

    I.      Introductory Overview ...........................................................................2

    II.     The Parties and Their Businesses .........................................................7

    III.    MHC Used Consultants To Purchase Connect Surreptitiously......................9

    IV.   MHC Could Not Win on Price, Technology, or Service.............................11

        A.     Connect Offered Superior Functionality, Ease-of-Use,
              and Speed..................................................................................11

        B.     Customers Criticized the Quality and Timeliness of
              Network's Coverage....................................................................13

        C.     McGraw-Hill Chose Not To Invest in Network
              Improvements.............................................................................15

    V.     MHC Manufactured False Comparisons To Win and Maintain
        Premium Pricing..................................................................................16

        A.     The (Not Really) "Roper Reports"................................................17

             1.    The Roper Comparisons Were Not Independent,
                    and Roper Did Nothing to Ensure That "█████████
                    █████████" Were Used...................................................18

             2.    Flawed Methodology Generated Inaccurate Results,
                    and MHC Knew It...........................................................21

        B.     The "Executive Brief"................................................................26

        C.     "*Ad Hoc*" Comparisons.............................................................27

        D.     Purported "Exclusives".............................................................29

        E.     Individual State and Local Comparisons.....................................30

        F.     The "5:1/3:1" Ratios.................................................................31

        G.     Functionality Comparisons........................................................34

VI.     MHC Misappropriated Data To Improve Editorial and Compete
        Unfairly...................................................................................34

VII.    MHC Used Its Illegal Access To Develop and Later Enhance
        Network..................................................................................36

VIII.   MHC's Illegal Access and False Comparisons Materially Affected
        Consumers................................................................................37

IX.     Consumers Made Purchasing and Pricing Decisions Based on False
        Comparisons.............................................................................40

ARGUMENT AND CITATION OF AUTHORITIES.............................................44

POINT I   McGraw-Hill Violated the Lanham Act by Making False and
          Misleading Statements to Customers about the Superiority of
          Its Data..................................................................................44

     A.     MHC Repeatedly Made Statements That Are Literally False............45

          1.     MHC Falsely Represented that Roper Reports Were
                 Created by an Independent Firm That "�altr" and "▐▐▐▐▐" for the Analysis.............46

          2.     MHC Falsely Represented That the Roper Reports
                 Accurately Reflected the Relative Number of
                 "Comparable" Projects Available in Network and
                 Connect...................................................................47

               a.     MHC Created Comparisons Using Its ▐▐▐▐
                      ▐▐▐▐ and Advertised Those Comparisons as
                      Valid for Network...........................................48

               b.     The Roper Reports Did Not Make a "▐▐▐▐▐"
                      Analysis of ▐▐▐ Projects Because MHC Did Not
                      Have Access to All of RCD's ▐▐▐ Project Data......48

               c.     MHC Double-Counted Projects that Appeared in
                      Multiple Stages or Reports in the Databases............48

               d.     MHC Failed to Count "ASAP" Projects in RCD's
                      Database While Counting Them in MHC's.............49

               e.     MHC Manipulated Its Data Searches to Ensure
                      Biased Results...............................................49

3.     MHC's Used the "Executive Brief" to Show Customers
       Roper Comparison Data that MHC Knew Were Invalid.........50

4.     MHC's "*Ad Hoc*" and State/Local Comparisons
       Incorporated the Same Flawed Methodology as the
       Roper Reports.................................................................50

5.     MHC Misrepresented Projects as "Exclusives" When
       They Were Not.................................................................50

6.     MHC Falsely Represented That It Had "5:1" and "3:1"
       Advantages over RCD and Other Competitors.....................51

B.   McGraw-Hill's Claims of Superiority Misled and Confused
     Consumers..........................................................................51

C.   McGraw-Hill's False and Misleading Statements Were
     Material to Consumers' Purchasing Decisions...........................54

D.   RCD Is Entitled To Recover Damages Including Disgorgement
     of MHC's Profits..................................................................55

POINT II   RCD'S Antitrust Claims Are Not Subject to Summary Adjudication
           Because MHC's Anticompetitive Conduct Harmed Competition............58

A.   MHC's Systematic Anticompetitive Conduct Caused Significant
     Harm to Competition.............................................................59

B.   Given the Structure of the Relevant Market and the Nature of
     MHC's Systematic Campaign of Deception, the *De Minimis*
     Test is Inapplicable Here.......................................................63

C.   RCD Has Established a Genuine Issue of Material Fact as to Each
     of the Necessary Elements of the *De Minimis* Test for
     Disparagement.....................................................................65

     1.     The Second Circuit Has Not Held That All Six Factors Are
            Mandatory.................................................................65

     2.     RCD Meets All of the Elements of the *De Minimis* Test..........68

            a.     MHC Distributed Clearly False Information About
                   RCD..................................................................68

            b.     The Falsehoods MHC Distributed Were Material.........70

-iii-

c.     Customers Reasonably Relied Upon MHC's Falsehoods............................................................72

d.     Because Customers Lacked Expertise in Complex Data and Statistical Analysis, They Were Unable to Discern the Falsity of MHC's Claims....................73

e.     MHC's Competitive Statements Were Impossible to Neutralize.....................................................75

POINT III RCD'S State Law Claims Are Not Subject to Summary Judgment Under New York Law.....................................................................77

A.     New York Law Applies to RCD's State Law Claims.......................77

    1.     MHC Waived the Right to Raise Choice of Law....................77

    2.     New York Law Applies Because It Is the Locus of the Misconduct....................................................................78

B.     A Genuine Issue of Material Fact Exists as to Whether MHC Misappropriated Trade Secrets and Confidential Information..............81

    1.     MHC Is Judicially Estopped From Arguing That RCD's Data Is Not a Trade Secret..............................................81

    2.     The Evidence Establishes the Existence of RCD's Protected Trade Secrets................................................82

        a.     RCD's Trade Secrets Were More Than Just Connect...........................................................82

        b.     RCD's Trade Secrets Did Not Lose Protection When Connect Was Sold......................................83

        c.     RCD's Trade Secrets Were Secret...........................84

C.     RCD Has Established a Genuine Issue of Material Fact as to Whether MHC's Misconduct Constituted Unfair Competition............85

D.     RCD Has Identified Specific Customers That Selected Network Over Connect Based on MHC's Tortious Interference....................87

E.     MHC Was Unjustly Enriched by Its Use of RCD's Product and Services...............................................................................88

-iv-

F.    MHC's Fraud Directly and Independently Caused RCD
      Pecuniary Loss.................................................................88

POINT IV RCD'S State Law Claims Are Not Subject to Summary Judgment
      Under Georgia Law...........................................................89

A.    RCD's Misappropriation Claims Are Viable Under the Georgia
      Trade Secrets Act..............................................................89

      1.    RCD's Trade Secrets Derive Value from their Secrecy............90

      2.    RCD's Trade Secrets Are the Subject of Reasonable
            Efforts to Maintain Secrecy.........................................90

B.    RCD's Fraud and Unjust Enrichment Claims Are Not Preempted
      by the GTSA....................................................................91

POINT V McGraw-Hill's Statute of Limitations Defenses Raise Questions of
      Fact and Ultimately Fail Due to Fraudulent Concealment.....................91

A.    McGraw-Hill's Fraudulent Concealment Bars Its Statute of
      Limitations Defenses..........................................................92

      1.    What RCD Knew – And What It Didn't.............................92

      2.    Fraudulent Concealment Tolls Any Applicable Statute of
            Limitations...........................................................93

      3.    RCD Has Presented Facts Satisfying the Requirements for
            Fraudulent Concealment Under Any Potentially Applicable
            Tolling Doctrine.....................................................95

B.    New York's Borrowing Statute Determines the Limitations Period
      Governing Each of RCD's State Law Claims................................97

C.    The Numerous Dates Marking the Accrual of Each of RCD's Claims
      Raise Questions of Fact Precluding Summary Judgment..................98

POINT VI RCD Does Not Object to the Dismissal of the John Doe Defendants.........99

CONCLUSION.................................................................................99

## PRELIMINARY STATEMENT

This case involves a lengthy and far-reaching industrial espionage campaign waged by an entrenched monopolist to counter a threat from its only national competitor.  Faced with the prospect of declining prices and profit margins when Reed Construction Data ("RCD") launched its new online construction project information ("CPI") service "Connect," McGraw-Hill – through its McGraw-Hill Construction division ("MHC") – embarked on a stealth mission to access Connect and use that information to maintain its dominant position in the national market for CPI services.  Through an intricate system of surreptitious and illegal conduct, MHC purchased a Connect subscription and then used the information it obtained from Connect to gain an advantage in negotiations with consumers.  Knowing that competition from RCD threatened MHC's ability to charge premium prices, MHC used its access to Connect to create false comparisons between Connect and MHC's own Network service so it could persuade consumers to purchase Network at substantially higher prices than MHC otherwise could have charged.  The record shows that MHC operatives rigged the comparisons to exaggerate Network's advantages over Connect and, desperate to lend credibility to these bogus comparisons, falsely told consumers that they were created by an independent, third-party auditor.  As a result of this anticompetitive conduct, MHC was able to maintain its monopoly position in the national market for CPI services and charge supracompetitive prices for years, while RCD both lost customers and had to lower its own prices to remain competitive.

MHC's years-long campaign of false and misleading statements about the superiority of its data constituted false advertising in violation of Section 43(a) of the Lanham Act.  The record demonstrates that MHC intentionally and repeatedly made literally false and misleading representations to consumers that were material to their purchasing decisions.  MHC's

comprehensive scheme to mislead the market to maintain its premium pricing structure and to eliminate its only national competitor also constitutes monopolization and/or attempted monopolization in violation of Section 2 of the Sherman Act.  At this stage in the litigation, McGraw-Hill's sole challenge to RCD's Section 2 claims is its contention that there is no evidence of injury to competition.  But the record is replete with evidence that MHC's misconduct harmed competition by distorting consumers' perception of MHC and enabling MHC to charge supracompetitive prices.  Finally, MHC's pervasive campaign of espionage and deception satisfies the elements of numerous state law claims including fraud, misappropriation of trade secrets and/or confidential information, unfair competition, tortious interference with RCD's prospective business relations, and unjust enrichment.  There is ample evidence in the record demonstrating that RCD may proceed to trial on each of these claims.  Because there is overwhelming evidence that MHC committed numerous violations of federal and state law, the Court should deny McGraw-Hill's motion for summary judgment.

**STATEMENT OF FACTS**

## I.      Introductory Overview

McGraw-Hill scoffs at the idea that it engaged in "industrial espionage," yet elsewhere that is exactly how it defines the term.[1]  (Br. at 1.)  MHC's competitive intelligence director was "████████" a consultant asked to be called "█████" and everyone called "████████████████" when they needed data comparisons created from the illegal access to Connect.[2]  No matter how much McGraw-Hill now seeks to diminish its misconduct in the sunshine of public filings, these



practices conducted in the shadows were illegal and wrong.  The competitive intelligence industry's Code of Ethics requires one to "comply with all applicable laws" and "disclose all relevant information, including one's identity and organization."[3]  McGraw-Hill ultimately amended its own Code of Business Ethics in 2011 to prohibit this misconduct, and the most senior McGraw-Hill executive deposed now proclaims ████████████████████████████ ██████████.[4]  Third parties who assisted in the misconduct testified that ██████████████ ████████████.[5]  For MHC it was "████" that one would not want a competitor to access its data.[6]  Yet MHC still violated well-established law and business ethics.

For years MHC surreptitiously accessed RCD's online service ("Connect") through a web of employees and consultants it called "█████" who used aliases and "██████████████" for illegal purchases.[7]  They used Post Office boxes in New Jersey and Wisconsin and virtual offices in Texas and California to receive invoices and CPI in print form.[8]  At its Manhattan headquarters, MHC accessed Connect via a "████████" not on McGraw-Hill's server to prevent RCD from detecting access.[9]  Because of "█████████████████" and to avoid "████████

---

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████
██████████████████████████████

███" MHC obtained cash and money orders for competitive purchases from McGraw-Hill's credit union.[10]  MHC also paid consultants with McGraw-Hill company checks.[11]  McGraw-Hill hid the expenses on its books under such terms as "████████████" and "████████ ████."[12]  From 2002 when RCD launched Connect until 2009 when MHC consultant Glenn Lewin confessed that he was purchasing Connect for MHC's access, MHC spent about $███ ███ in furtherance of the misconduct.[13]  Surely McGraw-Hill would not have expended so much money on illegal conduct – and taken elaborate steps to hide it – if the financial return did not far exceed the risk to its purported "gold standard" reputation.[14]  (MHC Br. at 30.)

The purpose of this illegal conduct was to create comparisons that would enable MHC to maintain its premium pricing and take business from RCD.[15]  McGraw-Hill claims it "never condoned" the misconduct (Br. at 11), but it began from the top down.  Norbert Young, MHC's President for all years relevant to the case, said ████████████████████████ ██████████████████████████████████████████████ ████████████.[16]  Young testified that ████████████████████████

───────────────

████████████████████████████████████
████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████████████████
███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  ," [17]   Young said that

█████████████████████████████████████████████████████████████

████████████████████████████████.[18]   During the period when Young reported

to an intermediary, Harry Sachinis, Young also ████████████████████████████████.[19]

Other former MHC senior executives corroborated Young's testimony.[20]   Documents support the

testimony and show that comparison information ████████████████████████████████████

███████.[21]   McGraw-Hill asserts that knowledge of comparisons equals knowledge of access.

(Br. at 12-13.)  If so, McGraw-Hill's most senior executives knew of MHC's illegal access.  As

MHC employee Patricia Major testified, "████████████████████████████████████," [22]

McGraw-Hill tries to downplay the scope of its illegality by saying that "MHC's

principal comparison was known as the Roper Report" and just "[s]ix Roper Reports were

prepared" (Br. at 16), as if that is all the case is really about.  This case is about the false Roper

———————————————

████████████████████████

██████████████████████████████

████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

comparisons, but it is also about much more.[23]  In addition to the Roper comparisons, MHC used

constant access to Connect to create ▮▮▮▮▮▮ other unique false comparisons.[24]  MHC also

used consultants to ensure it "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[25]  As detailed below, sales and marketing

widely distributed the false comparisons to the market to boost profits.  MHC's employees who

obtain CPI (which MHC calls its "editorial department") on a few occasions stole projects from

Connect, more often used Connect to identify sources for projects, and continuously used their

knowledge of RCD's project coverage to allocate MHC editorial resources most advantageously.

Product development saw advances RCD made with Connect and sought to improve its own

lumbering MHC Network ("Network") to compete.  McGraw-Hill itself has stated that MHC's

two most senior product development executives "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮"[26]  Even training manuals referenced comparisons.[27]  And the finance

department facilitated payment for the whole nefarious program.[28]  Access and comparisons

propped up a declining brand, and MHC hid the disreputable enterprise from both competitors

and consumers.[29]

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

Using its illegal access to retain and win customers and charge monopoly prices, MHC sought to █████████" and "█████████████████████████████████."[30]  In fact, in summer 2009 when RCD discovered MHC's illegal access through Lewin, MHC was using that access for another premium price analysis, this time ordered by ███████.[31]  Given that MHC's first reaction when caught was to look for new sources to buy Connect and that the misconduct lasted into 2012, MHC likely would still be accessing Connect but for this case.[32]

## II.    The Parties and Their Businesses

RCD f/k/a Construction Market Data ("CMD") is a subsidiary of Reed Elsevier and part of its Reed Business Information ("RBI") division.[33]  MHC f/k/a F.W. Dodge is a division of McGraw-Hill Financial and was part of McGraw-Hill's Information & Media ("I&M") segment during the time relevant to this case.[34]  As McGraw-Hill states (Br. at 5-7), the "core business" of RCD and MHC is providing CPI by subscription to building product manufacturers ("BPMs"), contractors and subcontractors, insurers, equipment firms, architects, engineers, unions, and others.[35]  BPMs use planning data (before a project is out for bid) to ask that architects and engineers specify their products for the project.[36]  Bid-stage data aids contractors bidding on a



project and also BPMs, both those BPMs trying to maintain specification and those BPMs which are asking to be added as "equal."[37]

The CPI that RCD, through its research department, and MHC, through its editorial department, compile comes from architects, engineers, owners, developers, newspapers, and public listings, and it includes project stage and type, estimated value, sub-bidding data, bid date, plans and specifications ("P&S"), and owner, architect, and engineer information.[38]   Most contractors and some BPMs buy a limited geography of CPI.[39]   Many BPMs and some contractors buy nationwide CPI.[40]   For the time period at issue, RCD was MHC's "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[41]   RCD and MHC were the only two participants in the market for national online CPI subscription services, which is a relevant market for purposes of this action.[42]   From 2004 until at least 2009, MHC exercised its monopoly power by charging supracompetitive prices.[43]

Consumers originally received CPI in print form and later via microfilm, compact discs, and dial-up service.[44]   In the 2000s, delivery transitioned to web-based access with search



capability – with RCD launching Connect in early 2002 and MHC following in August 2003 with Network.[45]  Despite the assertion that "MHC has always been at the forefront of the CPI industry" (MHC Br. at 6), Connect starkly showed otherwise; and the market recognized it.[46]  To counter the threat that Connect posed to MHC's monopoly, MHC resorted to illegality.[47]

III.    **MHC Used Consultants To Purchase Connect Surreptitiously.**

When Connect launched, MHC felt the impact right away and told consultant Henning Lorenz "█████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████"[48] Lorenz expressed legal concerns but ultimately agreed to buy access for MHC.[49]  Deceiving RCD, Lorenz purchased Connect through an entity he called NE14T and told RCD that he worked with an actual BPM, Hager Hinge.[50]  Lorenz purchased Connect for MHC from 2002 through 2005.[51]  In 2006, Lorenz and MHC's new head of competitive intelligence Tim Ryan ended the relationship.[52]  Thereafter, MHC bought Connect through Lewin, who also expressed legal concerns, but MHC convinced him to obtain the access.[53]  Like Lorenz, Lewin deceived

RCD by using fictitious entities and a "▮▮▮▮▮▮" that he worked with actual BPMs, including Andersen Windows.[54]  As Lewin testified, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[55]  When Lewin became alarmed in early 2006 that Eric Kubicka, MHC's former competitive intelligence director, might expose him, Lewin changed the Connect subscription to another entity whose name and contact information he fabricated.[56]  Lewin testified that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and he continued to purchase Connect through 2009.[57]  MHC "▮▮▮▮▮▮▮▮▮" and its employee Patricia Major used Connect continuously; Lorenz used it "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"; and for Lewin it was "▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮" as he simply provided his login to credentials to Major for her unfettered use.[58]

Lorenz and Lewin were just two of many such MHC consultants, and surreptitiously buying data was not their only duty.[59]  Using their customer status, MHC also required them to seek strategic information.[60]  They did so and provided reports which were sent to ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[61]  Lewin posed as a headhunter with a

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

departing RCD COO and as a journalist with RCD's then-CEO.[62]  Such activities fell within

MHC's strategy to know "███████████████████████████████."[63]

## IV.   MHC Could Not Win on Price, Technology, or Service.

Consumers deposed in the litigation have testified that, in choosing a CPI service, they

consider content, price, functionality and ease-of-use, customer service, and training, with

content and price typically being most important.[64]  Connect cost substantially less than

Network, generally about one-half the price.[65]  Consumers have said that RCD exceeded or

equaled MHC on customer service and training.[66]

### A.   Connect Offered Superior Functionality, Ease-of-Use, and Speed.

Contrary to assertions that Connect "lagged" Network (MHC Br. at 8), Connect's

functionality far surpassed it according to consumers and even MHC's employees.[67]  Victoria



Pao, the MHC executive who ██████████████████████████████████" said it was

launched with "████████████████████████"[68]  Potoula Chresomales, her successor as

Vice President of Marketing & Product Development, said Network's "████████████" and

Connect had superior functionality.[69]  MHC product development ratings recognized Connect's

advanced functionality, and the MHC sales force ranked it higher for perceived ease-of-use.[70]

   Consumers so often told MHC that Connect had advanced functionality and was more

user-friendly that MHC's Vice President of BPM Sales Chris Noble complained,

██████████████████████████████████████████████

to which MHC's Senior Director of Product Development Andrew Fischer responded, "████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████"[71]  The ForeSee survey itself

concluded that "████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████"[72]

████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

████████████████████

McGraw-Hill claims that Connect operated "█████████████████" (Br. at 8), but Connect was a roadrunner compared to Network.[73]  Customers repeatedly lambasted MHC for Network's slowness.[74]  Forrester Research, a usability expert retained by MHC reported,

████████████████████████████████████████[75]

According to a merger *pro forma*, McGraw-Hill wanted to "████████████████ ████████"[76]  It felt that Connect's "███████████████████████████ ██████████" and MHC could "████████████████████████████" for its large customers.[77]  Indeed, just two days before RCD learned of MHC's access in August 2009, Goldberg told a colleague, "████████████████████████████████"[78]

### B.   Customers Criticized the Quality and Timeliness of Network's Coverage.

Customers routinely criticized MHC for its coverage of projects, the lack of details in projects it did cover, and the timeliness with which MHC posted and updated those projects:

████████████████████████████████████████

████████████████████████████████████████

██████████████

███████████████

█████████████████████████

████████████



One employee of ▮▮▮▮▮▮, a large BPM, ranked MHC below the "▮▮▮▮▮▮▮▮▮▮▮ ▮▮" for project information; then – in case it was not abundantly clear – he reemphasized "▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[86] Customers with experience on Connect noted the comparative ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[87] MHC's documents contain hundreds, if not thousands, of similar complaints about Network's data, difficulty of use, and slow speed.

### C.  McGraw-Hill Chose Not To Invest in Network Improvements.

McGraw-Hill's claim (Br. at 6) that "MHC invests significantly in its data reporting operations because it knows that one of the most important things it can provide customers is timely, accurate and comprehensive information" is almost comical: McGraw-Hill ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ *the very program at issue in the exhibit it cites* (MHC Br. Ex. 14 (PX533)), even though MHC was "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and falling behind:

[For RCD, in contrast, MHC's report said:]

-15-

Rather than investing in Network to improve it legitimately – or telling customers the truth that RCD had far outpaced MHC from May 2004 to March 2007 – a stagnant MHC instead propped up Network at much lesser cost, using illegal competitive purchases to create false comparisons. "█████████████████████" and no real investment, they were MHC's only chance to maintain premium pricing.[89]   As one sales employee said, "████████████████████████ ██████████████████████████████████████████"[90]

## V.   MHC Manufactured False Comparisons To Win and Maintain Premium Pricing.

Unable to distinguish itself on functionality, ease-of-use, content quality, timeliness, service, or training, the only way for MHC to retain customers at twice the price was convince them that MHC provided far more projects.[91]   In the early 2000s some large purchasers of CPI were concluding that RCD's project coverage was comparable to MHC's and, with Connect's features and lower price, were switching to RCD.[92]   If allowed to follow its natural course, this restructuring would have benefited consumers.   But it would have destroyed MHC's monopoly, so MHC could not let it occur.   As Noble told Senior Vice President of Sales Howard Mager,



███████████████████████████████

MHC responded to this existential threat by saturating the market with illegally obtained, false data comparisons, the extent to which cannot be overstated.  At one time, MHC sent a comparison to every single customer, and documents show the use of comparisons with more than ████ named companies.[94]  Other comparisons were created for consumers unnamed in the document, and the entire extent to which MHC used the Roper comparisons cannot be tracked because they were hard copy documents that the sales force used in person and were told not to e-mail or leave behind "████████████████" and there will be "████████████"[95]

### A.      The (Not Really) "Roper Reports"

Needing a national comparison that it could describe as independent and unbiased, from 2004 to 2008 MHC paid GfK Roper Public Affairs & Media f/k/a Audits & Surveys simply to watch Patricia Major on seven occasions create project count comparisons of MHC and RCD for planning and bidding projects (and their P&S) nationwide.[96]  MHC sent six of them, which it



called "Roper Reports," to the sales force for widespread communication to the market.[97]   MHC

suppressed the seventh, in March 2008, because MHC felt it was not sufficiently favorable.[98]

MHC planned to re-run the comparison a few months later, but in the meantime RCD asked

Roper if it was accessing Connect, and Roper told MHC that it would not participate anymore

because " ████████████████████████████████████ "[99]   As the MHC sales

force clamored for more Roper comparisons in 2008 and 2009, MHC searched for another entity

to rubber-stamp its comparisons but did not find one before RCD uncovered its misconduct.[100]

> **1.    The Roper Comparisons Were Not Independent, and Roper Did Nothing to Ensure That " ████████████████ " Were Used.**

The "Roper Reports" were represented as " ██████ " " ██████ " " ██████ "

" ██████ " " ██████ " by a " ██████ " and like an " ██████████████ "[101]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Testimony from Thompson Ritchie, the Roper employee who watched Major perform five of the

six comparisons sent to the market, ███████████████████████████████████████████

(1)   ███████████████████████████████████████████;

(2)   ████████████████████████████████████████████
      ██████;

(3)   ███████████████████████████████████████████;

(4)   ██████████████████████████████████████
      ███;

(5)   █████████████████████████████████████████
      ████████████████████████████████████████”; and

(6)   ████████████████████████████████████████ [102]

Under oath, Ritchie disagreed ███████████████████████████

███████████, and when asked, "█████████████████████████████████████████

█████████████████████" the answer was "█████"[103]  It was even incorrect to call them "Roper



Reports," which were a different, highly regarded report that Roper created and disseminated.[104]

The cover page of MHC's "Roper Reports" said, "████████████████████
████████████████████████████.[105]  Ritchie said he was
"████████" the "████████," but he did not ████████████████████
████████████████; (1) he could not even say ████
████████████████; (2) he could not explain ████
████████████████████████████████
████████████████████████; (3) he did not know ████
████████████████████████████.[106]
Ritchie did not know ████████████████████████████
████████████████████████.[107]  All he did was
████████████████████████████.[108]  He did not
████████████████████████████████
████.[109]
████████████████████████████████



-20-



█████████████████.[110]  He did not know ████████████

██████████████████████████████████████████

████████████████████████████████████████.[111]

He did not know ████████████████████████████████████

████████████████████████████████████████████████

███████████████.[113]  About all he seemed aware of was ████████████████[114]

As Ritchie said, the work involved MHC "██████████████████

██████████████████████████████████████████

██████████████"[115]  Unlike "████████████████████████

██████████████████████████████████████████

████████████," Roper was just a vessel for MHC to "████████████

██████████████" which meant MHC could "████████████████

███████████"[116]

### 2.   Flawed Methodology Generated Inaccurate Results, and MHC Knew It.

MHC never portrayed the "Roper Reports" as only showing what a user might see with a given search query.  (MHC Br. at 16, 43.)  As well as misrepresenting their creation, MHC said

they compared the number of ***projects*** in the " ███████ "[117]  McGraw-Hill's own purported data

expert says ██████████████████████████████████████ , and MHC knew the

results were actually the " ████████████████████████████████ ."[118]

     Other evidence destroys McGraw-Hill's claim that the Roper comparisons were always

just a search of what a user would have seen on Connect and Network.  For at least the first

Roper comparison – and maybe others – MHC ████████████████████████████████████

██████████████████.[119]  MHC also never told consumers this truth: it ran

searches on ████████████████████████████████████ because ██████



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[120]  And
MHC never published the comparisons' exact search queries for consumers to test themselves.[121]

As Sonya Kwon, a structured data expert at Navigant Consulting, has testified, the Roper comparisons were fundamentally flawed in how they were conducted and their results drastically overstated the project coverage of Network versus Connect.[122]  With its illegal access, MHC intentionally rigged the comparison criteria.  It conducted the comparisons at times of the year that most advantaged it and set up predestined search queries to get the desired result – and then re-cherry-picked them when unexpected results occurred.[123]  Before a new comparison, editorial employees were alerted "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[124]  MHC knew that "▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



████████████████████████.[125]  Because "Reed's ████████████████████

████████████████," MHC limited the Roper comparisons to projects ████████████████, and

its searches also captured projects above ████████ in Network while excluding them in

Connect.[126]  Between 2004 and 2008, MHC did not purchase RCD civil/engineering data, which

fell within the Roper comparisons' "████" classification, and thus it excluded additional RCD

projects.[127]  MHC included single-family housing projects, but even MHC's Ryan says ████

██████████.[128]  MHC criticized RCD for issuing multiple reports on projects, but MHC did

so far more often, especially with "██████████" which inflated its project counts for both

planning and bidding.[129]  RCD moved projects to ████████████ than MHC, further

inflating MHC's bidding counts without revealing the truth to the market: "████████████

███████████████████████████████████████████

████████████"[130]  MHC also bolstered its project counts by running searches to capture

MHC's ASAPs but exclude RCD's.[131]  Because RCD's data was more robust, MHC deliberately

used a limited timeframe and updating requirements to improve its numbers:

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

-24-



MHC's own purported data expert says running the Roper comparisons in this manner would

make them "▮▮▮▮▮▮."[133]  Doing so, MHC drastically overstated its projects compared to RCD.[134]

The Upper Quadrant study (which was lawfully conducted, *see* Rule 56.1 Statement ¶

45), did not validate the Roper comparisons (MHC Br. at 19); it actually highlighted the flaws in

comparing the two databases, said it was like comparing apples and oranges, and "▮▮▮▮▮▮▮▮▮

▮▮▮▮▮."[135]  Most revealingly, although McGraw-Hill criticizes Navigant's expert analysis as a

"data dump" (Br. at 43), MHC admitted internally that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████" and "████████████████████████████████████████████

████████████████████████████████████"[136]

The manufacture and distribution of false project counts and their misrepresentation as independently verified gave MHC an "███████████" that more opinionated statements could not accomplish.[137] According to consumers and █████████████████████, the Roper comparisons affected consumer purchasing and pricing.[138] Though MHC said they were "███████████████

███████████" and used them "████████████████" the "Roper Reports" were patently false.[139]

**B.      The "Executive Brief"**

In addition to using the Roper comparisons themselves, in February 2008 MHC began distributing an "Executive Brief ████████████████████████████████████

███████████"[140] On the page right after the cover, MHC claimed, "████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████"[141]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████

████████████████████████████████████████████████

████████████████████████

███████████████████████

███████████████

The Roper comparison was not recent; it occurred almost a year before in March 2007.[142] When MHC suppressed the March 2008 comparison the next month, it still did not change the Executive Brief.[143] The next year MHC updated the Executive Brief but did not change the 2007 Roper references despite knowing they were inaccurate: an MHC comparison conducted in November 2008 using the Roper criteria showed MHC with a ███ bidding ratio and ███ P&S ratio, but MHC did not use that data.[144] MHC's answer was "████████████████"[145]

MHC thought that the Executive Brief was "████████████████████████ ████████████████" and so helpful that its Roper information was often used in PowerPoints.[146] Even though McGraw-Hill said the misconduct ended when this case began, MHC kept using the Executive Brief at least until March 2012.[147]

**C.    *"Ad Hoc"* Comparisons**

In an attempt at "Roper Report" revisionism, McGraw-Hill now claims the Roper comparisons were "irrelevant" and "what matters is the timeliness, accuracy and



comprehensiveness of the ***specific data*** relevant to each customer's business." (Br. at 47

(emphasis in original).)  The Roper comparisons were not irrelevant, but, even if so, MHC

created many other false comparisons.  To consumers who cared about "specific data" for

specific categories (often called "verticals"), MHC presented custom, "*ad hoc*" comparisons:



As McGraw-Hill says, "[t]hese comparisons were performed in a similar manner to the Roper

Report." (Br. at 17).  They suffered from the same flaws, and MHC deliberately chose criteria to

portray itself as superior.[149]  Hundreds were created, and once Roper comparisons no longer

existed, their use increased.[150]  ▮▮▮▮▮▮▮▮▮▮▮, they affected consumer decisions.[151]



### D.    Purported "Exclusives"

To "████████████████████████████████" MHC's sales force encouraged

consumers to search Connect for particular projects which MHC knew from its illegal access

were not there, projects which MHC called "exclusives."[152]  Here is how it often worked: "██

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████"[153]

For existing MHC customers considering RCD, MHC's sales force might pull the

customers' recent Network searches before a meeting with them and have Major search the list

for MHC exclusives.[154]  For customers lost to RCD, MHC used exclusives to plant doubt and try

to win them back.[155]  Sometimes MHC would even create a list which included a few projects in

Connect but stacked the deck for MHC, so the consumer would not sniff out the malfeasance:





[REDACTED][156]

MHC did not tell customers what it said internally – "[REDACTED]"
or "[REDACTED]"[157]  MHC also misrepresented projects as
exclusives when they were not.[158]  And MHC would lie about the source, saying that [REDACTED]
[REDACTED]
[REDACTED].[159]  [REDACTED], the use of exclusives affected customer decisions.[160]

**E.    Individual State and Local Comparisons**

MHC also created many state and local comparisons to influence consumers focused on
certain geographies.[161]  These "regional or local" comparisons also "were performed in a similar
manner to the Roper Report" (MHC Br. at 17) and bore the same flaws.[162]  MHC's "[REDACTED]

[redacted] [163] For years, these comparisons were distributed widely throughout MHC.[164]

MHC used them with all-sized consumers – both to win business and extract a premium

price.[165]  MHC even falsely claimed these comparisons were "Roper Reports" notwithstanding

that Roper had no involvement whatsoever in them.[166]  According to customer testimony and by

[redacted], the use of these comparisons affected customer decisions.[167]

F.      The "5:1/3:1" Ratios

For the entire 2002 to 2009 time period, MHC told consumers it had a "[redacted]

[redacted]

[redacted]"[168]  McGraw-Hill did not just "occasionally"

reference these ratios.  (See MHC Br. at 17.)  MHC repeated this literal falsehood often (and

sometimes used false 6:1 and 4:1 exclusives ratios).  These ratios were in a one-pager shown at

_____

[redacted]

meetings with consumers and in proposal templates that the sales force was instructed to use.[169]
The ratios were heavily used in proposals, especially for large consumers.[170]  They were not
"buried at the end of lengthy contract documents."  (MHC Br. at 17 (citing PX823, MHC's BPM
Proposal Workbook, not an actual proposal).)  The ratios often were emphasized in the first two
or three pages after the proposal cover letter.[171]  For something that no one "ever noticed" (MHC
Br. at 17), it is odd that when MHC told employees to stop using comparisons in August 2009,
the first questions were ███████████████████████████.[172]

  McGraw-Hill is also wrong to say these ratios were presented, if at all, "after the
purchasing decision had already been made."  (Br. at 17.)  Evidence shows they were presented
early in the process well before decisions were made, sometimes repeatedly.[173]  Even if MHC
were correct that they were presented only when contract terms were being negotiated, their use
still supports RCD's allegations that MHC used the comparisons to inflate its prices.[174]



McGraw-Hill says that "[o]n their face, the 5:1 and 3:1 ratios had no relationship to the numbers in the Roper Report." (Br. at 17.)  In fact, these ratios had no relation to any MHC comparison – or reality.[175]  According to MHC's own comparisons, the 5:1 and 3:1 ratios are literally false.  Even its own hopped-up results show nothing remotely approaching these ratios.  Project count comparisons against "███████████" were incorporated into ████████████ ██████████████.[176]  These reports show that for no month during the entire 2002 to 2009 time period was MHC anywhere close to a 3:1 ratio against all competitors.[177]  Spreadsheets which underlay these reports also show the total was nowhere near a 3:1 ratio.[178]

As to the "exclusives" ratio, whether 4:1, 5:1, or 6:1, the calculations which MHC included in its state comparisons against RCD contradict it.[179]  Even using MHC's flawed methods, adding the totals for exclusives in all these comparisons reveals that the ratios were about ████ over the entire time period and never more than ████ for any of the years – a far cry

-33-

from the false 5:1 ratio.[180]  Internally, MHC itself said ███████████████████

█████████████████████████████████████████████████████████

███████.[181]  These literally false 5:1/3:1 ratios also affected consumer decisions.[182]

### G.   Functionality Comparisons

MHC also presented functionality comparisons for its sales force to create doubt about

Connect's content and influence consumers in comparing the data (*see infra* § VIII).[183]  MHC

trained its sales force on Connect at national sales meetings, in sales team web-exes, and through

individual tutorials, which by its own admission gave it an "███████████████."[184]

### VI.   MHC Misappropriated Data To Improve Editorial and Compete Unfairly.

McGraw-Hill's assertion that there is "no evidentiary support" that MHC "used the

access to misappropriate and republish data" and that "strict rules" prevented any improper use,

other than creating comparisons, is baseless.  (Br. at 14.)  Even McGraw-Hill cannot deny that on



a few occasions MHC stole projects.[185]  (*Id.* at 15 n.6)  At other times, MHC sought to do so, but it is unclear if it succeeded.[186]  MHC also used its illegal access to find sources for projects.[187] MHC's purported "strict rules" separating competitive intelligence and editorial never actually existed.  Editorial received specific project information from Connect throughout the access period, and once Kubicka left the next two executives overseeing competitive intelligence (Ryan and Cliff Brewis) ran editorial concurrently.[188]

Editorial supported the false comparisons by helping Major search for ways to portray Connect's data unfavorably.[189]  And perhaps most importantly, MHC editorial leaders continuously used their knowledge of RCD's project coverage to reallocate MHC's data



collection.[190]   When comparisons did not result in a sufficiently favorable ratio despite MHC's

shenanigans, editorial would request that they not be disseminated, reallocate resources, and then

have Major re-run the comparisons thereafter.[191]   This happened not only with state and local

comparisons but also was attempted with a Roper comparison.[192]   Employees were judged on the

comparison results, which incentivized them to fudge the numbers.[193]

## VII.   MHC Used Its Illegal Access To Develop and Later Enhance Network.

McGraw-Hill also claims that MHC did not use Connect to "perform a number of other

bad acts," including developing and enhancing Network (Br. at 16-17), but the evidence shows

otherwise.  The two vice presidents over product development from 2002 through 2009 and its

senior director all said ███████████████████████████████████████

███████.[194]   Product development conducted comparisons as it worked to develop Network in

-36-

2002 and 2003.[195]  Fischer ████████████████████████████████████████

████████████████████████████.[196]  When new

Connect capabilities were released, product development received the information for its use in

improving Network.[197]  Even during MHC's 2008 attempt to buy RCD, product development

became involved in the surreptitious purchase and review of a specific Reed service.[198]  When so

many at the heart of the misconduct were never disciplined at all, surely McGraw-Hill would not

have ████████████████████████████████████████████████████████████

████████████████████████" if there were no evidentiary support.[199]

## VIII.  MHC's Illegal Access and False Comparisons Materially Affected Consumers.

MHC claims that "customers came to the independent conclusion that MHC's data was

vastly superior to Reed's" (Br. at 21), but such statements are not even supported among the

customers which MHC cites.  For United Rentals, *the very same page of the document cited*

shows other users felt far differently, and the ratings averages were similar.[200]  And despite

McGraw-Hill saying "Josam found MHC the hands down winner," Josam signed its following

_____

yearly contract with RCD – and another the year after.[201]  Even a supporter of MHC at KI complained that the "███" coming from MHC's service "████████████████████ ████████████████" and said her new boss was "██████████████████ ██████████████████████████████"[202]

McGraw-Hill's litigation position is that customers are uniformly sophisticated and impervious to false information.  (Br. at 24-27.)  Yet when its own counsel asked the person who "████████████████████████████" this question, she testified otherwise:



Customers complained about how difficult it was to use Network, and cancellations from the largest BPMs to the smallest contractors occurred because they could not use the service.[204]

In fact, even MHC's own employees could not agree how to search for particular Network projects and often came up with wildly different results.[205]

MHC detested and feared uninfluenced "trials" in which the consumer was left alone to explore Connect versus Network.[206]  MHC, however, loved "side-by-sides" in which it could sit down with consumers with access to Connect and guide the search.[207]  Noble, MHC's Vice President of BPM Sales, boasted of .[208]  MHC's illegal access aided these two side-by-sides, and Noble told his BPM sales managers afterwards,



Through its illegal access, MHC knew what consumers' search results would be and steered them to results skewed in favor of MHC.[210]  And when all else failed, MHC returned to the Roper comparisons because "███████████████████████████████████████████████████████████████████████████████████████████"[211]

Right after MHC's illegal access ended, the MHC sales force lamented that consumers were concluding MHC was "██████," but management could only respond, "█████████████████████████████████████████████████"[212]  If MHC really thought customers could figure it out themselves, it would not have accessed Connect and created comparisons in the first place.[213]  Sophisticated customers are not impervious to deception, but perhaps fooling them requires a sophisticated scheme.  MHC had one from 2002 to 2009.

## IX.   Consumers Made Purchasing and Pricing Decisions Based on False Comparisons.

MHC used its illegal access and the false comparisons to extract inflated prices, force RCD to lower prices, and entice consumers to choose Network over Connect in an effort to

-40-

maintain its monopoly power and premium pricing. The harm to RCD and benefit to MHC that

resulted from misconduct is demonstrated in the documents, consumer testimony, and economic

empirical research.[214] Even one of McGraw-Hill's hand-picked customer deponents, when asked

by McGraw-Hill's counsel whether the comparisons would affect the price he would pay,

███████████████████████.[215] Other customers deposed by MHC admitted that ████████

███████████████████████.[216]

In addition to the price effect of MHC's misconduct, it also affected consumers'

decisions regarding which service to purchase, resulting in lost sales to RCD and additional sales

to MHC.[217] RCD has obtained declarations from customers who chose to purchase from MHC

instead of RCD specifically because of the comparisons – and documents created at that time



corroborate the testimony of each of these witnesses.[218]  Even one of McGraw-Hill's own hand-picked customer deponents ██████████████████████████████████

████.[219]  Another deponent said █████████████████████████████████████████

████████████.[220]  And although another MHC customer now ███████████████████

████████████, contemporaneous documents say █████████, and he admits ██████████

██████████████████████████████████████████████████,[221]

     Additionally, many of the customer representatives that McGraw-Hill deposed were

senior executives who did not use Network and relied on recommendations of others, many of

whom did receive comparisons from MHC but whom McGraw-Hill chose not to depose.[222]  For

example, ██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████[223]███████████████████

██████████████████████████████[224]

───────────

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

MHC documents also contain ██████████████████████████████

███████.[225]  With their misbehavior under the harsh light of litigation, MHC's sales leaders

now claim ███████████████████████████████████, but that is

definitely not ███████████████.[226]  Their revisionism is also contradicted by testimony

of other MHC current and former employees.[227]  And although McGraw-Hill says "any close

look at the decisions made by particular customers referenced in the emails would show that the

comparisons made no difference" (Br. at 27), consumers say exactly the opposite.[228]  The

evidence of MHC's misconduct and its effect is voluminous and far exceeds that needed to

survive summary judgment.[229]

