UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REED CONSTRUCTION DATA INC.,

Plaintiff,

- v. -

THE MCGRAW-HILL COMPANIES, INC.,
JOHN DOES One through Five, and
JOHN DOE ENTITIES One through Five,

Defendants.

09 Civ. 8578 (JPO)

**REDACTED**

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT MCGRAW HILL FINANCIAL, INC.'S MOTION FOR SUMMARY JUDGMENT**

PATTERSON BELKNAP WEBB
& TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Defendant McGraw Hill Financial, Inc.*

OF COUNSEL:
Saul B. Shapiro
Joshua A. Goldberg
Michelle W. Cohen

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....................1

ARGUMENT ....................2

I. McGraw Hill Did Not Violate the Lanham Act....................2

A. Reed Cannot Establish the Elements of a Lanham Act Claim for Any Specific Piece of Advertising....................3

B. Reed Cannot Show Falsity with Regard to Any Challenged Advertising....................4

1. Manner of Presentation....................4

a. There Is No Genuine Dispute That Representations Concerning Roper's Role in the Comparison Process Were Literally True....................4

b. The Executive Brief Comparisons Are Not "Stale" ....................7

2. Numerical Comparisons....................8

a. The Roper Comparisons Were Accurate ....................8

b. Ad Hoc Comparisons and Exclusives Lists....................11

c. 5:1/3:1 Ratios....................12

C. There Is No Genuine Issue of Fact as to the Materiality of Any Challenged Advertising....................13

1. Representations Related to Roper's Level of Involvement Are Immaterial as a Matter of Law ....................13

2. Customer Testimony Refutes Reed's Claim That Alleged Errors in MHC's Data Comparisons Were Material....................14

D. Reed Cannot Recover Damages With No Evidence of Actual Injury and Customer Deception....................19

E. Reed Is Not Entitled to Disgorgement of McGraw Hill's Profits....................20

II. Reed's Antitrust Claims Should Be Dismissed Because MHC's Conduct Did Not Have More Than a De Minimis Effect on Competition ....................20

**TABLE OF CONTENTS**
**(continued)**

**Page**


A. The Court Must Presume That MHC's Alleged Disparagement Had a De Minimis Effect on Competition ....21

B. Reed Cannot Satisfy Five of the Six Ayerst Factors....23

1. MHC's Marketing Pieces Were Not Clearly False....23

2. MHC's Marketing Materials Were Not Clearly Material....24

3. MHC's Marketing Materials Were Not Clearly Likely to Induce Reasonable Reliance ....24

4. Customers Typically Have Direct Personal Knowledge of the Subject of MHC's Marketing Materials....25

5. MHC's Marketing Pieces Were Susceptible to Neutralization....25

III. Reed's State Law Claims Fail Under Both the Laws of Both Georgia and New York ....26

A. Georgia Law Applies to Reed's State Law Claims ....26

1. The Court Has Already Rejected Reed's Argument That McGraw Hill Waived the Right to Apply Georgia Law ....26

2. Georgia Law Applies to Reed's State-Law Claims Because the Conflict Is Loss-Allocating....27

B. Reed's Common-Law Claims Are Fully or Partially Preempted by GTSA....28

1. Reed's Common-Law Fraud, Tortious Interference, Misappropriation of Confidential Information and Misappropriation of Trade Secrets Claims Are Fully Preempted by GTSA....28

2. Reed's Unfair Competition and Unjust Enrichment Claims Are Preempted to the Extent They Are Construed as Misappropriation-Based ....30

C. On the Merits, Reed's Claims Fail Under the Laws of Georgia and New York ....30

1. Reed Concedes that it Cannot Prove an Essential Element of Fraud: Damages....30

**TABLE OF CONTENTS**
**(continued)**

**Page**


2. Reed Cannot Prove Misappropriation of Trade Secrets ............................31

3. Reed's Unfair Competition Claim Also Fails...........................................33

4. Tortious Interference With Prospective Economic Advantage Fails Because Reed Did Not Lose Business Prospects Based on Tortious Conduct ...........................................................................................34

5. Unjust Enrichment Fails Because McGraw Hill Did Not Receive Anything of Value at Reed's Expense .......................................................36

IV. Portions of Reed's Claims Are Time Barred ...............................................37

CONCLUSION..................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abernathy & Closther, Ltd. v. E & M Adver., Inc.*,
553 F. Supp. 834 (E.D.N.Y. 1982) ....................13

*Adams v. Deutsche Bank AG*,
11 Civ. 1893, 2012 U.S. Dist. LEXIS (S.D.N.Y. Sept. 24, 2012) ....................39

*Adelson v. Harris*,
-- F. Supp. 2d. --, 2013 WL 5420973 (S.D.N.Y. Sept. 30, 2013) (Oetken, J.) ....................28

*Airwatch LLC v. Mobile Iron, Inc.*,
1:12-cv-3571, 2013 WL 4757491 (N.D. Ga. Sept. 4, 2013) (Carnes, C.J.) ....................28, 29

*AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*,
726 F. Supp. 2d 307 (S.D.N.Y. 2010) ....................28

*Alternative Electrodes, LLC v. Versus Empi, Inc.*,
597 F. Supp. 2d 322 (E.D.N.Y. 2009) ....................22

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc*,
323 F.3d 366 (6th Cir. 2003) ....................22

*Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*,
05-5155, 2010 WL 652832 (E.D.N.Y. Feb. 22, 2010) ....................32

*Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*,
108 F.3d 1147 (9th Cir. 1997) ....................22, 23

*Applera Corp. v. MJ Res. Inc.*,
349 F. Supp. 2d 338 (D. Conn. 2004) ....................21, 23, 24

*Avis Rent A Car Sys., Inc. v. Hertz Corp.*,
782 F.2d 381 (2d Cir. 1985) ....................9

*Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*,
145 F.3d 481 (2d Cir. 1998) ....................19

*Borghese Trademarks, Inc. v. Borghese*,
10-cv-5552, 2013 WL 143807 (S.D.N.Y. Jan. 14, 2013) (Oetken, J.) ....................20

*Brandaid Mktg. Corp. v. Biss*,
03-CV-5088, 2008 WL 190494 (S.D.N.Y. Jan. 22, 2008) ....................31

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Burndy Corp. v. Teledyne Indus., Inc.*,
748 F.2d 767 (2d Cir. 1984)....................20

*Camp Creek Hospitality Inns v. Sheraton Franchise Corp.*,
139 F.3d 1396 (11th Cir. 1998) ....................31

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
348 F. Supp. 2d 217 (S.D.N.Y. 2004)....................11

*Century 21 Real Estate Corp. v. RE/MAX S. Cnty. (In re Century 21-RE/MAX Real Estate Adver. Claims Litig.)*,
882 F. Supp. 915 (C.D. Cal. 1994) ....................18

*Cerbone v. Int'l Ladies' Garment Workers' Union*,
768 F.2d 45 (2d Cir. 1985)....................40

*Chamilia, LLC v. Pandora Jewelry, LLC*,
04-CV-6017, 2007 WL 2781246 (S.D.N.Y. Sept. 24, 2007) ....................11

*City of Atlanta v. Hotels.com*,
710 S.E.2d 766 (Ga. 2011)....................36

*Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.*,
88 A.D.2d 461 (2d Dep't 1982) ....................31

*Coleman & Co. v. Giaquinto Fam. Trust*,
236 F. Supp. 2d 288 (S.D.N.Y. 2002)....................38

*Conopco, Inc. v. Campbell Soup Co.*,
95 F.3d 187 (2d Cir. 1996)....................37

*DC Comic, Inc. v. Filmation Assocs.*,
486 F. Supp. 1273 (S.D.N.Y. 1980)....................17

*DeRosa v. Nat'l Envelope Corp.*,
595 F.3d 99 (2d Cir. 2010)....................32

*Document Sec. Sys. v. Coupons.com, Inc.*,
11-cv-6528, 2012 WL 3597769 (W.D.N.Y. Aug. 20, 2012)....................27

*eBay Inc. v. MercExchange L.L.C.*,
547 U.S. 388 (2006)....................19

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Edelman v. Starwood Capital Grp.*,
70 A.D.3d 246 (1st Dep't 2009) ....................36

*Eon Labs Mfg., Inc. v. Watson Pharm., Inc.*,
164 F. Supp. 2d 350 (S.D.N.Y. 2001)....................23

*F. W. Dodge Co. v. Constr. Info. Co.*,
66 N.E. 204 (Mass. 1903) ....................32

*F. W. Dodge Corp. v. Comstock*,
140 Misc. 105 (N.Y. Sup. Ct. 1931) ....................32

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
314 F.3d 48 (2d Cir. 2002)....................6, 11

*Fed. Express Corp. v. United Parcel Serv., Inc.*,
765 F. Supp. 2d 1011 (W.D. Tenn. 2010)....................7

*FMC Corp. v. Taiwan Tainan Giant Indus.Co.*,
730 F.2d 61 (2d Cir. 1984)....................31

*Gen. Sec., Inc. v. APX Alarm Sec. Solutions, Inc.*,
647 F. Supp. 2d 207 (N.D.N.Y. 2009) ....................37

*George Basch Co. v. Blue Coral, Inc.*,
968 F.2d 1532 (2d Cir. 1992)....................3, 20

*Gonzales v. Nat'l Westminster Bank PLC*,
847 F. Supp. 2d 567 (S.D.N.Y. 2012)....................38

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
277 F. Supp. 2d 269 (S.D.N.Y. 2003)....................33

*Hecny Transportation, Inc. v. Chu*,
430 F.3d 402 (7th Cir. 2005) ....................29

*Heisler v. Toyota Motor Credit Corp.*,
884 F. Supp. 128 (S.D.N.Y. 1995) ....................27

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
12 N.Y.3d 132 (2009) ....................36

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Int'l News Serv. v. Associated Press*,
248 U.S. 215 (1918)....................34

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*,
920 F.2d 171 (2d Cir. 1990)....................31

*Inventory Locator Serv., LLC v. Partsbase, Inc*.,
02-2695 2005 WL 2179185 (W.D. Tenn. Sept. 2, 2005) ....................32

*Kermanshah v. Kermanshah*,
580 F. Supp. 2d 247 (S.D.N.Y. 2008)....................37

*Lan v. Time Warner, Inc.*,
11 Civ. 2870, 2013 WL 1703584 (S.D.N.Y. Apr. 19, 2013)....................38

*Lia v. Saporito*,
909 F. Supp. 2d 149 (E.D.N.Y. 2012) ....................37

*Lipton v. Nature Co.*,
71 F.3d 464 (2d Cir. 1995)....................6

*Loengard v. Santa Fe indus., Inc.*,
70 N.Y.2d 262 (1987) ....................37

*Medisim Ltd. v. BestMed LLC*,
910 F. Supp. 2d 591 (S.D.N.Y. 2012)....................18

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ....................21

*Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*,
960 F.2d 294 (2d Cir. 1992) ("*J&J v. Smithkline*") ....................3, 6

*Merck Eprova AG v. Gnosis S.p.A.*,
901 F. Supp. 2d 436 (S.D.N.Y. 2012)....................20

*Millennium Import Co. v. Sidney Frank Importing Co.*,
03-cv-5145, 2004 WL 1447915 (D. Minn. June 11, 2004) ....................7

*Multivideo Labs, Inc. v. Intel Corp.*,
99 CIV 3908, 2000 WL 12122 (S.D.N.Y. Jan. 6, 2000)....................13, 23

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
850 F.2d 904 (2d Cir. 1988) ("*Ayerst*") .......... passim

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
105 F.3d 841 (2d Cir. 1997) ("*NBA*") .......... 3, 13

*Nora Bevs. v. Perrier Grp. of Am.*,
269 F.3d 114 (2d Cir. 2001) .......... 17

*OPA Amsterdam BV v. American Inst. of Physics*,
973 F. Supp. 414 (S.D.N.Y. 1997) .......... 8, 9

*Pedinol Pharmacal, Inc. v. Rising Pharms., Inc.*,
570 F. Supp. 2d 498 (E.D.N.Y. 2008) .......... 20

*Penalty Kick Mgmt., Ltd. v. Coca Cola Co.*,
318 F.3d 1284 (11th Cir. 2003) .......... 29

*Pfizer, Inc. v. Miles, Inc.*,
868 F. Supp. 437 (D. Conn. 1994) .......... 8

*Pizza Hut v. Papa John's Int'l*,
227 F.3d 489 (5th Cir. 2000) .......... 6

*PPX Enters. Inc. v. Audiofidelity Enters., Inc.*,
818 F.2d 266 (2d Cir. 1987) .......... 19

*Prime Healthcare Servs. v. Serv. Emps. Int'l Union*,
11-CV-02652, 2012 WL 3778348 (S.D. Cal. Aug. 30, 2012) .......... 23

*Redeye Grill, L.P. v. Rest. Opportunities Ctr. of N.Y.*,
13 Misc. 3d 1212A (N.Y. Sup. Ct. 2006) .......... 33

*RMS Titanic v. Zaller*,
1:13-CV-0625, 2013 WL 5675523 (N.D. Ga. Oct. 17, 2013) .......... 28, 29

*Robbins v. Supermkt. Equip. Sales, LLC*,
722 S.E.2d 55 (Ga. 2012) .......... 29

*Ruso v. Morrison*,
695 F. Supp. 2d 33 (S.D.N.Y. 2010) .......... 38



6595544v.1

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*S&L Vitamins, Inc. v. Australian Gold, Inc.*,
521 F. Supp. 2d 188 (E.D.N.Y. 2007) ....................27

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010)....................19

*Schneider v. Pearson Educ., Inc.*,
12 Civ. 6392, 2013 WL 1386968 (S.D.N.Y. Apr. 5, 2013) (Oetken, J.)....................31

*Seven-Up Co. v. Coca-Cola Co.*,
86 F.3d 1379 (5th Cir. 1996) ....................3

*Stichting Ter Behartiging Van de Belangen Van Oudasndeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
407 F.3d 34 (2d Cir. 2005)....................27

*Stiefel v. Schick*,
398 S.E.2d 194 (Ga. 1990)....................31

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
646 F. Supp. 2d 510 (S.D.N.Y. 2009)....................7

*Tambrands, Inc. v. Warner-Lambert Co.*,
673 F. Supp. 1190 (S.D.N.Y. 1987)....................19

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
497 F.3d 144 (2d Cir. 2007)....................2

*US Engine Prod. v ISO Grp., Inc.*,
12-CV-4471, 2013 WL 4500785 (E.D.N.Y. Aug. 20, 2013) ....................28

*Util. Metal Research, Inc. v. Coleman*,
03-cv-1463, 2008 WL 850456 (E.D.N.Y. Mar. 28, 2008) ....................34

**STATUTES**

15 U.S.C. § 1117(a) ....................20

Ga. Stat. Ann § 10-1-761 ....................28

**PRELIMINARY STATEMENT**

Just like its overheated complaint and general approach to this case over the last four years, Reed's summary judgment papers contain voluminous details regarding McGraw Hill Construction's access to Reed Connect—which is undisputed—but scant proof about the consequences of that access or its legal ramifications. There are at least two critical flaws that run through all of Reed's claims.

<u>First</u>, there is no proof that any of MHC's product comparisons were false, either in the information conveyed or in the manner presented. To the contrary, REDACTED



. Even Reed's purported data expert REDACTED

.

<u>Second</u>, there is no evidence that MHC's marketing materials made any difference to customer decisions. Reed has no answer to the fact that customers repeatedly and unanimously testified that they obtained information about the parties' expensive products from free trials and hands-on test drives, as well as their own experiences with the products, not from marketing materials. Nor has Reed come forward with testimony from a single customer—in a market of tens of thousands—who relied on an MHC comparison in deciding what product to buy or how much to pay. To the contrary, all of the customers who have testified—each one drawn from ***Reed's*** listing of accounts allegedly "stolen" by MHC—REDACTED

In its moving papers, McGraw Hill set forth the evidence exposing these gaping

holes in Reed's case. Instead of addressing them, Reed simply ignores the key evidence. For the materials Reed does address, it twists their meaning beyond all recognition. Reed takes a similar approach on the law, frequently distorting legal doctrine and ignoring well-established precedent. Neither of these strategies creates a genuine factual issue on any of Reed's claims.

**ARGUMENT**

## I. McGraw Hill Did Not Violate the Lanham Act

The essence of Reed's Lanham Act claim, as set forth in its opposition brief, is that "MHC intentionally and repeatedly made literally false and misleading representations to consumers that were material to their purchasing decisions." Reed Construction Data's Memorandum of Law in Opposition ("Op. Br.") 1. No part of this statement is true:

***There is no evidence that MHC made any literally false representations.*** Reed's own expert found REDACTED . She has not offered any opinion on the truth or falsity of any other comparisons. Moreover, there is no dispute that REDACTED . And Reed can point to no evidence that MHC's intent was anything other than to disseminate truthful statements.

***There is no evidence that any representations were misleading.*** The crux of Reed's Lanham Act case—whether it relates to numerical comparisons or the presentation of those comparisons to customers—is that MHC's representations were literally true but misleading. To make this argument, Reed spends much of its opposition arguing about what customers might have understood MHC's claims to mean. Reed has not, however, offered any survey to demonstrate how any customers may have been misled. Under well-settled law, this lack of proof is fatal to Reed's Lanham Act claim. *See Time Warner Cable, Inc. v. DIRECTV,*

*Inc.*, 497 F.3d 144, 153 (2d Cir. 2007); *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) ("*J&J v. Smithkline*").

***There is no evidence that any representations were material to customers' purchasing decisions.*** The undisputed evidence is that the competitive comparisons at issue in this case played no role in customers' purchasing decisions.

### A. Reed Cannot Establish the Elements of a Lanham Act Claim for Any Specific Piece of Advertising

To prove a claim under the Lanham Act, a plaintiff must identify a ***specific*** statement in an advertisement that (a) is false or misleading, (b) is material, and (c) caused injury through actual consumer confusion or deception. *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) ("*NBA*"); *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992). A plaintiff cannot make this showing merely by complaining about a wide array of alleged misconduct without showing that it had an effect on consumers. *See, e.g.*, *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1387-89 (5th Cir. 1996). Similarly, it is insufficient to show that a statement had an effect on customers if there is no proof that the statement is false.

Here, Reed's opposition relies on disjointed evidence of supposed misconduct, but it fails to trace any one advertising statement through all the elements of a false advertising claim. Reed relies on its data expert, Sonya Kwon, to establish falsity, but Ms. Kwon opined on only three Roper Reports (one of which was never published) and has offered no opinion on any of the other advertising statements at issue in this case. Reed attempts to show materiality by relying on isolated internal MHC emails supposedly showing that a competitive comparison may have been helpful. But Reed makes no effort to link those emails to any particular competitive comparison—much less to the two published Roper Reports that Ms. Kwon analyzed—and so

cannot demonstrate that a particular allegedly ***false*** advertisement influenced a purchasing decision. Likewise, Reed relies on the three customer declarations to argue that these particular customers may have been confused about the source of a comparison, but does not link the declarations to a specific comparison that it has shown to be false. Finally, Reed relies on the opinion of its damages expert, Dr. Frederick Warren-Boulton, to argue that Reed was injured by MHC's alleged misconduct. But Dr. Warren-Boulton expressly stated that REDACTED

. Ex. 164[1] (Warren-Boulton Tr. 367:12-20). Reed's inability to link a particular piece of advertising to particular evidence of falsity and particular evidence of materiality, consumer confusion and injury is fatal to Reed's Lanham Act claim.

**B. Reed Cannot Show Falsity with Regard to Any Challenged Advertising**

While the focus of Reed's Lanham Act claim previously had been the accuracy of the numerical comparisons in the Roper Reports, in its summary judgment opposition, Reed now focuses on a hodgepodge of alleged misrepresentations. These challenges fall into two categories: (1) the manner in which MHC allegedly presented those comparisons, and (2) numerical comparisons in the Roper Report and other alleged customer communications.

**1. Manner of Presentation**

***a. There Is No Genuine Dispute That Representations Concerning Roper's Role in the Comparison Process Were Literally True***

Reed's primary allegation under the Lanham Act is that MHC "convinced customers that a respected, independent, third-party auditor conducted the comparisons, when in fact that involvement was a complete sham." Op. Br. 53. Reed characterizes this alleged

[1] Exhibits 1-163 are attached to the September 6, 2013 Declaration of Saul B. Shapiro in Support of Defendant McGraw Hill Financial, Inc.'s Motion for Summary Judgment. Exhibits 164-193 are attached to the December 13, 2013 Declaration of Saul B. Shapiro in Further Support of Defendant McGraw Hill Financial, Inc.'s Motion for Summary Judgment.

misrepresentation as the "[w]orst of all." *Id.* Reed rests this claim on a snippet of text on the cover page of the Roper Report: "REDACTED" *See id.* at 46; *see, e.g.*, Ex. 83 (PX 415). Reed cannot show falsity as to this statement, however, because the statement is literally true.

There is no dispute that Roper was retained to oversee the comparison process. Nor is there any dispute that representatives from Roper participated in the preparation of the Reports. And there is no dispute that Roper permitted MHC to distribute the comparisons under its name with the challenged language. Patricia Major (of MHC) and Thompson Ritchie (of Roper) testified REDACTED. For example, Ms. Major testified as follows:

REDACTED

Ex. 73 (Major Tr. 247:25-248:17) (emphasis added). Mr. Ritchie similarly testified that he REDACTED Ex. 76 (T. Ritchie Tr. 26:10-27:22, 91:24-92:2). With respect to the project categories used for the Roper searches, Mr. Ritchie testified that REDACTED Ex. 76 (Ritchie Tr. 27:5-22). Ms. Major testified that REDACTED

REDACTED

Ex. 73 (Major Tr. 250:23-251:19). This uncontroverted evidence establishes the literal truth of the representations on the cover of the Roper Report.[2]

Reed does not dispute this evidence. Instead, Reed challenges whether Roper played a "***meaningful role***" in creating the comparisons. Op. Br. 46 (emphasis added). In other words, Reed argues that the statement about Roper's involvement is impliedly false because a customer might infer from the Roper Report text that Roper played more of a role than it actually did. But Reed has no survey or other evidence to show that customers took away any message about Roper's level of involvement, much less that consumers were misled. *See, e.g., J&J v. Smithkline*, 960 F.2d at 296-98. Moreover, the phrase "meaningful role" is so indeterminate and subjective that it cannot be literally false. *See, e.g., Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995) (claim that research was "thorough" is a "[s]ubjective claim[] . . . which cannot be proven either true or false") (quotation omitted).

To bolster its argument regarding Roper's involvement, Reed cites isolated emails in which REDACTED *See* Op. Br. 18 & n.101, 46. This evidence does not create a genuine issue of fact. First, these statements have no bearing on how consumers interpreted the claim that Roper "oversaw" the comparison, which is the only relevant inquiry. *See J&J v. Smithkline*, 960 F.2d at 297-98; *see also Pizza Hut v. Papa John's Int'l*, 227 F.3d 489, 503 (5th Cir. 2000). Second, these one-off emailed statements do not appear in the advertising at issue and are not themselves "advertising or promotion" under the Lanham Act. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,

---

[2] Reed cites Mr. Ritchie's testimony that REDACTED Op. Br. 46. But the fact that REDACTED proves nothing at all and certainly cannot support a finding of literal falsity.

314 F.3d 48, 56 (2d Cir. 2002) (advertising and promotion are statements made as "part of an organized campaign to penetrate the relevant market," not "isolated disparaging statements").

***b. The Executive Brief Comparisons Are Not "Stale"***

Reed argues that post-2008 versions of an MHC marketing piece called the Executive Brief were false because they referred to a "recent" comparison that was conducted in 2007. Op. Br. 50. But the word "recent" can easily encompass results of a comparison done in the past few years. Reed REDACTED. Ex. 97 (RCD00371691); Ex. 165 (Cummings Tr. 119:13-121:16 & DX 625). Given REDACTED, Reed has no basis to challenge that term here. *See Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 533-34 (S.D.N.Y. 2009).

Since Reed cannot show literal falsity, it is again left to argue implied falsity. Reed's opposition states that MHC "***convey[ed]*** the false and misleading ***impression*** that MHC continued to have the advantage over RCD that it had claimed in 2007." Op. Br. 50 (emphasis added). But Reed offers no survey or other extrinsic evidence of what "impression" was "conveyed" by the Executive Brief's use of "recent." Moreover, as set forth in McGraw Hill's opening brief, the use of an older study—even one contradicted by more recent studies—is insufficient to establish falsity under the Lanham Act. *See Fed. Express Corp. v. United Parcel Serv., Inc.*, 765 F. Supp. 2d 1011, 1021-22 (W.D. Tenn. 2010); *Millennium Import Co. v. Sidney Frank Importing Co.*, 03-cv-5145, 2004 WL 1447915 at *6-7 (D. Minn. June 11, 2004).[3]

[3] The "updated comparison" that Reed says should have been included in the 2008 Executive Brief actually showed REDACTED.

**2. Numerical Comparisons**

Reed initiated this case alleging that the project count comparisons in the Roper Report were false. Because discovery has proved that theory wrong, Reed now argues that despite the accuracy of the Roper project counts, MHC's competitive comparisons either exaggerated MHC's advantage or unfairly emphasized MHC's strengths. These arguments do not make out a valid claim under the Lanham Act.

***a. The Roper Comparisons Were Accurate***

Reed fails to mention that every attempt to re-create the Roper Report has confirmed its accuracy. This includes, most prominently, REDACTED Ex. 110 (DX 449). Reed also ignores REDACTED

Unable to challenge the literal accuracy of the Reports, Reed resorts to challenging how the Reports were prepared. For example, Reed complains that the parameters chosen for the Roper Report "maximize[d MHC's] project counts relative to RCD's." Op. Br. 49. But there is nothing false about highlighting a product's strengths. *See, e.g.*, *Pfizer, Inc. v. Miles, Inc.*, 868 F. Supp. 437, 449 (D. Conn. 1994) (the Lanham Act does not require "all facts material to a consumer's decision to purchase a product or service be contained in each advertisement."). Likewise, it is immaterial that alternative comparisons (such as those suggested by Ms. Kwon) could have been performed. *OPA Amsterdam BV v. American Inst. of Physics*, 973 F. Supp. 414, 428 (S.D.N.Y. 1997).

***"Manipulated/Preselected" Searches to Ensure "Biased" Results.*** Reed complains that MHC "preselected" search criteria to ensure that results were "biased" in MHC's favor. Op. Br. 49-50. Reed does not quantify the impact of this "preselection" or point to a single comparison that was false for this reason. Even if Reed could particularize its allegations, it would not be able to show literal falsity. That's because the comparison criteria were stated plainly on the face of the Roper Report, *see, e.g.*, Ex. 83 (PX 415), and the results in the Report were exactly the same as what a customer would see by searching with the specified criteria. Reed has no evidence to the contrary. Advertising is not literally false simply because the plaintiff considers it to be "biased." *See OPA Amsterdam*, 973 F. Supp. at 428 (no literal falsity where a comparison is designed to showcase a product's strength, as long as the comparison is accurate).

***ASAP Projects.*** Reed argues that projects with bid dates of "ASAP" were excluded from the two published Roper Reports that Ms. Kwon considered (this argument has no bearing on any other challenged advertising). Op. Br. 49. Reed neglects to mention, however, that REDACTED . Ex. 89 (McGowan Rep. at 16); Ex. 147 (RCD06071085). That not all ASAP projects may have been returned in her searches is the result of a flaw in Reed's search algorithm. Ms. Kwon REDACTED . *See id.*; 56.1 Statement ¶¶ 174-78. A court analyzing literal falsity should consider the audience and context of the statement. *See, e.g.*, *Avis Rent A Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 385-86 (2d Cir. 1985). The audience for the Roper Report was consumers, not structured data analysts. It was therefore not literally false for MHC to accurately tally the

search results that any customer searching the consumer-facing product would have seen.

***Utility Projects.*** Reed argues that the Roper Reports failed to include "utility projects" from Reed Connect because MHC did not subscribe to Reed's civil/engineering data at the time the Roper Reports were created. Op. Br. 48. Reed makes no effort to quantify the impact of this supposed omission. That may be because Reed is simply wrong in its allegation. The undisputed evidence is that "utility" projects, like power plants and wastewater treatment facilities, were classified in Reed Connect within either "general building" or "wastewater treatment," REDACTED . Ex. 110 (DX 449). There is no dispute that REDACTED Ex. 167 (PX 9); Ex. 168 (PX 12); Ex. 169 (PX 15); *see also* Ex. 147 (RCD06071085). Accordingly, such "utility" projects were included in the Roper Report tallies.

***"Double Counting."*** Reed claims that MHC "double-counted" projects that appeared in multiple stages of construction, thereby inflating its numbers. Op. Br. 48-49. Reed's argument does not survive scrutiny, however, because what Reed is complaining about is not the accuracy of the project tallies, but rather the ways in which the parties listed projects in their respective databases. Construction projects often proceed on multiple tracks. For example, REDACTED . Ex. 89 (McGowan Rep. 24-25). What Reed refers to as "double-counting" is the fact that the Roper Report would have accurately tallied each of these projects in Dodge—REDACTED



REDACTED. In contrast, REDACTED. As a result, a customer searching Reed Connect would not find this project when searching in the phase that Reed chose to ignore. This is a flaw in Reed's business rules, not in the accuracy of Roper's project counts.

***Dataline.*** For the first time in the long history of this litigation, Reed asserts that the 2004 Roper Report (which Ms. Kwon neither analyzed nor opined about) is false because MHC used an electronic listing product called Dataline (the precursor to the Dodge Network) to generate the project counts for that report. Op. Br. 48. To be clear, this argument applies only to the 2004 Roper Report and not to any of the other competitive comparisons at issue in this case. But even as to the 2004 Report, Reed's argument fails. That's because REDACTED. Ex. 83 (PX 415). Reed cannot claim that this statement was literally false, and it has no evidence to show that the statement was misleading.

***b. Ad Hoc Comparisons and Exclusives Lists***

Reed challenges an unspecified number of one-off communications allegedly sent to particular customers with *ad hoc* comparisons and lists of exclusive projects, each of which was unique. The fact that these are "*ad hoc*" comparisons and individually tailored communications makes plain that they are not "advertising" under the Lanham Act. *See Fashion Boutique of Short Hills*, 314 F.3d at 56; *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 250 (S.D.N.Y. 2004); *Chamilia, LLC v. Pandora Jewelry, LLC*, 04-CV-6017, 2007 WL 2781246, at *8-9 (S.D.N.Y. Sept. 24, 2007). Reed's challenge to these comparisons—apparently to all of them, but none in particular—exemplifies the fundamental problem with its

Lanham Act claim: it cannot throw these disparate communications together and ask the Court (and jury) to construct a coherent Lanham Act claim.

In any case, Reed has failed to show falsity as to any of these challenged comparisons: Ms. Kwon REDACTED, Ex. 170 (Kwon Tr. 77:8-23), and Reed has offered no evidence at all on the *ad hoc* comparisons. On the exclusives lists, Reed merely alleges that on two isolated occasions, Reed personnel were able to find projects in Reed Connect that MHC had said were exclusive to Dodge Network. Op. Br. 30 n.158. Reed's "evidence" consists of REDACTED . *Id.* Because the parties' databases are constantly updated as new construction project information is discovered, these unreliable statements shed no light on whether the projects were in the database at the time the exclusives claims were made.

***c. 5:1/3:1 Ratios***

Finally, Reed challenges statements included in various one-off communications regarding 5:1/3:1 ratios. Ms. Kwon REDACTED and Reed has offered no evidence regarding how these ratios were calculated or why they are false. Reed's attempt to show falsity by tallying up the results of ***other*** comparisons—namely those performed by Ms. Major—fails because these comparisons used more limited parameters and looked at only a subset of the parties' projects. Ex. 171 (Palmer Tr. 60:25-62:18); Ex. 172 (Brewis Tr. 113:5-21) (explaining process to create the studies Reed now relies on). In contrast, the ratios refer to the parties' respective databases as a whole. Reed conducted no survey related to the ratios, so it has no basis to argue that they conveyed a misleading message.

### C. There Is No Genuine Issue of Fact as to the Materiality of Any Challenged Advertising

Reed's Lanham Act claim fails for the additional reason that Reed has failed to offer any evidence that any particular allegedly false advertising claim by MHC was likely to influence the purchasing decisions of CPI customers.

As an initial matter, Reed misstates the law by arguing that it can establish materiality merely by showing that the alleged misstatements related to characteristics of the products at issue. Op. Br. 54. This is incorrect. While such a showing is a necessary prerequisite to establishing materiality under the Lanham Act, it is not enough on its own. *See NBA*, 105 F.3d at 855. A plaintiff must ***also*** prove that the allegedly false statement is likely to influence purchasing decisions. *See id.* Reed cannot come close to meeting this standard.

#### 1. Representations Related to Roper's Level of Involvement Are Immaterial as a Matter of Law

Under Reed's own definition of materiality, representations concerning the amount of work performed by Roper do not even pass the initial threshold under the Lanham Act because they do not relate to "an inherent quality or characteristic of a product." *See* Op. Br. 54 (quoting *NBA*, 105 F.3d at 855). The products at issue in this case are construction project information services, not data comparisons. Alleged misstatements about how the Roper Reports were prepared cannot ground a Lanham Act claim. *See Multivideo Labs, Inc. v. Intel Corp.*, 99 CIV 3908, 2000 WL 12122, at *17 (S.D.N.Y. Jan. 6, 2000) (statement about the authorship of a letter describing a product did not relate to an inherent quality of the product); *Abernathy & Closther, Ltd. v. E & M Adver., Inc.*, 553 F. Supp. 834, 837 (E.D.N.Y. 1982) (statement that an offer was exclusively available through a TV advertisement did not relate to an inherent quality).

Moreover, there is no evidence—by way of a survey or otherwise—that

customers made purchasing decisions based on Roper's role in preparing the Reports. On this point, it is worth noting that many of the comparisons now challenged by Reed, including the *ad hoc* comparisons, the exclusives and the 5:1/3:1 ratios, did not even mention Roper. For the Roper Reports themselves, the undisputed evidence is that the comparisons were ***only*** distributed by MHC personnel directly to customers and never distributed by Roper or any other independent source. For this reason, customers testified REDACTED . Ex. 91 (Bowman Tr. 29:8-24); Ex.124 (Borglum Tr. 31:2-32:18); Ex. 5 (Chester Tr. 118:20-120:10).

**2. Customer Testimony Refutes Reed's Claim That Alleged Errors in MHC's Data Comparisons Were Material**

Reed has not even attempted to counter evidence that the Roper Report comparisons were too generalized to have an impact, that customers used free trials as the primary means of evaluating the products, or the testimony from customers that REDACTED . *See*, *e.g.*, Ex. 11 (Franklin Tr. 22:19-23:11); Ex. 5 (Chester Tr. 52:13-24); Ex. 4 (Welch Tr. 39:24-40:22). Faced with this evidence, Reed attempts to perform a sleight of hand, arguing, based on generalized testimony and Dr. Warren-Boulton's opinions, that customers considered the quantity of project information when they made purchasing decisions. Op. Br. 54-55. This is a red herring: there is no doubt customers wanted the service that contained the most project information to suit their needs. But the fact that customers considered data quantity proves nothing about the materiality of the challenged ***advertising***.

On that question, Reed has no evidence. On the one hand, Reed asserts in its brief that "every single [MHC] customer" was exposed to an MHC comparison. Op. Br. 17. Yet Reed has not come forward with ***testimony*** from ***any*** customers, let alone a reasonably large

sample, who made decisions based on a comparison. All of the customers who testified said REDACTED

*See* 56.1 Statement ¶¶ 269-77; Ex. 90 (Thomas Tr. 63:12-19); Ex. 4 (Welch Tr. 36:9-37:23); Ex. 5 (Chester Tr. 71:20-72:12); Ex. 11 (Franklin Tr. 22:14-18); Ex. 12 (Roach Tr. 23:24-24:4); Ex. 92 (Dodge Tr. 25:20-25); Ex. 91 (Bowman Tr. 42:10-43:17); Ex. 124 (Borglum Tr. 30:3-15); Ex. 132 (Martin Tr. 32:6-25); Ex. 125 (Sloan Tr. 38:4-39:7). Reed's only response to this undisputed testimony is to erroneously characterize these customers as "hand-picked" by McGraw Hill. Op. Br. 41-42. But these customers were picked by Reed, not MHC; Reed singled them out in its pleadings and interrogatory responses as customers who made purchasing decisions on the basis of the comparisons. Their testimony is devastating to Reed's claims.

Left with this gaping hole in its case, Reed relies over and over again on three declarations (not "testimony" as Reed repeatedly mischaracterizes it) it solicited more than fifteen months after the close of fact discovery from employees of three customers—Pat McCoy of J&J Industries, Alyssianne Curry Brennan of Siemens Energy & Automation ("SE&A") and Jeremy Ross of K Ross Company. Reed's brief includes a whopping ***37 citations*** to these three declarations, which only highlights the weakness of its case. As explained in McGraw Hill's accompanying Renewed Motion to Preclude Reed's Untimely Customer Declarations, two of these declarations—from Ms. Brennan and Mr. Ross—should not even be considered by the Court, as those declarants worked at companies that Reed did not identify in discovery and Magistrate Judge Pitman already ruled that Reed may not claim damages for those customers. But even if the Court were to consider the declarations, they prove nothing. Two of the declarants had no responsibility for choosing a construction project information service. As former vice president of J&J Industries Lee Martin ***testified at deposition***, REDACTED

REDACTED Ex. 132 (Martin Tr. 11:4-9, 28:18-25, 31:11-32:25). Similarly, McGraw Hill has obtained (and Reed again fails to mention) a declaration from Tom Walter of SE&A explaining REDACTED Ex. 173 (Walter Decl. ¶¶ 12, 14); *see also id.* ¶¶ 2, 5-11. Reed's third declaration is from a small local contractor who did not even purchase the national service at issue in this case. *See* Ex. 174 (Ross Decl. ¶ 5). In the face of the overwhelming evidence that MHC's comparisons did not have an appreciable effect on customer decisions and the unanimous testimony from all the customers who were deposed, Reed's resort to three paltry (and highly questionable) declarations does not create an issue of fact.[4]

Reed also cites a few isolated internal MHC emails in which sales representatives suggest that MHC's comparisons were used for a handful of specific sales. But, as Reed's own witnesses have testified, REDACTED. Ex. 42 (Melville Tr. 197:9-15); Ex. 177 (Fuss Tr. 135:3-25). When customers have been asked, they have uniformly rejected Reed's allegations.

---

[4] Reed neglects to mention that it also procured a fourth declaration from Kathleen Ogilvie of Ulma Form Works, which parroted the other three. Reed omitted this declaration from its opposition papers after Ms. Ogilvie recanted her prior statements. (*Compare* Ex. 175 (RCD25061886 (1st Ogilvie Decl.) ¶ 9 ("Based on my review of the comparisons MHC provided, I believed MHC's Network had substantially superior coverage . . . [and] I was willing to pay a premium for a Network subscription . . . and] believed I should pay less for Reed Connect . . . ") *with* Ex. 176 (MHC09211186 (2nd Ogilvie Decl.) ¶ 4 (REDACTED) (emphasis added), ¶ 10 (REDACTED)). McGraw Hill is confident that the remaining declarations would suffer similar fates if Reed's untimely production had not prevented McGraw Hill from taking appropriate discovery as to these customers.

For example, the only evidence apart from its discredited customer declarations and the self-serving statements of its expert cited by Reed in support of its "price effect" theory of damages is a 2006 email from an MHC sales representative to Kim Miller of customer Rieth-Riley. Op. Br. 41 n.214 (citing PX 406). Reed characterizes the email as evidence of MHC "using Roper comparison[s] to counter [a] customer's 'request to lower the cost of [a Network subscription] based on a trial . . . of [Reed Connect],'" *id.*, but the email shows nothing of the sort. Instead, the customer, Ms. Miller completely debunked Reed's theory and refuted Reed's allegation that the comparisons had any impact. Ms. Miller explained that REDACTED Ex. 178 (Miller Decl. ¶ 8). Ms. Miller's supervisor REDACTED. Ex. 179 (Inniger Decl. ¶¶ 10-11). Had Reed ***asked the customer***, it would have learned that its allegations were baseless. Neither the 2006 Rieth-Riley email nor the handful of other self-congratulatory emails purporting to attribute sales to Roper create a genuine issue of fact.

In any event, Reed's isolated customer evidence, even if believed, is insufficient as a matter of law to establish materiality in a market that Reed has estimated to include over 70,000 customers. Ex. 180 (April 8, 2013 Tr. of Argument before Judge Pitman at 13). Isolated examples of customer confusion, without more, are not probative of how the market as a whole views the message of an advertisement. *C.f. Nora Bevs. v. Perrier Grp. of Am.*, 269 F.3d 114, 124 (2d Cir. 2001); *DC Comic, Inc. v. Filmation Assocs.*, 486 F. Supp. 1273, 1280 (S.D.N.Y. 1980). The very case that Reed relies on makes this point plain. In *Mobileye, Inc. v. Picitup*

*Corp.*, the plaintiff survived summary judgment by performing a consumer survey demonstrating that at least 9.2% of the relevant consuming public was deceived by an advertisement. 928 F. Supp. 2d 759, 777 (S.D.N.Y. 2013). Even the low threshold in *Mobileye* far exceeds the proof Reed has offered on materiality. Reed has conducted no survey and instead attempts to rely on declarations from just three customers, representing only 0.004% of the customers Reed estimates are in the market. This is insufficient by any standard of materiality.

Moreover, even if Reed had evidence that MHC's comparisons generally were effective with customers (which it does not), this would still not prove Reed's case. Reed does not (and cannot) dispute that under ***any*** comparison MHC had more projects than Reed. *See, e.g.*, REDACTED. To establish materiality Reed must show that the alleged ***exaggeration*** in MHC's project totals mattered to consumers because the pertinent question is whether the allegedly ***false*** aspect of the advertisement influenced purchasing decisions, not whether the advertisement in general had an effect. *See, e.g., Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591, 618 (S.D.N.Y. 2012); *Century 21 Real Estate Corp. v. RE/MAX S. Cnty. (In re Century 21-RE/MAX Real Estate Adver. Claims Litig.)*, 882 F. Supp. 915, 924 (C.D. Cal. 1994). On this issue, Reed has absolutely no evidence and no response to the cases cited by McGraw Hill holding that modest exaggerations are not material. *See* McGraw Hill Financial, Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment ("Br.") 47.

Finally, Reed cannot rely on its expert's REDACTED Ex. 181 (Warren-Boulton Decl. ¶ 50 n.50); *see also* Op. Br. 4. But as Reed must admit, it would not be the first time in the history of American business that a marketing idea did not, at the end of the day, generate any significant return. Nor,

if Reed's theory were true, would there ever be any need to inquire into the materiality of an allegedly false advertisement, which would always stand as proof of its own effectiveness. This is silly and is obviously not the law.

### D. Reed Cannot Recover Damages With No Evidence of Actual Injury and Customer Deception

Because it has no evidence of actual deception or injury, Reed argues that the Court can presume an effect on consumers if Reed proves literal falsity. Op. Br. 54. Of course, Reed has no evidence of literal falsity, so this argument gets Reed nowhere. More fundamentally, Reed's reliance on the presumption to meet this element is frivolous because the presumption has never applied in cases such as this where the plaintiff seeks ***damages***. Damages in false advertising cases are rare, and require a heightened showing of causation and injury compared to suits seeking injunctive relief. *See PPX Enters. Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 271 (2d Cir. 1987). Where, as here, the plaintiff seeks monetary relief, it must prove ***actual injury*** that is directly attributable to the disputed advertising claims at issue. *See Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 493 (2d Cir. 1998) (citing *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992)). Contrary to Reed's assertion, Op. Br. 54, this rule applies regardless of whether the plaintiff can prove literal falsity. *See, e.g.*, *Tambrands, Inc. v. Warner-Lambert Co.*, 673 F. Supp. 1190, 1196 (S.D.N.Y. 1987).

Even within the context of injunctive relief, the presumption Reed attempts to rely on is in doubt following the Supreme Court's ruling in *eBay Inc. v. MercExchange L.L.C.*, 547 U.S. 388, 392 (2006), which disapproved the practice of presuming injury when granting injunctions. *See Salinger v. Colting*, 607 F.3d 68, 77-78 & n.6 (2d Cir. 2010). But even if the presumption survives in suits for injunctive relief, there is no dispute that the presumption has

never had any application in a case like this one where a plaintiff is seeking monetary compensation for damages that it claims to have actually suffered. Reed's failure to prove that any measurable portion of the market relied on the disputed advertisements to make purchasing decisions is fatal to Reed's claim for damages.

### E. Reed Is Not Entitled to Disgorgement of McGraw Hill's Profits

"[U]nder any theory, a finding of defendant's willful deceptiveness is a prerequisite for awarding profits." *George Basch*, 968 F.2d at 1537; *see also Borghese Trademarks, Inc. v. Borghese*, 10-cv-5552, 2013 WL 143807, at *10 & n.6 (S.D.N.Y. Jan. 14, 2013) (Oetken, J.). Reed has failed to point to any evidence of deception, much less evidence of ***willful*** deception. Moreover, Reed may not seek disgorgement of the alleged inflation of MHC's prices under its "price effect" theory because, by Reed's expert's own reasoning, those allegedly inflated profits would ***not*** have "otherwise . . . gone to the plaintiff." *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 772 (2d Cir. 1984); *see also* 15 U.S.C. § 1117(a) (damages "shall constitute compensation and not a penalty"). Reed has identified no false advertising case in which a court sitting in this Circuit awarded disgorgement without first making a determination that the defendant's profits would have gone to the plaintiff but for the misconduct. *Cf. Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 457-458 (S.D.N.Y. 2012); *Pedinol Pharmacal, Inc. v. Rising Pharms., Inc.*, 570 F. Supp. 2d 498, 504 (E.D.N.Y. 2008).

## II. Reed's Antitrust Claims Should Be Dismissed Because MHC's Conduct Did Not Have More Than a *De Minimis* Effect on Competition

Under the settled law of this (and other) Circuits, disparaging communications are presumed to have a *de minimis* effect on competition as a matter of law. Accordingly, a plaintiff can sustain an antitrust claim based on disparagement only if it satisfies a rigorous six-part test. *See Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988)

("*Ayerst*"). Here, Reed concedes that the "gravamen" of its antitrust claims is the distribution of allegedly disparaging comparisons. Nevertheless, Reed argues that the *Ayerst* test does not apply because its econometrics expert disagrees with the test's applicability to this case. Presumably, Reed seeks to avoid the test because it knows it cannot meet it. Notwithstanding the unsupported musings of its hired gun, the law is clear that *Ayerst* governs Reed's claims. Its failure to meet the *Ayerst* test forecloses Reed's antitrust claims as a matter of law.

### A. The Court Must Presume That MHC's Alleged Disparagement Had a *De Minimis* Effect on Competition

Contrary to Reed's suggestion, the Second Circuit has explained that the *de minimis* presumption is "based on the perception that, while 'there is no redeeming virtue in deception, . . . there is a social cost in litigating over it.'" *Applera Corp. v. MJ Res. Inc.*, 349 F. Supp. 2d 338, 344 (D. Conn. 2004) (quoting *Ayerst*, 850 F.2d at 916). Accordingly, there is a high bar to suits by companies seeking to use the possibility of treble damages under the antitrust laws to punish competitors' commercial speech. *See Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 852 (7th Cir. 2011) ("Some other law may require judicial intervention in order to increase the portion of truth in advertising; the Sherman Act does not.").

In the face of this authority, Reed offers two reasons why the Court should reject the *de minimis* presumption. First, Reed argues that this action is different because MHC and Reed allegedly operate in a two-player market where the level of competition is too low to cure the negative influences of disparagement. Op. Br. 61-65. Second, Reed argues that because Roper supervised the comparisons, the Roper Reports were likely to be believed by consumers, rendering the *de minimis* presumption inapt. *Id.* at 64. Reed is wrong on both counts.

Reed's first point has been repeatedly rejected by the courts, which regularly apply the *de minimis* presumption in cases where the defendant operated in a market alleged to

be even less competitive than the one here. Indeed, in the seminal *Ayerst* case, the Second Circuit applied the presumption where the defendant manufactured the ***only*** drug approved for a certain indication. *See Ayerst*, 850 F.2d at 907-08. Similarly, the *de minimis* presumption applies even where the defendant had an alleged 100% market share. *Alternative Electrodes, LLC v. Versus Empi, Inc.*, 597 F. Supp. 2d 322, 325, 332 (E.D.N.Y. 2009); *see also Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1150, 1152 (9th Cir. 1997) (applying *de minimis* presumption where BARBRI was the dominant market player). Reed does not cite any authority for its argument that all of these cases were wrongly decided. Instead, it relies entirely on the opinion of its hired expert, Ex. 181 (Warren-Boulton Decl. ¶ 42), as well as a single opinion by a trial court in the District of Minnesota. Op. Br. 64 (citing *Insignia Sys. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1061 (D. Minn. 2009)). Reed's expert's self-serving assertion cannot trump the law of the Second Circuit, and the Minnesota case does not support Reed's position because the Eighth Circuit has never adopted the *de minimis* presumption. *See Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc*, 323 F.3d 366, 371 (6th Cir. 2003).

Reed is also wrong when it argues that the Roper Report's (truthful) statement that Roper "oversaw" the comparison process somehow takes this case out of the *de minimis* presumption framework. To begin, this argument does not apply to most of the challenged statements because they did not include representations that a third party was involved. Moreover, even as to the Roper Reports, there is no dispute that customers understood they were MHC marketing materials. *See* Ex. 182 (Bowman Tr. 29:13-24) (REDACTED ); Ex. 183 (Chester Tr. 118:24-119:25) (REDACTED ); Ex. 4 (Welch

Tr. 38:8-22) (REDACTED).

Reed cites two district court cases in the Ninth Circuit to support its position that disparagement by a third party does not qualify for the presumption, Op. Br. 64, but those cases misinterpret the relevant Ninth Circuit precedent. The only support cited in *TYR Sport Inc. v. Warnaco Swimwear Inc.* for determining that the *de minimis* presumption did not apply was the Ninth Circuit's *American Professional Testing* decision. *See* 679 F. Supp. 2d 1120, 1132-33 (C.D. Cal. 2009); *see also Prime Healthcare Servs. v. Serv. Emps. Int'l Union*, 11-CV-02652, 2012 WL 3778348, at *10 (S.D. Cal. Aug. 30, 2012) (relying on the reasoning of *TYR*). But in *American Professional Testing*, the Ninth Circuit applied the *de minimis* presumption to ***anonymous*** fliers. *See* 108 F.3d at 1150. If the *de minimis* presumption applied to anonymous fliers, it must apply to marketing pieces distributed by MHC sales representatives.

### B. Reed Cannot Satisfy Five of the Six *Ayerst* Factors

Reed cannot dispute that district courts sitting in the Second Circuit have repeatedly dismissed antitrust claims when even one *Ayerst* factor was not met. *See Applera Corp.*, 349 F. Supp. 2d at 345 (dismissing antitrust claim because publication was not clearly false); *Multivideo Labs*, 2000 WL 12122, at *15 (same); *Eon Labs Mfg., Inc. v. Watson Pharm., Inc.*, 164 F. Supp. 2d 350, 361 (S.D.N.Y. 2001) (dismissing antitrust claim when reasonable-reliance factor was not met).[5] Summary judgment should be granted in McGraw Hill's favor because Reed cannot meet ***five*** of the *Ayerst* factors.

#### 1. MHC's Marketing Pieces Were Not Clearly False

Under *Ayerst*, it is not enough for a plaintiff to show that allegedly disparaging

[5] Reed also mischaracterizes *Ayerst* by arguing that the Second Circuit suggested that meeting two factors was sufficient to rebut the *de minimis* presumption. Op. Br. 66. To the contrary, the only take-away from *Ayerst* is that the court needed further discovery before it could "adequately evaluate[]" the six-factor test. 850 F.2d at 917.

statements were misleading or even literally false. Instead, a plaintiff must show that the challenged statements were ***clearly*** false. But, as discussed in Part I.B *supra*, Reed has no evidence to establish that MHC's marketing pieces were literally false, let alone clearly false. This alone dooms its antitrust claims. *See, e.g.*, *Applera Corp.*, 349 F. Supp. 2d at 345.

### 2. MHC's Marketing Materials Were Not Clearly Material

Under *Ayerst*, it is not enough for a plaintiff to show that the alleged falsehoods were material. Instead, a plaintiff must show they were ***clearly*** material.[6] For the reasons discussed in Part I.C *supra* , Reed cannot establish materiality under the Lanham Act, much less clear materiality under *Ayerst*.

### 3. MHC's Marketing Materials Were Not Clearly Likely to Induce Reasonable Reliance

In a case where Reed alleges that hundreds, if not thousands, of customers relied on MHC's marketing pieces, Reed's sole evidence concerning reasonable reliance is declarations Reed obtained long after the close of discovery from three customers. *See* Op. Br. 72. One of these declarations is not even relevant to the antitrust claims because it was submitted by a local customer (who was therefore not in the market Reed claims MHC monopolized), and the other two have been thoroughly refuted, as explained above. *See* Part I.C.2 *supra*. Even accepting these three declarations at face value, they fall woefully short of establishing that the challenged materials were likely to induce reasonable reliance by a substantial percentage of customers in the relevant market. *See id*. Reed has not met this *Ayerst* factor.

[6] Reed suggests that McGraw Hill has conceded that the Lanham Act's materiality standard should be used for this portion of the *Ayerst* test. *See* Op. Br. 70. This is incorrect. The *Ayerst* "clearly material" standard is more stringent than the Lanham Act standard and McGraw Hill has conceded nothing on this score.

**4. Customers Typically Have Direct Personal Knowledge of the Subject of MHC's Marketing Materials**

Reed argues that the parties' customers were not "knowledgeable" in the relevant sense because they were not experts in "complex data and statistical analysis." Op. Br. 74. But Reed cannot seriously suggest the parties' customers were unable to make informed decisions about which product better met their needs without the sort of months-long "complex data analysis" performed by Reed's expert in this litigation. The ***subject matter*** of the representations here had nothing to do with structured data analysis. It had everything to do with the quantity of projects in the systems meeting the stated parameters of the Roper Report or other comparisons. Reed has not set forth any evidence that the recipients of the comparisons were "without knowledge" of that subject—indeed, any customer with a free trial or subscription could have run the same searches and received the same results notwithstanding their ignorance of "complex data and statistical analysis." *See, e.g.*, Ex. 90 (Thomas Tr. 28:3-17); Ex. 120 (DX 694 (REDACTED )); Ex. 4 (Welch Tr. 27:21-28:3); Ex. 5 (Chester Tr. 52:13-24); Ex. 11 (Franklin Tr. 17:13-19).

**5. MHC's Marketing Pieces Were Susceptible to Neutralization**

Reed claims it could not neutralize the statements in MHC's comparisons because they were "not empirical facts about RCD that could be easily disproven . . . [or] meaningful[ly] rebutt[ed]." Op. Br. 75. But the Roper Report's numerical results REDACTED . If Reed nevertheless believed the facts were false, it could have distributed a response at any time. The fact that Reed chose not to—despite its long-time knowledge of the competitive comparisons and its access to its own comparisons—proves only that the challenged comparisons were accurate. It says nothing about whether the challenged comparisons were



6595544v.1

"susceptible" to neutralization under *Ayerst*.

Because Reed cannot meet five of the six *Ayerst* factors, its antitrust claims must be dismissed.[7]

## III. Reed's State Law Claims Fail Under Both the Laws of Both Georgia and New York

Reed concedes—as it must—that, if Georgia law applies, Reed's common-law claims based on misappropriation are all preempted by the Georgia Trade Secrets Act ("GTSA"). Op. Br. 89. Because Georgia law does apply and Reed's claims for fraud, tortious interference, trade secret misappropriation and misappropriation of confidential information are all based on misappropriation, those claims are completely preempted. Reed's claims for unjust enrichment and unfair competition are really restatements of its false advertising claims and fail on the merits for the reasons stated above. To the extent that these claims ***are*** instead misappropriation-based, they are preempted by GTSA. Moreover, even absent preemption, every one of Reed's claims fails on the merits under both the laws of Georgia and New York.

### A. Georgia Law Applies to Reed's State Law Claims

#### 1. The Court Has Already Rejected Reed's Argument That McGraw Hill Waived the Right to Apply Georgia Law

In opposition to McGraw Hill's prior motion to amend its Answer to add affirmative defenses under Georgia law, Reed raised the same argument it repeats now: that McGraw Hill waived its choice-of-law argument because the parties cited New York law at the motion-to-dismiss stage and because McGraw Hill omitted the GTSA affirmative defense in early Answers. *See* Op. Br. 77; Reed's Memorandum of Law in Opp. to McGraw-Hill Co.,

---

[7] Although McGraw Hill moves for summary judgment because Reed cannot overcome the *de minimis* presumption, contrary to Reed's insinuation otherwise, Op. Br. 58, McGraw Hill has not conceded any elements of Reed's antitrust claims. Should the claims proceed to trial, McGraw Hill expects to prevail on every element, including, but not limited to, the elements of standing, market definition, intent to monopolize, anticompetitive conduct, and antitrust injury.

Inc.'s Mot. for Leave to File a Third Amended Answer [Dkt. 128]. In April 2013, the Court rejected Reed's argument and granted McGraw Hill's motion to add the GTSA defense as an affirmative defense. April 4, 2013 Order [Dkt. 135]. Reed adds nothing new in its instant opposition. The only difference is that the GTSA defense has now been in the case for over a year, and Reed still cannot articulate any prejudice.

In any event, even if McGraw Hill was raising the GTSA preemption defense for the first time at summary judgment—which it is not—that would be permissible because there is no prejudice to Reed. *See S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 2d 188, 213 (E.D.N.Y. 2007); *Heisler v. Toyota Motor Credit Corp.*, 884 F. Supp. 128, 132 n.4 (S.D.N.Y. 1995). Reed has not cited a single case from a court in this Circuit to the contrary.

### 2. Georgia Law Applies to Reed's State-Law Claims Because the Conflict Is Loss-Allocating

Reed simply declares that "RCD's state law claims involve conduct-regulating rules." Op. Br. 78. But all claims "involve" conduct-regulating rules, otherwise there would be no cause of action. The pertinent question is whether the specific ***laws that are in conflict*** are conduct-regulating or loss-allocating. The issue here is whether statutory provisions in the GTSA ***preempt*** otherwise actionable claims. In other words, the conflict concerns rules that "prohibit[], assign[], or limit[] liability after the [alleged] tort occurs," *see Stichting Ter Behartiging Van de Belangen Van Oudasndeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 50 (2d Cir. 2005) (quotation omitted). This is the very definition of a loss-allocating conflict. *See, e.g.*, *Document Sec. Sys. v. Coupons.com, Inc.*, 11-cv-6528, 2012 WL 3597769, at *2-4 (W.D.N.Y. Aug. 20, 2012) (conflict between California Uniform Trade Secret Act and New York common law was loss-allocating because it "pertain[ed] to [a party's] ability to bring certain claims arising from tortious conduct.").

Having misclassified the conflict here as conduct-regulating, Reed does not address the proper standard. As set forth in McGraw Hill's opening brief, because the conflict is loss-allocating, under *Neumeir v. Kuehner*, the law from the place of injury applies unless "displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate systems or producing great uncertainty for litigants." 31 N.Y.2d 121, 128-29 (1972). Reed has not asserted ***any*** reason why applying New York law would advance the substantive purposes of any state's law.[8]

**B. Reed's Common-Law Claims Are Fully or Partially Preempted by GTSA**

**1. Reed's Common-Law Fraud, Tortious Interference, Misappropriation of Confidential Information and Misappropriation of Trade Secrets Claims Are Fully Preempted by GTSA**

***Fraud.*** "Georgia law is clear that . . . a trade secret misappropriation claim will supersede any fraud claim based on the same set of facts." *Airwatch LLC v. Mobile Iron, Inc.*, 1:12-cv-3571, 2013 WL 4757491, at *5 (N.D. Ga. Sept. 4, 2013) (Carnes, C.J.). Reed does not contest that its fraud claim is based on the same set of facts as its trade secret misappropriation claim. Nor could it. The fraud alleged by Reed is the exact same conduct that constitutes the "improper means" by which MHC allegedly obtained Reed's supposed trade secrets. *See* Ga. Stat. Ann § 10-1-761.

Instead, Reed cites to a single district court decision holding that because fraud

[8] Even if the Court were to determine that the conflict is conduct-regulating, Georgia law should still govern. In this case, unlike most tort claims, "say, a diversity action involving a car accident, it is not immediately apparent how one might identify 'the place' where the tort . . . occurred." *Adelson v. Harris*, -- F. Supp. 2d. --, 2013 WL 5420973, at *6 (S.D.N.Y. Sept. 30, 2013) (Oetken, J.). MHC accessed Reed Connect from New York. But MHC's consultants lived in Illinois and New Jersey, and the subscription agreements were negotiated over the phone with Georgia residents. Moreover, Reed alleges that MHC shipped its marketing pieces to customers who resided throughout the country. When there is no clear locus of the tort, it is proper to use the law from the place of injury. *See US Engine Prod. v ISO Grp., Inc.*, 12-CV-4471, 2013 WL 4500785, at *5 (E.D.N.Y. Aug. 20, 2013) (applying law from place of injury when there was no definitive locus of the tort); *AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, 726 F. Supp. 2d 307, 315-316 (S.D.N.Y. 2010) (same).

involves willful misconduct, a claim based on fraudulent misappropriation of an alleged trade secret "may be viable" notwithstanding GTSA. *RMS Titanic v. Zaller*, 1:13-CV-0625, 2013 WL 5675523, at *12 (N.D. Ga. Oct. 17, 2013). This outlier decision is not only in direct conflict with other cases from the same District, *see, e.g.*, *Airwatch*, 2013 U.S. Dist. LEXIS 125817, but is also inconsistent with the governing decision from the Georgia Supreme Court. As that court recently explained, using a new legal theory "to provide [plaintiff] the same relief based on the same allegations [that form the basis for a GTSA claim would] . . . undermine[] the exclusivity of the GTSA." *Robbins v. Supermkt. Equip. Sales, LLC*, 722 S.E.2d 55, 58 (Ga. 2012). Therefore, GTSA will preempt a plaintiff's claims even if they are based on "distinct theories of civil remedies" and not "dependent on the existence of a trade secret." *Penalty Kick Mgmt., Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1297 (11th Cir. 2003).

*RMS Titanic* does not consider this precedent. Instead, the decision is based on a misreading of *Hecny Transportation, Inc. v. Chu*, 430 F.3d 402 (7th Cir. 2005), a Seventh Circuit decision that is entirely consistent with finding that Reed's fraud claim is preempted. In *Hecny*, the Seventh Circuit, applying Illinois's version of the Uniform Trade Secret Act, found that "claims are foreclosed . . . when they rest on the conduct that is said to misappropriate trade secrets." *Id.* at 404-05. This rule requires preemption of Reed's fraud claim.

***Tortious Interference***. Reed concedes that its tortious interference claim is preempted by GTSA if Georgia law applies. Op. Br. 89.

***Misappropriation of Confidential Information and/or Trade Secrets***. Reed does not dispute that its common-law claims for misappropriation of confidential information and trade secrets are preempted in favor of a statutory GTSA claim. Moreover, as explained below, even if Reed's claims are analyzed under GTSA, they fail on the merits.

### 2. Reed's Unfair Competition and Unjust Enrichment Claims Are Preempted to the Extent They Are Construed as Misappropriation-Based

In its moving brief, McGraw Hill noted that Reed pleaded its unfair competition and unjust enrichment claims under both misappropriation and false advertising theories. Br. 72, 74. Reed does not contest that to the extent the claims are misappropriation-based, they are preempted by GTSA. *Id.*; *see also* Op. Br. 89.

## C. On the Merits, Reed's Claims Fail Under the Laws of Georgia and New York

### 1. Reed Concedes that it Cannot Prove an Essential Element of Fraud: Damages

In its moving brief, McGraw Hill demonstrated that Reed's fraud claim fails because there is no evidence Reed suffered damages as a "***direct, immediate and proximate***" result of the alleged misrepresentations underpinning its fraud claim. Br. 76-77. As McGraw Hill noted, Reed's damages, if they exist at all, stem entirely from ***customers' purchasing decisions*** supposedly in reliance on MHC's marketing materials, a cause very far removed from the alleged fraud, which consisted entirely of statements allegedly made ***to Reed*** by MHC's alleged agents to obtain Reed Connect subscriptions, sometimes years earlier.

Reed's only response is the feeble assertion that "[w]hether RCD will obtain fraud damages is not an issue to be considered at this stage." Op. Br. 88-89. But Reed's failure to address this issue amounts to a concession that it did not suffer any damages as a proximate result of the alleged fraud. Reed also fails to dispute, and therefore concedes, that it has not suffered any out-of-pocket pecuniary losses as required under New York law or that lost profits damages (which are all that it claims) are not available as a matter of law. *See* Op. Br. 75-76.

Reed tries to salvage its fraud claim by citing two cases that awarded nominal damages after a plaintiff ***was able to prove*** that it suffered losses as a proximate result of the

defendant's fraud, but was ***unable to quantify the amount***. *See Brandaid Mktg. Corp. v. Biss*, 03-CV-5088, 2008 WL 190494, at *5 (S.D.N.Y. Jan. 22, 2008); *Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.*, 88 A.D.2d 461, 470 (2d Dep't 1982). These cases are easily distinguished. Here Reed has not failed to quantify a loss that was proximately caused by an alleged fraud, it has ***utterly failed to show any such loss***. As this Court recently held, proximately caused pecuniary "damages are an essential element of a fraud claim." *Schneider v. Pearson Educ., Inc.*, 12 Civ. 6392, 2013 WL 1386968, at *5 n.6 (S.D.N.Y. Apr. 5, 2013) (Oetken, J.) (quotation omitted); *see also Stiefel v. Schick*, 398 S.E.2d 194, 196 (Ga. 1990) (in Georgia, "[plaintiff] must show that actual damages, not simply nominal damages, flowed from the fraud alleged.") (quotation and citation omitted).

**2. Reed Cannot Prove Misappropriation of Trade Secrets**

Reed brought its trade secret claim based on allegations that MHC misappropriated "information available on Reed Connect," including project information and search interface know-how. Third Amended Complaint ("TAC") [Dkt. 114] ¶ 176. But discovery revealed (and Reed admits) that Reed made these same alleged trade secrets available to thousands of companies through product trials that allowed full access to the database without any confidentiality restrictions. *See* Reed Construction Data's Response to Statement of Undisputed Material Facts Under Local Civil Rule 56.1 ¶¶ 202-04. This undisputed fact dooms Reed's trade secret claim. *See* Br. 68-69, 77.[9]

[9] Reed makes much of the fact that it has subscription agreements containing non-disclosure provisions. But this ignores the fact that Reed gave out ***trials*** without any non-disclosure obligations whatsoever. Ex. 130 (Dempsey Tr. 27:23-28:5), Ex. 41 (Royster Tr. 74:21-75:5). All of the cases cited by Reed are factually distinguishable because the plaintiff required a nondisclosure agreement before giving any access to the information at issue. *See Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (nondisclosure agreements prohibited former employees from disclosing information); *FMC Corp. v. Taiwan Tainan Giant Indus.Co.*, 730 F.2d 61, 62 (2d Cir. 1984) (agreement promising not to divulge information); *Camp Creek Hospitality Inns v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1411 (11th Cir. 1998) (express condition that information would not be made

Because Reed has no answer to this, it makes two equally desperate moves: (1) it argues that McGraw Hill is judicially estopped from even questioning Reed's assertion of trade secret status; and (2) it concocts a slew of brand new alleged "secrets" that were somehow known only to MHC, but not to the thousands of companies that had the exact same access to Reed Connect through free trials given out by Reed over the relevant time period. Neither argument comes close to saving Reed's claim.

Reed's claim that McGraw Hill is judicially estopped based on two early twentieth century cases is absurd. *See* Op. Br. 81. Judicial estoppel applies only where a party's position is "clearly inconsistent" with its earlier position. *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010). If the positions "can be reconciled in some way," judicial estoppel does not apply. *Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, 05-5155, 2010 WL 652832, at *3 (E.D.N.Y. Feb. 22, 2010). In the two antiquated decisions Reed cites, McGraw Hill's predecessor, F.W. Dodge, argued that it had a proprietary interest in print project reports, and that the interest was not lost when the reports were sold to customers ***under confidentiality agreements***. *See F. W. Dodge Co. v. Constr. Info. Co.*, 66 N.E. 204, 205 (Mass. 1903); *F. W. Dodge Corp. v. Comstock*, 140 Misc. 105, 106, 109 (N.Y. Sup. Ct. 1931). There is no inconsistency between that position and the fact that Reed's database, which was widely distributed in its entirety ***without any restrictions***, is not entitled to trade secret protection.

Reed's alternative, and equally unavailing, approach is to simply invent what it calls a "plethora of trade secrets" consisting of Reed's "methodologies and business practices," never before mentioned in the four years of this litigation. Op. Br. 83-84. Reed claims that a "trial" or "legitimate" user would, for unspecified reasons, be unable to discern this "secret"

public); *Inventory Locator Serv., LLC v. Partsbase, Inc.*, 02-2695 2005 WL 2179185, at *14 (W.D. Tenn. Sept. 2, 2005) (agreement prohibiting customers from conveying information to third party) (applying Tennessee law).

information, while a competitor with extended access ***might*** be able to. Op. Br. 84. This is a non-starter since Reed can point to no evidence that MHC accessed such information. To the contrary, Reed boasts that its own expert, Ms. Kwon, was "the only witness in this case who has reviewed and commented on the different business practices utilized by RCD." Op. Br. 84. Moreover, Reed does not cite to any case law to support the proposition that publicly available information somehow morphs into a protected trade secret once viewed over an extended period of time, or by a competitor. Reed's reliance on the self-serving conclusory allegations of its employee, Richard Remington, does not provide any support for Reed's arguments on this point.

**3. Reed's Unfair Competition Claim Also Fails**

Reed does not address McGraw Hill's argument that Georgia has never recognized an unfair competition cause of action based on either misappropriation or false advertising, the only potential theories advanced by Reed. Op. Br. 72. Accordingly, Reed has conceded that its unfair competition claim fails under Georgia law.

Turning to New York law, Reed asserts that MHC engaged in five types of "unfair competition": creating the Roper Report to allegedly mislead customers; using Reed Connect as an internal benchmark; identifying areas of editorial weakness; locating information sources; and "guid[ing] the development of Network." Op. Br. 86. Reed has no evidence to support any of these assertions, but, even if it did, the only type of alleged unfair competition for which it claims damages is the first one: the alleged distribution of misleading Roper Reports. This is a paradigmatic unfair competition by product disparagement claim, *see Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 277-78 (S.D.N.Y. 2003); *Redeye Grill, L.P. v. Rest. Opportunities Ctr. of N.Y.*, 13 Misc. 3d 1212A (N.Y. Sup. Ct. 2006), not, as Reed asserts a "textbook case of the misappropriation theory of unfair competition." Op. Br. 86. The reason

for Reed's mischaracterization of its own claim is obvious: Reed cannot sustain an unfair competition by product disparagement under New York law because it cannot demonstrate falsity, malice, or special damages. *See* Br. 80-81. Reed does not even respond to any of McGraw Hill's arguments on this score.[10]

**4. Tortious Interference With Prospective Economic Advantage Fails Because Reed Did Not Lose Business Prospects Based on Tortious Conduct**

Reed concedes that to sustain its claim for tortious interference it must present evidence "of a ***specific, identifiable prospective business relationship*** that has been impaired by the defendants' conduct." *Util. Metal Research, Inc. v. Coleman*, 03-cv-1463, 2008 WL 850456, at *8 (E.D.N.Y. Mar. 28, 2008); Op. Br. 85.[11] Reed cannot carry this burden.

In its latest interrogatory responses, Reed claimed that MHC's alleged misconduct caused 23 customers to switch to Dodge. Ex. 146 (Sec. Supp. Interrog. Resps.). Reed's opposition does not, however, make any effort to particularize its proof on these customers, instead simply citing en masse to footnotes from 40 pages earlier. Op. Br. 87 (citing to Op. Br. 41-43 nn.218, 225). This is insufficient to carry Reed's burden of demonstrating its claim for particular customers. Moreover, even if the Court is inclined to wade through the thicket of Reed's footnotes to piece together the customers Reed claims to have lost, it will find that Reed has failed to raise a genuine issue of material fact as to any of them. Reed's evidence relates to only five of the 23 customers in Reed's interrogatory responses—GE Consumer & Industrial,

---

[10] Reed concedes that unfair competition by misappropriation does not exist unless the defendant misappropriates property and "unreasonably interfer[es] with complainant's right to make merchandise of it." Op. Br. at 86 (*quoting Int'l News Serv. v. Associated Press*, 248 U.S. 215, 239 (1918)); *see also Int'l News Serv.*, 248 U.S. at 239 (defendant committed unfair competition by taking property and "selling it as its own."). Here, Reed makes no allegation and has no evidence that MHC took any property from Reed and sold it as MHC's own. Reed's claim is therefore defective under a misappropriation theory as well.

[11] As noted above, Reed concedes that this claim is fully preempted if Georgia law applies. Accordingly, only New York law is addressed in this section.

Hughes Supply, J&J Industries, National Gypsum and Polyvision. *See* Op. Br. nn.218, 225. Because Reed has failed to come forward with evidence concerning the remaining 18 customers on its list, summary judgment should be granted as to them as a matter of course.

As to the remaining five customers, Reed's evidence fails to raise a genuine issue of material fact. For example, while Reed claims REDACTED Reed has put forward no evidence to refute REDACTED. The same goes for the other four customers referenced in Reed's footnotes.[12] Summary judgment should therefore be

[12] To sum up the evidence on the other four:
***GE Consumer & Industrial***. REDACTED Ex. 185 (DX 79). REDACTED Ex. 186 (RCD00365453).
***J&J Industries***. Lee Martin, former Vice President of Sales & Marketing REDACTED Ex. 132 (Martin Tr. 32:18-25).
***National Gypsum***. REDACTED Ex. 187 (RCD00706650). REDACTED Ex. 188 (RCD00706733).
***Polyvision***. REDACTED Ex. 146 (Sec. Supp. Interrog. Resps. Ex. 4). REDACTED

granted as to Reed's tortious interference claim.

**5. Unjust Enrichment Fails Because McGraw Hill Did Not Receive Anything of Value at Reed's Expense**

Reed does not dispute that in both Georgia and New York "[a] plaintiff [seeking recovery for unjust enrichment] ***must have suffered a loss*** and [that] an action not based upon loss is not restitutionary." *Edelman v. Starwood Capital Grp.*, 70 A.D.3d 246, 250 (1st Dep't 2009) (emphasis added and quotation omitted); *see also City of Atlanta v. Hotels.com*, 710 S.E.2d 766, 771 (Ga. 2011) (unjust enrichment claim barred where defendant did not receive a benefit ***from the plaintiff***). Summary judgment should be granted on Reed's unjust enrichment claim because it has failed to present evidence that MHC was "enrich[ed] . . . at the expense of [Reed]." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009). For the reasons set forth above, Part I.C.2, Reed cannot establish that McGraw Hill obtained customers at Reed's expense. And Reed does not dispute that its price effect theory is based exclusively on the extent to which MHC was allegedly unjustly enriched when its customers paid higher prices than they otherwise would have—money that, by Reed's own expert's admission, would never have gone to Reed. Op. Br. 88. Reed's lost customer and price effect theories therefore do not provide evidence of unjust enrichment.

Reed also for the first time claims that "expenses MHC avoided by having access to RCD's Connect service" constitute unjust enrichment to McGraw Hill. The Court has already sanctioned Reed for failing to timely disclose its damage theories, and this new theory should meet the same fate. *See* April 15, 2013 Order [Dkt. 141] at 11. In any event, these supposed

---

REDACTED Ex. 189 (RCD00677001).

REDACTED Ex. 190 (MHC00086146; MHC00086147).

savings were not at Reed's expense and they therefore provide no basis for a claim.

## IV. Portions of Reed's Claims Are Time Barred

Reed agrees with McGraw Hill about the applicable statute of limitation for each of Reed's claims, except for unfair competition and unjust enrichment (see nn. 14-15 *infra*). *See* Op. Br. 97 n.237. Reed further concedes that, based on the nature of its allegations, its claims accrue separately upon each alleged wrongdoing. *See* Op. Br. 98-99. Assuming that the date of accrual is the date of injury (which allows the greatest portion of Reed's claims to be timely), each of Reed's claims is time-barred to the extent it involves injuries occurring prior to the following:[13]

| Count | Claim | Applicable Cut-Off Date |
|---|---|---|
| One | Fraud | October 8, 2005 (4 years) |
| Two | Misappropriation of Trade Secrets | October 8, 2006 (3 years) |
| Three | Misappropriation of Confidential Information | October 8, 2006 (3 years) |
| Four | Unfair Competition | October 8, 2008 (1 year)[14] |
| Five | Tortious Interference | October 8, 2006 (3 years) |
| Nine and Ten | Antitrust | October 8, 2005 (4 years) |
| Eleven | Unjust Enrichment | October 8, 2006 (3 years)[15] |

The only remaining question is whether Reed can toll the applicable limitations

[13] Reed points out that "McGraw-Hill does not raise a statute of limitations defense to RCD's Lanham Act claim." Op. Br. 92. Reed presumably knows that's because the Lanham Act does not contain a limitations period. *See Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996).

[14] Reed argues that its unfair competition claim is subject to a three-year statute of limitations. Op. Br. 97. This is incorrect, however, because the crux of Reed's unfair competition claim is product disparagement. Br. 80. Unfair competition by product disparagement is subject to a one-year statute of limitations. *See, e.g., Gen. Sec., Inc. v. APX Alarm Sec. Solutions, Inc.*, 647 F. Supp. 2d 207, 218 (N.D.N.Y. 2009)

[15] Reed argues that the statute of limitations for unjust enrichment is six years because it is seeking the "equitable remedy of restitution." Op. Br. at 98. This is incorrect. What Reed seeks through its unjust enrichment claim are "damages sustained due to Dodge's [alleged] unjust enrichment at RCD's expense," TAC ad damnum ¶ 16; *see also* TAC ¶ 343, not equitable remedies such as an accounting or a declaration of rights in specific property which would be governed by New York's six-year limitations period. *See Lia v. Saporito*, 909 F. Supp. 2d 149, 164-170 (E.D.N.Y. 2012); *Loengard v. Santa Fe indus., Inc.*, 70 N.Y.2d 262, 266 (1987). Where, as here, a plaintiff seeks monetary relief, the statute of limitations for unjust enrichment is three years, not six. *See, e.g., Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 263 (S.D.N.Y. 2008).

periods based on what Reed refers to as "fraudulent concealment."[16] Fraudulent concealment applies only where the plaintiff can show it "exercised reasonable care and diligence in seeking to learn facts" relevant to its claims. *Coleman & Co. v. Giaquinto Fam. Trust*, 236 F. Supp. 2d 288, 299 (S.D.N.Y. 2002). It is unavailable where a plaintiff has "timely knowledge sufficient to place her under a duty to make inquiry," *Lan v. Time Warner, Inc.*, 11 Civ. 2870, 2013 WL 1703584, at *25 (S.D.N.Y. Apr. 19, 2013) (alteration omitted), or where the plaintiff has knowledge of sufficient facts to bring a claim, *Gonzales v. Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 572 (S.D.N.Y. 2012). A plaintiff does not need to know every detail of an alleged scheme for the statute of limitations to run; knowledge of facts sufficient to bring a claim is enough. *Ruso v. Morrison*, 695 F. Supp. 2d 33, 47 (S.D.N.Y. 2010).

McGraw-Hill set forth the evidence of Reed's knowledge in its opening brief, none of which Reed can contest. That evidence includes REDACTED

*See* Br. 12-13. REDACTED

, *see* Ex. 1 (Jordan Tr. 13:11-14:8); REDACTED

[16] Reed's opposition interchangeably refers to "fraudulent concealment," "equitable tolling," and "equitable estoppel." Op. Br. 92-97. For purposes of this motion, McGraw-Hill will refer to the doctrine as "fraudulent concealment," since that is how Reed styles its theory in the header to its argument. Regardless of how Reed characterizes its theory, there is no genuine issue of material fact as to its inapplicability to this case.

REDACTED

See Ex. 61 (RCD00928247). Reed does not challenge any of this evidence.

Instead, Reed argues that (a) MHC attempted to conceal its access to Reed Connect through the use of what Reed hyperbolically refers to as "an intricate system of surreptitious conduct," including the use of aliases, a dedicated DSL line, and rules that directed sales representatives not to leave copies of the Roper Report with customers, *see* Op. Br. 1, 95; and (b) MHC attempted to mislead Reed on three occasions (in December 2006, Spring 2007, and July 2008) when Reed inquired about MHC's access. *Id.* at 96. These allegations, even if true, do not create a genuine issue of fact as to fraudulent concealment. At most, they would show that MHC ***tried*** to conceal its alleged misconduct; that is irrelevant, however, since any such attempt clearly was unsuccessful. *See Adams v. Deutsche Bank AG*, 11 Civ. 1893, 2012 U.S. Dist. LEXIS, at *21-22 (S.D.N.Y. Sept. 24, 2012).

The communications Reed cites from 2006, 2007 and 2008 do not change the analysis. First, the earliest of these communications occurred in December 2006, two months ***after*** the relevant time period for all claims other than unfair competition. Reed cannot raise an issue of fact as to the tolling of a statutory period based on a communication that occurred after the period in question. Second, none of the communications negate the actual knowledge that Reed undeniably possessed. Nor did any of these communications involve a situation where MHC induced Reed to forgo a claim. To the contrary, the 2007 communication between the parties' in-house counsel included a concession from Reed that it was aware of past misconduct, but only interested in discussing the future. *See* Br. 92-93. Finally, there is no dispute that Reed continued to have actual knowledge of MHC's alleged misconduct before, during and after each communication. *See, e.g.*, Ex. 51, (DX 40) (REDACTED

REDACTED ); Ex. 49 (DX 222) (REDACTED ); Ex. 44 (REDACTED ). Reed's long-time knowledge of MHC's conduct defeats any tolling defense based on fraudulent concealment. *See Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir. 1985).

## CONCLUSION

For the reasons set forth above and in McGraw Hill's opening brief, the Court should grant McGraw Hill's motion and dismiss Reed's complaint in its entirety.[17]

Dated: New York, New York
December 13, 2013

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By: ______________________

Saul B. Shapiro, Esq.
Joshua A. Goldberg, Esq.
Michelle W. Cohen, Esq.
*Attorneys for Defendant McGraw Hill Financial, Inc.*
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 336-2000

[17] In its opposition brief, Reed attempts to sully the reputations of senior McGraw Hill officials it knows had no part in the events at issue. For example, Reed claims that Vasant Prabhu, a corporate superior at a level above the MHC division, initiated a program of purchasing competitor products to create content comparisons. But Reed neglects to mention that REDACTED Ex. 191 (Pao Tr. 15:13-17:4); Ex. 192 (Young Tr. 28:9-29:4). Similarly, Reed misrepresents testimony from Ms. Major that REDACTED Op. Br. 5, as evidence that McGraw Hill's top executives, including the CEO of the company, "knew of MHC's illegal access." But Ms. Major, REDACTED Ex. 193 (Major Tr. 554:20-555:24). Ms. Major also confirmed that REDACTED *Id.* 588:6-589:6. There is no evidence that anyone outside of MHC participated in or knowingly condoned the misconduct alleged in this case.