```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
REED CONSTRUCTION DATA INC.,            :
                                        :    09 Civ. 8578 (JPO)
                    Plaintiff,          :
            -v-                         :    OPINION AND ORDER
                                        :
THE MCGRAW-HILL COMPANIES, INC., et al, :
                                        :
                    Defendants.         :
------------------------------------------------------------X
```

J. PAUL OETKEN, District Judge:

   This is a discovery-related dispute in a business tort case. The parties are corporate rivals: Plaintiff, Reed Construction Data Inc. ("Reed"), and Defendant, The McGraw-Hill Companies, Inc. ("McGraw-Hill"), offer competing construction project information databases ("CPI databases" or "databases") to subscribers, such as general contractors and architects who use the databases to find leads for construction-industry work.  Reed alleges that McGraw-Hill committed business torts and anti-competitive acts in violation of state and federal laws.  After several years of intensive discovery, McGraw-Hill moved for summary judgment (Dkt. No. 149). That motion was accompanied by the present motion to preclude certain declarations from this Court's review of the summary judgment motion (Dkt. No. 172).  For the reasons that follow, McGraw-Hill's motion to preclude is granted.

**I.**  **Background**

  **A.**  **Reed's Claims**

   The gravamen of this case is Reed's claim that McGraw-Hill's agents unlawfully accessed Reed's database to gather data that McGraw-Hill used to construct misleading

1

marketing materials comparing McGraw-Hill favorably against Reed.[1]  To prevail on its claims, Reed must demonstrate that customers relied on the challenged marketing materials when evaluating Reed's database and that the marketing had a material impact on customers' choice of database.[2]  Reed pursued such evidence throughout the four-year discovery process, which ran from 2010 until March 1, 2013.  This motion seeks to preclude two customer declarations that Reed obtained after the close of formal discovery and which Reed now seeks to use to defend against summary judgment.

### B. Procedural Background

In early 2010, at the start of discovery, Reed identified 221 customers whose purchasing decisions were allegedly materially impacted by McGraw-Hill's marketing tactics; these customers ("the original customers") were named in an amended complaint filed on December 10, 2009.  (Dkt. No. 20.)  At the time, Reed's theory of damages focused on revenue that was lost as a result of the original customers' decision not to purchase Reed's database ("lost-sales" damages).

At the close of fact discovery on July 27, 2012, Reed maintained the same list of 221 customers who were impacted by the contested marketing.  In a March 1, 2013 filing, however, Reed eliminated 198 customers from its case, leaving only 23 of the original customers.  Reed

---

[1] The contested marketing materials include side-by-side screen shots taken from Reed and McGraw-Hill databases; the screen shots were designed to show that when similar searches were run on the two databases, McGraw-Hill's database produced better results.  McGraw-Hill could not have produced this type of advertising without access to Reed's database.  Reed alleges that these searches were manipulated to highlight McGraw Hill's strengths and were ultimately misleading.

[2] The term "customer," as used in this opinion, refers to potential CPI database customers, including actual and potential customers of Reed and McGraw-Hill during the relevant time period.

simultaneously attempted to add 26 new customers who had not previously been identified ("the new customers"). McGraw-Hill objected to the addition of the new customers and ultimately prevailed on its motion to preclude Reed from seeking damages based on lost sales to those 26 new customers. In a April 15, 2013 Order granting that motion, Magistrate Judge Pitman applied Federal Rule of Civil Procedure 37(c)(1) to preclude Reed from seeking lost-sale damages based on the 26 new customers.[3]

Subsequently, in May and June of 2013, Reed produced three declarations from representatives of the precluded new customers, including the two declarations at issue in this motion, which were submitted on behalf of Alyssianne Curry Brennan, a former employee for Siemens Energy & Automation ("Siemens") ("Brennan Declaration"), and Jeremy Ross, an Account Manager for K Ross Company ("Ross") ("Ross Declaration"). McGraw-Hill objected to all three declarations and moved to preclude their use in this case. Judge Pitman denied that request on July 15, 2013 because the declarations had not yet been offered for any purpose and thus, "the dispute [was] not yet ripe for resolution." July 15, 2013 Order at 2. Reed now seeks to use the Ross and Brennan Declarations ("Declarations") to defend against McGraw-Hill's summary judgment motion, and McGraw-Hill has renewed its motion to preclude the declarations.

---

[3] The April 15, 2013 Order also precluded Reed from adding a new theory of damages: specifically, Reed was barred from recovering "lost seat charges," or fines that it would have charged had it known that customers were granting McGraw-Hill affiliates access to Reed's database without purchasing additional subscription codes, or "seats," for these users. April 15, 2013 Order at 4, 7.

## II. Discussion

### A. Rule 37 and the *Design Strategy* Factors

Federal Rule of Civil Procedure 37 provides that "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."[4]  "The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new evidence."  *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004).  Generally, preclusion is a "drastic remedy and should be exercised with discretion and caution."  *Id.*  In *Design Strategy, Inc. v. Davis*, the Second Circuit established a four-factor test for determining when evidence should be precluded under Rule 37.  469 F.3d 284, 296 (2d Cir. 2006).  Courts must consider:

> (1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Id.* (internal quotations omitted).

### B. Application of the *Design Strategy* Test in Prior Orders

Judge Pitman applied the *Design Strategy* test in his April 15, 2013 Order.  Analyzing the first factor, he found that because Reed became aware of the new customers while it was conducting depositions, and could have initiated bilateral discovery regarding the new customers during the designated discovery period, "there is little justification for [Reed's] failure to identify

---

[4] Federal Rule of Civil Procedure 26(a) covers required disclosures while 26(e) covers supplemental disclosures.

these lost customers in a timely manner."[5]  April 15, 2013 Order at 8.  Second, Judge Pitman assigned relatively little weight to Reed's interest in adding the new customers to its claim because Reed's additional lost-sales damages from those customers would have comprised less than six percent of Reed's overall damages.  *Id.* at 8-9.  In contrast, after analyzing the third factor, Judge Pitman found that McGraw-Hill would suffer significant prejudice and expense if the new customers joined the case.  *Id.* at 9. ("[D]efendants will have to perform a new review of their own documents to locate potentially relevant documents. . . . In addition, permitting the amendments will require revision of the expert reports, and perhaps, a new round of expert depositions.")  Fourth and finally, Judge Pitman discounted the possibility of a continuance given the numerous extensions and extraordinary delays that had already distended the timeline of this case.

In his July 15, 2013 Order, Judge Pitman noted that "it is impossible to assess the second and third factors" of the *Design Strategy* test "[w]ithout knowing the specific purpose for which evidence is being offered."  However, his finding on the first factor (that Reed's breach of Rule 26 was unjustified) remains in force regardless of the particular purpose for which the new evidence is offered.  *See* July 15, 2013 Order at 3 ("This Order does not, of course, modify my April 15, 2013 Order in this matter.") (internal citation omitted).  Furthermore, regarding the fourth factor, given Judge Pitman's concern with the delays that have already plagued discovery in this case, the appropriateness of a continuance only diminishes with time.  Ultimately, the July 15, 2013 Order left only the closely related second and third *Design Strategy* factors open for

---

[5] Implicit in Judge Pitman's application of the *Design Strategy* test is the conclusion that Reed's failure to name the new customers prior to the close of fact discovery was in fact a violation of Rule 26 and therefore triggered Rule 37 preclusion analysis.  Despite Reed's arguments to the contrary, there is no basis for this Court to reexamine this preliminary inquiry now.

5

later analysis.[6]  Accordingly, this Court must weigh the importance of the Ross and Brennan Declarations to Reed against the prejudice to McGraw-Hill of having to address the new evidence.[7]

      **C.**      **Application of the *Design Strategy* Test to the Declarations**

           **1.**      **The Declarations**

Both the Ross and Brennan Declarations support Reed's theory of the case.  The Brennan Declaration states that in July 2004, Siemens signed a two-year subscription contract with Reed, but during the contract's trial period Brennan terminated its $80,608-per-year Reed subscription and switched to a $171,950-per-year McGraw-Hill subscription because a salesman used the contested marketing materials to convince her that McGraw-Hill had a superior database that was worth the price premium.  The Ross Declaration states that in 2008, Ross orchestrated a downward bidding war between Reed and McGraw-Hill, with Reed dropping its price quote from $4,900 to $3,600 and McGraw-Hill dropping its quote from $8,642 to $3,837.  Ross

---

[6] Law of the case doctrine provides that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case."  *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991) (citing *Arizona v. California*, 460 U.S. 605, 618 (1983)).  This prudential doctrine helps to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit."  Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.).  Here, the parties have not presented any of the extraordinary circumstances that would warrant a departure from the law of the case.  *See Laurent v. PriceWaterhouseCoopers LLP*, 963 F. Supp. 2d 310, 314 (S.D.N.Y. 2013)   ("Under law of the case doctrine, the principal bases for departure from a prior ruling include 'an intervening change of controlling law, the availability of new evidence relating to the issue in question, or the need to correct a clear error or prevent manifest injustice.'") (quoting *Doe v. New York City Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)) (internal amendments adopted).

[7] The essence of this inquiry thus mirrors the types of evidentiary balancing that trial courts routinely make under Federal Rule of Evidence 403.  ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.")

declares that "although he initially indicated that [he] would select the lowest priced service, [he] accepted the [contested marketing materials] as true and relied on them in deciding to purchase [McGraw-Hill's] Network instead of Reed Connect." (Ross Declaration, at 3.)

### 2. The Declarations' Importance to Reed (*Design Strategy* Factor 2)

Reed seeks to use the Ross and Brennan Declarations to establish genuine questions of material fact regarding issues of materiality and reliance that are "at the very heart of liability in this case." (Dkt. No. 176, "Pl. Opp. Brief," at 21). In addition to using the declarations to support liability, Reed uses them to develop a new theory of damages. Reed's "price-effects" damages reflect the theory that McGraw-Hill's actions changed the market for CSI databases such that Reed was forced to lower its prices in order to stay competitive, while McGraw-Hill was able to charge supra-competitive prices. Reed seeks recovery based upon both its allegedly depressed prices and McGraw-Hill's allegedly inflated prices. The price-effects theory is based on McGraw-Hill's alleged monopoly power in the market for nationwide CSI databases. (Dkt. No. 161, "Warren-Boulton Declaration.") The Court separately analyzes the importance of the Declarations as to each of these two purposes.

First, the importance of the Declarations to Reed's liability case is a double-edged sword. Reed's briefings downplay the importance of the Declarations in order to preserve its argument on summary judgment that genuine questions of liability exist even absent the Declarations. Likewise, McGraw-Hill argues against interest that the Declarations are Reed's only evidence of materiality and reliance (and therefore, quite important to Reed's case); this argument preserves McGraw-Hill's stance in its summary judgment motion that, absent the Declarations, no genuine dispute exists as to those questions. Since the parties' positions on the importance of these Declarations appear to be largely strategic, the Court conducts its own analysis.

With respect to the issues of materiality and liability, the Declarations apparently provide direct proof in favor of Reed's position. However, they are not Reed's only evidence of such matters. *See, e.g.* Opp. Brief, at 20 n.5 (listing additional evidence in Reed's favor on the same liability issues). Moreover, it bears recalling that over the course of discovery, Reed and McGraw-Hill collectively plumbed the records of their interactions with at least 247 customers. Given that volume, the marginal importance of two additional Johnny-come-lately declarations should be diminishing to the point of insignificance. At summary judgment, Reed is tasked with showing that issues of materiality and reliance are at play. Either these two declarations are unnecessary because there is similar testimony from at least one of the other 245 customers, or they should be viewed as suspect because, in addition to being elicited outside the normal discovery process, they contradict the position of the remaining 245 customers. In any event, few inferences can be validly drawn from two declarations reflecting just .8 percent of the customers that were targeted in this case. This is especially true where those declarations have not been subject to the normal rigors of bilateral discovery.

Second, the importance of the Declarations to Reed's price-effects damages claim is dubious. Ross was not a customer in the national database market and Reed does not allege price-effect damages in local markets.[8] Therefore, the Ross Declaration offers little assistance in establishing Reed's price-effects claim.[9] In contrast, the Brennan Declaration pertains to the national market. But it includes very little substance to support the price-effects claim. As an

---

[8] Reed could not allege price-effect damages in local markets without demonstrating that McGraw-Hill had monopoly power in those markets as well. ("Warren-Boulton Declaration.")

[9] To the contrary, it could be interpreted to undermine the price-effects claim because it demonstrates that even in the absence of McGraw-Hill's monopoly power, Reed was willing to lower its prices to remain competitive.

initial matter, it is unclear that Brennan was the relevant decision-maker to depose at Siemens. (Dkt. No. 175, Def. Support Brief at 11.)  Furthermore, unlike the Ross Declaration, the Brennan Declaration does not include shifting price quotes.  Brennan merely states that McGraw-Hill's marketing materials convinced her to pay the premium for their product.  This, standing alone, is not strong evidence for a sprawling theory of antitrust damages.  The Declarations add little to Reed's claim for price-effects damages.

The importance of contested evidence is a factor in the *Design Strategy* test; however, so long as the result is not unfair, this factor is not dispositive even when the evidence is so important that precluding it would alter the final disposition of the case.  *See, e.g.*, *Design Strategy*, 469 F.3d at 296-97 (excluding evidence "[a]lthough the second . . . factor favors Design because . . . all of the other factors weigh heavily in favor of exclusion"); *Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008) (affirming preclusion of an affidavit despite its "obvious importance for Haas's claim"); *Ebewo*, 309 F. Supp. 2d at 608 ("Preclusion of Dr. Robles' affidavit prevents the plaintiff from raising an issue of triable fact and will require that the action be dismissed. However, in this case that result is not unfair to the plaintiff.").  Here, even if the Declarations were critically important for sustaining Reed's claims, allowing Reed to proceed with its case based solely on the strength of the Declarations, which were obtained after the close of fact discovery and after a court had already found Reed in violation of Rule 26 for failure to disclose in a timely manner the identity of the very customers who provided these Declarations, would violate the core purpose of Rule 37's preclusion provision.  Given these considerations, the Declarations' importance to Reed does not decide this motion, and the Court proceeds to the next factor.

### 3. Prejudice to McGraw-Hill of Meeting the Evidence (*Design Strategy* Factor 3)

In his April 15, 2013 Order, Judge Pitman recognized that McGraw-Hill would be severely prejudiced by Reed's addition of new customers because the burden of rebutting the new damages claims would be substantial. The burden of rebutting the new customers' Declarations in a summary judgment motion would also be weighty. Particularly in the context of a summary judgment motion, where the goal is to ferret out *genuine* disputes of material facts, rather than spurious disputes manufactured from imbalanced discovery tactics, the Court must be wary. To effectively rebut the allegation that a declaration places an issue in dispute, McGraw-Hill would have to engage in a costly and time-consuming backward leap. Document discovery would need to be re-opened, subpoenas would have to be issued for depositions,[10] experts may want to revisit their opinions, and motions may need to be re-briefed. Given the sprawling scale of this case,[11] the prejudice of returning to square one and essentially re-litigating this case in a second bout of discovery would be unduly burdensome. On balance, this prejudice to McGraw-Hill, together with Judge Pitman's findings regarding Reed's lack of justification for violating Rule 26 (factor 1) and the inappropriateness of a continuance at this late stage of litigation (factor 4), outweigh the importance of two customers' Declarations to Reed, which has investigated at least 245 other customers in this case.

---

[10] Although McGraw-Hill attempted to reach out to Brennan and Ross, Brennan would not voluntarily cooperate with McGraw-Hill's attempts to obtain a signed declaration from her and Ross could not be reached. (Def. Support Brief, at 12.)

[11] Tens of thousands of documents were produced in connection with depositions during discovery (Pl. Opp. Brief, at 5); over a thousand pages of materials were submitted in connection with the summary judgment motion.

## III.     Conclusion

For the foregoing reasons, McGraw-Hill's motion to preclude the Ross and Brennan Declarations from consideration in the pending summary judgment motion is GRANTED.

The Clerk of the Court is directed to terminate the motion at docket number 172.


SO ORDERED.

Dated: June 5, 2014
       New York, New York

_____
J. PAUL OETKEN
United States District Judge